IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re<br>HOUSTON REGIONAL SPORTS NETWORK, L.P.<br>　　　　　　　　Debtor. | Chapter 11<br>Case No. 13-35998 |

### COMCAST ENTITIES' OBJECTION TO THE APPROVAL OF THE DISCLOSURE STATEMENT[1]

The Comcast Entities hereby object, pursuant to section 1125 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3017, to the Disclosure Statement Relating To The Chapter 11 Plan Dated August 6, 2014 In Respect of Houston Regional Sports Network, L.P. proposed by the Debtor and the Teams [Dkt. # 472] (the "Disclosure Statement").[2]

As a threshold matter, the Plan is unconfirmable on its face.  To be clear, the Comcast Entities are not opposing the Plan because the Teams have elected to pursue a transaction with acquirers other than the Comcast Entities.  The Comcast Entities understood when they initiated this bankruptcy case that they faced the risk that a competitor would value the Network[3] more

---

[1] The four Comcast affiliates that initiated this proceeding are collectively referred to herein as "Comcast" or the "Comcast Entities." "Comcast Lender" refers to Houston SportsNet Finance, LLC, one of the Comcast Entities.  "Astros" refers collectively to Houston Astros, LLC; Astros HRSN GP Holdings LLC; Astros HRSN LP Holdings LLC; and their affiliates.  "Rockets" refers to Rocket Ball, Ltd and Rockets Partner, L.P.  The "Teams" refers collectively to the Astros and Rockets.  "AT&T" refers to AT&T Teleholdings, Inc. and its affiliates and "DirecTV" refers to DirecTV SportsNetworks, LLC and its affiliates.  "Proposed Acquirers" refers collectively to AT&T and DirecTV.

[2] "Plan" refers to the Chapter 11 Plan Dated August 6, 2014 In Respect of Houston Regional Sports Network, L.P. proposed by the Debtor and the Teams and filed as Exhibit A to the Disclosure Statement.

[3] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Disclosure Statement.

ActiveUS 134139182v.11

highly than Comcast does, and acquire the Network out of bankruptcy. It was Comcast's expectation and understanding, however, that such a scenario would play out only in accordance with title 11 of the United States Code (the "Bankruptcy Code") and the rules and principles of the case law under it. This Plan does not. Specifically:

- The Plan fails to pay Comcast Lender's $100 million secured loan in full—and likely accords it only *de minimis* value—even though the Network's assets, properly valued, exceed the amount due;

- Even if the value of the Network or its assets were insufficient to satisfy Comcast Lender's loan in full, the Plan fails to treat the Comcast Entities' unsecured claims ratably with the claims of other unsecured creditors, and is improperly gerrymandered effectively to deprive the Comcast Entities of the voting rights to which they are entitled under the Bankruptcy Code.

- The Plan likewise provides value to the Teams' equity (structured as payments under media rights agreements) despite the fact that it does not pay creditors in full, in violation of the absolute priority rule.

- The reorganization process was not structured in a manner that was calculated to maximize the value of the assets being sold—such as through a bankruptcy auction—and particular insiders (that is, the Teams) set aside the best interests of the Network to serve their individual self-interests;

- The Plan contains impermissible non-consensual third-party releases in favor of the Teams, and exculpations under the Plan exclude the Comcast directors from their scope without any stated basis.

To be sure, a detailed valuation exercise can be conducted only through the consideration of expert testimony, which the parties will present to the Court at the confirmation hearing, if necessary. But even without such testimony and analysis, the Disclosure Statement's approach to valuation makes clear that the Plan is patently unconfirmable. That is, the Plan uses two different and conflicting valuation standards and conclusions, and both cannot at the same time be correct. On the one hand, the Plan provides for a reorganization of the Debtor with carriage from DirecTV and AT&T—parties who, the evidence to be presented at confirmation will show, previously made clear that they had no interest in carriage arrangements on terms that would allow the Network to be viable. To the extent they have changed their minds and will now enter into carriage agreements that permit the Network to succeed, that is clearly a positive development for the Network and would, if the Plan were otherwise confirmable, mandate a valuation that reflects the Network's reorganization. On the other hand, the Teams seek to value Comcast's collateral, which certainly includes Comcast's affiliation agreement and the Network's goodwill, and may also include the purportedly "new" media rights agreements, as if the Network were liquidating. The teams *cannot have it both ways*: obtaining for themselves significant media rights payments that could only be justified if the Network were going to generate substantial revenue in a reorganization (indeed, in the absence of a profitable Network, the substantial value the Teams will receive would raise serious questions under the absolute priority rule), while seeking to value Comcast's collateral on a liquidation basis in order to deny Comcast its rights as a secured creditor. The text of the Bankruptcy Code says as much, making clear that the value of a secured creditor's collateral "shall be determined in light of the purpose of the valuation and *of the proposed disposition or use of such property*." 11 U.S.C. § 506(a)(1).

And that is to say nothing about the proposition that the Proposed Acquirers would acquire the entire Network for a total purchase price of $1,000, without an auction or anything resembling a competitive, market-based process. All of this runs afoul of basic bankruptcy principles.

The Comcast Entities understand that the Teams apparently prefer this transaction to Comcast's most recent offer, and that the Teams may even be disappointed with the manner in which this bankruptcy case has unfolded. That disappointment, however, provides no legal basis for their determination to propose a plan disregards Comcast's rights in a single-minded effort to benefit the Teams. The Plan they have proposed is unlawful on its face.

Moreover, while no amount of disclosure could remedy these fatal flaws, the Disclosure Statement also fails to provide basic information about the proposed transaction, including:

- Sources of cash to render the Plan feasible, including whether there is any cap on the Teams' obligation to contribute cash;

- Feasibility and cram-down mechanics, such as escrow accounts for disputed claims and accrual of interest for oversecured claims;

- The proposed treatment of Comcast Lender's secured claim if it makes an election pursuant to section 1111(b) of the Bankruptcy Code, and whether the Debtor and Teams intend to proceed with the Plan and waive the associated conditions if Comcast Lender makes such an election;

- The very existence of broad-based releases and exculpations (let alone any factual or legal basis therefor);

- The terms of new affiliation agreements between the Network and each of AT&T and DirecTV;

- The terms of the new media rights agreements between the Network and each of the Teams;

- The $1,000 price for which all of the equity in the Network will be sold to the Proposed Acquirers; and

- The existence of a $3.75 million break-up fee—for a purportedly $1000 transaction—payable by the Teams and a no-shop covenant, plus the factual and legal basis therefor.

In sum, the Disclosure Statement assumes a single outcome in this case: that Comcast will receive virtually nothing under the Plan and that Comcast and the directors that it appointed will be sued later by the Litigation Trust. The Disclosure Statement provides disclosure about that outcome and that outcome alone. But a disclosure statement is not adequate if it describes only a complete litigation victory for the proponents; it also needs to describe what happens should the proponents' litigation strategy fail, which Comcast submits is the far more likely outcome here. The Disclosure Statement should not be approved.

## ARGUMENT

### I. THE DISCLOSURE STATEMENT DESCRIBES A PLAN THAT IS UNCONFIRMABLE ON ITS FACE.

Approval of the Disclosure Statement should be denied because the Plan is not confirmable on its face. Even when a disclosure statement provides appropriate disclosure to creditors, "a disclosure statement should not be approved if the proposed plan, as a matter of law, cannot be confirmed." *In re Allied Gaming Mgmt., Inc.*, 209 B.R. 201, 202 (Bankr. W.D. La. 1997) (citing cases); *see also, e.g.*, *In re Miller*, No. 96-81663, 2008 WL 191256, at *3 (Bankr. W.D. La. Jan. 22, 2008) (*citing In re Cardinal Congregate I*, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990)). "The reasoning behind such holding is obvious—the estate should not be burdened

(both in terms of time and expense) with … the confirmation process where inability to attain confirmation is a *fait accompli.*" *Allied Gaming Mgmt.*, 209 B.R. at 202.  Accordingly, if the disclosure statement describes an unconfirmable plan, the court should exercise its discretion and deny approval of the disclosure statement on that basis alone. *Id.*; *accord Miller*, 2008 WL 191256, at *3 (approval of disclosure statement is not appropriate even if it contains adequate information "where it describes a plan of reorganization which is so fatally flawed that confirmation is impossible"); *In re U.S. Brass Corp.*, 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996) (same); *In re Batten*, 141 B.R. 899, 909 (Bankr. W.D. La. 1992) ("plan is so fatally flawed that it need not proceed to confirmation"); *see also In re Am. Capital Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012) ("We find the reasoning of these many courts to be persuasive and hold that a bankruptcy court may address the issue of plan confirmation where it is obvious at the disclosure statement stage that a later confirmation hearing would be futile because the plan described by the disclosure statement is patently unconfirmable.").  This Plan is facially unconfirmable for four separate and independent reasons.

### A. The Plan's Classification and Treatment of General Unsecured Creditors Is Unlawful.

The Bankruptcy Code's carefully crafted classification and voting requirements serve an important interest.  The Code permits a majority of creditors to reach an agreement that will bind the hold-out creditor.  At the same time, the Code's requirement that a plan be accepted by an impaired class, prohibition on discriminatory treatment, and requirement that a plan be fair and equitable to any dissenting class operate to ensure the fairness of the plan to all creditors.

This Plan, on its face, flunks that test.  Specifically, the Plan creates one class of general unsecured creditors ("Class 4" – trade claims) that it hardly impairs at all—paying the claims in full in four installments—while other unsecured creditors ("Class 5"—primarily the Comcast

Entities—as well as the Teams' manufactured claims for their unpaid media rights, which are created and inappropriately placed in this class for the sole and obvious purpose of having this class vote in favor of the Plan) receive essentially nothing—recoveries on specious claims that a litigation trust may pursue against the Comcast Entities and the directors they appointed to the board of directors of the Network's general partner, Houston Regional Sports Network, LLC.

Bankruptcy courts have refused to approve disclosure statements where the classification and treatment of creditors have plainly violated the requirements of the Bankruptcy Code. *See, e.g.*, *In re Robert's Plumbing & Heating, LLC*, No. 10-23221, 2011 WL 2972092, at *4-5 (Bankr. D. Md. July 20, 2011) (plan unfairly discriminated between certain vendors and other general unsecured claims); *In re Curtis Ctr. Ltd. P'ship*, 195 B.R. 631, 642-43 (Bankr. E.D. Pa. 1996) (separate classification of unsecured deficiency claim from other unsecured claims constituted improper gerrymandering).

This is such a case. The Fifth Circuit has made clear that it constitutes improper "gerrymandering" to separately classify "substantially similar claims" to create an accepting impaired class for purposes of Code section 1129(a)(10). "[S]uch classification may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims." *In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991). "In particular, debtors cannot place claims into separate classes to gerrymander the vote—that is, to create an impaired class that will approve the plan." *In re Save Our Springs (S.O.S.) Alliance, Inc.*, 632 F.3d 168, 174 (5th Cir. 2011).

It hardly requires a confirmation hearing and the testimony of witnesses to reach the conclusion that this is precisely what this Plan does. It is facially implausible to suggest that there can be any other basis for the Plan's classification scheme. It is, simply put, not believable

that the handful of creditors in Class 4, constituting just over a half a million dollars in claims (the vast majority of which appears to be held by the NBA, which plainly does not require preferential treatment in order to continue doing business with the Network and the Rockets), is critical to the success of the reorganized Debtor's business. Any alleged "business necessity" for preferring these creditors is belied by the Debtor's decision *not* to pay those claims during the four months in which it was operating in the gap period, during which it could have easily paid those claims out of its operating cash.

And artificial creation of the Teams' "rejection damages" claims—which are obviously being created for the sole purpose of having Class 5 support the Plan (even if such support is driven entirely by insiders, whose support would be ignored under section 1129(a)(10) but for the expected support of the sham "trade class")—suffers from the same defect. To the extent the Teams, which are proponents of the Plan and insiders of the Debtor, seek to renegotiate their media rights agreements with the Network, that is their prerogative. But the Plan's treatment of the media rights is little more than a gimmick. It purports to "reject" the existing agreements in order to create the appearance that the "new" agreements are outside Comcast's collateral base, as well as to manufacture claims for "rejection damages." The Network, however, will remain obligated to pay substantial value to the Teams, under the so-called "new" media rights agreements, the terms of which have essentially the same going forward terms as the prior agreements. As a result of this "clever" structuring, all of the payments the Network will make to the Teams is treated as being made "on account of" the future obligations. And a substantial "stub" claim will remain unpaid—a claim that will be used to vote in favor of the plan, and thereby improperly dilute Comcast's vote as an unsecured creditor.

A similar stunt (though a slight variant on the theme) was considered, and decisively rejected in *In re One Times Square Associates Ltd. Partnership*, 159 B.R. 695, 704-05 (Bankr. S.D.N.Y. 1993), *aff'd*, 41 F.3d 1502 (2d Cir. 1994). In that case, the debtor rejected two contracts and classified the rejection damages claims separately from other general unsecured claims in its proposed plan. Because the debtor could have renegotiated the contracts and assumed the modified ones, and because the separate classification was not "for 'reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims,'" *id.* at 703 (quoting *Greystone*, 995 F.2d at 1279), the court found the plan to be unconfirmable:

> Neither the testimony at trial, nor the documents submitted, convince this Court that the rejection of the [applicable] contracts, and their separate classification … is necessary to the Debtor. Rather than reject the current … agreements, the Debtor could have renegotiated the current contracts and included the new provisions in the modified contracts. The Debtor could then have assumed the modified contracts. This Court finds that the Debtor's assumption of the modified contracts would likely achieve the same economic goals as that which underlies the Debtor's arbitrary classification scheme, i.e., rejection of the current … agreements, creation of [an accepting impaired class], and the execution of the new agreements ….
>
> Since creation of [the class of rejection damages claims] serves no legitimate purpose in the financial restructuring of the Debtor, this Court finds that the purpose of creating [that class] was solely to create a separate, non-insider, impaired class guaranteed to accept the Plan. The lease rejection claimants and all other unsecured claimants have the same legal relationship with the Debtor, that of general unsecured creditors. The legal nature of the rejection claims are not unique and separate classification is not justified by any sound business reason. Therefore, this Court finds that the Debtor's Plan of Reorganization violates sections 1122(a) and 1129(a)(1) of the Code.

*One Times Square*, 159 B.R. at 704-05. Here, rather than serving the purpose of creating an artificial accepting impaired class (a purpose the current Plan accomplishes by other improper means), the stub claims are manufactured for the purpose of diluting Comcast's vote, and thus having Class 5 vote in favor of the Plan. The core point is the same: the scheme is not devised

9

to achieve any legitimate business objective, but is obviously constructed for the sole purpose of obtaining a favorable vote. *See also In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2004) (reversing confirmation of a plan of reorganization that turned, in substantial part, on the favorable vote of artificially created "stub" claims). That is unlawful. The Disclosure Statement accordingly should not be approved.

### B. The Plan is Facially Not Fair and Equitable, and Does Not Satisfy the Bankruptcy Code's Cram-Down Provisions

If Comcast Lender votes against the Plan (a result that should be unsurprising), the cram-down provisions of section 1129(b)(2)(A) of the Bankruptcy Code will automatically apply. While the Plan states that Comcast Lender's secured claim will be paid on the Effective Date, it also permits a subsequent proceeding in which the Litigation Trust may seek to disallow or subordinate Comcast Lender's secured claim—a process that could certainly extend for many months. Specifically, the Plan provides that the Court's confirmation valuation of Comcast Lender's collateral "shall not prevent the Litigation Trust from objecting to the Comcast Lender Secured Claim (including any Liens related thereto) on or after the Effective Date," Plan § 7.7, and purports[4] to terminate Comcast Lender's liens upon the Plan's Effective Date. Plan §§ 4.1(b); 7.8; 14.2. In view of the tone and tenor of the Disclosure Statement, Comcast Lender certainly anticipates that, if this Plan is confirmed, it will face such a claim disallowance and/or subordination action.

As a result, the Plan provides that on the Effective Date, Comcast Lender's secured claim will not be paid, and will no longer be secured by any lien running against the assets that now

---

[4] If the Proponents actually intended that Comcast Lender retain its lien through claim allowance (Section 14.2 of the Plan is arguably ambiguous on this point), then the Plan must be amended to make that plain. Such amendment would still fail to satisfy section 1129(b)(2)(A)(i)(II) of the Bankruptcy Code, however.

secure that claim, or any other assets.  That is an obvious facial violation of section 1129(b)(2)(A).

Section 1129(b)(2)(A) provides three alternative tests, at least one of which must be satisfied, in order for the Plan to be deemed "fair and equitable" to Comcast Lender.  If the Plan is not fair and equitable, it may not be confirmed without Comcast Lender's affirmative consent.  The first alternative prong of the "fair and equitable" cram-down test is that the creditor must both (i) receive deferred cash payments in an amount equal to its allowed secured claim (plus an appropriate interest rate) and (ii) retain all of its liens (to the extent of the allowed secured claim).  See 11 U.S.C. § 1129(b)(2)(A)(i); *Till v. SCS Credit Corp.*, 541 U.S. 465, 474 n.10 (2004); *In re Texas Grand Prairie Hotel Realty, LLC*, 710 F.3d 324, 330 (5th Cir. 2013).  The Plan fails to provide for any interest rate whatsoever to compensate Comcast Lender for the delay associated with the proposed allowance process here and strips Comcast Lender of its liens.

The second prong of the "fair and equitable" cram-down test pertains solely to asset sales and thus has no relevance to this Plan.  *See, e.g., RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065 (2012).

The third alternative prong of the "fair and equitable" cram-down test is the so-called "indubitable equivalence" test, which requires that the plan provide "for the realization by [the secured creditor] of the indubitable equivalent of [its secured] claims."  11 U.S.C. § 1129(b)(2)(A)(iii).  Here, the Plan's proposed treatment of Comcast Lender's secured claim facially fails this test as well.  In *RadLAX*, the Supreme Court held unequivocally that the "indubitable equivalence" test cannot be used to approve a plan that falls short of the other cram-down alternatives.  132 S. Ct. at 2071-72 ("The general/specific canon explains that the general

language of clause (iii), although broad enough to include it, will not be held to apply to a matter specifically dealt with in clause (ii).") (internal quotations marks omitted).  There, the plan provided for a sale of the secured creditor's collateral, as contemplated by the second cram-down clause, without allowing the lender to credit bid, as required by that clause.  *Id*. at 2069.  The Court reasoned that to confirm such a plan would be to approve "precisely what clause (ii) proscribes," which would be "hyperliteral and contrary to common sense."  *Id*. at 2070.  Here, as in *RadLAX*, the Plan cannot possibly satisfy the indubitable equivalence test—as a matter of law—because it defers the payment of cash to Comcast Lender past the Effective Date while failing to satisfy both requirements of the first alternative prong (i.e., retention of liens and payments with a present value, as of the Effective Date, of the allowed secured claim).

The Fifth Circuit has expressly held that the indubitable equivalence test requires that the secured creditor receive the value of its collateral and the payment of interest on any deferred payments.  *See, e.g.*, *In re Pacific Lumber Co.*, 584 F.3d 229, 246 (5th Cir. 2009) ("Clauses (i) and (ii) explicitly protect repayment to the extent of the secured creditors' collateral value and the time value compensating for the risk and delay of repayment.  Indubitable equivalent is therefore no less demanding a standard than its companions.").

Separate and apart from the impermissible lien-stripping described above, it is unclear whether Comcast Lender would have any recourse against any party, even if it were never paid anything in respect of its allowed secured claim.  The Plan seems to provide that the reorganized Debtor and the Proposed Acquirers would never be liable (Plan § 7.12); there is no escrow; nor is there privity of contract between Comcast Lender and the Teams (on whom the Plan relies for payment of cash to the distribution agent to pay creditors).  *Id.*  Such treatment is plainly not the

indubitable equivalent of any secured claim, not to mention a senior claim that is secured by all or substantially all of the assets of the Network.

As such, the Plan is facially not confirmable and the Disclosure Statement should not be approved.

### C. The Plan Contains Improper Non-Consensual Third-Party Releases.

Bankruptcy courts also decline to approve disclosure statements describing plans that contain improper non-consensual third-party releases. *See, e.g.*, *Robert's Plumbing*, 2011 WL 2972092, at *3-4; *In re M.J.H. Leasing, Inc.*, 328 B.R. 363, 372 (Bankr. D. Mass. 2005).

This Plan—consistent with its theme of disregarding established bankruptcy law in order to benefit the Teams—grants the Teams precisely such an unlawful non-consensual third-party release. Specifically, Article 14.3 of the Plan broadly exculpates the Teams and the Proposed Acquirers from any claims arising out of their actions during the course of the bankruptcy, except for claims for willful misconduct or gross negligence. But the Fifth Circuit has made clear that a plan may not provide, absent consent, exculpation for entities other than a debtor (or parties jointly liable with the debtor):

> There are no allegations in this record that either [of the parties receiving the third-party release] or their or the Debtors' officers or directors were jointly liable for any of [the Debtors'] pre-petition debt. They are not guarantors or sureties, nor are they insurers. Instead, the essential function of the exculpation clause proposed here is to absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy. The fresh start § 524(e) provides to debtors is not intended to serve this purpose.

*Pacific Lumber*, 584 F.3d at 252-53.

The same is true here. Article 14.3 is flatly inconsistent with Fifth Circuit precedent, and cannot be squared with the language of section 524(e) of the Code. It is unlawful, and a plan

containing such a non-consensual provision cannot be confirmed.  The Disclosure Statement accordingly should not be approved.

> D.     **The Sale of the Network for *De Minimis* Consideration Without An Auction Is Improper.**

The Plan also fails on its face because it purports to provide for a sale to the Proposed Acquirers for *de minimis* consideration ($1,000), and without an auction or other competitive process.  The evidence to be presented at the confirmation hearing will demonstrate that the value of the Network, with carriage from AT&T, DirecTV, and Comcast Cable, is substantially greater than $1,000.

It is an elementary proposition of bankruptcy law that a buyer in a bankruptcy transaction must pay a "fair" price—with fairness typically tested in market terms.  As *Collier*'s explains, a "plan may call for … equity interests to be issued to the third party in exchange for the consideration the third party is offering.  In this case, the bankruptcy court will have to assess the transactions to ensure that the price being paid and the manner in which the acquisition is being made is fair.  In a competitive bidding situation, with creditor classes being able to propose their own plans or find their own bidder, the court will be able to rely upon this market mechanism to provide evidence of such fairness."  7 Collier on Bankruptcy ¶ 1129.04 (16th ed. 2014).  The principle that a buyer must pay a fair price can be viewed either as part of the requirement that a plan be "fair and equitable," or simply a function of the exercise of the debtor-in-possession's obligation to obtain the highest and best price, in order to maximize the recovery for the bankruptcy estate.

This Plan fails to meet that standard.  The Delaware bankruptcy court, in the context of deciding whether a plan was "fair and equitable," explained the point well.  It explained that under the absolute priority rule, it is particularly problematic for a debtor-in-possession to

provide for a sale without an auction under a plan proposed during the exclusive period. "The exclusiveness of the opportunity, with its protection against the market's scrutiny of the purchase price by means of competing bids or even competing plan proposals, renders the partners' right a property interest extended 'on account of' the old equity position and therefore subject to an unpaid senior creditor class's objection." *In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 49 (Bankr. D. Del. 2000) (quoting *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 456 (1999)).

The court in *Global Ocean* rejected a plan proposed by an equity holder and insider—a Plan similar to the one the Teams have presented here. "Here, [an equity holder] through his control of the Debtors, as the largest shareholder and part of the group controlling over 50% of the stock in [the debtor], has retained his exclusive right, to determine who will be the owner of [the debtor] (as well as the price that she will pay for the ownership). This control of [the debtor] is a right which he holds 'on account of' his current position as a controlling shareholder of Global Ocean." *Global Ocean*, 251 B.R. at 49. The Bankruptcy Code thus required the plan to "subject the 'exclusive opportunity' to determine who will own Global Ocean to the market place test. This can be achieved by either terminating exclusivity and allowing others to file a competing plan or allowing others to bid for the equity (or the right to designate who will own the equity) in the context of the Debtors' Plan." *Id.*

The same concern is present here. Whether viewed through the lens of absolute priority or simply as a function of a debtor's obligation to obtain the highest and best price, the "no-shop" provisions of the proposed transaction are improper. That is all the more true in view of the fact that the reorganized Debtor is proposing to enter into new media rights agreements with the Teams—running the risk that the Teams are being *overpaid* on their media rights agreements

in exchange for granting the Proposed Acquirers the opportunity to pay virtually nothing for the equity in the reorganized Debtor. The reason this transaction *looks* improper is because it *is* improper. For this reason, too, the Plan described by the Disclosure Statement is unlawful. The Disclosure Statement accordingly should not be approved.

## II.    THE DISCLOSURE STATEMENT DOES NOT CONTAIN ADEQUATE INFORMATION.

In addition to describing a plan that is unconfirmable on its face, the Disclosure Statement does not contain "adequate information" within the meaning of section 1125 of the Bankruptcy Code and cannot be approved unless it is modified to provide additional and clarifying information.[5]

Section 1125(b) of the Bankruptcy Code conditions a debtor's solicitation of votes on a proposed chapter 11 plan on the bankruptcy court's determination that the disclosure statement contains "adequate information." The Bankruptcy Code defines adequate information as:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records … and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan ….

11 U.S.C. § 1125(a)(1).[6] Further, courts in this jurisdiction have held that the disclosure statement must disclose specific information to creditors, including "a description of the

---

[5] In addition to the points set forth herein, Comcast has provided the Debtor with a mark-up of the Disclosure Statement intended to provide a more balanced description of those matters as to which Comcast and the Plan Proponents disagree. To the extent the parties are unable to resolve these language issues on a consensual basis, the Debtor has agreed that Comcast may present these matters to the Court in connection with the September 4 hearing.

[6] *See also Eubanks v. F.D.I.C.*, 977 F.2d 166, 169 n.2 (5th Cir. 1992) (stating that a determination as to the adequacy of the contents of a disclosure statement necessarily depends upon the facts and circumstances of each case); *Texas Extrusion Corp. v. Lockheed Corp. (In re Texas Extrusion Corp.)*, 844 F.2d 1142, 1157 (5th Cir. 1988) (providing that the information

16

available assets and their value." *See Westland Oil Dev. Corp. v. MCorp Mgmt. Solutions, Inc.*, 157 B.R. 100, 102 (S.D. Tex. 1993).

Here, the Disclosure Statement fails because it lacks fundamental information necessary to evaluate or justify the Plan's feasibility, releases and exculpations, treatment of the Comcast Entities' claims, and lawsuits against the Comcast Entities. Critically, the Disclosure Statement does not state the amount that the Teams, as the Plan's purported economic sponsors, have committed to fund if, as is almost certain, the Debtor has insufficient available cash on hand and accounts receivable, both of which are clearly encumbered by the Comcast secured claim, on the Effective Date of the Plan.

The Disclosure Statement does not disclose the estimated or maximum amounts of the Comcast Entities' administrative and priority claims (other than presumably the already allowed Comcast wage reimbursement administrative and priority claims), or any basis—other than general insinuations about subordination in the future—for any treatment of such claims other than full cash payment, nor does the Disclosure Statement provide any information on the Debtor's ability to pay such claims if the Court rules that they should be treated differently than the Teams would like. Neither does the Disclosure Statement reveal the key feasibility information of: (i) how the Teams and the Plan would deal with an election by Comcast Lender under section 1111(b) of the Bankruptcy Code, (ii) how the Teams and Plan will deal with post-petition interest on the Comcast secured claim if the Court finds it to be oversecured, or (iii) the escrowing of maximum amounts owing to the Comcast Entities in the event that the Teams' fantasy subordination does not come to pass.

---

required will necessarily be governed by the circumstances of the case); *In re Fullmer*, No. 09-50086, 2009 WL 2778303 (Bankr. N.D. Tex. Sept. 2, 2009) (holding that the determination of whether the disclosure statement contains adequate information is made on a case-by-case basis).

Further, the Disclosure Statement provides no justification for the improper third party releases, discussed above.  Indeed the Disclosure Statement does not even disclose the releases or exculpations.  Neither does the Disclosure Statement disclose the basic terms of the AT&T affiliation agreement, the DirecTV affiliation agreement, or the new media rights agreements, which are the key elements of this Plan, particularly given that the proceeds of the unauctioned "sale" of the Debtor's equity to AT&T and DirecTV will yield only $1,000 to the estate and that these agreements, along with the Comcast affiliation agreement, are critical to the viability of the Debtor in the long run and thus to the feasibility of the Plan.  Finally, the Disclosure Statement contains no mention of the $1,000 purchase price for the equity of the Network, the $3,750,000 break-up fee payable by the Teams if the Investment Agreement with AT&T and DirecTV is terminated, or of any of the restrictive covenants, including the no-shop provision, contained in the Investment Agreement.

Wholly apart from the Plan's fatal flaws, the Disclosure Statement should not be approved unless and until it is revised to accurately describe the proposed transaction in sufficient detail to determine whether the Proponents intend to prosecute the Plan in good faith (and accord all parties of their rights under the Bankruptcy Code) or whether the Plan is simply a "free option" that will be abandoned if the Bankruptcy Code is enforced according to its terms.

## CONCLUSION

For the foregoing reasons, the Court should enter an order denying approval of the Disclosure Statement.

| Dated:  August 28, 2014 | Respectfully submitted, |
|---|---|
| | /s/ Vincent P. Slusher |
| Howard M. Shapiro | Vincent P. Slusher |
| Craig Goldblatt | Andrew Zollinger |
| WILMER CUTLER PICKERING | DLA PIPER |
| HALE AND DORR LLP | 1717 Main Street |
| 1875 Pennsylvania Avenue N.W. | Suite 4600 |
| Washington, D.C.  20006 | Dallas, Texas 75201-4629 |
| (202) 663-6000 | (214) 743-4500 |
| | |
| George W. Shuster, Jr. | Arthur J. Burke |
| Sanket J. Bulsara | Timothy Graulich |
| WILMER CUTLER PICKERING | Dana M. Seshens |
| HALE AND DORR LLP | DAVIS POLK & WARDWELL LLP |
| 7 World Trade Center | 450 Lexington Avenue |
| 250 Greenwich Street | New York, N.Y. 10017 |
| New York, N.Y. 10007 | (212) 450-4000 |
| (212) 230-8800 | |