IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION


| | | |
|---|---|---|
| IN RE: | § | CASE NO. 13-35998-H1-11 |
| | § | HOUSTON, TEXAS |
| HOUSTON REGIONAL SPORTS | § | THURSDAY, |
| NETWORK, LP, | § | SEPTEMBER 4, 2014 |
| DEBTOR. | § | 8:59 A.M. TO 4:39 P.M. |


DISCLOSURE STATEMENT HEARING


BEFORE THE HONORABLE MARVIN ISGUR__
UNITED STATES BANKRUPTCY JUDGE




APPEARANCES:

FOR THE DEBTOR:                    SEE NEXT PAGE

FOR THE TRUSTEE:                   SEE NEXT PAGE

COURTROOM DEPUTY/COURT RECORDER:   MARIO RIOS

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
(281) 277-5325 (office) ◊ (281) 277-0946 (fax)
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
                              APPEARANCES:


        FOR THE DEBTOR:                  HAYNES AND BOONE, LLP
                                         Charles Beckham, Esq.
                                         Henry Flores, Esq.
                                         Chris Castillo, Esq.
                                         Kelli M. Stephenson, Esq.
                                         1221 McKinney St., Ste. 2100
                                         Houston, TX  77010


        FOR COMCAST SPORTS
        MANAGEMENT SERVICES, LLC:        WILMERHALE
                                         Craig Goldblatt, Esq.
                                         1875 Pennsylvania Ave., NW
                                         Washington, DC  20006

                                         WILMERHALE
                                         Howard M. Shapiro, Esq.
                                         7 World Trade Center
                                         250 Greenwich Street
                                         New York, NY  10007

                                         WILMERHALE
                                         Isley M. Gostin, Esq.
                                         1875 Pennsylvania Ave., NW
                                         Washington, DC  20006

                                         DAVIS POLK & WARDWELL, LLP
                                         Timothy Graulich, Esq.
                                         Dana Seshens, Esq.
                                         450 Lexington Avenue
                                         New York, NY  10017

                                         DLA PIPER, LLP
                                         Vincent P. Slusher, Esq.
                                         1717 Main Street, Ste. 4500
                                         Dallas, TX  75201

                                         MARK ROCKFORD of Comcast


        FOR HOUSTON ASTROS, LLC:         VINSON & ELKINS, LLP
                                         Harry Perrin, Esq.
                                         Duston McFaul, Esq.
                                         1001 Fannin, Ste. 2500
                                         Houston, TX  77002
```

```
                                    KIRKLAND ELLIS, LLP
                                    Paul M. Basta, Esq.
                                    David Myre, Esq.
                                    601 Lexington Avenue
                                    New York, NY  10022

                                    KIRKLAND ELLIS, LLP
                                    Judson Brown, Esq.
                                    655 Fifteenth Street, NW
                                    Washington, DC  20005-5793

FOR THE HOUSTON ROCKETS:            WHITE & CASE, LLP
                                    Roberto Kampfner, Esq.
                                    633 West Fifth Street
                                    Suite 1900
                                    Los Angeles, CA  90071

                                    (Via Telephone)
                                    WHITE & CASE, LLP
                                    Alan Gover, Esq.
                                    1155 Avenue of the Americas
                                    New York, NY  10036

                                    Greg Little
                                    Rafael Stone, Jr.
                                    Rockets General Counsel

FOR AT&T:                           NORTON ROSE FULBRIGHT, LLP
                                    William Greendyke, Esq.
                                    John D. Cornwell, Esq.
                                    1301 McKinney St., Ste. 5100
                                    Houston, TX  77010

                                    (Via Telephone)
                                    NORTON ROSE FULBRIGHT, LLP
                                    David Rosenzweig, Esq.
                                    Judith A. Archer, Esq.
                                    666 Fifth Avenue
                                    New York, NY  10103-3198

FOR DIRECTV:                        WEIL GOTSHAL & MANGES, LLP
                                    Chris Lopez, Esq.
                                    Brenda L. Funk, Esq.
                                    700 Louisiana, Ste. 1700
                                    Houston, TX  77002
```

INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| TAD BROWN | | | | |
| By Mr. Beckham | 102 | . | . | . |
| By Mr. Goldblatt | . | 103 | . | . |

| EXHIBITS: | Marked | Offered | Admitted |
|---|---|---|---|
| (None offered.) | | | |

1      HOUSTON, TEXAS; THURSDAY, SEPTEMBER 4, 2014; 8:59 A.M.

2          THE COURT:  All right.  Good morning.  We are here in

3   the Houston Regional Sports Network, LP case.  It's 13-35998.

4          Parties may make their appearances up front, or

5   reserve and make their appearances during the course of the

6   hearing, whatever works best for you.

7          Mr. Beckham.

8          MR. BECKHAM:  Good morning, Your Honor.  Charles

9   Beckham, Henry Flores, Chris Castillo, and Kelli Stephenson for

10  the Debtor Houston Regional Sports Network.

11         THE COURT:  Thank you.  Anybody else?

12      (No audible response.)

13         THE COURT:  Okay.  Good.  No fights today, it looks

14  like, huh?

15         How did you all want to proceed, Mr. Goldblatt?

16         MR. GOLDBLATT:  Oh, I'm sorry.  Just for appearances.

17         THE COURT:  Right.

18         MR. GOLDBLATT:  On behalf of the Comcast entities,

19  Craig Goldblatt, along with Tim Graulich, Dana Seshens, Mark

20  Rockford from Comcast, Howard Shapiro, Isley Gostin, and Vince

21  Slusher.

22         THE COURT:  Thank you.

23         MR. PERRIN:  Your Honor, Harry Perrin, Vinson &

24  Elkins, along with Duston McFaul, Paul Basta, Judson Brown, and

25  David Myre from Kirkland & Ellis on behalf of the Houston

1     Astros entities.

2            THE COURT:  Thank you.

3            MR. KAMPFER:  Your Honor, Rob Kampfner from White &

4     Case.  Alan Gover is on the phone.  And Greg Little, my

5     partner, is with me today, and Rafael Stone, the General

6     Counsel of the Rockets is also present.

7            THE COURT:  Thank you.

8            MR. GREENDYKE:  Good morning, Judge.

9            THE COURT:  Morning.

10           MR. GREENDYKE:  Bill Greendyke and John Cornwell of

11    Norton Rose Fulbright, on behalf of AT&T Teleholdings, and

12    we're joined today on the telephone by my partners from New

13    York, Judith Archer and David Rosenzweig.

14           THE COURT:  Thank you.

15           MR. GREENDYKE:  Thank you, Judge.

16           MR. LOPEZ:  Good morning --

17           THE COURT:  Good morning.

18           MR. LOPEZ:  -- Your Honor.  Chris Lopez with Weil,

19    along with Brenda Funk.  We're here on behalf of DirecTV, LLC,

20    and DirecTV Sports Network, LLC.

21           THE COURT:  Good morning.  All right.

22           If any parties on the phone need to speak during the

23    course of the day, you'll need to press five-star on your

24    phone, and we'll try and get to you.

25           Did you all have any proposal on how we proceed today?

1          MR. BECKHAM:  Good morning, Your Honor.  Charles

2     Beckham on behalf of the Debtor.

3          My suggestion is we have four matters that are set,

4     this Disclosure Statement hearing, the solicitation scheduling

5     motion, which I'll call the "solicitation motion," and those

6     are mostly procedures.  The -- we also filed a motion to extend

7     exclusivity.  That was at issue and came up last week, or

8     earlier last month.  And then there was a motion to compel

9     production of documents by Comcast.

10          I would suggest we take up the Disclosure Statement,

11     the solicitation procedures motion, exclusivity, and then the

12     motion to compel in that order.

13          THE COURT:  Does that cause any heartburn?

14       (No audible response.)

15          THE COURT:  That's fine.

16          MR. GRAULICH:  Your Honor, Tim Graulich from Davis

17     Polk.

18          We've been discussing several aspects of the

19     Disclosure Statement and the solicitation procedures with the

20     teams and with the Debtor.  No problem with the order, but I

21     suspect that there may need to be a break at some point during

22     the procedures -- proceedings because I suspect that there is a

23     little bit more discussion that needs to be made with respect

24     to the language in the Disclosure Statement and certain of the

25     provisions of the -- of the solicitation procedures.

1        But I will -- that's sort of the tail of the dog.  The

2   main of it is the sort of substantive.

3        THE COURT:  Thank you.

4        So I've got some general concerns about where we're

5   going and whether the Disclosure Statement, if approved, gives

6   sufficient flexibility a confirmation hearing to deal with the

7   issues that might come up.  And the concerns that I've got

8   center around two issues:

9        One is the -- well, everything centers around whether

10  or not they do the 1111(b) election because, as I think you put

11  in your response, that may control a lot of what occurs at the

12  confirmation hearing.  So let me assume they don't do an

13  1111(b) election for the purpose of kind of figuring out where

14  we're going, with no prejudice about whether you all do it or

15  not.

16       It seems to me that we need to have a procedure to

17  estimate both the unsecured claims held by the teams, and the

18  unsecured claims that are held by the Comcast entities.  And we

19  need to know what the proponents of the plan are going to do if

20  they essentially lose the separate classification argument,

21  because that's the big deal.

22       I mean, if we were to estimate their claims, for

23  example, at zero, it's not a very big deal.  But if we estimate

24  their claims at $80 million, just to kind of throw a number out

25  there, not because that's what I'm thinking of, but I think

1    that's sort of where the math might start at, is something in

2    that range, and don't separately classify, I don't know whether

3    you all then withdraw from confirmation, or whether you say,

4    we're going to proceed, but then the trade creditors are going

5    to get paid a whole lot less.

6         And I don't want to get down to a confirmation hearing

7    and have you make that decision then, without notice to the

8    trade creditors.  So I'm going to make you make that decision

9    today, unless I misunderstand what we're doing.

10        And I've written an insert into the Disclosure

11   Statement that I'm contemplating requiring you to include, that

12   I'll show you, because it may sort of set the tone for the

13   hearing, because I just want to have everything teed up.

14        And I'm perfectly happy, for example, if you decide,

15   nope, if we don't get separate classification in the way that

16   we need, we just aren't going to proceed.  That's fine, let's

17   tell people that, the table is set.  But if what you're going

18   to try and do is then do an amendment, sort of orally at the

19   hearing, that says, well, okay, Judge, if you're going to

20   consider everything together as a unified class, we can still

21   confirm, that will, I think materially, way adversely affect

22   the trade creditors.  And I want to tell them what that is.

23        And maybe there's some third alternative.  And by

24   writing what I've written, I am not dictating that you can't

25   have some other alternative out there, but I'd like to know

1    what it is today, so that the table is set.

2         And part of my concern is this isn't a case that looks

3    like it makes a whole lot of sense to have a confirmation

4    hearing in October, that we then continue until January, right?

5    I mean, from what you all are telling me -- and Comcast seems

6    to agree -- we ought to be getting this done quickly.  So we

7    need you to make decisions now.  So I'll show you what I've

8    done.

9         (Pause in proceedings.)

10        THE COURT:  This is, unfortunately, longer than what

11   you're going to want to see, but it is what it is.

12        (Laughter.)

13        MR. BECKHAM:  That's just like some of the pleadings

14   that you saw over the last couple of days were longer than you

15   wanted to see.

16        (Pause in proceedings.)

17        THE COURT:  So -- and I'm going to kind of run through

18   this orally because I know that each of you has partners on the

19   phone or clients on the phone that may want to know what we're

20   doing.

21        And essentially, I'm confirming that Comcast needs to

22   make its 1111(b) election -- and this all assumes we approve

23   the Disclosure Statement today -- by September 11th at

24   midnight.  And if they choose not to make their 1111(b)

25   election, then this will largely apply.  If they do make the

1      1111(b) election, all of this becomes quite irrelevant.

2              The first thing is I want an estimation procedure for

3      the unsecured claims held by the teams.  It's a major issue

4      that's been brought up by Comcast, and that is:  Can you,

5      essentially, even if you get separate classification out of

6      both in the -- what I'll call the "Class 5 Insider Class."  And

7      so I want to have briefing and evidence, so that I can do a

8      502(c) estimation of what the teams' claims are.

9              And I'm establishing a briefing schedule.  I'm making

10     them be not more than 30 pages, with twelve-page reply briefs,

11     and then giving each side an hour of trial time for the

12     estimate of the teams' claims.

13             I know an hour is not a lot, but it is an estimation,

14     and I don't think this one is complicated.  You know, it's

15     going to be fighting over the present value of what their

16     future unpaid stream of revenue is.  So I don't think the

17     evidence is going to be all that hard.  Setting up the legal

18     table as to what evidence ought to be considered is going to be

19     in the briefing.  So I think an hour is enough.  I'm willing to

20     listen to you all, if you all tell me you don't think an hour

21     is enough.

22             And then the second thing is to do an estimate of the

23     unsecured claims, either in 4 or 5, that are held by the

24     Comcast entities.  I think this is much more complicated.  It

25     could involve subordination issues under 510, it could involve

1     setoff issues, because all of those are set out in the

2     Disclosure Statement.

3          MR. BECKHAM:  Your Honor, we're getting a message that

4     some parties on the phone can't hear.  And I'm sorry to

5     interrupt you.

6          THE COURT:  No, that's my fault.  No one on the phone

7     should be able to hear it.  I stopped -- okay.  They should be

8     able to hear now.  I apologize.  If there are parties on the

9     phone, I apologize, I didn't have the audio set up properly.

10          The -- what I'm going through is some changes that I

11    want to have made in the Disclosure Statement to set up

12    estimation processes at the confirmation hearing, so that we

13    don't delay things if we don't get down there.  And the first

14    is an estimation procedure for the teams' claims, for which I'm

15    going to set up a briefing schedule and set up one hour of

16    argument and evidence by either side.  And I'm willing to be

17    flexible on the dates on the schedule, as well as flexible on

18    that hour.  But I wanted to put something out there that we can

19    work with.  Then the second is to deal with the unsecured

20    claims held by the Comcast entities.

21          Now there are two different issues here, and we'll get

22    to that in a second.  But one is how much should their claims

23    be.  Because you allege that they've engaged in wrongful

24    conduct, and that implies the possibility of a setoff.

25          I don't know if you're going to argue that at

1    confirmation or not.  I'm not requiring that.  You've alleged

2    wrongful conduct that might justify subordination of their

3    claim.  I don't know if you're going to allege that at the

4    confirmation hearing, but if you are, I want to have it set up,

5    to where we don't get surprised by it.

6         And finally, you are arguing that, even without those

7    things, that it's proper to put them in a different class for

8    various reasons.  So the estimate is to figure out amount and

9    whether they go in Class 4 and 5.  And then there is -- that is

10   without prejudice to what we do on just the pure, separate

11   classification question.

12        And if what your client wants to do, Mr. Beckham, or

13   the other plan proponents want to do, is to not worry about the

14   amount and to deal solely with the argument that you're making

15   that you can separately classify, fine with me.  Then we don't

16   need to have that estimation proceeding.

17        But I get from the tenor of the Disclosure Statement

18   that there may be more coming at me at the confirmation

19   hearing, and I don't want it to come at me as a surprise, or

20   come at them as a surprise.  And I want to have it briefed, and

21   I want to have it set up to where we can rule promptly in

22   October.

23        Now the final issue that I've got in here is:  What

24   happens if you lose?  And that's the one where I started off.

25   If you lose, I want you to tell -- I want you either to amend

1    the plan right now to say, if we lose, trade creditors, sorry,

2    you're not going to get paid as much; or, if we lose, we're

3    going to give up on confirmation.

4         And that is, if Comcast has a material claim in Class

5    4, are you going to -- right now, you're saying you're going to

6    pay Class 4 in full.  Are you going to pay Comcast their

7    material claim in full in Class 4?  I don't care what you want

8    to do, but I want people that are voting for the plan to know

9    what they're voting on.

10        So I've written in here that you can elect not to

11   proceed with confirmation, or you can amend the plan now to

12   provide that, if you lose this issue, that the distribution to

13   Class 4 will be on the formula I've got there; you know, a

14   numerator/denominator formula, which is going to result in

15   trade creditors probably getting less than one percent

16   distribution from the estate.

17        And I've left open the possibility here, and AT&T and

18   Direct will have to commit to that, one way or the other.  You

19   know, if it's important enough to their business, and they want

20   to pay those trade creditors later, they can announce that.  I

21   don't -- fine with me if they announce it.  It won't be part of

22   the plan.

23        They said it's important to their business, it will

24   cost them money.  The money won't come out of the estate.  If

25   they want to do it, they can do it, and you can tell people

1     they're going to do it.  I don't care.  But I want the

2     Disclosure Statement to say what the deal is going to be, and

3     it's not going to diminish what the estate gets off the

4     proposal, if that's a decision that they make.

5          So, essentially, I want there to be a beefed-up

6     section of the Disclosure Statement that tells people what

7     occurs with the most significant -- if the most significant

8     fights in the case are lost by the plan proponents.  And I

9     think people need to know that.

10         So does that -- I've got this in writing to hand out

11    to you.  But does that influence whether you want to proceed

12    right now, or whether you want to talk to folks a little bit

13    right now about how we're going to go?

14         MR. BECKHAM:  I think my --

15         THE COURT:  This eliminates a lot of the arguments,

16    frankly, in today's hearing.

17         MR. BECKHAM:  I think it might be helpful for Your

18    Honor, for the Debtor and the co-proponents to have a few

19    moments, or some time to review what's in here.  I understand

20    the concepts, but I think we probably need to discuss it

21    amongst ourselves.

22         THE COURT:  It also may change the nature of Comcast's

23    objection because I, essentially, am trying to communicate

24    they're going to get to make their arguments, right?  They get

25    to litigate whether they have claims or not.  And they get to

1    litigate whether they can get outvoted with the classification

2    scheme that you all are proposing.

3         MR. BECKHAM:  Understood.

4         THE COURT:  So how much time does Comcast need to

5    think about all of this?

6         MR. GOLDBLATT:  We're prepared to think fast, Your

7    Honor.  Fifteen minutes?

8         MR. BECKHAM:  I think 15 minutes -- yeah, 15 minutes,

9    Your Honor.

10        THE COURT:  Okay.

11        (Participants confer.)

12        THE COURT:  We'll come back at 9:35.  And there's

13   copies of what's on the screen.  And again, you all are welcome

14   to change that, argue it's wrong, do whatever you want.  But I

15   want to set up confirmation, to where it's done right.

16        MR. BECKHAM:  And Your Honor, if we need -- if we find

17   we need additional time --

18        THE COURT:  Yeah, just let Mr. Rios know.  I would

19   like to be able to get the hearing concluded today.

20        MR. BECKHAM:  Okay.  Thank you.

21        THE COURT:  And so that's why I'm pushing you on time.

22        MR. BECKHAM:  Understood, Your Honor.  Thank you.

23        MR. GOLDBLATT:  Thank you, Your Honor.

24        THE COURT OFFICER:  All rise.

25        (Recess taken from 9:16 a.m. to 9:45 a.m.)

1          THE COURT:  All right.  Please be seated.

2          UNIDENTIFIED:  Your Honor, the masses are assembling.

3          THE COURT:  Thank you.

4       (Pause in proceedings.)

5          THE COURT:  So did I make your life easier or harder,

6    Mr. Beckham?

7          MR. BECKHAM:  Easier, Your Honor.

8          THE COURT:  All right.  What are we -- what do you all

9    want to do?  Let me hear what Mr. Goldblatt wants to do.

10          MR. BECKHAM:  Your Honor, I know that DirecTV's

11   counsel is still trying to talk to his client representative.

12   So I think they may need a little bit more time, but ...

13          THE COURT:  That's fine.  I mean, that's a plug-in in

14   this.  The question is, is this a good idea, generally, I

15   think.

16          MR. BECKHAM:  Yes, Your Honor.

17          THE COURT:  Okay.  So you all are willing to live with

18   declaring what you're going to do as part of the Disclosure

19   Statement hearing.

20          MR. BECKHAM:  Yes, Your Honor.

21          THE COURT:  And what are you all going to do; do you

22   know yet?  You need to wait for --

23          MR. BECKHAM:  I don't know that.

24          THE COURT:  You need to wait for Direct.

25          MR. BECKHAM:  Yeah.

1           THE COURT:  Okay.  But declaring it is fine.

2           MR. BECKHAM:  Okay.

3           THE COURT:  Is that right?

4           MR. BECKHAM:  Yes.  Yes, Your Honor.

5           THE COURT:  Having this process -- and we can talk

6      about the detailed dates and stuff -- of an estimation process

7      for both the proponents' claims and the Comcast claims, does

8      that work for you all?

9           MR. BECKHAM:  Yes, Your Honor.

10           THE COURT:  Mr. Goldblatt, what do you think?

11         (Participants confer.)

12           MR. BECKHAM:  Your Honor, perhaps we need a few more

13      moments because the teams are still out in the hall.

14           THE COURT:  Okay.

15           MR. GOLDBLATT:  So I'm happy to respond or to wait,

16      whatever Your Honor's preference.

17           THE COURT:  Well, that's up to you.  I asked him

18      first.  If you want to wait and see what their answer is before

19      you give yours, that's fine, or you can give yours now.  I

20      don't care.

21           MR. GOLDBLATT:  No.  My only concern is, to the extent

22      there are relevant litigants who aren't in the courtroom now.

23      I don't want to be unfair by -- by -- you know, so whatever --

24           THE COURT:  Oh, it's not unfair, so we can do it.

25           MR. GOLDBLATT:  If that's Your Honor's determination,

1    then ...

2         (Laughter.)

3              MR. GOLDBLATT:  So, Your Honor, in concept, to the

4    extent we're -- what Your Honor is saying -- and I think this

5    is what Your Honor is saying, is, look, before we start the

6    game, people are entitled to know what are the rules and what

7    are the consequences of when you are losing.

8              We're a hundred percent there.  I think that captures

9    not all, but a fair chunk of what we had to say about the

10   Disclosure Statement.

11             THE COURT:  Right.

12             MR. GOLDBLATT:  So we appreciate that.

13             I think there -- I think that --

14             MR. LITTLE:  Your Honor, if I may.

15             THE COURT:  One second.

16             MR. LITTLE:  I apologize.

17             MR. GOLDBLATT:  No please.

18             MR. LITTLE:  My name is Greg Little.  I apologize for

19   -- if it would be at all possible to have a fifteen-minute

20   delay because I'm sure he's being very insightful, and I would

21   like to have our full team capture all of that inside, if at

22   all possible.

23        (Laughter.)

24             MR. GOLDBLATT:  That's flattering, Your Honor.

25             THE COURT:  I'll let him repeat it when they get in

1    here.  I mean, I -- I want to move the hearing ahead, and let's

2    hear what he has to say.

3              MR. LITTLE:  Sure.  Thank you, Your Honor.

4              THE COURT:  And then he can repeat it, if we need to.

5              Go ahead.

6              MR. GOLDBLATT:  So that -- as far as that goes, we're

7    in agreement.

8              I think that there are some issues that are somewhat

9    more complicated than at least the description that Your Honor

10   lays out here --

11             THE COURT:  Right.

12             MR. GOLDBLATT:  -- that I just would like to identify.

13             The issues -- it's not just whether we make the

14   1111(b) election because, even if we make the 1111(b) election,

15   as Your Honor is aware, we filed a proof of claim against the

16   network for indemnity, as a result of the Astros lawsuit.  That

17   is an unsecured claim that is unliquidated and disputed.

18             That, presumably, would need to be liquidated, or at

19   least estimated, for the purposes of this proceeding because

20   whether we make an 1111(b) election or not, we believe we have

21   an unsecured claim that we'd be entitled to vote, in some

22   amount, as determined by the Court.

23             So the issues here, if one thinks about what one needs

24   to do, include, you know, a proceeding that is about -- I

25   understand it's estimation and that it's not a full proceeding,

1       and that one, you know, has abbreviated procedures.  But

2       determining the likelihood of liability to the Astros on their

3       claim, as well as whether that claim falls within the

4       indemnity, are substantial undertakings.

5               THE COURT:  I guess I -- one of the things that the

6       proponents put in response to the McLane Defendants' indemnity

7       is that those are simply subordinated as a matter of law.

8               MR. GOLDBLATT:  Sure, because they sold equity; we

9       didn't.  So that principle -- and I -- I'm not speaking --

10              THE COURT:  Right.

11              MR. GOLDBLATT:  -- for whether that falls within 510,

12      the subordination as relating to the purchase or sale of a

13      security or not.  But that's surely not true of us, and don't -

14      - and they don't even say it is.  Their claim for subordination

15      -- and so that's -- so one is that set of issues.

16              THE COURT:  Yeah.

17              MR. GOLDBLATT:  Two is the claims for subordination

18      against us turns on sort of the old, you know, equitable

19      subordination principles.  We did something that harmed the

20      estate --

21              THE COURT:  Right.

22              MR. GOLDBLATT:  -- and to the extent they can prove we

23      did something that harmed the estate, to the extent of that

24      harm --

25              THE COURT:  I think this -- I think you're making a

1    good point because I guess I'm not -- I have not given thought

2    to that question.  And we ought to amend this to say that the

3    1111(b) election may affect a large part of your claim, but

4    that you may have other remaining claims that will still need

5    to be estimated.  And I think that's a fair change to this.

6         MR. GOLDBLATT:  And my -- well, my point, Your Honor,

7    is, given the -- we've -- well, a lot of this is in their

8    hands.  If they're going to say, we're not going to equitably

9    subordinate you, that's one thing.  If they say, we're not

10   going to try to outvote you, and that it all turns on

11   classification, they have the ability to make this move

12   smoothly.

13        If we actually have to go forward -- we've engaged in

14   the litigation to date, including the production of documents

15   and all of that --

16        THE COURT:  Yeah.

17        MR. GOLDBLATT:  -- on the assumption that those issues

18   were outside the scope of what we were going to be doing.

19        So I guess what I'm saying is, if -- what you're

20   saying makes sense as a way to proceed.  It's just that, given

21   where we are and the amount of work we have to do -- I'm never

22   one to come into court and say, I want delay.  Maybe it's a

23   result of spending too much time representing insurance

24   companies, in which, if you say to a judge you want delay, they

25   think it's because you're holding the other side's money.  So I

1      hate saying we want delay.

2            But just as a practical matter, given the number of

3      issues and the way discovery to date has been built, I think it

4      requires kind of going back to the drawing board here.  So

5      that's my concern I just wanted to express.

6            THE COURT:  Yeah, I don't think it does.  I think we

7      can do an estimation proceeding in short order, and I think you

8      announced six people here representing your client.  You all

9      can get ready for a hearing.

10           MR. GOLDBLATT:  We are more than happy to work hard.

11     We think there is an awful lot to do, and we'd need to work

12     through that.

13           THE COURT:  I think I'm going to have to work hard,

14     too.  But I don't think that the need to work hard means that

15     we can't.  I mean, that's the whole function of estimation

16     proceedings in the Bankruptcy Code, is we don't let things get

17     way of the administration of the estate; we estimate them.

18           And I do think this is wrong, what I've drafted was

19     wrong, because it didn't take into account other claims not

20     affected by 1111(b).  And I don't want to express a view as to

21     where those ought to be at all.  But this does express a view

22     about that that's incorrect, so that I need to fix.  But I

23     don't see much of an argument for delay.  I got it that we're

24     all going to work hard, so ...

25           MR. GOLDBLATT:  Okay.  Well, you've heard what we have

1    to say.

2            THE COURT:  I have, yeah.

3            MR. GOLDBLATT:  Thank you, Your Honor.

4            THE COURT:  All right.  And now, Mr. Beckham, did you

5    want to break?  Because I did want to hear what he had to say.

6            MR. BECKHAM:  Your Honor, I know that we were

7    discussing -- the teams were discussing things out in the hall,

8    and I think we may need a little more time and we need more

9    time.  I think we do need a little more time, Your Honor, let's

10   say 15.

11        (Laughter.)

12           MR. BECKHAM:  Can we have 15 additional minutes, Your

13   Honor?

14           THE COURT:  Okay.

15           MR. BECKHAM:  I think it would assist in --

16           THE COURT:  I will come back at 10:08.

17           MR. BECKHAM:  We will be --

18        (Laughter.)

19           MR. BECKHAM:  We will only need until 10:08, Your

20   Honor.  Thank you.

21           THE COURT OFFICER:  All rise.

22        (Recess taken at 9:53 a.m.)

23        (Proceedings resume at 10:09 a.m.)

24           THE COURT:  Mr. Beckham.

25           MR. BECKHAM:  Good afternoon, Your Honor -- or good

1    morning, Your Honor.

2            THE COURT:  It's still morning.

3            MR. BECKHAM:  It -- it's already a long day.

4            Your Honor, I believe the plan proponents are prepared

5    to go forward with what the Court has presented, with a couple

6    of caveats, one of which is AT&T and DirecTV are still waiting

7    to receive confirmation from their clients and don't have that

8    at this point in time.

9            But with respect to the proposal, Your Honor, what the

10   plan proponents would be willing to do is try to kill with

11   will, which is one of the bracketed terms, in terms of the

12   payment.  The plan proponents would be prepared to go forward

13   with the second option.

14           THE COURT:  Okay.

15           MR. BECKHAM:  And with one word of caution there, Your

16   Honor.  We -- because the payments to that class may come from

17   outside of the plan, we wouldn't want this procedure to create

18   some prejudice for designating the votes of the creditors who

19   received payments under this procedure to somehow contend --

20   for Comcast to contend that, gee, since you're getting paid

21   from a source outside the plan, that, for some reason, their

22   vote could be designated.

23           THE COURT:  Well, I just think that's -- I'm not going

24   to reach that conclusion until we have that, any more than I'm

25   going to reach a conclusion on separate or joint

1    classification.  Those are all going to be confirmation

2    questions.  So that may influence whether AT&T and DirecTV

3    choose to fund those monies.  I don't know.

4              MR. BECKHAM:  Okay.

5              THE COURT:  But I'm not going to reach that

6    conclusion.  I'm simply trying to have a confirmation hearing

7    where everybody knows what's going to happen.  And if people

8    want to make objections and say that there's something wrong

9    with the plan proponents saying they're going to pay trade

10   creditors, they can do that.  I don't know whether that's

11   right, wrong, neutral.

12             MR. BECKHAM:  Okay.  Understood, Your Honor.

13             THE COURT:  Take your pick.

14             MR. BECKHAM:  Additionally, Your Honor, in the first -

15   -

16             THE COURT:  Do you agree, though, that, in terms of

17   Mr. Goldblatt's issue, that, here in the beginning, we should

18   probably have you all fix that, to indicate that it may affect

19   -- that the 1111(b) election will eliminate the issue as to

20   their deficiency claim, but that they have other claims that

21   they may assert that will be subject to the balance of this?

22   Do you agree with that position?

23             MR. BECKHAM:  Yes, Your Honor.

24             THE COURT:  Okay.

25             MR. BECKHAM:  Yes, Your Honor.

1          One other housekeeping matter, Your Honor.  In the

2     third -- or I guess fourth paragraph, there's a reference to

3     the Comcast parties Class 3 and Class 5 claims.  Comcast has

4     claims in Class 2.

5          THE COURT:  I meant 4 and 5.  That's a typo.

6          MR. BECKHAM:  Okay.

7          THE COURT:  Yeah, that's a typo.

8          Well, you all have got -- I think my law clear emailed

9     to the parties --

10         MR. BECKHAM:  Okay.

11         THE COURT:  -- copies of this.

12         MR. BECKHAM:  Okay.

13         THE COURT:  I'm not going to -- you all feel free to

14     change the language.

15         MR. BECKHAM:  All right.

16         THE COURT:  As long as you've got the concept down

17     here.

18         MR. BECKHAM:  Okay.

19         THE COURT:  You need to fix the 1111(b) issue that

20     Mr. Goldblatt raised.  You can take out the fact that you have

21     two options, and you've elected one.  Just tell people what

22     you're going to do.

23         MR. BECKHAM:  Okay.

24         THE COURT:  It will actually be less confusing.  But I

25     mean, you get the idea.  I want people to know what we're

1    doing, I want to know where we're going, and I want to have

2    everything teed up with pleadings and discovery, so that I can

3    rule on the matters in November.

4          MR. BECKHAM:  Understood, Your Honor.

5          THE COURT:  But I don't need to revisit this; just

6    amend it, as we said.

7       (Participants confer.)

8          MR. BECKHAM:  We'll address the classes, and make sure

9    of that.

10          THE COURT:  Right.  And I -- you know, and if I've

11   called people by different names than your official

12   definitions, I assume you're going to clean all that up --

13          MR. BECKHAM:  We will clean that up, Your Honor.

14          THE COURT:  -- and just get this done right.  Yeah.

15   Okay.  So that means I think we can proceed with your hearing,

16   more along the lines that you intended.

17          MR. BECKHAM:  We can clean that up, Your Honor.

18          THE COURT:  Who's going to be your first witness?

19          MR. BECKHAM:  Your Honor, for purposes of today, we do

20   not have a witness because we believed a Disclosure Statement

21   hearing is not an evidentiary, and hope that the Court is of

22   the same mind.

23          THE COURT:  Well, I'm going to want somebody to tell

24   me that everything in there is true and correct; I want that

25   representation to be made by a proponent, so I don't -- I want

1    to know that what you're telling people, you believe.

2         MR. BECKHAM:  We do believe it is, Your Honor.  We had

3    not anticipated calling a witness.  But I am quite certain, by

4    the end of the hearing --

5         THE COURT:  Yeah, it can be a one-sentence question

6    and answer.  I just want that officially on the record; that

7    the Debtor alleges that its Disclosure Statement is true and

8    correct.  We can then deal with objections as to whether it's

9    adequate or not on a different basis.  But I don't want to send

10   it out if you all aren't willing to stand behind what you say.

11   So I want somebody to tell me that you think it's accurate.

12        MR. BECKHAM:  Your Honor, we will have someone in a

13   position to do that.

14        THE COURT:  Thank you.

15        MR. BECKHAM:  And --

16        THE COURT:  Mr. Goldblatt, are you going to have any

17   witnesses today?

18        MR. GOLDBLATT:  We don't intend to call our own

19   witnesses, though obviously reserve the right to cross any

20   witnesses called by the plan proponents.

21        THE COURT:  Right.  So, if they call a witness who

22   says everything in there is true and correct to the best of my

23   knowledge, information, and belief, are you going to cross-

24   examine that witness?

25        MR. GOLDBLATT:  Well, let me say the following.  So

1    long as the absence of cross wouldn't be taken as accepting the

2    truth of the statements --

3              THE COURT:  It will not be.

4              MR. GOLDBLATT:  -- I don't feel the need to do that.

5    I guess I would be interested in understanding the basis on

6    which the witness came to the view that what is there is true

7    and correct, which is:  Is the person who's offering the

8    testimony competent to give the testimony?  But beyond that, I

9    don't envision doing more than that.

10             THE COURT:  Okay.  Thank you.

11             So let's just hear argument then.  And maybe we ought

12   to start with Comcast, as to whether they have issues.  I mean,

13   I've reviewed the Disclosure Statement, I know what it says, I

14   know what 1125 says.  So I'm not sure -- I think most of what

15   you're doing is then going to be responding to what he's

16   saying, right?

17             MR. BECKHAM:  Yeah, I believe that's correct, Your

18   Honor.

19             One thing to assist the Court with is the parties have

20   been exchanging red-lined drafts of the Disclosure Statement,

21   to attempt to narrow the issues.

22             THE COURT:  Right.

23             MR. BECKHAM:  And of course, Comcast had certain

24   language they wanted taken out of the plan.

25             THE COURT:  Right.

1          MR. BECKHAM:  They also had language they wanted put

2     into the plan.  We have --

3          THE COURT:  In the plan or in the Disclosure

4     Statement?

5          MR. BECKHAM:  In the Disclosure Statement.

6          THE COURT:  Okay.

7          MR. BECKHAM:  I mean, no, in Disclosure Statement.

8     And we have been exchanging red-line drafts back and forth.  We

9     have considerably narrowed the issues and --

10         THE COURT:  If it can be easiest -- and I'll leave

11    this up to you and Mr. Goldblatt -- just to put up on the

12    screen, here's the two choices, which one are you going to

13    approve --

14         MR. BECKHAM:  I believe we could do that.

15    Mr. Graulich --

16         THE COURT:  Sorry.  I didn't mean to be --

17         MR. BECKHAM:  -- has been involved in that process,

18    and --

19         THE COURT:  But would that work, just to show me,

20    here's the remaining disputes, and make your call?

21         MR. GRAULICH:  Your Honor, in fact, there may be just

22    a -- this is what I was referring to earlier, about there being

23    -- perhaps that we needed to talk some more about -- there's

24    two issues that are left open, I think, in the Disclosure

25    Statement, and maybe it's only, in fact, one.

1          We've agreed -- and at least I -- I understand that

2     all the parties have agreed -- and this was our principal

3     concern, and I think Your Honor has alluded to it with respect

4     to the possibility of having a witness about the Disclosure

5     Statement -- is that we were concerned that there -- this

6     Disclosure Statement, frankly, even after taking some of our

7     comments, still represents a litigation posture from

8     principally the teams, is our position.

9          THE COURT:  Okay.

10         MR. GRAULICH:  And that's fine.  We recognize it's the

11    plan proponents' Disclosure Statement.  I don't think it's a

12    good use of Your Honor's time or the parties' time to go line

13    by line, and say, wait a second, this is an unfair statement,

14    what's the basis of this.

15         So what we've done is we've proposed a reservation for

16    the beginning of the Disclosure Statement, and a new decretal

17    paragraph for the Disclosure Statement order that makes clear

18    that, if Your Honor were to find that this Disclosure Statement

19    contains adequate information, that you're not passing on the

20    truth and validity of the various statements contained therein.

21    So we could hand that up, Your Honor.

22         And then I think the only -- the only other issue that

23    I think that we -- that is open is that there's a section of

24    the Disclosure Statement, frankly, which I don't think would

25    meet Your Honor's question about is there somebody from the

1    Debtor that's prepared to stand behind this section, because it

2    specifically says it's the teams' position; and in fact, at one

3    point, it's just one of the team's positions.

4              We thought it was sort of unnecessary, and not -- you

5    know, unnecessary for voting.  Frankly, though, if we have

6    this, this may solve the problem.  But I can walk you through

7    the one provision of the Disclosure Statement that we think is

8    still open.

9              THE COURT:  Where is it; what page?

10             MR. GRAULICH:  It's Section J.  Hang on one second,

11   let me just see ...

12             THE COURT:  I think there's more than one Section J,

13   so ...

14             MR. GRAULICH:  Yeah, unfortunately, that is correct.

15   It is --

16             MR. BECKHAM:  Page 29?

17             MR. GRAULICH:  Yeah.

18             THE COURT:  Page 29.

19        (Participants confer.)

20             MR. BECKHAM:  You know, if we turn the ELMO on, it

21   would, perhaps, be helpful.

22             MR. GRAULICH:  I don't know.  Will two-sided copies,

23   Your Honor, work on the ELMO?

24             THE COURT:  I can only see one side at a time on the

25   ELMO, but they will work, maybe.  You need to press the green

1     button on there and ...

2             MR. GRAULICH:  Oh, that -- yes, Your Honor.  That's --

3             THE COURT:  Yeah.

4             MR. GRAULICH:  So this is the beginning of ....

5             THE COURT:  So that's from Page 28.  Yeah, I'm looking

6     at that.

7             Well, if the Debtor -- and let me just ask you.  This

8     is a statement that purports to be hearsay of the Debtor.  And

9     it says that Rocket Ball and Astros believe that the following

10    is subordinated.  So, if the Debtor believes that Rocket Ball

11    and Astros believe that, that's all I'm looking for.  I -- it

12    doesn't purport to be a statement of fact; it purports to be a

13    statement of hearsay, which is fine for a Disclosure Statement.

14            MR. GRAULICH:  But if -- Your Honor, if -- it goes on

15    for quite some time, and it is -- it is a statement of various

16    allegations that the teams believe --

17            THE COURT:  Right.

18            MR. GRAULICH:  -- that may, one day, be investigated

19    by a litigation trustee.  I don't think the Debtor has a view

20    on the accuracy of any of this.  I'm not so sure what its

21    relevance is to voting.

22            THE COURT:  Well, let me tell you what the problem is

23    that we have in this circuit, and I think it's now in a lot of

24    circuits, which is, if they don't tell you what their likely

25    complaint is, you can maybe later come back and say, well, you

1    didn't tell us the nature of your complaints, and so you can't

2    now bring them.

3            If you want to waive any argument that, if any

4    complaint brought against Comcast, that you will not defend

5    based on an absence of disclosure, then I see no reason why

6    this does need to be there for voting.  But if you want to

7    retain your right to object under existing Fifth Circuit law

8    that some complaint is not within the scope of what was

9    preserved, then I see why -- I understand why they would want

10   this.  So what do you all want to do?

11           Mr. Castillo, I didn't mean to take your thunder, but

12   I suspect that's why that's here.

13           MR. CASTILLO:  You said it better than I ever could,

14   Your Honor.

15           THE COURT:  Okay.

16           MR. GRAULICH:  We're prepared to waive our rights with

17   respect to that, in the sense that, if the litigation trust

18   later were to bring -- claim substantially similar to what's

19   described in the Disclosure Statement, we wouldn't stand on

20   that as very -- as sort of the sole basis for --

21           THE COURT:  No, you can either -- it won't be in the

22   Disclosure Statement.

23       (Participants confer.)

24           THE COURT:  So you can either --

25           MR. GRAULICH:  Correct, but --

1          THE COURT:  You can either waive the argument, and say

2     you will not raise a defense that if you weren't given proper

3     notice, or you can preserve the argument.  I don't want to

4     preserve the argument as to something that's not in the

5     disclosure.

6          MR. GRAULICH:  Your Honor, actually, you know, at the

7     end of the day, while I don't want to have this create a

8     massive distraction, I think the language that we have in the

9     order and the Disclosure Statement is satisfactory.  There was

10    a proposal --

11         THE COURT:  I will give --

12         MR. GRAULICH:  -- that perhaps --

13         THE COURT:  I will give you a --

14         MR. GRAULICH:  -- we could have --

15         THE COURT:  -- little bit of -- I will give you a

16    little bit of comfort --

17         MR. GRAULICH:  Yeah.

18         THE COURT:  -- which is, I will not, today, make any

19    findings that any of the allegations on Pages 28 or 29 of the

20    draft Disclosure Statement have any merit whatsoever.

21         MR. GRAULICH:  Okay.  I think -- I think that's -- you

22    know, there are more substantive arguments that we need to hit

23    today.  That, I think, is satisfactory.  There may be an extra

24    sentence added to this that says Comcast disagrees with this.

25    But I mean, that -- we can work that out without troubling Your

1    Honor.

2              THE COURT:  Okay.  So we're --

3              MR. CASTILLO:  Your Honor --

4              THE COURT:  -- going to leave that in there.

5              MR. CASTILLO:  Yeah, I believe we've already -- we've

6    already agreed to include just a provision at the very end

7    there.

8              THE COURT:  Okay.

9              MR. CASTILLO:  Yeah.

10             THE COURT:  So, and then how about the general

11   language; the advanced disclaimer, and then the provision in

12   the confirmation order?  Have you all agreed on that, as well,

13   Mr. Castillo?

14             MR. CASTILLO:  I believe that's acceptable to the

15   Debtor and the teams.  And there's the decretal paragraph that

16   Comcast has proposed at the beginning of the Disclosure

17   Statement.

18        (Pause in proceedings.)

19             THE COURT:  I don't have any problem including that.

20             MR. CASTILLO:  And then Your Honor --

21             THE COURT:  And then in the decretal --

22             MR. CASTILLO:  -- here's the language for the order.

23             THE COURT:  Okay.

24        (Pause in proceedings.)

25             THE COURT:  I don't have any problem with that order,

1    either.

2         MR. GRAULICH:  Thank you, Your Honor.  That way, we

3    don't have to worry about anything being waived or anything not

4    being waived, the Disclosure Statement is for voting purposes,

5    and we'll -- and we'll deal with everything then in the future.

6    That's fine.

7         THE COURT:  All right.  You all had some objections --

8    and I know this is stepping into the solicitation motion a

9    little bit -- some objections to that, which I think really

10   drove a lot of what I wrote in this section.  So it seems to me

11   that the solicitation motion, if it is amended -- the proposed

12   order is amended to incorporate the changes in the handout, at

13   that point, I think it resolves, really, all of your objections

14   to that.  But I'm -- tell me if I'm wrong about that.

15        MR. GRAULICH:  That is correct.  There is an

16   additional, I think, noncontroversial comment that we had been

17   discussing with the Debtors.  I think that that's even subsumed

18   by this proposal.

19        THE COURT:  Okay.

20        MR. GRAULICH:  Because all we wanted is exactly what

21   Your Honor is describing, which is just to know up front what

22   we're voting, what the teams are voting.  And so I think that

23   this does resolve --

24        THE COURT:  Right.

25        MR. GRAULICH:  -- those objections.

1        THE COURT:  I thought it did, and I thought your

2   objections had a lot of merit, and that's why I tried to deal

3   with them.

4        So you'll need to then upload a revised solicitation

5   order that incorporates the timing provisions in the handout,

6   or simply leave them out of the order, and it will be governed

7   by the Disclosure Statement, where we're -- it will have the

8   handout in it, and you can leave all of those complexities out.

9   What do you think is best?

10        MR. BECKHAM:  Probably leaving the complexities out of

11   the order and just putting it in the Disclosure Statement.

12        THE COURT:  So we'll just use a bunch more simple

13   order approving the Disclosure Statement?

14        MR. BECKHAM:  That would be my thought on it, yes.

15        THE COURT:  Are you okay with that?

16        MR. GRAULICH:  Yeah, I mean, we'll -- we can work with

17   them with the Disclosure Statement order, and I think that that

18   would be.

19        THE COURT:  Okay.  Well, the problem is I need to get

20   this done today, pretty much, because I have shortened

21   deadlines, and I want to get this out, so he'll need to get

22   stuff written.  And then we'll come back this afternoon with

23   final versions of the Disclosure Statement and orders --

24        MR. GRAULICH:  And Your Honor --

25        THE COURT:  -- and we'll adjourn for a while.

1          MR. GRAULICH:  -- it strikes me that, based upon the -

2     - this process, that there may need to be something additional

3     now in the solicitation procedures to make sure that a valid *en*

4     *banc* is going to go out to at least the teams and to Comcast,

5     so that there's -- so that people get to vote.

6          We don't know, necessarily, what the allowed amount of

7     the vote is.  But if we're trying to determine what the claims

8     are later, I haven't checked, but that may be --

9          THE COURT:  Yeah, I'm going to --

10         MR. GRAULICH:  -- actually after --

11         THE COURT:  I'm going to --

12         MR. GRAULICH:  -- the voting deadline.

13         THE COURT:  I will orally authorize that the ballots

14    that are filed by parties that are the subject of the

15    estimation handout may vote their ballots by simply writing in:

16         "-- all of the claims allowed by the Court at the

17         estimation proceeding."

18         MR. GRAULICH:  That would be -- that would be --

19         THE COURT:  Then you don't have to worry about the

20    amount --

21         MR. GRAULICH:  -- the proposal.

22         THE COURT:  -- so that the ballot will be regular, if

23    that's what it says.  Does that work for everybody?

24         MR. BECKHAM:  I believe that works, Your Honor.

25         THE COURT:  Does that work for the teams?  It seems to

1    work for Comcast.

2              UNIDENTIFIED:  Yes, Your Honor.

3              THE COURT:  Okay.

4              MR. GRAULICH:  Thank you, Your Honor.

5              MR. BECKHAM:  Your Honor, I don't know if

6    Mr. Goldblatt has other things to say, but.

7              MR. GOLDBLATT:  Well, we do have other objections to

8    the Disclosure Statement that we're happy to advance, if we

9    may.

10             THE COURT:  Absolutely.

11             MR. GOLDBLATT:  And I guess we're happy to take

12   whatever the guidance.  The Court has some -- as we said, I

13   think, when we were first here with respect to the status

14   conference on the plan, some of our objections get to, as a

15   matter of law, problems in the Disclosure Statement.  And the -

16   - you know, the Disclosure Statement describes the plan as

17   unconfirmable, as a matter of law.

18             I think we've set those out; I think Your Honor

19   understands what those points are.  I'm happy to address them,

20   or to come back to them.  I don't want to waste the Court's

21   time.

22             THE COURT:  Well, I mean, look, I've read your

23   objection.  I think you can tell, from what I wrote, that I've

24   read your objection.  And the parts of it that I thought had to

25   be dealt with, I've tried to deal with.

1            I do agree, right now, that, essentially, those will

2     turn into confirmation objections, and I don't believe that

3     matters are presently futile with respect to confirmation, or

4     that there is anything facially non-confirmable about the plan.

5            There may be facts at the confirmation hearing, for

6     example, on separate classification, which I know has been a

7     big discussion, but it's a big focus of your objection --

8            MR. GOLDBLATT:  Uh-huh.

9            THE COURT:  -- that say that, based on those facts

10    that come out at confirmation, the separate classification

11    renders the plan non-confirmable as a matter of law.  But I

12    think, without exploring the facts, I'm unprepared to rule

13    today that there is futility in confirmation.

14            MR. GOLDBLATT:  Okay.  So --

15            THE COURT:  But your -- all of your objections would

16    be preserved for confirmation.

17            MR. GOLDBLATT:  That's fine.  I don't want to --

18            THE COURT:  And you're -- well, you're welcome to

19    argue against me.  But I'm just telling you, I have read it,

20    I've thought about it, that's where I am right now.  And if you

21    think I'm wrong, you know -- you can, first of all, try and

22    persuade me.  But second, you can have a record.  You know, I

23    don't -- it's up to you.

24            MR. GOLDBLATT:  Well, I -- those observations are very

25    helpful, Your Honor.  And we are happy to address those issues

1    at confirmation and put on a case.

2            THE COURT:  Okay.  Well, they're all preserved.

3            MR. GOLDBLATT:  I think that --

4            THE COURT:  Okay.

5            MR. GOLDBLATT:  -- that, as far as that goes, I think

6    is fine.

7            With respect to disclosure *qua* disclosure --

8            THE COURT:  Right.

9            MR. GOLDBLATT:  And in some respects, you know, the

10   questions of disclosure in its context also have something to

11   do with discovery; in that, we think we're entitled to

12   understand, as the Court I think put it before --

13           THE COURT:  I agree.  I think there's a link between

14   those two.

15           MR. GOLDBLATT:  A fixed target at which we're

16   shooting.

17           THE COURT:  Right.

18           MR. GOLDBLATT:  And so I don't mean to segue into what

19   might be described as "discovery disputes," but I'd like to --

20   here's what we're getting at.

21           What Your Honor directed was that the Disclosure

22   Statement set out the valuation of our collateral, and not just

23   the conclusion, but the basis for that.  And we negotiated with

24   the other side a scheduling order that was premised on the

25   notion that the basis for their evaluation would be set out at

1    the Disclosure Statement stage.

2          Now I don't -- I'm not saying I'm sorry about the

3    language in the Disclosure Statement.  But I think, before we

4    watch, we're entitled to understand how they got to the

5    valuation to which they got.

6          And what they say with respect to the valuation of our

7    collateral, what they say in their amended Disclosure Statement

8    is, well, here's what we've done, we've conducted a valuation

9    of the enterprise, and using the traditional, you know,

10   comparable companies, comparable transactions and discounted

11   cash flow, and so we've come to a number, we won't tell you

12   what that is.  And then what we did is we allocated that value

13   across certain assets, and we won't tell you what that

14   allocation is.  And then we charged against the part that is

15   your collateral the costs of our concessions, we won't tell you

16   what the formula is.  And so that's the target.  And I thought,

17   when the Court said, you're going to get the valuation and the

18   basis therefor, the information that they decided not to give

19   us is what we would have.

20         THE COURT:  When you say they decided not to give them

21   to you, do you -- are you saying that they just are alleging

22   they don't need to put that level of detail in the Disclosure

23   Statement, or are you saying that, in discovery, that they're

24   also not going to tell you?

25         MR. GOLDBLATT:  They're -- I think -- you should ask

1    them.  But I think what they're -- what their position is, is

2    that we get that information two days before our expert report

3    is due, which we think is unreasonable and inconsistent with

4    what the Court intended.

5        THE COURT:  Where is the -- let me open the

6    stipulation that I approved.

7        MR. GOLDBLATT:  The actual scheduling order itself?

8        THE COURT:  Right.  Do you remember the -- here it is,

9    498.

10        (Participants confer.)

11        THE COURT:  I think 498 is the one, right here.  Is

12    that it, on the screen?

13        (Participants confer.)

14        MR. GOLDBLATT:  So the scheduling order itself --

15        THE COURT:  I think I've got it on the screen.

16        MR. GOLDBLATT:  Oh, it's on the -- it's on the screen.

17    Okay.  So it was built on the premise that we get the

18    fundamental notions of valuation at -- on August 28th, and that

19    they would wrap that up in an expert report on September 19th,

20    and that we would have an expert report on the 21st.  So it was

21    really built on the notion that they would carry out the letter

22    and spirit of the Court's ruling on August 7th, I believe it

23    was.  And the failure to provide that information, which exists

24    -- I mean, you can -- if you read what they disclosed, they

25    said they've done this, they just won't tell us.

1            THE COURT:  But I -- I know what I said, and I think
2      you've accurately quoted what I said.  I think they have put in
3      the Disclosure Statement something that is on one end of the
4      range of what I said.
5          (Laughter.)
6            THE COURT:  And it's, for a Disclosure Statement, sort
7      of what you would expect.  For an expedited discovery order, it
8      may not be and --
9            MR. GOLDBLATT:  That's my point.  I'm not complaining
10     for --
11           THE COURT:  Yeah.
12           MR. GOLDBLATT:  -- for 1125 purposes --
13           THE COURT:  Yeah.  And so what I --
14           MR. GOLDBLATT:  -- that creditors need that.
15           THE COURT:  What I want to really hear from
16     Mr. Beckham is why that data can't go ahead and be provided to
17     you now; not in the Disclosure Statement, but get it to you, so
18     that your expert can start working on their report.  And I'm
19     talking about the basic data, like you've described.  Because I
20     -- it's one thing to say that the Disclosure Statement is
21     adequate, which it may very well be.  It's another to say that
22     you should have to wait for all that data.
23           MR. GOLDBLATT:  Right.  As I started, that's exactly
24     my view.
25           THE COURT:  So let me hear from Mr. Beckham.

1          MR. BECKHAM:  Your Honor, on this point, I'm going to

2     pass to Mr. Basta.

3          THE COURT:  That's fine.

4        (Pause in proceedings.)

5          MR. BASTA:  Mr. Basta, good morning, Your Honor.

6          MR. BASTA:  Good morning, Your Honor.

7          I just take this as sort of being made more

8     complicated than it is.  There's going to be a valuation

9     dispute at the confirmation hearing.  They have the

10    projections.  We're going to have an expert; they're going to

11    have an expert.  We've been complying with the discovery, we've

12    been rolling out the discovery.  They're going to take their

13    discovery, they're going to see the projections.

14         We're going to have a valuation expert.  Our report is

15    due September 19th.  We have met all of our deadlines.  Our

16    valuation methodology will be -- has been laid out in the

17    Disclosure Statement, will be laid out in the expert report,

18    and will be subject to the briefing at confirmation.

19         They will have the same.  They will have access to the

20    same set of projections, they will have their own view of

21    valuation.  And at the confirmation hearing, the Court will be

22    -- will have two different views of the valuation of the

23    collateral.  The Court will make a ruling, and we'll go forward

24    on that basis.

25         I don't know what is different about this valuation

1    exercise that is different than a valuation exercise that

2    occurs in virtually every single, you know, confirmation.  I'm

3    not aware -- I think there's a motion to compel that's on

4    later, in the court, about additional financial information

5    that they're seeking from AT&T and Direct --

6           THE COURT:  Well, that's for AT& and Direct, but --

7           MR. BASTA:  -- DirecTV, but from my -- my

8    understanding is they have been given -- they have been given

9    the projections, and that's the key items, in terms of --

10   there's three pieces of collateral, really:  There's the FF&E,

11   there's the cash -- it's easy to value the cash -- FF&E, cash,

12   and the affiliation agreement.  The affiliation agreement, the

13   methodology for evaluating the affiliation agreement is a

14   function of how much it contributes to the reorganization value

15   of the Debtor.

16          THE COURT:  But you can't tell that from the

17   Disclosure Statement.

18          MR. BASTA:  You can't tell --

19          THE COURT:  How the calculation got done.  If you all

20   have done the calculation, can't you give it to them right

21   away?  That's what they need.  It's not --

22          MR. BASTA:  They need -- when you say the

23   "calculation," Your Honor, I don't want to --

24          THE COURT:  How did you calculate the value of the

25   affiliation agreement for the purpose of putting it -- you put

1      a number or a range of numbers in the Disclosure Statement.

2              MR. BASTA:  So, Your Honor, we're a little -- well, we

3      -- the expert report is being finalized.  The expert report is

4      going to use different valuation methodologies, and are going

5      to have a number of inputs that -- the deadline that was

6      negotiated --

7              THE COURT:  Well, that's fine.

8              MR. BASTA:  But I don't -- what I don't want to do,

9      Your Honor, is to give a -- we have a deadline of the 19th for

10     giving the expert report.  If we're -- I don't want to give the

11     expert -- information now, and then have an expert report that

12     comes, that's inconsistent with the information.  I mean, the

13     reason you do an expert report --

14             THE COURT:  Well ...

15         (Laughter.)

16             MR. BASTA:  No, no.  I'm just saying it's -- the

17     expert is doing -- it's doing its report.  It comes in one --

18             THE COURT:  Yeah.

19             MR. BASTA:  It comes in one piece.  They get the

20     expert report; they don't get it piecemeal.

21             THE COURT:  No, I know that you don't want an expert

22     report that's inconsistent with what you currently believe.

23     But they get to know what you currently believe, and that's

24     discoverable.

25             MR. BASTA:  It's --

1                THE COURT:  And if it turns out to be that what your

2      expert says is inconsistent with what --

3                MR. BASTA:  It --

4                THE COURT:  -- your client thinks --

5                MR. BASTA:  Yeah, but --

6                THE COURT:  -- then they get to exploit that.

7                MR. BASTA:  One second, Your Honor.

8                THE COURT:  Yeah.

9           (Participants confer.)

10               MR. BASTA:  Your Honor, Comcast manages the network.

11     The teams have not independently done a valuation of the

12     collateral.  The --

13               THE COURT:  There is a statement in the Disclosure

14     Statement that gives a range of value for the collateral.  I

15     assume that was not pulled out of thin air.  What was used to

16     create that number needs to be turned over to them, and not on

17     the 19th.  Now, if you want, I'll accelerate your expert

18     deadline, and I'll extend their expert deadline.  But I think,

19     really, just giving them the data that the Disclosure Statement

20     was based on makes more sense.  And I got it that your expert

21     may come up with a different conclusion.

22               MR. BASTA:  Uh-huh.

23               THE COURT:  But they're entitled to know, and just

24     common sense says they get to know where that number comes

25     from.

1          (Participants confer.)

2              THE COURT:  And I assume you don't care about how they

3      valued the furniture, right?

4              MR. GOLDBLATT:  No.  I mean, just to be --

5              UNIDENTIFIED:  One second, Chris.

6              MR. PERRIN:  The -- it's my understanding that the

7      valuation range we gave was for preliminary discussions with

8      our expert, which you would expect us to rely upon.  And I

9      think it's a little unusual to turn over preliminary work

10     product from an expert until they've concluded their work.  I

11     mean, are they going to -- are they going to turn over --

12             THE COURT:  Well, I --

13             MR. PERRIN:  -- everything their expert --

14             THE COURT:  Well, I think --

15             MR. PERRIN:  I mean, I think -- is that what you're

16     asking us to do?

17             THE COURT:  No.  I think that the rules say that, with

18     respect to expert reports -- they've changed the rules, and

19     those preliminary --

20             MR. PERRIN:  Right.

21             THE COURT:  -- reports don't come in.

22             MR. PERRIN:  Right.

23             MR. BASTA:  Right.

24             THE COURT:  So, if your answer to the discovery is, we

25     have conducted no analysis, and all we have is preliminary

1     reports from our experts --

2             MR. PERRIN:  I think that's --

3             THE COURT:  -- that may a fair answer.

4             MR. PERRIN:  Isn't that the case?

5             THE COURT:  Because that's a different answer than

6     saying, we don't want to give away our preliminary numbers.  So

7     that may then change some of the other deadlines, I got it.

8             MR. GOLDBLATT:  Okay.

9         (Participants confer.)

10            THE COURT:  I'm not restricting to change deadlines.

11            MR. PERRIN:  Fine.  Well, it's the point --

12            THE COURT:  But I don't think they have to turn over

13    preliminary expert reports.

14            MR. BASTA:  Well, that's what this, this is a

15    preliminary expert --

16            MR. PERRIN:  But that's exactly what we're relying

17    upon.  And I mean, we don't have the capacity or the tools to

18    do that.  And they can't argue this and cry about that.  I

19    mean, that's what -- battle of the experts, Your Honor.

20            MR. GOLDBLATT:  Your Honor, the dead --

21            MR. PERRIN:  Why -- I --

22            MR. GOLDBLATT:  The dead -- I'm sorry.  The deadlines

23    were negotiated against the backdrop of what this Court ordered

24    and said --

25            THE COURT:  Right.

1          MR. GOLDBLATT:  -- on August 7th.  And what the Court

2     said then was that, on August 28th, we'd get the basis for

3     their valuation.  And what they're saying now is we're not

4     going to give you the basis for our valuation because we've got

5     reasons that we don't want to give it to you.

6          MR. PERRIN:  No, no, no.  That's not what we're

7     saying.

8        (Participants speak simultaneously.)

9          THE COURT:  Hold on.  Let me pull out the Rule.)

10       (Pause in proceedings.)

11          THE COURT:  Okay.  I mean, I think the rule is pretty

12    unambiguous about this.  And if their sole basis is that they

13    relied on their experts, and they have no independent knowledge

14    of how to value it, they can put that in the Disclosure

15    Statement.  And I've told them to give me the basis, and their

16    basis is it's what our expert told us.  That's it, that's all

17    they know.  That said, I'm not going to make your report due

18    two days later.

19          MR. GOLDBLATT:  Okay.

20          THE COURT:  So I mean, we're going to figure out a way

21    to delay that or to accelerate theirs.

22          MR. GOLDBLATT:  Right.  Because we were operating

23    under the assumption that we'd have some period of weeks, after

24    we saw their report, to do ours.

25          THE COURT:  Yeah.

1          MR. GOLDBLATT:  And so -- not their report --

2          THE COURT:  Well, not of their report.

3          MR. GOLDBLATT:  -- but after the fundamental inputs

4    into their conclusion.

5          (Participants confer.)

6          THE COURT:  All right.  Notwithstanding the

7    stipulation of the parties, I am going to give Comcast 10

8    calendar days from the date on which they receive the expert

9    report to file their expert report; so that the proponents of

10   the plan may make their expert disclosures prior to September

11   21, if you want to try and get the report from Comcast earlier,

12   or you may make it on September 21, and then you're going to

13   not get their report until 10 days later.  Ten days counts

14   weekends.  But I'm going to give you a full 10 days.  I do

15   think they're right about what that -- what the rule is and --

16   if their sole basis is reliance on experts.

17          I'm additionally going to order that, in discovery, if

18   they have information about the valuation that was done, not by

19   their experts, but their own internal valuation that led them

20   to conclude that was the right range, that data must be turned

21   over within three days of today.

22          So I think that is their basis, and that's what I

23   ordered.  But I'm going to give you a full 10 days.  I just --

24   I do understand that you made the stipulation believing it was

25   going to be in good faith.  I don't think they've acted in good

1    faith, and I'm going to just amend the stipulation, to try and

2    be fair about this.

3           MR. GOLDBLATT:  Okay.  Here's what -- that makes

4    sense, and I appreciate what Your Honor is trying to

5    accomplish, and I think that, fundamentally, that's fair.

6           My one concern is that our expert -- the Jewish

7    holidays fall right in the middle of this period, and you've

8    given them some flexibility about when they'll provide it.

9           THE COURT:  Right.

10          MR. GOLDBLATT:  I'll tell you, my expert is observant.

11   And if the 10 days include the heart of the holidays, that

12   could be problematic.  So we're happy to work with them --

13          THE COURT:  If the 10 days includes the heart of the

14   Jewish holidays, I will instruct the parties that I expect you

15   all to work about appropriate extensions on that.  I'm not

16   observant, but I'm respectful, so --

17          MR. BROWN:  Judge, I was going to say, on behalf of

18   the teams, we can certainly work with Comcast.  We know that a

19   number of folks involved in the case are observant and --

20          THE COURT:  Right.

21          MR. BROWN:  -- we can work with them.

22          THE COURT:  I'm not, but I'm going to insist that we

23   respect those religious beliefs.  And if that means 10 days is

24   impractical because of that, then -- I want them to have a real

25   period of time to prepare their expert report and --

1              MR. GOLDBLATT:  We appreciate that, Your Honor.

2              THE COURT:  So that -- I'm orally amending the

3      stipulation to do that, and would encourage you all to probably

4      get your expert report out early, so that we don't really have

5      a problem.  When is Rosh Hashanah and Yom Kippur?  I just don't

6      know.

7           (Participants confer.)

8              MR. GOLDBLATT:  Mr. Shapiro will address that, Your

9      Honor.

10             MR. SHAPIRO:  Rosh Hashanah is the night of the 24th,

11     Your Honor.

12             THE COURT:  Okay.

13             MR. BROWN:  Your Honor.

14             THE COURT:  Mr. Brown.

15             MR. BROWN:  Good morning, Your Honor.  Judson Brown

16     for the Astros.

17             Just looking at the schedule, the change in the

18     deadline for their expert disclosure is going to have a ripple

19     effect on some of the other deadlines.  And we'll work with

20     Comcast and Mr. Goldblatt --

21             THE COURT:  Okay.

22             MR. BROWN:  -- his team, and just work through those.

23             THE COURT:  That's fine.  I'm finding other days to

24     have over the week following the date we've set, so that we

25     aren't going to end up with one of these confirmation hearing

1   that runs over a couple of months.  If that means that the

2   expert reports will be sort of the last thing we do, instead of

3   the first thing we do, you all should take that into account,

4   in terms of creating some flexibility here, where perhaps we

5   don't even get to expert testimony until the second

6   confirmation day.

7          I'll just -- I'm prepared to be flexible with how we

8   deal with that, and I will give you all enough time to get this

9   done.  But this isn't going to be a confirmation hearing that

10  occurs in October, November, and December.  It's going to occur

11  starting October -- when did we say, 2nd or 4th?

12          MR. BROWN:  2nd, Your Honor.

13          THE COURT:  Whatever day we have.  And proceeding on

14  an orderly basis within -- I'll tell you right now what I've

15  got.  If we don't finish on the 2nd, we'll come back on the

16  6th.  And if we don't finish in the 6th, we'll come back on the

17  7th.  And if we don't finish on the 7th, then you all violated

18  my time limits, so ...

19      (Participants confer.)

20          THE COURT:  I don't think it's going to take longer

21  than that, but -- so that may give you all some flexibility on

22  how to schedule this.  I'm just telling you all that for your

23  all's own internal agreements.  And I'm prepared to allow the

24  case-in-chief to come in without the expert testimony, and then

25  to put on the two experts on the last day, of that's what makes

1    sense.  I'm not requiring that at all, but I want to give you

2    all some flexibility as you work through that.

3         MR. BROWN:  In other words, Your Honor, if the plan

4    proponents, for example, put on their case-in-chief, Comcast

5    put on their case-in-chief, we could then call experts after

6    both sides have done their cases-in-chief.

7         THE COURT:  If that works for the two -- for the

8    parties.  I'm not going to order it, but I'm --

9         MR. BROWN:  Yeah.

10        THE COURT:  -- trying to give you all flexibility, as

11   you talk, to tell you that I'll be flexible about how I hear

12   this.

13        MR. BROWN:  We appreciate that, Your Honor.

14        MR. BECKHAM:  Your Honor, one -- perhaps a

15   housekeeping issue.  But in order to, perhaps, speed up the

16   process, we would anticipate presenting direct testimony by

17   proffers and declarations, if that would be acceptable to the

18   Court.  And the same thing for Comcast.  I don't know if -- I

19   haven't discussed that with Mr. Goldblatt yet, to find out if

20   that would be satisfactory with him.

21        THE COURT:  I take -- I will do proffers and

22   affidavits only by agreement, and so I will not do that

23   inconsistent with the Federal Rules of Evidence, if I get an

24   objection to it.  So you all can work that out or not work it

25   out, I don't care.  But if they don't -- I will tell you, if,

1    for example, Comcast doesn't agree, I -- it's my view that a

2    proffer is the ultimate form of leading testimony, right?  So

3    I'm not going to allow it.  But if they agree, and the parties

4    want to do it that way, I'm quite happy to.  This isn't --

5             MR. GOLDBLATT:  Your Honor, this is the first we've

6    heard of it.  We'll consider it, but ...

7             THE COURT:  I'm going to leave that up to you all.

8             MR. BECKHAM:  Right.

9             THE COURT:  But I don't want you walking in, saying,

10   well, we were going to do that by proffer, I didn't know they

11   were going to object.

12            MR. BECKHAM:  Right.

13            THE COURT:  If they object, you ain't doing it

14   proffer.

15            MR. BECKHAM:  Okay.  All right.  We'll discuss it with

16   Comcast and see what we progress we can make.

17            THE COURT:  Okay.  So what I would like to do,

18   assuming this works for everybody, is go ahead and take up the

19   discovery dispute with AT&T and DirecTV now, and then adjourn

20   until, I'd suggest around 3:30, to give Mr. Flores time to fix

21   the orders and incorporate the language into the Disclosure

22   Statement, and then come back with the contemplation that we'll

23   sign orders on the Disclosure Statement this afternoon, before

24   we go home.  Is that a workable time frame to do that?

25            MR. BECKHAM:  I believe so, Your Honor.  We do have

1      the exclusivity motion that you may want to take up now.

2              THE COURT:  That's fine.

3              MR. BECKHAM:  I don't think that's going to take very

4      long.

5              THE COURT:  I mean, we can take that up now, if you

6      want to.

7              MR. BECKHAM:  Okay.

8              THE COURT:  But let's talk about, for a moment,

9      though, the Disclosure Statement and the solicitation order.

10     Any -- if no one has any problem with that, why don't we let a

11     sufficient number of people leave now, so that they can go and

12     work on that, and come back at 3:30.  Is that -- I assume,

13     Mr. Flores, you're the primary drafter, from the way things

14     have been being discussed.  Is that right?

15             MR. FLORES:  Your Honor, I don't want to take the

16     credit or the blame for a lot of this.  Me and Mr. Castillo can

17     take care of this, Your Honor, yes.

18             THE COURT:  And is -- I don't want to bring you back

19     here at 3:30, if you're not going to be ready.  Is that a

20     reasonable time, or do you need more like 4:30?  What do you

21     want?

22             MR. FLORES:  I think we can do 3:30.

23             THE COURT:  3:30?

24             MR. FLORES:  That's fine.

25             THE COURT:  Okay.  I'll see you all at 3:30.  Anyone

1    that needs to leave to consult with them is welcome to leave

2    now.  You all are welcome to stay for the other, more

3    miscellaneous matters.

4         (Participants confer.)

5         THE COURT:  All right.  Did you want to go to

6    exclusivity, or do you want to go to discovery?  I don't care.

7         MR. BECKHAM:  Let's go to discovery, Your Honor.

8         THE COURT:  All right.

9         MS. SESSIONS:  Good morning, Your Honor.

10         THE COURT:  Good morning.

11         MS. SESSIONS:  Dana Seshens for the Comcast entities.

12         Your Honor, we are here on the Comcast entities'

13    motion to compel additional discovery from AT&T and DirecTV,

14    who, as Your Honor undoubtedly has seen in the papers, are

15    withholding a series of internal communications that predate

16    the final deal terms that were reached by the parties for the

17    transactions that have given rise to the plan.  I think --

18         THE COURT:  Let me -- just to be sure that I'm

19    following the dispute.

20         MS. SESSIONS:  Sure.

21         THE COURT:  My understanding is that what they are

22    withholding are documents that were not communicated to the

23    plan proponents, correct?

24         MS. SESSIONS:  That is correct, Your Honor.

25         THE COURT:  Okay.

1          MS. SESSIONS:  Internal communications only.

2          THE COURT:  Okay.

3          MS. SESSIONS:  And so, as we understand, and I think

4     as their papers yesterday made clear, they are not asserting a

5     privilege over those communications, and they are not asserting

6     that the production of those communications would impose an

7     undue burden.

8          Rather, it is their view, as we understand it, that

9     internal communications, to Your Honor's point; communications

10    not shared with the teams or the Debtor, are somehow not

11    relevant to the issues for confirmation, insofar as they are

12    just deal terms that were non-final and discussed in and

13    amongst each of AT&T and DirecTV.

14         We, obviously, disagree with that position on

15    relevance and think, at the discoverability stage, there can be

16    little dispute that that information is likely to give rise to

17    the discovery of admissible evidence on issues such as

18    valuation, whether the plan, as proposed is fair and equitable,

19    and bad faith, as we've set forth in our papers.

20         I would note that the -- AT&T and DirecTV are really

21    percipient witnesses to how this transaction came to pass.  And

22    as a result of that, they are uniquely situated to have

23    knowledge and information about how certain provisions came to

24    be, what the motivation was in putting this plan together, what

25    this pricing mechanisms were that were considered, even if they

did not get into the final deal.

And so discussions in and amongst themselves, for example, about a telephone call that AT&T and DirecTV had with the teams, where AT&T, internally, is discussing the subject matter of the call, proposals they might make, but maybe ultimately decide not to make because of what they understand to be going on, in terms of plan structure and motivations, we think would bear on these issues.

Similarly, they have -- they are withholding a series of financial projections that we think go to valuation; insofar as those projections do not reflect the non -- the final deal terms.  And from our perspective, analyses and valuations that were undertaken to consider various structures, various pricing mechanisms, and other components of the plan that were considered, but ultimately perhaps not agreed upon, we think bear on the structure of this plan and how it came to pass.

It is not the case, as I understand it, that AT&T and DirecTV do not have these materials at the ready.  They have already reviewed them, as we understand things, to sort of sequester this to the side.  And so they are the only source of this information we're seeking.  It is not as though we can get at what AT&T and Direct, individually, was talking about or discussing or thinking about, in connection with the plan, from any other source.

And therefore, standing on this relevance objection,

1   at this point in time, we think is inappropriate because it

2   could give rise, and is likely, in our view, to give rise to

3   the discovery of admissible evidence.

4         THE COURT:  So let's talk about what you think might

5   give rise or might, itself, have relevance on the pricing

6   structure --

7         MS. SESSIONS:  Sure.

8         THE COURT:  -- or on some other specific -- I want to

9   get a little bit into some specifics, so I understand it

10  better.  So not anything that gets communicated to a plan

11  proponent.  They, internally, try and figure out what the right

12  pricing structure is.

13        MS. SESSIONS:  Yes.

14        THE COURT:  And they deal with different per capita

15  prices or different tier prices, and they come to a final set

16  that they think is a more accurate forecast.  How do those

17  affect a confirmation issue?

18        MS. SESSIONS:  Well, I think in at least two ways,

19  Your Honor.  And I think -- we have been looking at it from the

20  perspective that they may have all these analyses that they

21  have run through to get to a pricing structure.  And it may be

22  -- I don't know what their documents say --

23        THE COURT:  Right.

24        MS. SESSIONS:  -- but internally, they have

25  considered, well, maybe we pay more than X, and if we pay more

1    than X, this is what the deal looks like.  But perhaps the
2    teams want something else.  And so, in exchange for giving them
3    something else, let's say higher value on the rights
4    agreements, will reduce X.  And maybe that discussion --
5              THE COURT:  I know, but -- so the -- well, it's clear
6    the teams would have wanted as much as they could for their
7    rights agreements.
8              MS. SESSIONS:  Sure.
9              THE COURT:  I mean, I think we can -- anybody wants as
10   much as they can for what they own.  So the teams negotiate for
11   as much as they can get.  How does that then -- how would that
12   affect anything?
13             MS. SESSIONS:  Well --
14             THE COURT:  Because from the owner's point of view,
15   they're always going to want the highest possible price from
16   the consumer, and they're going to want to pay the lowest
17   possible price to the Astros, so -- or to the Rockets.
18             MS. SESSIONS:  Correct.
19             THE COURT:  So how would that -- how would their
20   internal documents then lead me to a confirmation question?
21             MS. SESSIONS:  Well, let's say, internally, they are
22   talking about, we want to propose we'll pay X for the network,
23   and they have a call with the teams.  And they come back, and
24   they're talking internally --
25             THE COURT:  Because -- let's use some numbers.  Let's

1     say that they were originally thinking of -- right now, they're

2     not paying really anything, in terms of to the equity owners.

3             MS. SESSIONS:  Agreed.

4             THE COURT:  So let's assume that they were originally

5     saying they'll pay -- and I'm just going to throw a number out

6     -- $25 million --

7             MS. SESSIONS:  Uh-huh.

8             THE COURT:  -- to the equity owners.  But the Astros

9     and the Rockets held out for as much as they could possibly

10    get, and Comcast -- I'm sorry -- and DirecTV and AT&T said,

11    look, if we're going to have to pay that much to the Astros and

12    the Rockets, we'll no longer be willing to pay $25 million to

13    the owners, we're going to now pay them each $1,000.

14           MS. SESSIONS:  Right.  And that may --

15           THE COURT:  So how does that leave anything that

16    affects confirmation?

17           MS. SESSIONS:  Well, I think we've got two arguments

18    on that, Your Honor.  The first is it could -- I don't know

19    what the documents would say, but it could give rise to

20    arguments that there is a problem -- a violation of the

21    absolute priority rule; insofar as, if the documents were to

22    support it, and the information were to support it, the

23    additional payments to the Astros and to the Rockets on account

24    of -- on their media rights, if a payment on account on old

25    equity, as opposed to -- and therefore, old equity is getting

1    paid before senior creditors --

2           THE COURT:  But at least the -- at least the

3    allegations that have been made -- and I don't think -- and I

4    assume you've seen these, that you now know the truth, so --

5    you may not yet, because I don't know what the status of

6    discovery is.  But the Astros and the Rockets are saying

7    they're getting paid less for their media rights agreements

8    than they were when they were in a deal with Comcast.  So that

9    would tend to not support your argument.  I mean, I --

10           MS. SESSIONS:  Well, and that -- but that is -- that

11   is exactly our point, Your Honor; that is their argument.  I

12   think we don't necessarily agree with that.  And so, in order

13   to test their assertions that this is somehow materially worse

14   for them, and that they are making these concessions, and not

15   somehow bargaining --

16           THE COURT:  Right.

17           MS. SESSIONS:  -- to get more for themselves, and to

18   take that away, value that otherwise could have been there for

19   the Debtor, let's say, that that somehow could give rise to a

20   violation of the absolute priority rule.

21           THE COURT:  Well, no.  But so long as they're getting

22   less for their media rights agreement -- and maybe that's a

23   fact in dispute.

24           MS. SESSIONS:  Well, that's what I'm saying, is I

25   think --

1           THE COURT:  But if they are getting less for their

2    media rights agreement, then I don't understand the argument.

3    If they're getting more for their media rights agreement, I

4    start to appreciate your argument.

5           MS. SESSIONS:  And that is what we want to explore

6    because I think we have said that -- as we put in our papers,

7    that their media rights could be above market, and in which

8    case, they're getting above-market media rights, and we --

9           THE COURT:  Have you not seen their media -- their new

10   media rights agreement yet?

11          MS. SESSIONS:  We have seen their new media rights

12   agreements, I believe, but we have not undertaken all --

13   completed all of the discovery --

14          THE COURT:  Okay.  But I mean --

15          MS. SESSIONS:  -- surrounding that.

16          THE COURT:  -- let's assume that you complete that,

17   and that it turns out that, under the -- that their

18   representations are accurate, and they're getting less for the

19   media rights than they have currently contracted for.  Then

20   what's the argument that there was a shift from equity to media

21   rights?

22          MS. SESSIONS:  The argument is slightly different,

23   Your Honor.

24          THE COURT:  Okay.

25          MS. SESSIONS:  It is that the media rights are above

1    market value; and, therefore, they are getting value on account

2    of their old equity interests, and that the shift is from

3    equity -- or value that would be available for senior claimants

4    that somehow is getting shifted to the equity holders through

5    the media rights.

6        We are not in agreement -- it should not surprise,

7    Your Honor -- that their media rights are necessarily -- they

8    are worse off, or that they are materially worse off, or that

9    they're not -- we think they're above market.  And so we want

10   to test all of that by looking at the negotiations that gave

11   rise to that.  And some of that derives from internal

12   communications.

13       It is not the case that these are somehow -- you know,

14   it's sort of like they're making a work product argument; that,

15   somehow, because you have behind-the-scenes communications that

16   don't give rise to the final product, you don't get to see the

17   process by which this deal came to pass.  It's like should --

18       THE COURT:  Well, no.  All they need is a relevance

19   argument.  I'm trying to -- and so that's why I keep asking

20   relevance questions.

21       MS. SESSIONS:  Well, and that's what --

22       THE COURT:  I'm trying to --

23       MS. SESSIONS:  And --

24       THE COURT:  -- understand your --

25       MS. SESSIONS:  That's entirely fair, Your Honor.  I

1    think there are analyses and discussions that could have taken

2    place internally that speak to the issues that we believe are

3    ripe for confirmation; valuation, for example.  It could be the

4    case -- I don't know -- that there are internal discounted cash

5    flow analyses, projections, things of that nature, that are

6    different, and that undermine either the disclosure that's come

7    forward in the Disclosure Statement, or would ultimately will

8    come to pass for valuation in the litigation.

9          And insofar as they have that work, and it's not

10   protected by a privilege and it's not unduly burdensome to

11   produce, we don't see a reason that we're not entitled to that,

12   to test what it is that they --

13         THE COURT:  And I will say that I'm pretty

14   sympathetic, in terms of operating revenue and operating

15   expense projections, which is different than the flow-through

16   of the deal points, because the operating revenue and operating

17   expenses are what's going to drive valuation.

18         But I also want to respect the fact that we shouldn't

19   just, wholesale, turn stuff over that isn't relevant.  And that

20   becomes especially true when we're dealing with direct

21   competitors of one another.  And I --

22         MS. SESSIONS:  I --

23         THE COURT:  I'm going to be sensitive to that point.

24         MS. SESSIONS:  To address that, Your Honor, if I may.

25         THE COURT:  Yeah.

1        MS. SESSIONS:  I think the notion that there is some

2  competitive angle here I think is completely belied by the fact

3  that we have a protective order here that has a highly

4  confidential designation, that is attorney -- outside counsel's

5  eyes only.

6        And so the -- I mean, we've been at this for ages,

7  where Direct and AT&T are trying to get Comcast's information.

8  I mean, it goes both ways here.  And I don't think -- while I

9  think we're all sympathetic to competitive concerns, my client

10  included, it is not the case that this is getting at that

11  information for the sake of sharing it with, for example,

12  businesspeople at Comcast.  This really goes to what we think

13  are confirmation issues.

14        The one we did not touch on is bad faith, which is

15  something that we are exploring in discovery.  And I think the

16  closest people to the subjective intent and motives behind this

17  plan, other than the plan proponents themselves, are the people

18  that negotiated all of the transactions that give rise to the -

19  - this plan.  And so, to block that whole process really

20  handicaps our ability to take discovery that could give rise to

21  these arguments.

22        Part of discovery is -- we don't know what their

23  internal communications are, obviously.  But on the three

24  arguments we laid out, we think that they are, at a minimum,

25  discoverable, we think they're relevant.  But the -- what we're

1   talking about now is:  Are they likely to give rise to evidence

2   --

3           THE COURT:  Right.

4           MS. SESSIONS:  -- that could support our arguments at

5   confirmation.

6           THE COURT:  Thank you.

7           MS. SESSIONS:  Thank you, Your Honor.

8           THE COURT:  Let me hear from Mr. Lopez or

9   Mr. Greendyke, or whoever wants to argue for their side.

10          MR. GREENDYKE:  Thank you, Judge.  Bill Greendyke on

11  behalf of AT&T Teleholdings.

12          Judge, it's sort of an impression.  The amount of

13  discovery that's been propounded against our client is pretty

14  stunning, and the amount of discovery that we've provided to

15  Comcast has been, I think, very large and very impressive.

16          At the time of the filing of our reply or our

17  objection to the motion to compel, approximately 16,000 pages

18  of documents were provided, and more were sent last night.  You

19  know, this is a preview, from a discovery standpoint.  We're

20  engaged in conversations with them about depositions.

21          And I'm telling you, unless we can make an agreement,

22  I think we're going to push back hard on that because the scope

23  of the discovery that's sought against the buyers is, I think,

24  extensive, compared to the discovery that's sought against the

25  plan proponents or the Debtor.  And that really highlights a

1       distinction that is very important to our arguments to the

2       Court.

3               You know, to the extent that the stated issues are

4       valuation of the Comcast claim, the fair and equitable rule,

5       and whether or not that works; the absolute priority rule; or

6       the plan proponents' good faith under 1129(a)(3), the only one

7       that really has any relevance to what's going on and what we're

8       doing is valuation, and we have no valuation documents, as far

9       as I understand.

10              We have provided everything that relates to the deal,

11      as we said in our pleadings, and gave you a list of the

12      documents and transactions that are part of the plan that's

13      being proposed, that we have been involved in as buyers; all

14      that has been provided.

15              THE COURT:  Well, let's take her argument that you all

16      may have decided that you were intentionally paying above-

17      market rates, instead of paying market-rates, and that that is

18      a shifting to some equity owners, to the disadvantage to

19      holders of unsecured claims.  That's essentially, her --

20              MR. GREENDYKE:  Well, I mean --

21              THE COURT:  -- one of her arguments.

22              MR. GREENDYKE:  Let -- I mean, that's a very specific

23      argument.  I think, to the extent it relates to the deal and

24      those documents exist, they've been provided.  he documents

25      that we asked to withheld -- asked to withhold on the basis of

1    relevance are things that are things that are not part of the

2    deal --

3              THE COURT:  Right.  But let's assume --

4              MR. GREENDYKE:  -- never were part of the deal.

5              THE COURT:  -- that you all have an internal -- and I

6    don't know what -- obviously, I haven't seen your internal

7    documents.  So let's assume that the market rate -- and we'll

8    use some outlandish number because I know everybody has always

9    sealed what these market rates are.

10             So we'll assume that the market rate for a household

11   is 10 bucks.  Okay?  And that, under the pricing deal that you

12   all cut with the Astros and Comcast, you're paying 12; and

13   that, if you were only paying 10, that would have paid

14   something to the entity to get the deal, but that you're not

15   paying anything to the entity because you're paying 12, your

16   internal documents could reflect that.  I don't know that they

17   do.  What do I do with that argument by her?  Because that's

18   her argument.

19             MR. GREENDYKE:  I mean, I think it's irrelevant.  I

20   think what we decided not to do is irrelevant.  To the extent

21   that there were documents or there was trading between the

22   teams and/or the Debtor and AT&T, or DirecTV for that matter, I

23   think those have all been disclosed.

24             All that you're -- all that you're talking about is

25   sort of like the thoughts, if you will, of a whiz kid at AT&T,

1    who's thinking about -- you know, not to use your example, but

2    to use even more, you know -- to use such example.  Let's say

3    somebody had an idea of combining this network with the Rockets

4    and with the Astros with the San Antonio Spurs or with the Los

5    Angeles Dodgers, or something like that.  That's not the deal,

6    that's not what's happening.  What difference does it make?  A

7    better question, though, is --

8              THE COURT:  But take my --

9              MR. GREENDYKE:  The better --

10             THE COURT:  Let's assume that my example is in your

11   internal documents, that --

12             MR. GREENDYKE:  The better question, using your

13   example, Judge, is:  What difference does what happens in the

14   mind of somebody deep inside the structure of AT&T have to do

15   with the attitude of the plan proponents?  Because if we're

16   talking about fair and equitable, none of this has anything to

17   do with fair and equitable.

18             If we're talking about the absolute priority rule,

19   that's a legal decision you're going to have to make about what

20   they're doing with their equity and whether or not the

21   mechanics of the plan have an impact on it or qualify for that.

22             We're talking about the plan proponents' good faith.

23   It doesn't matter what AT&T thought about good faith; it's the

24   plan proponents' good faith that the Court needs to examine.

25             THE COURT:  So you're not going to be looking for a

1    finding that AT&T and DirecTV acted in good faith?

2              MR. GREENDYKE:  That's not what's been argued to.

3              THE COURT:  Yeah.  Yeah, she --

4              MR. GREENDYKE:  That's not what's been argued to.

5              THE COURT:  She just argued it.

6              MR. GREENDYKE:  Sure.  Sure, we want to be in good

7    faith.  Sure we want to be --

8              THE COURT:  Well ...

9              MR. GREENDYKE:  -- you know, take free and clear of

10   claims if we buy something under a plan.

11             THE COURT:  Right.

12             MR. GREENDYKE:  But the argument that's been made to

13   you is the proponents lack good faith, or good faith with

14   regard to the proposal of the plan.  That's not us.  It can't

15   be use.  And that's the mechanics that we really have a problem

16   with, Judge.

17             THE COURT:  How many documents are there --

18             MR. GREENDYKE:  I think --

19             THE COURT:  -- that you're withholding?

20             MR. GREENDYKE:  I think approximately a thousand have

21   been withheld.

22             THE COURT:  A thousand pages or a thousand documents?

23             MR. GREENDYKE:  I think a thousand pages, Your Honor.

24             THE COURT:  But you all, or by you all and DirecTV

25   together?

1            MR. GREENDYKE:  I don't know about DirecTV.  You'd

2       have to ask their counsel.

3            THE COURT:  Okay.

4            MR. GREENDYKE:  I actually asked that question of my

5       litigation team this morning.  They told me it was

6       approximately a thousand.  And most of those, if not all of

7       them, involve terms that are not part of the deal.

8            THE COURT:  Okay.  Look, I mean, I've -- I think your

9       example of should this network be combined with San Antonio,

10      that's so farfetched, it stretches any credibility.

11           If there was a shift from your client's willingness to

12      pay for the entity, versus your client is willing to pay rights

13      fees, that seems to be something that could lead to

14      discoverable evidence.

15           MR. GREENDYKE:  But you would see that shift in the

16      documents that were not privileged, that were produced in

17      connection with discussions with the teams, discussions with

18      the Debtor or discussions with DirecTV.

19           THE COURT:  You could.  You could, but there may be a

20      shift, and there's no explanation for the reason for it.  So I

21      don't know what's in your internal documents.  Is there a

22      reason why they shouldn't be submitted in camera for me to take

23      a look at, and the ones that I think might have relevance,

24      we'll order disclosed or redacted?

25           MR. GREENDYKE:  I mean, we will do what the Court

1        orders, Judge.

2                THE COURT:  Well, I mean --

3                MR. GREENDYKE:  Our argument was that we didn't think

4        they were relevant because they didn't relate to the deal, and

5        the Court should adjudicate the appropriateness of the deal, as

6        opposed to something that's not the deal.

7                THE COURT:  Well, I think there are two different

8        levels.  On one, I absolutely should adjudicate the deal and

9        not what's not the deal.  I don't see how anybody could argue

10       that.

11               MR. GREENDYKE:  Correct.

12               THE COURT:  But if what I'm going to be looking at is

13       whether there is something artificial in the deal, I can't tell

14       if there's something artificial in the deal without knowing,

15       perhaps, what internal alternatives were considered by your

16       client.  And that's why I think they may have some relevance

17       there.  Although, by and large, I would think most of it is not

18       going to be relevant.

19               And I'm just -- I'm trying to find out whether it's a

20       big imposition for me to look -- take a look at them.  And the

21       thousand pages isn't a big imposition on me, and I don't know

22       if it's a big imposition on you all.  My experience is, if it's

23       a thousand pages, there's only 200 original emails, and then I

24       get to look at them each five times.

25               MR. GREENDYKE:  That's probably a correct calculation.

1          THE COURT:  You know, so it's not that much.

2          I'm a bit inclined to do that.  I want to hear what

3    arguments you have against that, and I want to hear what

4    Mr. Lopez has against that.  Because I think that some of it

5    might lead to relevant questions.  I don't know that at all,

6    obviously.  And I bet most of it doesn't.  But let me hear from

7    Mr. Lopez.

8          MR. LOPEZ:  Your Honor, for the record, Chris Lopez on

9    behalf of DirecTV, LLC, and Direct Sports Network, LLC.

10         Your Honor, you've read our papers and obviously heard

11   the argument of counsel, so I won't repeat what's in our

12   papers.  I just want to highlight a few points, and address

13   certain points made by Your Honor.

14         First of all, something that is not highlighted in our

15   papers is that, in response to the raw document requests that

16   we were served with, we have produced to date over 10,000 pages

17   of nonresponsive -- excuse me -- of responsive, non-privileged

18   information that directly go to the heart of the issues that

19   will be before the Court.

20         I'd like to stress to Your Honor, as Your Honor knows,

21   that there is one plan that this Court is considering at this

22   time.  And assuming the Court approves the Disclosure Statement

23   and the solicitation procedures, there will be one plan and one

24   transaction for this Court to consider.  And it is the burden

25   of the Debtor and the plan proponents to satisfy the 1129

1    standards.

2            I think it's important to note that DirecTV is a

3    proposed buyer in this transaction.  And so I think -- where I

4    think the motion gets a little off, and where Comcast I think

5    gets a little confused is that they're hoping and expecting to

6    see documents that perhaps a plan proponent might consider

7    relevant; for example, a valuation of the Comcast affiliation

8    agreement or the value of Comcast's secured claim under Section

9    506, that a proposed buyer like DirecTV, who's been -- who's

10   hoping to buy assets free and clear of all liens, claims, and

11   encumbrances, may not consider these things.

12           And so Your Honor, when we were asked in meet-and-

13   confers about whether there were any valuation materials

14   regarding the Comcast secured claim, we explained to them that,

15   to our knowledge, we didn't have any, but to the extent that

16   there were, we would produce them.  And to my knowledge, Your

17   Honor, there are none.

18           We were asked if there would be comparable company

19   analysis and traditional valuation about the Comcast -- about

20   the reorganization that's subject to this plan, and we told

21   them we didn't have any, Your Honor.  And so we were a bit

22   confused when we saw at least assumptions made in the motion

23   that there may be some types of documents like this.

24           THE COURT:  Well, but what --

25           MR. LOPEZ:  So --

1          THE COURT:  And let me tell you something I'm

2    assuming, and I'm -- my assumption may be wrong, too -- is that

3    your client and AT&T -- if I've got these right.  You're

4    Direct, right?

5          MR. LOPEZ:  Yes, that's correct, Your Honor.

6          THE COURT:  That your client and AT&T aren't doing

7    this without internal forecasts of revenues and expenses.  One

8    of the issues that I'm going to have to address at confirmation

9    is:  How do I value the Comcast carriage agreement?  Should I

10   value it as of the order for relief or as of the petition date;

11   and if so, should I value it based on the fact that they are

12   the only large carrier, and that I've got expensive Astros and

13   Rockets rights agreements, which will tremendously minimize the

14   value of their carriage agreement, and make it, perhaps, zero?

15         Their argument is going to be, if I understand it,

16   that I should look at it on a go-forward basis, and say that

17   the value of their carriage agreement is the value that it's

18   going to have to you all, once you get that carriage agreement;

19   and, therefore, I need to look at your revenue and expense

20   projections.

21         The result of that is to let them make their argument,

22   whether I accept it or reject it.  I don't know if you ever

23   shared your forecast even with the plan proponents.  You may

24   not have.  But wouldn't your forecast be relevant to their

25   argument that that's the way the pricing ought to go?

1          MR. LOPEZ:  Your Honor, as it relates to the deal that

2     is before the Court --

3          THE COURT:  Right.

4          MR. LOPEZ:  -- the deal that is subject to the plan,

5     they will have all that information, Your Honor.  Anything

6     related to the deal, internal or external communications with

7     AT&T, the plan proponents --

8          THE COURT:  Sure.

9          MR. LOPEZ:  -- and the teams, they will have, Your

10    Honor.

11         THE COURT:  Yeah.

12         MR. LOPEZ:  So they will have communications, they

13    will have our internal thoughts, as it relates to the deal.

14    They have gotten drafts of the termsheet -- the termsheets, and

15    drafts of the termsheet, as it relates to this -- to this

16    particular deal.

17         Your Honor, what we're withholding are simply

18    DirecTV's internal thoughts about how they thought about

19    potential scenarios that are not reflected in the deal.  And I

20    appreciate that Your Honor -- I mean, although there's a

21    protective order, I -- you know, I certainly want to --

22    certainly there is some sensitivity to --

23         THE COURT:  Sure.

24         MR. LOPEZ:  -- providing the --

25         THE COURT:  But I'm not --

1          MR. LOPEZ:  -- competitor --

2          THE COURT:  See, I'm not worried about the parts of

3    the prior forecasts that are, if you will, below the operating

4    income line.  That's what the -- and I'm imagining what these

5    spreadsheets look like.  See, the part that's below the

6    operating income line is going to deal with changes in the

7    deal.  The part that's above the operating income line, if you

8    were forecasting, you know, $8 million of revenue in a month,

9    and suddenly, it changed to $4 million of revenue in a month, I

10   think they ought to have the right to know, well, what happened

11   to those forecasts on an operating basis.

12         Now I don't -- you know what my guess is?  Those

13   didn't change much, as the deals changed.  And so it's going to

14   become, we're sort of fighting over a tempest in a teapot.  But

15   it's pretty easy to just redact the bottom part of that

16   spreadsheet and show them the non-deal portions of it.

17         MR. LOPEZ:  Your Honor, you know, I do want to stress

18   they've gotten -- the information that they've at least

19   stressed in their papers, and in connection with the meet-and-

20   confers --

21         THE COURT:  Right.

22         MR. LOPEZ:  -- has to do with this particular plan,

23   Your Honor.  And so it's -- you know, I agree that, you know,

24   it -- if we looked at all potential scenarios in which the

25   Debtor could have proposed a plan of reorganization -- but Your

1    Honor, that's not before the Court.  There's one particular

2    plan --

3              THE COURT:  Right.

4              MR. LOPEZ:  -- and one particular transaction.  And

5    what they're trying to get at is the good faith of the Debtor,

6    valuation of the Debtor, and the absolute priority rule to see

7    whether, you know, the plan would satisfy the absolute priority

8    rule.

9              And as it relates to the particular deal before the

10   plan, Your Honor, we're telling you we're giving the internal

11   and external communications, and with respect to this deal,

12   Your Honor.  And so, you know, at some point, I guess from what

13   I'm hearing, it almost seems like that, you know, there's a

14   mini fishing expedition going on, Your Honor.

15             And you know, Rule 7026, you know, there are limits to

16   it, Your Honor.  And I guess anything can go under a good will

17   bucket, a good faith bucket --

18             THE COURT:  Yeah.

19             MR. LOPEZ:  -- if we allowed it, Your Honor.  So you

20   know, I think, once they see what they actually have, Your

21   Honor --

22             THE COURT:  Yeah.

23             MR. LOPEZ:  -- I think -- you know, you look at the

24   financial projections that are reflected in the Disclosure

25   Statement.  There will be discovery, there will be documents

1    that they can look at.  They'll have all kinds of

2    communications between AT&T and DirecTV, DirecTV and the teams,

3    DirecTV and the Debtor.  They have asked for depositions of

4    certain people, and they can ask them questions on those

5    documents, Your Honor.

6        But asking to see documents about what DirecTV thought

7    about a deal that never, ever made it to a table, and something

8    that will never be before the Court, Your Honor, I think it

9    starts to get into the realm of the fishing expedition.  And

10   we're asking, what is the relevance of these documents, Your

11   Honor.  And we don't believe that we've heard a sufficient

12   answer.  Now we'll do what the Court has asked --

13       THE COURT:  I know; I know you will.  About how many

14   pages are your documents?  Mr. Greendyke thought they had about

15   a thousand pages.

16       MR. LOPEZ:  I am unaware of the actual pages of

17   documents.

18       THE COURT:  He's about to --

19       MR. LOPEZ:  My understanding is that --

20       THE COURT:  He's about to change his thousand, too.

21       MR. LOPEZ:  I looked at it -- we looked at it in terms

22   of number of documents.

23       THE COURT:  About how many documents do you --

24       MR. LOPEZ:  My understanding is that there are several

25   hundred.

1            MR. GREENDYKE:  I'm going to take the opportunity to

2      mention mine, and to correct a mistake that I made on the

3      record.

4            THE COURT:  Okay.

5            MR. GREENDYKE:  It's not a thousand pages; it's a

6      thousand documents that have been withheld.

7            THE COURT:  Okay.

8            MR. GREENDYKE:  And I apologize to the Court and the

9      parties.

10           THE COURT:  No, that's okay.

11           MR. LOPEZ:  I'm sorry.

12           THE COURT:  Okay.

13           MR. LOPEZ:  My understanding is that there are between

14     two to 300.

15           THE COURT:  Documents?

16           MR. LOPEZ:  Documents.

17           THE COURT:  Okay.  All right.  I can't make the

18     decision -- I'm sorry.  Mr. Basta, go ahead.

19           MR. BASTA:  Your Honor, Paul Basta for the Astros.

20           I only wanted to get up on the relevance objection,

21     and to your example about the 12 versus 10 example that you

22     gave.

23           THE COURT:  Right.

24           MR. BASTA:  And Ms. Seshens' argument is the relevance

25     that this has to an absolute priority argument.  And the only

1    point I wanted to make, Your Honor, is I think it just

2    conflates 365 and 1129, in the sense that the -- there are

3    existing media rights in place.

4              THE COURT:  Right.

5              MR. BASTA:  And nobody is proposing to fund the

6    assumption of those, right?

7              THE COURT:  Correct.

8              MR. BASTA:  So no one is proposing to fund the cure

9    costs, and nobody is proposing to live on those terms going

10   forward.

11             THE COURT:  Right.

12             MR. BASTA:  And so with those agreements essentially

13   being forced to be rejected, there are new agreements that are

14   being entered into.

15             Now if your court -- if the Court looked at those new

16   agreements, which are on file, I believe, and are -- they have,

17   and said to them, well, that's like -- you know, that's a

18   masquerading assumption because what you did was reject them,

19   but then enter into better agreements, then I could see you're

20   saying what you did was you kind of end-run 365 to deprive

21   equity of some recovery.

22             But if you looked at those agreements and you said,

23   nobody is funding the cure costs, the escalators are -- won't

24   work, you know, the terms are worse --

25             THE COURT:  Yeah.

1          MR. BASTA:  -- then I don't know why you need to go --

2     I don't know why it goes into relevance because that's just

3     sort of an objective analysis.

4          THE COURT:  Well, and that's -- I walked out believing

5     that, I will tell you that.

6          MR. BASTA:  Yeah.

7          THE COURT:  Ms. Seshens' argument is slightly

8     different than your argument, and so I'm sympathetic to your

9     argument, because I sort of started it.  But her argument is,

10    that's fine, toss the old agreements.

11         MR. BASTA:  Uh-huh.

12         THE COURT:  If the new agreements are, nevertheless,

13    above market --

14         MR. BASTA:  Uh-huh.

15         THE COURT:  -- why would DirecTV and AT&T be willing

16    to pay your client above market, unless they were getting a

17    bargain from the Debtor; and, therefore, there's an indirect

18    violation of the absolute priority rule because they're paying

19    above market?

20         MR. BASTA:  They're paying above market for -- if I

21    can ask the Court.

22         THE COURT:  Yeah.

23         MR. BASTA:  What would they be paying above market

24    for; is it for an asset of the Debtor, Your Honor?

25         THE COURT:  No.  No.

1          MR. BASTA:  Okay.  So the Debtor's --

2          THE COURT:  But it's -- but if --

3          MR. BASTA:  -- option, Your Honor, is to -- is to see

4     if it could preserve its assets.

5          THE COURT:  But the Debtor needs to sell the Debtor

6     for as much as the Debtor can get --

7          MR. BASTA:  The Debtor needs to sell --

8          THE COURT:  -- for the Debtor.

9          MR. BASTA:  -- the Debtor for as much as it can.

10          THE COURT:  Right.

11          MR. BASTA:  And if the Debtor -- and if the Debtor can

12     assume the agreements, then the media rights agreements would

13     belong to the Debtor, and the Debtor can then monetize them.

14     Okay?

15          Whether or not there -- whether or not there is a deal

16     to assume those -- the existing agreements, which is what would

17     preserve the most value for the Debtor, is an objective fact

18     because the teams can -- and I can tell the Court, and it's not

19     rocket science, that $150 million of admins and the full amount

20     of past-due fees would -- the teams would prefer that they be -

21     - that those be in the teams' pockets.  Okay?

22          So like it seems it's a little bit like a conspiracy

23     theory that this was structured to deprive the network of

24     value, in exchange to the value flowing for the -- to the

25     teams.  But if there's nothing, either in the course of the

1      case or in the agreements, that shows that the teams are doing

2      better than what they would have under their existing

3      contractual rights, I believe, Your Honor, all it is, is a

4      conspiracy theory.

5           THE COURT:  I really do understand the argument, but I

6      think I understand theirs, as well.  And in large part, you

7      know, what gets negotiated between two parties is going to be

8      treated as market.

9           MR. BASTA:  Uh-huh.

10          THE COURT:  But there could be some smoking gun in

11     there.  And you know, what else am I supposed to do at night?

12     So ...

13        (Laughter.)

14          THE COURT:  Let me see.  I've got somebody on the

15     phone that wanted to talk.  Yes, from 546?  Who do we have?

16     713-546?

17          MS. FUNK:  Yes.  Your Honor, this is Brenda Funk with

18     Weil Gotshal. I was simply on the phone in case Mr. Lopez

19     needed to ask any questions about these documents, but I have

20     nothing further to add, Your Honor.  Thank you.

21          THE COURT:  Okay.  Thank you.  Sorry I didn't call on

22     you earlier.

23          Mr. Lopez, do you want to talk to her?

24          MR. LOPEZ:  No, Your Honor.  It's simply the point

25     that -- I just want to point out, they've gotten the financial

1    projections, and they can ask questions about the financial

2    projections as it -- so the questions about whether there are -

3    - whether they're overpaying for media rights or dealing with

4    valuation in connection with the media rights agreement, all

5    that will be in the projections.  They've gotten that, and

6    they've gotten discussions between DirecTV and any third party

7    in connection with these issues.

8         So I'm not sure how any internal thoughts that DirecTV

9    could have amongst itself, that it never shared with anyone

10   else, has any bearing on whether -- has anything to do with

11   valuation, the current valuation of the -- of the existing

12   media rights agreement.  I think Your Honor will have enough

13   information in connection with the projections to make that --

14   to make that adequate assessment, Your Honor.

15        I just don't understand how internal thoughts that

16   were never shared with anyone else, about a deal that's never

17   on the table, is going to reveal that kind of information in

18   connection with this deal and the valuation of the existing

19   media rights agreement.

20        THE COURT:  Well, I don't think it will go towards --

21   if it wasn't shared, it's not going to go towards the

22   proponents' good faith.  It may go towards the purchaser's good

23   faith finding that you're going to want, and it may go towards

24   valuation.  I'm not sure.  I will say that I -- I think you're

25   hearing -- I hope you're hearing me.

1          MR. LOPEZ:  I am, Your Honor.

2          THE COURT:  Because there may be some relevance here,

3     but I have a relatively high level of what it's going to

4     require to be relevance.

5          MR. BASTA:  Okay, Your Honor.

6          THE COURT:  I'm not just turning everything over.

7          And so let me go ahead and -- Ms. Seshens, unless you

8     object, I'm going to have them deliver hard copies of the

9     documents to chambers, and I'm going to go through them, and

10    I'll reach a determination as to what you get.

11         MS. SESSIONS:  Your Honor, Dana Seshens for the

12    Comcast entities.

13         We do not have an objection.  I will just note,

14    perhaps for Your Honor's own self-preservation, that, in this

15    day and age, a thousand documents, 1,400 documents is something

16    that is not a burdensome amount for them to produce.  I

17    appreciate Your Honor wants to review them.

18         But in the scheme of what has been produced -- and I

19    will note that AT&T and DirecTV have a deadline of production

20    of last Saturday, and they're continuing to produce.  So we are

21    now in a place where --

22         THE COURT:  Okay.

23         MS. SESSIONS:  -- depositions are scheduled to start

24    next week.  They are continuing to produce past their deadline.

25    And so, in the interest of efficiency, if there are ways we can

1    facilitate this, we can do it.

2              THE COURT:  No.

3              MS. SESSIONS:  But it's --

4              THE COURT:  And the only thing I would request is that

5    they -- I get hard copies, rather than a disk.  I just think

6    it's going to be so much easier for me to make notes on the

7    hard copies, and then issue an order that says -- I assume

8    everything will be Bates-stamped; probably already is Bates-

9    stamped, and I can just deal with the Bates-stamp numbers.

10             In the interest of time, I would ask -- because I know

11   you want these quickly -- that on documents -- and I'll ask

12   both parties how extensive you're going to ask for reasons why

13   I am ordering something not turned over or turned over, and see

14   what you want.  If you want reasons, it's probably going to

15   delay things.  If you just want to me to say, the following are

16   turned over, without reasons, I can do it faster and --

17             MS. SESSIONS:  I -- Your Honor, on behalf of the

18   Comcast entities, we will accept your determinations, and we do

19   not need explanation for those determinations.

20             THE COURT:  Mr. Greendyke, what do you all want on

21   that?

22             MR. GREENDYKE:  Thank you, Judge.  I'm going to let my

23   litigation partner chime in, if she disagrees with me.  But I

24   think our objection is relevance.  If the Court thinks they're

25   relevant, we'll abide by the Court's ruling.

1          THE COURT:  And I don't need to explain to you why I
2     think this particular document --
3          MR. GREENDYKE:  Well, I think we've talked about all
4     the reasons --
5          THE COURT:  Well, I mean, I've dealt with --
6          MR. GREENDYKE:  -- the relevance --
7          THE COURT:  -- some hypotheticals.  I don't know what
8     I'm going to see.
9          MR. GREENDYKE:  The only thing that was new was the
10    Court's, you know, I guess, suggestion that we would want a
11    good faith finding as a buyer --
12         THE COURT:  Right.
13         MR. GREENDYKE:  -- afterwards, which wasn't in the
14    argument, wasn't in the objections, so --
15         THE COURT:  Yeah.  But I assume --
16         MR. GREENDYKE:  -- I mean, obviously --
17         THE COURT:  -- you're going to want that.
18         MR. GREENDYKE:  -- that's part of -- that's part of
19    the -- sure, we do.
20         THE COURT:  Yeah, so ...
21         MR. GREENDYKE:  Sure, we do.
22         THE COURT:  Okay.  Well, then Mr. Castillo, are you --
23    I'm sorry, Mr. Lopez, are you on the same --
24         MR. LOPEZ:  Yeah.  Just simply to say we will abide
25    it.

1          THE COURT:  That's fine.  Then I'm not going to -- I

2     think it actually puts me too much in the litigation to say,

3     well, here's why I think this one is relevant, and kind of

4     gives people arguments.  So I would -- I would rather just do

5     that.  I'm simply going to give you all Bates numbers.

6          And then, on ones that need to be redacted, taking the

7     spreadsheet example, you know, I may say, produce the

8     spreadsheet, but only through the net operating income line,

9     and then allow you to redact the balance of it.  I think it's

10    extremely unlikely that I will give you their conclusion as to

11    the bottom-line results of different structures, as opposed to

12    their forecasts of operating revenues.

13         MS. SESSIONS:  Your Honor, that is fine.  The one

14    thing I would just note is it's almost impossible to redact

15    spreadsheets because they're done in native form.  And so it's

16    very rare, as Your Honor probably knows, to redact for

17    relevance anyhow.  So it may be that those just become highly

18    confidential.  Otherwise, they become like five-hundred-page

19    documents that are incomprehensible.  So I just wanted Your

20    Honor to bear that in mind, if you were thinking redactions on

21    relevance.

22         THE COURT:  I'm thinking I'm going to give them the

23    right to redact, and they may give you hard copies instead of

24    native format copies.

25         MS. SESSIONS:  Okay.

1          THE COURT:  And then, if you want to take discovery

2     about having some guy sitting there looking at it in the native

3     format, I ...

4          (Laughter.)

5          THE COURT:  You know, getting from a top line on down

6     to a net operating income line, you know, I bet we can do the

7     addition and subtraction in our heads, and figure out whether

8     it used A3 plus A4 to get to A5, so ...

9          MS. SESSIONS:  That's fine, Your Honor.

10          THE COURT:  But you know, I'll leave that up to them.

11     I'm going to let them, if I order it redacted, decide that.

12          So Monday, by noon, can I get those delivered?

13          MR. LOPEZ:  Yes, Your Honor.

14          MR. GREENDYKE:  Yes, Your Honor.

15          THE COURT:  Does that work?  Okay.  Monday, by noon,

16     I'll require the notebooks in Bates-numbered ordered, to be

17     submitted with the documents, in hard copies.  Thank you.

18          And then let's go to exclusivity.

19          MR. BECKHAM:  Thank you, Your Honor.  Charles Beckham

20     on behalf of Debtor.

21          The -- I believe this is, hopefully, just a

22     housekeeping matter, Your Honor.  I don't believe that there

23     are any objections.  This comes to light in conjunction with

24     the motion -- the first motion for extension of exclusivity,

25     which we filed, and the Court entered the extended exclusivity

1        through early July.  Then we filed a subsequent motion and had

2        a hearing on July 2nd, I believe, and which the Court extended

3        exclusivity until September -- until August the 7th, but did

4        not rule specifically with respect to the extension of the

5        sixty-day period.

6              The -- and we've only filed this motion out of an

7        abundance of caution because there is differing case law

8        relative to whether or not the extension of the exclusive time

9        to file a plan automatically extends to 60 days.

10             You had previously entered an order extending the

11       solicitation period through September 3rd, which is today.  If

12       we went with a line of case law called -- under -- called

13       Ravina (phonetic), that is a -- any extension of the time to

14       file a plan automatically extends the 60 days, or some other

15       authority that says the Court needs to also extend the

16       additional 60 days for solicitation, we are simply asking for

17       an extension of the sixty-day period for solicitation of votes

18       through October the 6th.

19             THE COURT:  Do you have any problem?

20             MR. GOLDBLATT:  No, we don't, Your Honor.

21             THE COURT:  Thank you.

22             Does anybody else have a problem?

23        (No verbal response.)

24             MR. BECKHAM:  Thank you, Your Honor.

25             THE COURT:  Thank you.

1          MR. BECKHAM:  There should be a form of order.

2          THE COURT:  There is.  Okay.  I've signed that order.

3          MR. BECKHAM:  Thank you, Your Honor.

4          I believe that is all that I am aware the Debtor has.

5          THE COURT:  Okay.

6          MR. BECKHAM:  But we will plan on returning at --

7          THE COURT:  I'll see you all at 3:30, and I'm hoping

8   to have the final draft of the Disclosure Statement, a revised

9   plan that incorporates the provisions that were in the handout,

10  and a revised solicitation order that deletes the controversial

11  provisions because they are now incorporated into the

12  procedures set forth in the Disclosure Statement.  And that's

13  at least what I'm anticipating.  Is that what everybody else is

14  thinking we're going to get?

15      (No verbal response.)

16          THE COURT:  Okay.  And then go ahead and fill into

17  your order all the confirmation dates and the voting deadlines

18  and everything like that.

19          MR. BECKHAM:  We will do so, Your Honor.

20          THE COURT:  Okay.  Thank you.

21          MR. BECKHAM:  Thank you.

22      (Recess taken from 11:35 a.m. 3:30 p.m.)

23          THE COURT:  Please be seated.  Okay.  We're going to

24  go back on the Record on the Houston Regional Sports Network

25  case.

1          Mr. Beckham?

2          MR. BECKHAM:  Good afternoon, Your Honor, Charles

3    Beckham on behalf of the Debtor.  We are -- since we left you,

4    we've been working on language and -- my team has just arrived,

5    and I think the order, we sent a draft of the order over to the

6    Comcast side earlier this afternoon.

7          We've been waiting on a red line and revisions to the

8    Disclosure Statement, and I believe we've accepted all of the

9    Comcast comments to the Disclosure Statement.  There's not

10   going to be any controversy with respect to that.

11         The thing that we have been waiting for is review and

12   approval of language in the Court's insert.  And while the

13   Debtor and the teams are satisfied with that, as we talked

14   about earlier, AT&T and DirecTV were attempting to -- were

15   reviewing it, we were waiting to hear from them.  In fact, when

16   I left the office, they were on a conference call.  So I may

17   need to consult with the team's counsel.

18         THE COURT:  Well, I'm not sure that I need that answer

19   because if -- I just want you to put -- you can put one of

20   three statements in.  They've decided this way, they've decided

21   that way, or they haven't decided.  I don't care.

22         MR. BECKHAM:  Okay.

23         THE COURT:  You've got put one in by the time you

24   circulate it.

25         MR. BECKHAM:  All right.  We can certainly do that.

1    Yeah, we have proposed language.

2              THE COURT:  Okay.

3              MR. BECKHAM:  But Comcast has not had an opportunity

4    to review it yet with respect to that one point.

5              THE COURT:  Right.  Well, let's show it to them.

6              MR. CASTILLO:  Okay.  It is in transit, Your Honor.

7              THE COURT:  Well, you mean we don't have the language.

8              MR. CASTILLO:  It exists, and it is on its way here.

9              THE COURT:  By an electronic method or by a person?

10             MR. CASTILLO:  Both.  It's hard copies and electronic

11   copy.  My colleagues are -- had it with them and will be here

12   shortly.

13             THE COURT:  Okay.  Is there anything I can do in the

14   meantime to be of any help, Mr. Greendyke?

15             MR. GREENDYKE:  Thank you, Judge.  Bill Greendyke on

16   behalf of AT&T Teleholdings.  With relationship to the motion

17   to compel that we discussed earlier today, I wanted to apprise

18   the Court of a couple of things, I don't think it's going to

19   disadvantage Comcast at all.  Some of the documents are

20   spreadsheets.

21             THE COURT:  Okay.

22             MR. GREENDYKE:  And I know the Court directed us to

23   deliver paper copies, which we will do with everything, but we

24   thought it would be more convenient to you if we gave you disks

25   or digital copies of the spreadsheets, because to print

1    everything you get a bunch of blank pages, and it'd --

2              THE COURT:  Okay.

3              MR. GREENDYKE:  -- be difficult to follow, so we

4    wanted to not surprise you with that.

5              THE COURT:  That's fine.  I just didn't want it to go

6    through CD after CD where I couldn't really identify it.

7              MR. GREENDYKE:  Correct.  There will be a disk on

8    that.

9              And the second thing was, there are some documents to

10   give you an example that might be a compilation of every

11   transaction that AT&T would work on for a given week.

12             THE COURT:  Right.

13             MR. GREENDYKE:  Now, there might be 49 on the list and

14   one of them is this deal.  The rest of them, we would redact

15   and --

16             THE COURT:  I have no problem --

17             MR. GREENDYKE:  -- delete things like that.

18             THE COURT:  -- with that and I assume Comcast has no

19   problem.

20             MR. GREENDYKE:  Show you things that are relevant.

21   And we just didn't want you to see the document that we would -

22   - had withheld, and have you release it, and have all that

23   other stuff on it or something.

24             THE COURT:  No.  In fact, I would prefer that if it's

25   totally unrelated to what we're doing here that it be redacted,

1    so I don't have to find it, yeah.

2           MR. GREENDYKE:  That's correct, that'd be the only

3    thing.

4           THE COURT:  That's great.

5           MR. GREENDYKE:  Thank you, Judge.

6           THE COURT:  Thank you.

7           MR. BECKHAM:  Your Honor, one thing while we are

8    waiting for the language to appear, you did want a statement

9    from a representative of the Debtor, and we could call our

10   witness in support of the Disclosure Statement, if you'd like

11   to pursue that.

12          THE COURT:  Thank you.

13          MR. BECKHAM:  All right.  We'd call Tad Brown.

14          THE COURT:  Mr. Brown.

15          Mr. Brown, would you raise your right hand, please?

16       (Witness sworn)

17          THE COURT:  Thank you, sir.

18                     DIRECT EXAMINATION OF TAD BROWN

19   BY MR. BECKHAM:

20   Q   Mr. Brown, state your name?

21   A   Tad Brown.

22   Q   And what is your relationship to Houston Regional Sports

23   Network?

24   A   I'm on the board.

25   Q   The board of the general partner?

1   A   Yes.

2   Q   And the general partner is the manager of the limited

3   partnership?

4   A   Yes.

5   Q   And are you the designated authorized representative of the

6   board with respect to signing the plan and Disclosure

7   Statement?

8   A   Yes.

9   Q   And are you familiar with the Disclosure Statement?

10  A   Yes.

11  Q   And to the best of your knowledge, is the information

12  contained in the Disclosure Statement true and correct?

13  A   To the best of my knowledge.

14          MR. BECKHAM:  Nothing further, Your Honor.

15          THE COURT:  Thank you.  Mr. Goldblatt.

16          MR. GOLDBLATT:  Sure.

17                  CROSS-EXAMINATION OF TAD BROWN

18  BY MR. GOLDBLATT:

19  Q   Mr. Brown, can you just describe the extent of your

20  involvement in putting together the Disclosure Statement?

21  A   The extent of my involvement, I reviewed it as all of the

22  board members have.

23  Q   Were you involved in negotiating the underlying

24  transactions that are reflected in -- that are described in the

25  Disclosure Statement?

1    A    The underlying transactions relative, the structure of a

2    potential deal?

3    Q    Yes.

4    A    I was involved in some of that, yes.

5    Q    And did you -- was that involvement in your capacity as a

6    board member or in your capacity as President of the Rockets?

7    A    My involvement as a fiduciary of the network was to try to

8    probably parse both at that time, as I was trying to get as

9    much value for the network as possible.

10   Q    I'm sorry, I just didn't -- you said you're -- I'm sorry, I

11   just didn't follow what you said.

12            MR. BECKHAM:  Your Honor, excuse me.  I want to

13   object.  The purpose of the testimony was to represent to the

14   Court that a representative of the Debtor had -- was familiar

15   with the Disclosure Statement, and that the statements

16   contained therein, and the disclosure information was true and

17   correct.  And we've made that representation going into

18   negotiations of the plan is something far afield from --

19            MR. GOLDBLATT:  And I'm not looking to go into

20   negotiations with him.  Just for the basis for the knowledge.

21            THE COURT:  I'm going to sustain it only as to the way

22   it was worded.

23            MR. GOLDBLATT:  Okay.  And I may have worded it

24   improperly.

25            THE COURT:  But I'll let you reword the question and

TAD BROWN - CROSS BY MR. GOLDBLATT

1    I'm going to let you go into his knowledge.  I think the way it

2    was worded --

3              MR. GOLDBLATT:  That may have been my fault.

4              THE COURT:  He knows what he knows, no matter what

5    capacity he knows it in, and so his personal knowledge extends

6    to -- and frankly, I don't want his knowledge limited to which

7    hat he was wearing.

8              MR. GOLDBLATT:  Fair enough.

9              THE COURT:  If he knows something in his Rockets hat

10   that makes this an untrue statement, I want to know about that.

11   So it's more important to me that we get everything he knows,

12   not --

13             MR. GOLDBLATT:  Okay.

14             THE COURT:  Thank you.

15   BY MR. GOLDBLATT:

16   Q    Let me just ask this question.  Mr. Brown, when was the

17   first time you saw a draft of the Disclosure Statement?

18   A    I believe it was Monday night.

19   Q    Of this week?

20   A    Of a portion of the Disclosure Statement, Monday night

21   possibly, or a portion of this Disclosure Statement.

22   Q    The amended Disclosure Statement.

23   A    The amended Disclosure Statement.

24   Q    Okay.  There's a Disclosure Statement that was filed on

25   August 7th, if I'm not mistaken.  Is that consistent with your

1    understanding?

2    A    Yes, it is.

3    Q    And so --

4              THE COURT:  If you don't know, you have to say you

5    don't know.

6              THE WITNESS:  Well, there are a lot of dates, Judge, I

7    apologize.

8              THE COURT:  Right.  Yeah, Mr. Beckham's going to just

9    give you a blank stare when you look at them for that, so if

10   you don't know, you're welcome to say you don't know.

11             THE WITNESS:  Frankly there are a lot of documents

12   that are prepared independent of my understanding from counsel.

13             THE COURT:  Here --

14   BY MR. GOLDBLATT:

15   Q    And is the Disclosure Statement one of them?

16   A    No, this Disclosure Statement I reviewed, and to the best

17   of my knowledge it's accurate.

18   Q    Okay.  And my question is, when did you review it, the one

19   that was filed on August 7th --

20             THE COURT:  August 6th.

21   BY MR. GOLDBLATT:

22   Q    August 6th, I appreciate the correction, the one that was

23   filed on August 6th that we came to court on to discuss on

24   August 7th, when did you first see that Disclosure Statement?

25   A    I don't recall.

1          MR. GOLDBLATT:  Okay.  I think I've got the best

2     information I'm going to get, Your Honor.

3          THE COURT:  Fair enough, thank you.

4          MR. GOLDBLATT:  If you could hold on one second, I

5     don't know if Mr. Beckham -- but I do Mr. Shapiro.

6        (Pause in the proceedings.)

7          MR. GOLDBLATT:  Okay.  Nothing further, Your Honor.

8          THE COURT:  Thank you.  Thank you, sir.

9        (Witness steps down.)

10         All right.  I find the Disclosure Statement meets all

11    of the requirements of Section 1125, I've imposed certain

12    additional requirements for the purpose of clarity of what's to

13    go on at the confirmation hearing, and I understand we're

14    getting a draft over that incorporates in principle what we've

15    imposed, but I will approve the Disclosure Statement under

16    1125.

17         MR. BECKHAM:  Your Honor, I believe probably it's

18    appropriate for -- to -- and thank you for approval of the

19    Disclosure Statement.  I believe it's finally appropriate to

20    allow Comcast parties to see the amended language.  I don't

21    know that we need anything further unless they're going to have

22    some objection to the language.

23         UNIDENTIFIED:  It's hard to answer that question

24    before you see the language.

25         MR. BECKHAM:  Let me --

1         UNIDENTIFIED:  Yeah, you've done a lot of that.

2         MR. BECKHAM:  Yeah.  So I think it might be

3    appropriate to give them the opportunity to review the language

4    and again, a ten minute recess might be appropriate.

5         THE COURT:  Well, that's fine.  Is the language that

6    he hasn't seen only the one sentence, or is the language he

7    hasn't seen the redraft of what we handed out?

8         MR. BECKHAM:  It is a partial -- it's some revisions

9    to what you -- the Court's insert.

10        THE COURT:  Well then, let's give him a little longer

11   than ten minutes.  Would you just let Mr. Rios know when you've

12   had a chance to review it and you're ready either to sign off

13   or make your objections?

14        MR. BECKHAM:  Certainly.

15        THE COURT:  And I'll come back out.  I'm just sitting

16   back there looking at my in box so I'm not going anywhere.

17        MR. BECKHAM:  Thank you, Your Honor.

18        THE COURT:  And we'll just take a recess till that's

19   ready.  Thank you.

20        THE CLERK:  All rise.

21      (Recess was taken at 3:40 p.m. to 4:08 p.m)

22        MR. BECKHAM:  Good afternoon, Your Honor, Charles

23   Beckham on behalf of the Debtors.  We have, I believe,

24   delivered a red line back to the Court.

25        THE COURT:  I've got a red line.

1          MR. BECKHAM:  And I'm not certain if you've had an

2     opportunity to review everything.  I think we've satisfied all

3     but one objection of Comcast who the language in the insert and

4     we've discussed it, I don't believe we're going to be able to

5     resolve this, so we're going to need the Court to resolve that.

6          THE COURT:  What page are you on?

7          MR. BECKHAM:  And you would turn to page 38.  And I'll

8     allow Mr. Goldblatt to describe his objection.

9          MR. GOLDBLATT:  Sure.  So, Your Honor, it's just --

10    what we're mostly looking for, we're not looking to litigate an

11    issue, we're looking simply for a reservation and for some

12    clarity.  But if you look at this provision --

13         UNIDENTIFIED:  Which paragraph?

14         MR. GOLDBLATT:  It's the paragraph above the bolded

15    paragraph in the middle of page 38, that begins "Under this

16    alternative."  And it says:

17       "The Court recognizes that AT&T and DirecTV may have

18          determined that a hundred percent payment to the holders of

19          allowed Class 4 trade claims is a business necessity by the

20          reorganized Debtor."

21          I guess as a statement of what AT&T and Direct have

22    determined, that doesn't -- the Court's recognition I'm not

23    sure is a fair statement, so I guess I would propose striking

24    the words, the "Court has recognized that" or "the Court

25    recognizes that."

1          THE COURT:  Okay.

2          MR. GOLDBLATT:  Then it says, "If the Court finds that

3    separate classification is not appropriate, AT&T and DirecTV

4    shall instruct the Astros and the Rockets to pay the holders of

5    allowed Class 4 trade claims on the same terms contemplated by

6    the plan, which the teams are required to pay in full pursuant

7    to the investment agreement."

8          THE COURT:  All right.

9          MR. GOLDBLATT:  Okay.  Your Honor, we think it's sort

10   of bankruptcy 101 that receiving consideration in exchange --

11   consideration outside of a plan in exchange for creditors

12   voting in favor of a plan is -- it's sort of bankruptcy 101,

13   that that's the one thing you can't do.  So what we'd like is a

14   statement that basically says, you know, Comcast contends that

15   this provision provides a basis for designating the vote with

16   any such creditor, period.

17         THE COURT:  Do we have this electronically?

18         MR. BECKHAM:  Yes, Your Honor.

19         THE COURT:  Let me see what we can -- if I can -- if

20   you can just plug it in there to your --

21         MR. GOLDBLATT:  The front or --

22         THE COURT:  Front, back, won't matter.

23         MR. BECKHAM:  It's plugged in, Your Honor.

24         THE COURT:  And which document is it?  This one?

25         MR. BECKHAM:  It'd be the Claim DS, Your Honor.

1          (Pause in the proceedings.)

2          MR. GOLDBLATT:  So, in fairness, Your Honor, in

3     concept, I think we're almost there.  I think our view and I

4     think to state fairly would say, Comcast has alleged that such

5     payment is unlawful and would allow.  That's certainly our

6     view.

7          THE COURT:  Let me ask whether the teams or the Debtor

8     have any objection to that rewording.

9          MR. BECKHAM:  You know, I think the parties need an

10    opportunity to just look at it and confer for a moment.

11         (Pause in the proceedings.)

12         THE COURT:  And let me just clarify one thing which is

13    I'm trying to reflect what I think the facts are, not to change

14    those facts.  And if that's not a present intent, but rather

15    that they may do that, that's fine, I just -- I don't want to

16    change the facts.

17         MR. BECKHAM:  Yeah.

18         THE COURT:  All I'm saying is, Mr. Kampfner, was if I

19    put in here, because I think that's what I'm hearing you all

20    say, is that AT&T and DirecTV have informed the proponents that

21    they intend to instruct.  If it's simply that you may instruct,

22    that's fine.  I'm not trying to change whatever your -- the

23    facts are.  I just want the facts reflected in the language of

24    the Disclosure Statement.

25         UNIDENTIFIED:  To say may instead of having informed

1      the proponents.

2              MR. BECKHAM:  It's may instead of intend.

3              UNIDENTIFIED:  That they may.

4              THE COURT:  I mean, if those are the facts, that's

5      fine.  If those aren't the facts -- all I want is the facts

6      down here, so.

7          (Pause in the proceedings.)

8              MR. BECKHAM:  Your Honor, here may be a -- yeah.  Two

9      suggestions.  In the highlighted area that says -- "and that

10     they allege" in the -- okay, now I've lost it.

11             THE COURT:  I can reverse that, I just thought it

12     might be easier to read the back-line.

13             MR. BECKHAM:  Yeah.

14             THE COURT:  Do you want me to reverse it?

15             MR. BECKHAM:  Yeah, if you would, Your Honor.  Okay.

16     It just makes it easier to identify, one, two, three, four --

17     sixth line down after the words "the plan" you have "and that

18     they allege."  We would suggest "and in that event the teams

19     are required" to pay these amounts.

20             And then second thing, Your Honor, before the last

21     sentence, I would add language that says:

22         "The proponents disagree with the Comcast allegation."

23             THE COURT:  So with that language, do we then have

24     agreement on that paragraph?

25             MR. BECKHAM:  That'll be --

1        UNIDENTIFIED:  In the event that we get rid of

2    the --

3        MR. BECKHAM:  Yeah, second that, yeah, in that event,

4    yeah.

5        MR. YOUNG:  Yeah, proponents should be capitalized.

6        MR. BECKHAM:  And proponent, the word proponent should

7    be capitalized.

8        MR. YOUNG:  That was just proponents, not --

9        MR. BECKHAM:  And in the fourth line, "have informed

10    the proponents."

11        With that language, it's satisfactory to the

12    proponents.

13        THE COURT:  Mr. Goldblatt?

14        MR. GOLDBLATT:  No issue with those changes, Your

15    Honor.

16        THE COURT:  Thank you.

17        I've also made my formula pretty again.  Is there any

18    other objection to any part of the Disclosure Statement at this

19    point?

20        Mr. Goldblatt, you got a full chance to read it and

21    you're now okay, subject to the fact that I've overruled you

22    earlier today on some things.

23        MR. GOLDBLATT:  Yeah, exactly.

24        THE COURT:  All those are preserved, but with respect

25    to the changes, you're okay?

1          MR. GOLDBLATT:  With respect to the changes, we're

2     otherwise okay, Your Honor, yes.

3          THE COURT:  All right.  So let me save this back to

4     your disk.

5          MR. BECKHAM:  Yes, Your Honor.

6          THE COURT:  It should be saved back now on top of what

7     it was.  And do we have then an order?

8          MR. BECKHAM:  We do have an order that is satisfactory

9     to all parties.

10          MR. CASTILLO:  Your Honor, this is a red line of the

11     changes we made to the order, and the clean of the order is

12     also on the flash drive as well.  Would you like the red line,

13     Your Honor?

14          THE COURT:  I don't think so.

15          MR. BECKHAM:  Your Honor, we'd like to point out that

16     there are some minor modifications to the plan which we'll be

17     making this evening, and I can run through those with you if

18     you'd like.

19          THE COURT:  Let me find this order first.

20          MR. BECKHAM:  All right.  Thank you, Your Honor.

21          THE COURT:  So is the order that we're talking about

22     right here?

23          Is this the order, Mr. Castillo?

24          MR. CASTILLO:  Yes, Your Honor, it is the order.

25          (Pause in the proceedings.)

1          THE COURT:  So what belongs in this blank right here?

2          MR. BECKHAM:  I'm sorry, Your Honor?

3          THE COURT:  There's a blank there, what date belongs

4     there?

5          MR. CASTILLO:  The 28th, Your Honor.

6       (Pause in the proceedings.)

7          MR. BECKHAM:  Yeah, Your Honor -- go ahead.

8          MR. KAMPFNER:  I just want to make one clarification

9     on that Disclosure Statement language that we just talked

10    about.  I don't know if there's a way to put it back up on the

11    screen.

12         THE COURT:  Should be.  Hold on.

13         Okay.  Right here?

14         MR. KAMPFNER:  Yeah, so the provision reads that AT&T,

15    Direct may instruct the teams to pay the holders of allowed for

16    claims on such terms contemplated by plan, and in that event,

17    are required to pay those amounts.  The clarification is just

18    to make clear that the "in that event" refers to in the event

19    that we are instructed to pay, then we, in that event, then we

20    will pay them pursuant to the investment agreement.

21         THE COURT:  Is that what you're saying?

22         MR. KAMPFNER:  Yes.

23         MR. BECKHAM:  No issue, Your Honor.

24         THE COURT:  Thank you.

25         MR. LOPEZ:  Your Honor, can I -- Chris Lopez for

1    DirecTV.

2         The purpose is just to say that we're not instructing

3    them that in that event, that's what they would be required to

4    do.  That's just an acknowledgment that all parties agree that

5    that's what would have to happen in that event, the plan

6    proponent and the Debtor.

7         THE COURT:  So tell me what language you want?

8         MR. LOPEZ:  No, no, I think it's just more a

9    clarification on the record, just so there's no confusion as to

10    the interpretation that DirecTV is not informing them that in

11    that event that that's -- that they would be required to pay,

12    but more in that event that they would be required to pay and

13    that they're not disputing that that's a fight for another day,

14    that everybody just kind of acknowledges, the plan proponents

15    and the Debtor acknowledge that under the investment agreement

16    they would be required to pay.

17         THE COURT:  Yeah, what I'm not doing though is saying,

18    that that could be -- that that is necessarily an enforceable

19    provision, given the Comcast allegation that it is unlawful,

20    and therefore expressing no view as to whether take this really

21    as no view.  I'm expressing no view as to whether your

22    announcement is something I would enforce.

23         MR. LOPEZ:  I understand, Your Honor, but I'm -- more

24    of what -- I'm trying to just acknowledge is just from the

25    perspective of the teams, that they would not dispute that they

1      would be required to pay under the investment agreement,

2      whether Your Honor enforces the agreement or not, but just

3      simply to -- that we are all on the same page at this juncture,

4      that they would be required to pay under the investment

5      agreement.

6              THE COURT:  Thank you for that announcement then.

7              MR. LOPEZ:  Thank you, Your Honor.

8              THE COURT:  Thank you.

9              MR. GREENDYKE:  Judge, I have one comment, Bill

10     Greendyke on behalf of AT&T.

11             The insert by Comcast where Comcast has alleged that

12     such payment is unlawful, my question is the word choice

13     unlawful.  It might be contrary to the Bankruptcy Code or

14     something similar to that, but to a layman reading that as a

15     voter and a potential claimant, that might make them fearful of

16     something above and beyond an incapacity to receive such --

17             THE COURT:  If I change that to say would violate the

18     Bankruptcy Code.

19             MR. GOLDBLATT:  It's more than that, Your Honor.  I

20     mean, look, my view is that if you look at Title 18, that this

21     is by the terms of Title 18 arguably criminal.  So unlawful as

22     I think a fair description of our position, and it's just a

23     statement of our position.  And unlawful is what our position

24     is.

25             UNIDENTIFIED:  I guess I missed the whole argument, of

1    how Title 18 got involved in this.

2         MR. GOLDBLATT:  I'm happy to walk you through that if

3    you'd like, I can put this on the record if that would be

4    helpful or not.

5         THE COURT:  But I don't think it would be helpful.

6         MR. GOLDBLATT:  Okay.

7         THE COURT:  If you want to pursue your challenge to

8    that language, I'll let you do that, but if what we're doing is

9    putting in the statement of their position.

10         MR. GOLDBLATT:  I understand.

11         THE COURT:  And that's it.

12         MR. GREENDYKE:  I've told you what I thought.  I

13    respectfully just think that that's a strong word.  I mean, if

14    that's their point is that they want to threaten everybody in

15    sight, so be it.  I know Disclosure Statements are here's what

16    the Debtor thinks, and here's what the objecting party think,

17    we'll put them both in there.

18         THE COURT:  Well, I don't think they have to be that

19    way.  I mean, if you all want to fight whether that's

20    appropriate or not.  But I thought that your original point

21    was, that maybe we weren't really characterizing what they were

22    saying right.

23         MR. GREENDYKE:  Well, evidently he is, so I get it.

24         THE COURT:  But if you want to fight a battle that

25    says that we shouldn't have that language, I'll certainly let

1      you --

2            MR. GREENDYKE:  I made my comment on the record,

3      that's what I thought, now I know it's more than what I had

4      anticipated.

5            THE COURT:  Thank you.

6            MR. GREENDYKE:  Thank you.

7         (Pause in the proceedings.)

8            THE COURT:  Are there any objections to the order at

9      this point?

10        (No audible response.)

11           THE COURT:  All right.  I've signed that order.  Is

12     there anything else we need to do?

13           MR. FLORES:  Your Honor, one housekeeping matter on

14     the order.  I believe Exhibit A and Exhibit B represent the

15     order on the flash drive.  There's a form of notice and then

16     the ballot.

17           THE COURT:  Let me open those up.  And then I need you

18     all to upload the Disclosure Statement, right.  Form of ballot

19     you said and what else is there?

20           MR. FLORES:  Yes, Your Honor, the confirmation notice

21     and the form of ballot, the last two documents on it.  Thank

22     you.

23        (Pause in the proceedings.)

24           THE COURT:  Which is A and which is B?

25           MR. FLORES:  Your Honor, if it's helpful, we have a

1    version that's already marked.

2           THE COURT:  What is that?

3           MR. FLORES:  We have a version that's already marked,

4    Exhibit A and Exhibit B --

5           THE COURT:  Oh.

6           MR. FLORES:  -- from the filing, if you prefer.

7           THE COURT:  Sure.

8           MR. FLORES:  May I approach?

9           THE COURT:  Yeah, why don't you just give them to

10   Mr. Isgray (phonetic).  Thank you.  Those aren't front and back

11   printed, are they?

12          MR. FLORES:  That's a good question, Your Honor, I

13   don't think so.  They do not appear to me.

14          THE COURT:  Yes, they are.

15          MR. FLORES:  Oh, they are?

16          THE COURT:  So which one's A and which one's B?

17          MR. FLORES:  The notice is A, the ballot is B.

18   Apologies, Your Honor.

19          THE COURT:  Okay.  So we'll throw those away that he

20   just handed you.  Thank you.

21          What else do we have?

22          MR. BECKHAM:  I believe that's it, Your Honor, we do

23   have -- we are filing an amended plan this evening, which has a

24   couple of minor non-material changes to it, and I can go

25   through those changes with you if you like, or we'll just --

1          THE COURT:  Well, I don't need to hear them, but you

2     may want to announce them --

3          MR. BECKHAM:  All right.  I'll go ahead and --

4          THE COURT:  -- if -- for other purposes.

5          MR. BECKHAM:  With respect to the plan, there's a

6     modification to Section 7.7, which creates an escrow account.

7     With respect to Section 12.1, the voting deadline for rejected

8     executory contracts and leases was ten days from nine days.

9          THE COURT:  It's what now?

10          MR. BECKHAM:  Prior to the voting deadline.

11          THE COURT:  Nine days, okay.  Okay.

12          MR. BECKHAM:  And then finally, Your Honor, with

13     respect to the voting deadline, it's modified on -- in the

14     definitions in Section 123 to reflect the other changes.

15          THE COURT:  1.3?

16          MR. BECKHAM:  Yeah.  123 on B(11) of the --

17          UNIDENTIFIED:  In the glossary.

18          MR. BECKHAM:  In the glossary.

19          THE COURT:  All right.

20          MR. BECKHAM:  And those are the minor changes.

21          THE COURT:  Anything else that we need to do today?

22        (No audible response.)

23          THE COURT:  All right.  I appreciate the hard day of

24     work, and we'll see you all in October.

25          Thank you.

1          MR. BECKHAM:  Thank you, Your Honor.

2       (Proceedings adjourned at 4:39 p.m.)

3                      *  *  *  *  *

4          *I certify that the foregoing is a correct transcript*

5    *to the best of my ability from the electronic sound recording*

6    *of the proceedings in the above-entitled matter.*

7       /S./  MARY D. HENRY

8    *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

9    *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**D-337*

10   *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

11   *JTT INVOICE #52941*

12   *DATE:  SEPTEMBER 8, 2014*

13

14

15

16

17

18

19

20

21

22

23

24

25