UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re<br><br>HOUSTON REGIONAL SPORTS NETWORK, L.P.<br><br>                    Debtor. | Chapter 11<br><br>Case No. 13-35998 |

PROPONENTS' RESPONSE TO COMCAST ENTITIES' SUPPLEMENTAL
BRIEF REGARDING THE PROPER DATE OF VALUATION OF
COMCAST LENDER'S COLLATERAL

The Comcast Entities have filed a supplemental brief [D.I. 684] (the "**Supplemental Brief**") arguing that (1) the Petition Date is not the appropriate date for valuing the Comcast Lender Collateral and (2) the deduction of the administrative and priority claims owed to the teams on account of past due media rights payments (the "**Administrative and Priority Claims**") from the Reorganized Debtor's total enterprise value is inappropriate. The Comcast Entities are wrong on both points. The Proponents file this Supplement Brief to respond to the Comcast Entities' arguments.

## RESPONSE

**I.    *Stembridge* Controls and Appropriately Requires Valuation of the Comcast Lender Collateral to Be As of the Petition Date**

1.    The Comcast Entities attempt to undermine *Stembridge* by citing opinions from outside the Fifth Circuit that suggest the Petition Date is not the appropriate date of measurement. The Comcast Entities' citations fail to overcome *Stembridge*, which makes clear that in the Fifth Circuit collateral should be valued as of the petition date for cramdown purposes. Indeed, the specific question presented in *Stembridge* was "at which point in time should a secured asset be valued for the confirmation of a cram-down plan?" The Fifth Circuit answered that question by

holding that value should be determined as of the filing of the petition. 394 F.3d 383, 386-87 (5th Cir. 2004). The Court should follow the Fifth Circuit here.

2. The Comcast Entities also attempt to minimize *Stembridge* by arguing that it should be limited to chapter 13 cases.[1] The Fifth Circuit's holding, however, can and should be applied with equal force in a chapter 11 case. In *Stembridge*, the Fifth Circuit was interpreting the secured creditor "cram down" provisions of chapter 13, which are very similar to the secured creditor cram down provisions of chapter 11 and attempt to achieve the same goals—the fair treatment of secured creditors in connection with a cram down.

3. Section 1325(a)(5)(B) of the Bankruptcy Code states that a bankruptcy court is permitted to cram down a secured creditor if "the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim." 11 U.S.C. § 1325(a)(5)(B)(ii). Section 1129(b)(2)(A)(i) of the Bankruptcy Code provides that a bankruptcy court is permitted to cram-down a chapter 11 plan where the plan provides for "deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property." 11 U.S.C. § 1129(b)(2)(A)(i)(II). Both statutes require that the *payments* to be made under a plan have a value, as of the effective date, equal to the secured claim. Neither statute requires that a secured creditor's *collateral* be valued as of the effective date of a plan. This is a critical distinction that Comcast ignores in its Supplemental Brief. Both statutes serve a similar purpose, have similar wording and are silent on when collateral should be

---

[1] The irony of this argument is not lost upon the Proponents. The case most notably cited by the Comcast Entities in connection with this trial and in their Supplemental Brief, *Associates Commercial Corp. v. Rash*, 520 U.S. 953 (1997), is itself a chapter 13 case in which a truck was valued. Though perhaps not as complicated as this Chapter 11 Case, *Rash* has become the leading case on valuing collateral and interpreting section 506(a) of the Bankruptcy Code.

2

valued. The fact that *Stembridge* is a chapter 13 case and this one is a chapter 11 is simply not a material distinction for purposes of this case.

4. Moreover, the reasoning of *Stembridge* is rooted in an analysis of the Bankruptcy Code, including section 506(a), which applies equally in both chapter 11 and chapter 13. The Fifth Circuit reasoned that section 506(a) of Bankruptcy Code does not indicate when collateral should be valued. Nor do any other provisions of the Bankruptcy Code. As a result, the Fifth Circuit concluded that "[i]f the code provides for neither the confirmation date nor some intermediate time before that date as the proper date for valuation, then the value of the creditor's interest must be determined vis-a-vis the amount of its interest at the institution of the bankruptcy proceedings — *i.e.,* the filing date." *Stembridge*, 394 F.3d at 387. This analysis is equally applicable to chapter 11. Interestingly, the text of section 506(a) of Bankruptcy Code strongly implies that property should be valued *before* the effective date of a plan. The statute notes that a claim is secured "to the extent of the value of such creditor's interest in the estate's interest in such property . . ." 11 U.S.C. § 506(a). But an estate only exists prior to the effective date.

5. The Fifth Circuit's analysis is sound. The petition date acts as a breakage in time and establishes who is a creditor and who is not. The petition gives rise to the automatic stay, and section 552(a) of the Bankruptcy Code invalidates prepetition security agreements. It makes perfect sense that the petition date should be the date for valuing a secured claim. The world changes on that date.

6. Indeed, numerous courts have found that a secured creditor's collateral should be valued as of the petition date in connection with confirmation, especially where it is equitable to do so. *See Wood v. LA Bank (In re Wood)*, 190 B.R. 788, 790-91, 795 (Bankr. M.D. Pa. 1996); *see also Johnson v. Gen. Motors Acceptance Corp. (In re Johnson)*, 165 B.R. 524, 528 (S.D. Ga.

3

1994); *cf. In re Hulen Park Place, Ltd.*, 130 B.R. 39, 43 (N.D. Tex.1991) (determining that, in a chapter 11 cramdown case, "[t]he date of the petition is the date that the secured status of creditors is determined.").

7. The Comcast Entities' assert that the Court should not follow *Stembridge* because the Fifth Circuit intended to protect secured creditors from the postpetition depreciation of their collateral. But there are equally compelling reasons for valuing the Comcast Lender Collateral on the Petition Date. As noted in the Proponents' Valuation Brief, on the Petition Date, the Debtor had only one major carriage agreement and could not afford to make its media rights payments. Comcast Lender's solution to the problem was to publicly indicate that it would not make a bid, thereby walking away from the Debtor and jeopardizing its existence. The teams, on the other hand, moved mountains to restructure and save the Debtor, at great cost. The teams are waiving their priority with respect to $108.7 million of Administrative and Priority Claims. The teams are funding all cash payments under the Plan, and the teams are entering into New Media Rights Agreements that are materially worse than their Existing Media Rights Agreements. Comcast Lender is simply not entitled to the benefit of the value created by the sacrifices of the teams, and valuing the Comcast Lender Collateral on the Petition Date, as required by *Stembridge*, will assure that this does not occur.

8. Finally, the Proponents note that courts are provided with even wider discretion in determining value under section 1111(b) than under section 506(a). Section 506(a) requires that collateral be valued "in light of the proposed disposition or use of such property," but section 1111(b) contains no such language. *Compare* 11 U.S.C. § 506 (a)(1) and 11 U.S.C. § 1111(b); *see e.g., Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452, 122 S. Ct. 941, 951, 151 L. Ed. 2d 908 (2002) ("…it is a general principle of statutory construction that when Congress includes

particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal citations omitted).

9. This makes sense because an 1111(b) election can be made at any time during a chapter 11 case, including before a proposed plan of reorganization determines the treatment of a secured creditor's claim and the proposed disposition of its collateral. The flexibility embedded in section 1111(b) allows a court to make a fair valuation based on the circumstances of the case. In this case, the value of the Comcast Lender Collateral should not be determined in a manner that provides Comcast Lender with the benefit of a restructuring resulting solely from the efforts and sacrifices of the teams.

## II. The Deduction of the Teams' Administrative and Priority Claims from the Debtor's Total Enterprise Value Is Appropriate

10. The Comcast Entities assert that, even if the Comcast Lender Collateral is valued as of the Petition Date, the deduction of the Administrative and Priority Claims from the Reorganized Debtor's total enterprise value is an impermissible section 506(c) surcharge. As noted in the Proponents' pre-trial brief and as emphasized in opening statements, such deduction is not a surcharge at all, but, rather, a standard component of the methodology used calculate a reorganized debtor's total enterprise value. Section 506(c) is not intended to supersede standard valuation methodologies and does not apply here.

11. In any event, valuing the Comcast Lender Collateral as of the Petition Date necessarily requires that the waiver of the Administrative and Priority Claims incurred by the teams be deducted from the value of the Comcast Lender Collateral. Such claims were incurred after the Petition Date and constitute Debtor losses that must be charged against the value of the Comcast Lender Collateral in any TEV analysis. Moreover, the teams are waiving the priority of

the Administrative and Priority Claims on the Effective Date of the Plan. Waiving those claims permits the reorganization of the Debtor to occur, increasing the value of the Comcast Lender Collateral well *after* the Petition Date. The Comcast Lender Collateral is not entitled to any increase in the value of its collateral resulting from a waiver of claims that occurs well after the date upon which the collateral is valued. Accordingly, the teams' Administrative and Priority Claims not only should, but must, be deducted from the value of the Comcast Lender Collateral.

12. Courts have consistently taken this position. The Court in *Wood v. LA Bank (In re Wood)* found that a secured creditor was not entitled to the increase in the value of its collateral resulting exclusively from the Debtor's postpetition efforts. The court in *Nanuet National Bank v. Photo Promotion Associates, Inc. (In re Photo Promotion Associates, Inc.)*, 61 B.R. 936 (Bankr. S.D.N.Y. 1986), reached the same result. There, the court considered whether a secured creditor was entitled to share in the proceeds resulting from the completion of certain portrait orders placed prepetition with the debtor photography services company but completed postpetition without the support of the secured creditor. The court explained that

> [T]here was no evidence that these orders had any value to the [secured creditor] plaintiff or to anyone else unless they could be processed promptly into family portraits. Many of the orders were not recent and there was uncertainty as to whether the customers still wanted their relatives' pictures long after the snapshots were taken. In any event, in order to obtain payment from the debtor's customers the trustee was required to borrow additional funds on behalf of the estate to process the orders, including the delivery of the unprocessed film to a photography laboratory to develop the pictures, print the portraits, mount them in appropriate wooden frames or backs; and then mail the finished portraits to the customers. The proceeds that the trustee received for the finished portraits resulted from the trustee's expenditure of estate funds to create items of value that did not exist when the Chapter 11 case was converted to Chapter 7 for liquidation. Accordingly, the estate was responsible for all of the value of the finished products which were transformed into the proceeds that the plaintiff now claims. In these circumstances it would be inequitable to allow the plaintiff to claim these proceeds from this estate pursuant to the after-acquired clause in its security agreement, especially since the general policy reflected in 11 U.S.C. § 552(a) is to restrict the claims of prepetition

6

secured interests to prepetition collateral and regard after-acquired property as property of the estate.

*Id.* at 939.

13. Comcast Lender is in exactly the same position. On the Petition Date, there was substantial uncertainty as to whether the Network could gain sufficient carriage to become a viable going concern. The Debtor incurred the Administrative and Priority Claims by consequence of the continued use of the existing media rights agreements. The Rockets and the Astros are waiving those claims to reorganize the Debtor and unlock value in an otherwise valueless asset. Comcast Lender does not get the benefit of value that it did not generate and, in fact, has fought to defeat.

14. Importantly, the Debtor was able to carry Rockets and Astros' games for over a year without paying for the content, and Comcast Lender, as the principal beneficiary, never made any efforts to fund those amounts or otherwise contribute to the Debtor's estate. It should not be entitled to the benefit of administrative and priority claims that it refused to fund.

15. The Comcast Entities also attempt to distinguish *In re Roy*, 2010 WL 4916576 (Bankr. D.N.H. Nov. 30, 2010) and *In re LTV Steel Co.*, 285 B.R. 259 (Bankr. N.D. Ohio 2002) on the grounds that their holdings are based on public policy considerations. But that is not what those cases hold. The court in *LTV Steel* expressly rejected the public policy arguments raised by the parties and determined that deducting the administrative expenses relating to the environmental liabilities should be deducted purely as a matter of section 506(a). *Id.* at 269 ("Persuasive policy arguments may be made for either position, but the Court need not decide which is appropriate. The die was previously cast by the terms of 506(a)"). Further, the court in *In re Roy* made no mention of public policy.

16. Comcast Entities also claim that *Rash* does not support the Proponents' position because "[r]eplacement-value . . . is applicable only in circumstances in which the asset in question

can be replaced.  Here, the debtor proposes to retain and use the property at issue – which cannot be replaced in the open market – as part of the reorganized business." Supplemental Brief at 8. The record clearly contradicts the Comcast Entities' argument.  There is no evidence to suggest that Comcast Entities would not negotiate a replacement agreement if the existing affiliation agreement were rejected.  Indeed, the evidence suggests otherwise.  Among other things, certain exhibits presented at trial show that the Comcast Cable fully intends to carry the Debtor whether or not the current Comcast Affiliation Agreement remains in place.  Further, the Comcast Entities have raised many objections to the Plan, but they have not objected to the proposed assumption of the Comcast Affiliation Agreement.

17. In addition, the Comcast Entities have asserted that carriage from DTV and AT&T will create "competitive pressures" that will drive Dish, SuddenLink and other providers to carry the Debtor within a few years.  If the Comcast Entities are correct, there is simply no reason that those competitive pressures would not also force the Comcast Entities to carry the Debtor.

NEWYORK 9332614

## CONCLUSION

WHEREFORE, the Proponents respectfully request that the Court value the Comcast Lender Collateral at an amount equal to or less than the value ascribed to such collateral in the Proponents' Expert Report.

Dated: October 8, 2014
      Houston, Texas

HAYNES AND BOONE, LLP

By: /s/ Charles A. Beckham, Jr.
Charles A. Beckham, Jr.
Henry Flores
Christopher L. Castillo
1221 McKinney Street, Suite 2100
Houston, Texas 77010
Telephone: (713) 547-2000
Facsimile: (713) 547-2600

*Counsel to Debtor and Debtor in Possession*

MITHOFF LAW FIRM
Richard Warren Mithoff
Sherie Potts Beckman
One Allen Center, Penthouse
500 Dallas Street
Houston, Texas 77002-4800
Telephone: (713) 654-1122
Facsimile: (713) 739-8085

WHITE & CASE LLP
Alan Shore Gover
Ian J. Silverbrand (admitted *pro hac vice*)
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113

Roberto J. Kampfner (admitted *pro hac vice*)
633 West Fifth Street, Suite 1900
Los Angeles, California 90071-2007
Telephone: (213) 620-7700
Facsimile: (213) 452-2329

*Counsel for Rocket Ball, Ltd.*

VINSON & ELKINS LLP
Harry A. Perrin
Duston K. McFaul
1001 Fannin Suite 2500
Houston, Texas 77002
Telephone: (713) 758-2548
Facsimile: (713) 615-5016

KIRKLAND & ELLIS LLP
Paul M. Basta, P.C. (admitted *pro hac vice*)
David S. Meyer (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Jeffrey S. Powell (admitted *pro hac vice*)
Judson D. Brown (admitted *pro hac vice*)
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

*Counsel for Houston Astros, LLC*

9