IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION


| | | |
|---|---|---|
| IN RE: | § | CASE NO. 12-36187-H1-11 |
| | § | HOUSTON, TEXAS |
| ATP OIL AND GAS CORPORATION, | § | THURSDAY, |
| | § | SEPTEMBER 5, 2013 |
| DEBTOR. | § | 1:30 P.M. TO 5:59 P.M. |


<u>MOTIONS HEARING</u>

BEFORE THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

FOR THE DEBTOR:                    SEE NEXT PAGE

FOR THE TRUSTEE:                   SEE NEXT PAGE

COURTROOM DEPUTY:                  MARIO RIOS

COURT RECORDER:                    PAULA CRAWFORD


TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
(281) 277-5325 (office) ◊ (281) 277-0946 (fax)
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.


JUDICIAL TRANSCRIBERS OF TEXAS, LLC

APPEARANCES:

FOR ATP OIL AND GAS            MAYER BROWN, LLP
CORPORATION                    Charles S. Kelley, Esq.
                               700 Louisiana, Suite 3400
                               Houston, TX 77002


FOR THE OFFICIAL COMMITTEE OF  PORTER & HEDGES, LP
UNSECURED CREDITORS:           Joshua Wolfshohl, Esq.
                               1000 Main Street, 36th Floor
                               Houston, TX 77002


FOR OMEGA NATCHIQ:             PERRIN LANDRY DELAUNAY
                               DARTZ & OUELLET
                               Gerald C. deLaunay, Esq.
                               251 La Rue France
                               Lafayette, LA  70508


FOR SUPREME SERVICE &
SPECIALTY CO., INC.:           SNOW SPENCE GREEN, LLP
                               R. Ross Spence, Esq.
                               2929 Allen Parkway, Ste. 4100
                               Houston, TX  77019


FOR NGP CAPITAL:               THOMPSON & KNIGHT
                               Tye Hancock, Esq.
                               333 Clay St., Ste. 3300
                               Houston, TX  77042


FOR MACQUARIE AMERICAS         GORDON ARATA McCOLLAM
CORPORATION, MACQUARIE         DUPLANTIS & EAGAN, LLC
INVESTMENTS, AND KEBA          Courtney S. Lauer, Esq.
ENERGY, LLC                    1980 Post Oak Blvd., Suite 1800
                               Houston, Texas 77056


FOR GREYSTAR CORPORATION:      WALKER WILCOX MATOUSEK, LLP
                               Tony L. Draper, Esq.
                               1001 McKinney, Suite 2000
                               Houston, Texas 77002


FOR HARRIS CAPROCK:            HOOVER SLOVACEK, LLP
                               T. Josh Judd, Esq.
                               5847 San Felipe, Ste. 2200
                               Houston, TX  77057

APPEARANCES (CONTINUED):

FOR GOMEZ HUB PIPELINE              McDERMOTT WILL & EMORY
PARTNERS, LP                       Greg Kopacz, Esq.
                                   340 Madison Ave.
                                   New York, NY  10173-1922

FOR EXTERRAN ENERGY
SOLUTIONS, LP:                     ANDERSON LEHRMAN
                                   Kevin M. Maraist, Esq.
                                   1001 Third Street, St. 1
                                   Corpus Christi, TX  78404

FOR CAMERON INTERNATIONAL          DORE MAHONEY LAW GROUP, PC
CORPORATION AND WRIGHT             Zachary McKay, Esq.
WELL CONTROL:                      17171 Park Row, Ste. 160
                                   Houston, TX  77084

FOR ERA HELICOPTERS, LLC:          MONTGOMERY BARNETT
                                   Stephen L. Williamson, Esq.
                                   1100 Poydras, Ste. 3300
                                   New Orleans, LA  70163

INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| MICHAEL PIERSON | | | | |
| By Mr. deLaunay | 35 | . | 80 | . |
| By Mr. Kelley | . | 66 | . | 87,93 |
| By the Court | 92 | | | |
| GREGORY SANDOZ | | | | |
| By Mr. deLaunay | 94 | . | 115 | . |
| By Mr. Kelley | . | 107 | . | 116 |
| GARY BUCHANAN | | | | |
| By Mr. deLaunay | 119 | . | 133 | . |
| By Mr. Kelley | . | 125 | . | . |

| EXHIBITS: | Marked | Offered | Admitted |
|---|---|---|---|
| Debtor's: | | | |
| | . | . | . |
| Omega's: | | | |
| Exhibits AA through KK | 32 | 32 | 32 |
| Exhibit LL | 32 | 32 | . |
| Exhibit MM | 32 | 32 | 34 |
| Exhibit NN | 32 | 32 | . |
| Exhibit OO | 34 | 34 | 35 |

1      HOUSTON, TEXAS; THURSDAY, SEPTEMBER 5, 2013; 1:31 P.M.

2      THE COURT:  Please be seated.  All right.  Good

3 afternoon.  We're here on the ATP Oil & Gas Corporation

4 hearings.  It is 12-36187.  We're going to follow our usual

5 appearance protocol and allow parties to make appearances as

6 they wish during the course of the hearing.

7      Mr. Kelley.

8      MR. KELLEY:  Good afternoon, Your Honor.  Charles

9 Kelley from Mayer Brown on behalf of the Debtor ATP Oil &

10 Corp.

11      THE COURT:  Thank you.

12      MS. LAUER:  Good afternoon, Your Honor.  Courtney

13 Lauer with Gordon Arata on behalf of MacQuarie Investments.

14      THE COURT:  Thank you.

15      MR. DELAUNAY:  Judge, Gerald deLaunay representing

16 Omega Natchiq, Inc.

17      THE COURT:  All right.  Thank you.

18      MR. SPENCE:  Ross Spence, Your Honor, representing

19 Supreme Service & Specialty Company, Inc.

20      THE COURT:  Thank you.

21      MR. WOLFSHOHL:  And Joshua Wolfshohl on behalf of the

22 Unsecured Creditors Committee.

23      THE COURT:  Thank you.

24      All right.  Let's go on through the Agenda, if we

25 could, please.

1          MR. KELLEY:  Beg your pardon, Your Honor?

2          THE COURT:  I said let's go through the Agenda and see

3     what we have.

4          MR. KELLEY:  You bet.  And I thank you, Your Honor.

5          The first matter that we have set up, Your Honor, is

6     the Debtors' Fourth Emergency Motion for Entry of an Order

7     pursuant to 105 and 363, authorizing interim use of cash

8     collateral.

9          We filed, last weekend, Your Honor, a budget that

10    carries through the end of August.  What we are only seeking

11    today is permission to use the cash for essentially the first

12    three weeks of September.  As the Court will recall, our budget

13    expired on August 31st.  We've worked with the DIP lenders,

14    we've worked with the financial advisors of the DIP lenders and

15    the financial advisors of the Debtors and have prepared that

16    budget.

17         But because we have a couple of open issues and for

18    various other reasons, we're only seeking for three weeks, and

19    we will set a hearing, I believe the week of the 17th, if I'm

20    -- I'm doing this from memory, Your Honor; my apologies -- that

21    would be Thursday that week --

22         THE COURT:  All right.

23         MR. KELLEY:  -- would be when we would continue the --

24    the remaining portion of the budget.  But we want to get

25    permission today for the first three weeks.

1          I -- because we filed it Friday night, I'm not sure

2     that parties who would have opposed would have filed anything,

3     but I have received some contact from people and communicated

4     with them.  It is my understanding there's no objection, but

5     let me step aside and see if anyone has any objection to that.

6          THE COURT:  What Form of Order are you seeking to use,

7     so that people know what they're objecting to, if anything?

8          MR. KELLEY:  The Form of Order was the one that was

9     attached to our pleading, Your Honor.

10          THE COURT:  So the same one that was attached to the

11     2482?

12          MR. KELLEY:  It specifically says in Paragraph 2, Your

13     Honor, it mentions September 1st through September 22nd.

14          THE COURT:  Right.  All right.  Let me hear objections

15     to the proposal at 2482-2.

16          Ms. Lauer?

17          MS. LAUER:  Your Honor, Courtney Lauer, here on behalf

18     of Macquarie Investments.

19          We do not have an objection to the approval of this

20     budget for the next three weeks, but wanted to note for the

21     Record that we are concerned with the budget that's been

22     attached that they propose will be -- they will seek approval

23     of at the next hearing.  Our concerns are that it shows in that

24     budget that these funds that are coming in that are proceeds of

25     the Macquarie overrides are going to be used throughout that

1    period, and that the Debtor will then end the month of October

2    with zero cash, leaving them with an inability to comply with

3    this Court's Order and to pay the -- turnover override funds in

4    the month of November, which would be for September

5    collections; so that's our concern.

6         We sent and email to the DIP lenders and counsel and

7    -- for the Debtor, and I think it's something we can work out.

8    But I just wanted to note on the Record that that's one of our

9    concerns with the budget that's been attached.

10        THE COURT:  Thank you, Ms. Lauer.

11        Anybody else?  Mr. Hancock.

12        MR. HANCOCK:  Your Honor, just -- I would just note --

13   Tye Hancock for NGP Capital Resources Company.

14        Our payment terms under our conveyance documents, I

15   believe are basically the same as Macquarie's, so we have the

16   same situation.  Others may -- it may vary with respect to

17   override holders because their terms may be different.  But as

18   the budget stands, it purports to spend all of the proceeds for

19   September production, so that's -- we essentially have the same

20   issue.

21        THE COURT:  Thank you.

22        MR. DRAPER:  Your Honor, Tony Draper on behalf of

23   GreyStar Corporation.

24        GreyStar filed a limited objection at Docket 2503.  We

25   set forth, Your Honor, that, you know, already for services

1    provided in August, there are payments due to GreyStar in the
2    amount of $375,156.34, with a projected additional 368-$370,000
3    in services to be provided during the month of September.  And
4    it's imperative that the budget provide, and that the Debtors
5    clarify that the budget provides for the payment of those
6    amounts to GreyStar, whether the -- and my understanding from
7    the prior interim cash collateral usage was that the budget
8    that expired August 31 provided for the payment of those
9    services that were performed by GreyStar in August, which were
10   in the list, in the amount of $375,000, as set forth in the
11   objection; and also, Your Honor, the -- at least $375,000 --
12   I'm sorry, $368,000 that's projected going forward for
13   September.  We need clarification on that, Your Honor.
14        THE COURT:  Mr. Kelley?  Mr. Kelley, what's the status
15   of the GreyStar payments that were budgeted for August?
16        MR. KELLEY:  I was just conferring with the CFO.  It's
17   my understanding, Your Honor, that the GreyStar August services
18   will be paid in -- according to their terms in September.  It
19   may be within that three-week period.  I was exploring that
20   while he was making the inquiry.  But the intent is to pay
21   those and include those in the budget.
22        Obviously, we're only seeking permission to go through
23   three weeks.  If it was scheduled to be paid within that three-
24   week period, it will be paid; if it's scheduled to be paid in
25   the period after that, we'll pay it after that.

1          THE COURT:  I think his question is this was scheduled

2     in the August budget itself, but not paid in August.  And so

3     the issue, I think, is:  Does the August budget now carry into

4     September, so that money that was budgeted in August will be

5     paid in September, as I understood the question.

6          MR. DRAPER:  Effectively, yes, Judge.

7          MR. KELLEY:  I'm a little lost, so I'm going to have

8     to take a few minutes and ask my client.  But they will -- what

9     I heard him say was payments in August, for August time.

10    Normally, we get invoiced at the end of August for their August

11    time that gets paid in September.  So I'm not -- I'm not sure

12    what --

13         THE COURT:  He's saying it was shown in the August

14    budget.  I'm --

15         MR. KELLEY:  For payment for the August time?

16         THE COURT:  I don't know.

17         MR. DRAPER:  Your Honor, Tony Draper.

18         It's -- and that was one of the things that we

19    clarified.  I believe it was the June 27th hearing that the

20    clarification, as I recall it, on the Record was that -- that

21    the budget to be approved through August provided for the

22    payment of all services rendered by GreyStar on the assets

23    being purchased during the month of August.

24         So if we are in a situation where the September budget

25    provides for the payment of the services rendered in August,

1    then we get to a cash-zero position at the end of this budget,

2    and I'm hearing from the other -- certain ORRI holders that

3    they're concerned their funds are being used, regardless, it

4    looks like we're left in a cash-zero position, and they're

5    going to be asking GreyStar to provide services again in

6    September to the tune of somewhere around $400,000, with no

7    apparent means of -- of paying those.

8         So it's -- we just need to know that the money is

9    there, and that GreyStar is going to be -- going to be paid.

10   The services provided by GreyStar are clearly essential and

11   important to preserving the assets, so we're entitled to them,

12   Judge.

13        (Participants confer.)

14        MR. KELLEY:  I have to be honest with Your Honor, I

15   don't remember what the clarification was that Mr. Draper was

16   referencing from the July hearing.

17        THE COURT:  I think he said the June --

18        MR. KELLEY:  But I do know that we paid --

19        THE COURT:  I think he said the June 26th hearing.

20        MR. DRAPER:  Your Honor, it was June 26 or June 27.

21   My recollection is June 27.

22        THE COURT:  Would it be helpful to hear what that was?

23   I don't remember it at all.

24        (Laughter.)

25        MR. KELLEY:  What I know is that, whatever services

1    they provide, they invoice us, and they're paid thirty days in

2    arrears, according to standard terms.  So my understanding is,

3    typically, then in September, we'd be paying the August bill.

4    That's what I have just been inquiring with my client, that's

5    standard terms.

6         (Participants confer.)

7              MR. KELLEY:  Fourteen days arrears?

8         (Participants confer.)

9              MR. KELLEY:  So then if it's fourteen days, then it

10   will be paid -- we've confirmed that the -- the payments to

11   GreyStar are included within the lease operating cash

12   disbursements, as it appears on the budget.  Without the

13   breakdown behind this specifically, I don't know that we can

14   answer specifically which week.  But they are paid in arrears,

15   so the August time would have been billed, Mr. Draper is

16   telling me about fourteen days; Mr. Reese was thinking it was

17   twenty-five days.  So it's either the last week of September or

18   the second week of September.  But whatever it is, the money is

19   in the budget, and is intended to be in the budget, and is

20   intended to be used to pay GreyStar, if that answers your

21   question.

22             THE COURT:  I don't know if that answers your question

23   or not.  I'm happy to figure out what we did in June.

24             MR. DRAPER:  Your Honor, it's -- I appreciate the

25   situation Mr. Kelley is in.  I'm not sure whether he's telling

1    me that the services GreyStar has already provided in August

2    are now being allocated and provided for in this September

3    budget, and then --

4              THE COURT:  Let's see what we did --

5              MR. DRAPER:  -- for September, we're --

6              THE COURT:  Let's see what we did in June.

7              MR. DRAPER:  Whatever --

8              THE COURT:  Here is your colloquy in June.

9              MR. KELLEY:  Okay.  We found it; that's amazing.

10             THE COURT:  Yeah.

11        (Playback of proceedings from June 27, 2013 from 1:42 p.m.

12    to 1:44 p.m.)

13             MR. DRAPER:  Your Honor, can I interrupt?

14             And I'm sorry.  The discussion -- that discussion was

15    relating to the terms of the sale order --

16             THE COURT:  Correct.

17             MR. DRAPER:  And the issue that I'm referring to is

18    when the Debtors sought approval of the next interim budget,

19    and I believe that was also June 27th.  There was a

20    presentation of a motion to approve that, I believe by

21    Mr. Kelley, and then I requested clarification on the Record

22    that it included payments for GreyStar.  There was a break, and

23    we attended to other business temporarily while someone from

24    the Debtor consulted with their financial advisor, and then

25    they came back ultimately and confirmed.  I believe it was

1    closer to the end of the hearing.  And I'm sorry, I see that I
2    don't have a page reference in my -- in my objection.
3         THE COURT:  So this is the hearing -- I'm going to
4    back to the beginning.  So it starts at 1:30.  There's no break
5    -- I don't know if you're looking at the time stamps on the
6    left side, but --
7         MR. DRAPER:  It's -- and I believe what Your Honor did
8    was suggest that we effectively hold the motion and address
9    other business.  There was no recess.
10        THE COURT:  Gotcha.
11        MR. DRAPER:  But there was discussion off the record
12   while we attended to other business in the court.
13        (Pause in proceedings.)
14        MR. DRAPER:  And that is, Your Honor, your --
15        (Playback of proceedings from June 27, 2013 from 1:45 p.m.
16   to 1:48 p.m.)
17        THE COURT:  Is there more that pertains to the
18   hearing?
19        MR. DRAPER:  Yes, Your Honor.
20        THE COURT:  There is more?  There's more?
21        MR. DRAPER:  Yes, Your Honor, there is -- it is -- I'm
22   trying to recall about how much time.  I think it was around
23   forty-five minutes to an hour later, sometime shortly before
24   the conclusion of the hearing --
25        THE COURT:  Okay.

1           MR. DRAPER:  -- that we took the issue back up, and it
2      was -- it was clarified that yes, it did.
3           THE COURT:  Okay.
4           MR. DRAPER:  So in --
5           THE COURT:  Hold on.  I want to get there.  I want to
6      -- it's an important question to everybody, and I want to hear
7      what got said.
8           (Pause in proceedings.)
9           (Playback of proceedings from June 27, 2013 from 1:49 p.m.
10     to 1:50 p.m.)
11          THE COURT:  All right.
12          MR. DRAPER:  That's all.
13          THE COURT:  Now go ahead.  I think we've --
14          MR. DRAPER:  And --
15          THE COURT:  It's important to know what happened, and
16     I didn't remember it.
17          MR. DRAPER:  Yes, Your Honor.  The bottom line,
18     GreyStar needs to know that it's going to be paid.  If GreyStar
19     is only now being paid in the September budget for services
20     provided in August, then we get to a cash-zero position when
21     GreyStar is still going to be providing services during the
22     month of September.
23          My understanding from the June 27th hearing was that
24     that budget through August provided for the funds necessary to
25     pay GreyStar for the services it provided during that budget

1    period.  Now so it's --

2         THE COURT:  All right.  Let's take this one step at a

3    time.  Is it true that the work through August is budgeted and

4    will, in fact, now be paid within fourteen days including --

5         MR. KELLEY:  Whatever the -- yes, consistent with

6    their terms.

7         THE COURT:  Within fourteen or thirty, whatever the

8    terms are.

9         MR. KELLEY:  Right.  It is contemplated that, in

10   September, we will be paying for the services they provided in

11   October -- in August.

12        THE COURT:  Whether out of the August budget or out of

13   the September budget.

14        MR. KELLEY:  It's being paid -- booked into the

15   September budget, is my understanding.

16        THE COURT:  Okay.  Now as to the September work, why

17   are you doing work if you don't think you're going to get paid

18   for it?

19        MR. DRAPER:  That's -- that's why I'm here.  So I need

20   clarification on that point, because it is -- I may have been

21   wrong; I don't think so.  But my understanding was they had

22   provided special funds in the August budget to pay for the

23   services provided by GreyStar during that budget period, which

24   was --

25        THE COURT:  All right.  Your --

1      MR. DRAPER:  -- that August budget had the money set

2   aside.

3      THE COURT:  You get paid for it for the work through

4   August.

5      MR. DRAPER:  Yes.

6      THE COURT:  Now the question is, is there going to be

7   work for September, right?

8      MR. DRAPER:  Yes.

9      MR. KELLEY:  It's my understanding that this budget

10  reflects payments for the work that will be performed in

11  September.  I will -- but we're not asking for approval --

12     THE COURT:  But that wouldn't be --

13     MR. KELLEY:  -- of that budget period yet.

14     THE COURT:  I thought that wouldn't be paid until

15  October, so --

16     MR. KELLEY:  That's correct.  So that's -- it's not

17  being approved yet.  It's in the budget that has been filed.

18  The budget that we filed goes through the end of October.

19     THE COURT:  Right.

20     MR. KELLEY:  So September work from GreyStar is

21  reflected in the budget, and will be paid in the budget.  So it

22  shows in the budget, but we're not asking the Court for

23  permission to spend those monies yet.

24     THE COURT:  What would you like to do?  Do you object,

25  not object?

1        (Laughter.)

2                MR. DRAPER:  And I'm sorry.  Can I ask Mr. Kelley?

3    When is that phase of the budget going to be --

4                THE COURT:  September 19th.

5                MR. DRAPER:  -- sought for approval?

6                THE COURT:  September 19th.

7                MR. DRAPER:  That's -- I think that's the best we can

8    do under the circumstances, Judge.

9                THE COURT:  So do you --

10               MR. KELLEY:  And we'll continue to provide backup and

11   show --

12               THE COURT:  I just want to know then, do you object to

13   entry of the interim cash collateral order?

14               MR. DRAPER:  Not with those representations, Your

15   Honor.

16               THE COURT:  All right.  Any other party object?  I

17   mean, I know we had a couple of reservation of rights and those

18   -- I would say that all parties have reserved their rights on

19   those statements; no one else needs to do that.

20               Anybody now object to the interim cash collateral

21   order?

22           (No verbal response.)

23               THE COURT:  All right.  Do you have that Order

24   available?

25               MR. KELLEY:  I have a copy in my notebook, Your Honor.

19

1          THE COURT:  But the one in my book doesn't have the

2     attachment.

3          MR. KELLEY:  Unfortunately, the one in my book does

4     not, either.  I can compile that and get that to you, Your

5     Honor.

6          THE COURT:  Okay.  It's supposed to have a budget, I

7     think, for September 1 through 22, and that's the budget that I

8     think I'm missing.

9          MR. KELLEY:  We actually were planning on attaching

10    the whole budget with the Order, just limiting our ability to

11    spend for that period of time.  We were going to attach the

12    entire exhibit and --

13         THE COURT:  Oh, so we can take the budget off of

14    the --

15         MR. KELLEY:  Off the motion and attach it to the -- I

16    can pass mine up.

17         THE COURT:  I've got that, if that's what -- if that's

18    okay with the parties.

19         MR. KELLEY:  That's fine.

20         THE COURT:  I'm fine doing it that way.

21         MR. KELLEY:  Because you're only approving our

22    authority to spend through September 22nd.

23         THE COURT:  I thought you actually had separated it

24    out of the budget.

25         MR. KELLEY:  We didn't; we didn't reduce it down.

1          THE COURT:  All right.

2       (Pause in proceedings.)

3          THE COURT:  All right.  What do we have next?

4          MR. KELLEY:  Your Honor, I'm going to go through some

5    -- what's listed on the --

6          THE COURT:  I'm sorry.  Let me make one more entry --

7          MR. KELLEY:  Sorry.

8          THE COURT:  -- for the minute purposes, which is we're

9    now going to carry Docket No. 2482 to September the 19th.

10      (Court and court personnel confer.)

11         THE COURT:  Go ahead.

12         MR. KELLEY:  And the second item on the Agenda today,

13   Your Honor, is the motion for relief from stay filed by Harris

14   CapRock.  We've been in discussions with them.  I believe they

15   have decided to continue the hearing to a point in time in

16   October.  I'm not sure a specific date has been identified.

17         MR. JUDD:  Sure, Your Honor.  Josh Judd on behalf of

18   Harris CapRock Communications.

19         Your Honor, we represented that, as long as the

20   interim order approving use of cash collateral was entered,

21   we'd agree to an October 10th hearing date, if that's

22   available.

23         THE COURT:  October 10th.  Any objection by the

24   Debtor?

25      (Participants confer.)

1          MR. KELLEY:  Well, I may have a conflict, and I may

2     talk to them about maybe moving it one week to the 17th, but

3     we'll visit.  We don't need to settle that here at the podium.

4          THE COURT:  Well, the docket is going to reflect that

5     it's carried to the 10th.  The parties can, by agreement, move

6     it to another date on the Agenda, with just a note on the

7     Agenda that the parties have agreed to continue it, but

8     officially, it will be carried to the 10th.

9          MR. JUDD:  Thank you, Your Honor.

10          MR. KELLEY:  Of course, thank you.

11          THE COURT:  Okay.  Thank you.  The 10th of October.

12          Okay.  The next thing we have then is 2241?

13          MR. KELLEY:  The third item is the motion of Gomez Hub

14     Pipeline Partners.  Again, Your Honor, it's my understanding

15     that those parties have agreed to move that to September 26th.

16          THE COURT:  Is there anybody here on behalf of Gomez

17     Hub?

18          MR. KELLEY:  They may be on the line, Your Honor.  I

19     don't know.

20        (Pause in proceedings.)

21          THE COURT:  Mr. Covad, is that you?

22        (No verbal response.)

23          THE COURT:  Mr. Covad, do we have you on the line?

24          MR. KOPACZ:  (Via telephone)  Hello, Your Honor.  This

25     is Greg Kopacz of McDermott, Will & Emory.  I'm just -- on

1    behalf of Gomez Hub Pipeline Partners.  And Mr. Kelley is

2    correct that we've adjourned the hearing to September 26th.

3              THE COURT:  All right.  We'll continue Number 2241

4    until September 26th, at 1:30.  Thank you.

5              MR. KELLEY:  Your Honor, my apologies.  But we had

6    filed an updated Agenda, and I had brought an extra copy for

7    you, just in case you didn't have the updated Agenda.  It may

8    be the last one we filed, if you've already got it.

9              THE COURT:  I think I've got it.  And I know these

10   dates are all in there.  I just want the parties to tell me

11   whether they agree to them or not agree to them.

12             Okay.  Next we have the --

13             MR. KELLEY:  That's the one I'm working from, so I

14   just wanted to --

15             THE COURT:  Thank you.  So I think we're next at 2248.

16   Is that right?

17             MR. KELLEY:  Yes, Your Honor.  The fourth item is

18   actually -- it doesn't identify it in the style of the motion,

19   but it's actually a pleading filed by Gulf Coast Chemical.

20             THE COURT:  Right.

21             MR. KELLEY:  It's an application for allowance of

22   administrative expense.  And that motion has been moved to the

23   19th, by agreement of the parties.

24             THE COURT:  Is there anyone here on behalf of Gulf

25   Coast that wants to object to moving the hearing?

1    (No verbal response.)

2         THE COURT:  All right.  The hearing is continued until

3    September 19th at 1:30.  Okay.

4         MR. KELLEY:  The next one, Your Honor, is the motion

5    of -- and I want to pronounce this correctly -- Exterran Energy

6    Solutions for allowance and payment of an administrative

7    expense claim.

8         THE COURT:  Number 2282?

9         MR. KELLEY:  Yes, Your Honor.  We have been in

10   discussions with them, and I believe we have reached an

11   agreement with them, and we are negotiating an Agreed Order,

12   and at some point, we'll be providing an Agreed Order.

13        THE COURT:  Is there anybody here on behalf of

14   Exterran?

15        MR. KELLEY:  In the interim, Your Honor, I think

16   Exterran has requested that we ask that the Court reset this to

17   the 19th, as the sort of back-in date.

18        THE COURT:  I've got Mr. Maraist on the phone.

19        MR. KELLEY:  Okay.  Thank you.

20        THE COURT:  Mr. Maraist, would you prefer that it call

21   for just submission of an Agreed Order within fourteen days, or

22   do you want me to continue the hearing until September 19?

23        MR. MARAIST:  (Via telephone)  Good afternoon, Your

24   Honor.

25        THE COURT:  Good afternoon.

1          MR. MARAIST:  Kevin Maraist for Exterran Energy.

2          I think we'd like to retain the setting, Your Honor,

3    with the expectation that we will upload an Agreed Order,

4    hopefully in the next few days.  But in the event that we have

5    some issues, it -- we could have the setting or, if the Court

6    would prefer, we could certainly have it reset, whatever the

7    Court prefers.

8          THE COURT:  I don't care.  I just -- I want to

9    accommodate the parties.

10          MR. KELLEY:  The Debtor is fine with the resetting on

11    the 19th.  I'm confident we'll have something uploaded well

12    before then.

13          THE COURT:  They're going to be here anyway,

14    Mr. Maraist.  The question is whether you need to either be

15    here or be on the phone.  If I just call for an uploaded order,

16    then you don't need to be there.  If it's on the 19th, then

17    normally, I would expect somebody from Exterran to be on the

18    phone or here.  Your pick.

19          MR. MARAIST:  Your Honor, I have -- I'll plan on

20    participating on the telephone if we don't have an agreement.

21          THE COURT:  Thank you.  The hearing is continued until

22    September 19th at 1:30.  All right.

23          MR. KELLEY:  I may sound like a broken record, Your

24    Honor, as to Item No. 6, Hornbeck Offshore, Motion for

25    Allowance with respect to the administrative expense claim, has

1      also been continued to the 19th by agreement of the parties.

2              THE COURT:  Is there anyone here on behalf of Hornbeck

3      on Docket No. 2285?

4          (No verbal response.)

5              THE COURT:  All right.  I've got no appearance on the

6      Hornbeck matter.  We will continue it until September the 19th

7      at 1:30.

8              MR. KELLEY:  Your Honor, Item No. 7 is the motion by

9      Omega.  Can we skip that and come back to that?  Because I

10     believe the rest we'll just tick off, and then we'll come back

11     with the last item being the Omega one.

12             THE COURT:  All right.

13             MR. KELLEY:  Number 8, Your Honor, is the Cameron

14     motion.

15             THE COURT:  Correct.

16             MR. KELLEY:  And Cameron, too, has asked that theirs

17     be extended to the 19th.  We have no opposition to that.

18             THE COURT:  Thank you.

19             MR. MCKAY:  Your Honor, Zach McKay for Cameron

20     International.  We do agree to pass it to the 19th.

21             THE COURT:  Okay.  The hearing then is continued to

22     September the 19th at 1:30.

23             Thank you.

24             2358, which is Supreme.  That's yours, Mr. Spence.

25         (Participants confer.)

1          MR. KELLEY:  Okay.  That is Supreme.  Sorry.

2          MR. SPENCE:  I believe we are working it out, it just

3     isn't fully worked out, and so a continuance to the 19th would

4     be good.

5          THE COURT:  You'd prefer that, than just call for an

6     uploaded order?

7          MR. SPENCE:  We'd prefer that because there are still

8     some issues.

9          THE COURT:  We'll continue the hearing until

10    September 19th at 1:30.

11         Thank you.

12         MR. KELLEY:  Your Honor, if, in between, we do resolve

13    the issues, and we do upload an order, would you prefer that we

14    still appear on the 19th, to announce that, or?

15         THE COURT:  Yeah.  But you'll be here on the 19th,

16    right?

17         MR. KELLEY:  I will be here on the 19th.

18         THE COURT:  I won't require the other parties to be

19    here if it's just an agreement, if they're confident that I'll

20    sign it.  If I've got questions about it, though, I'm going to

21    proceed with my hearing; and, if they're not here --

22         MR. KELLEY:  I understand, Your Honor.

23         THE COURT:  -- then they're going to be at their own

24    risk because I'm going to try and dispose of it at that point.

25         MR. KELLEY:  Got it.

1          THE COURT:  It's up to them.  They won't be in

2     contempt, but they may not like what the result is.

3          (Laughter.)

4          THE COURT:  All right.  Then we have?

5          MR. KELLEY:  Item No. 10, Your Honor, is Technip's

6     motion.

7          THE COURT:  Right.

8          MR. KELLEY:  It is their Emergency Motion to Compel

9     Payment.  We've been in discussion with Technip's counsel, and

10    they've requested a continuance of this until the 19th, and we

11    are in -- the Debtor is comfortable with that, and we agree

12    with that, Your Honor.

13         THE COURT:  Is there anyone here on behalf of Technip

14    on Document --

15         MR. KELLEY:  I'm --

16         THE COURT:  -- 2460?

17         MR. KELLEY:  I believe they might have been out

18    because of the religious holiday, and we agreed that we would

19    announce the --

20         THE COURT:  All right.  The hearing is continued until

21    September 19th.

22         Thank you.

23         What do you have next?

24         MR. KELLEY:  Number 11 is the motion of Era

25    Helicopters.  It's the relief with respect to the liens, which

1    spent significant time talking about last week.  I think this

2    will be very brief, but we'll let Mr. Lamberson address it.

3            THE COURT:  2454?

4            MR. WILLIAMSON:  Good afternoon, Your Honor.

5            THE COURT:  Good afternoon.

6            MR. WILLIAMSON:  Steve Williamson for Era Helicopters,

7    LLC.

8            Our motion to track those that we discussed at length

9    last Thursday -- and we uploaded an Agreed Order yesterday,

10   which tracks the terms of the Agreed Order that resolved those

11   matters.

12           THE COURT:  I have not seen that yet.  Do you happen

13   to have a docket number on that, or do you have a copy --

14           MR. WILLIAMSON:  Yes, Judge.

15           THE COURT:  -- or do you have --

16           MR. WILLIAMSON:  The --

17           THE COURT:  -- a copy of the Agreed Order, either one?

18           MR. WILLIAMSON:  It's Docket No. 2492, but I have a

19   copy for the Court.

20           THE COURT:  Thank you.

21           MR. LAMBERSON:  And Your Honor, Phillip Lamberson on

22   behalf of certain DIP lenders.

23           To this point, we have worked out an Order with the

24   Movants form the hearing last week.  I have a copy of that with

25   me.  I did not upload it yet, but I'm happy to present it to

1    Your Honor in electronic form.

2              THE COURT:  Thank you.

3              MR. LAMBERSON:  And this is an Order agreed to by all

4    Movants, and in fact, signed off on by all Movants.

5              THE COURT:  And is it similar to the one that

6    Mr. Williamson has just handed up?

7              MR. LAMBERSON:  It's identical, actually, other than

8    the names of the parties, and the fact that objections were

9    filed.

10             THE COURT:  All right.  Let me have your Order, if I

11   could, please?

12             Thank you.

13             I've signed Mr. Williamson's Order.

14             MR. LAMBERSON:  Thank you.

15             MR. WILLIAMSON:  Thank you, Judge.

16        (Pause in proceedings.)

17             THE COURT:  Do I want to scan and fix the Kingston --

18   there might be a problem with some files on the device.  I

19   think we'll take that option, so.

20             MR. LAMBERSON:  Do you want me to upload a digital

21   copy?  I'm happy to do that, Your Honor.

22             THE COURT:  The device was successfully scanned.

23   We'll see if you've infected the federal Government here.

24   That's a dangerous question.

25        (Laughter.)

1          THE COURT:  So this is identical to what we just dealt
2     with?
3          MR. LAMBERSON:  It is, other than the names of the
4     parties, and then the fact that no file -- no objection was
5     filed to the Era Helicopters motion.
6          THE COURT:  Okay.
7          MR. LAMBERSON:  But obviously, there were objections
8     filed to those.  The substance is exactly the same.
9        (Pause in proceedings.)
10         THE COURT:  Does any party have any comment on the
11    Agreed Order that resolves 2356, 2373, 2386, 2388, 2400, 2406,
12    2437, 2441, and 2447?
13       (No verbal response.)
14         THE COURT:  I've signed your Order.  Thank you,
15    Mr. Lamberson.
16         MR. LAMBERSON:  Thank you, Your Honor.
17         THE COURT:  All right.  I think that goes to Wright
18    Well Control now.  Is that correct?
19         MR. KELLEY:  That is correct, Your Honor.  And Wright
20    Well Control's motion, we've reached an agreement to move that
21    one to the 19th.
22         MR. MCKAY:  Your Honor, Zach McKay for Wright Well
23    Control.  We agree to pass that until the 19th.
24         THE COURT:  Thank you.
25         We'll continue the hearing until September 19th at

1     1:30, by agreement of the parties.

2              All right.  So we just have the one now to go back to.

3     Is that correct?

4              MR. KELLEY:  That's correct.  That is Item No. 7, if

5     my memory serves me correctly, and that's Omega's motion.

6              THE COURT:  Go ahead.

7              MR. KELLEY:  Omega here -- is here and has witnesses,

8     and I think they're prepared to proceed, Your Honor.

9              THE COURT:  Thank you.

10         (Pause in proceedings.)

11             THE COURT:  All right.  Mr. deLaunay, who's going to

12    be your first witness today?

13             MR. DELAUNAY:  Judge, we call Mr. Michael Pierson.

14             THE COURT:  All right.  Are there any exhibits that

15    you're going to be offering?

16             MR. DELAUNAY:  Judge, I have exhibit books.

17             THE COURT:  Thank you.

18         (Participants confer.)

19             THE COURT:  Is the Debtor or any other party-in-

20    interest going to have any exhibits, as well, on the Omega

21    motion?

22             MR. KELLEY:  We may, Your Honor.  Ours are going to be

23    proof of those that were paid.  I'm going to wait and see what

24    their case consists of --

25             THE COURT:  All right.

1          MR. KELLEY:  -- before we offer these.

2          THE COURT:  Are you offering all of these, at this

3    point, Mr. deLaunay?

4          MR. DELAUNAY:  I would offer them.  I don't know that

5    the -- if there's any objections at this point.  We would

6    eventually offer them all.

7          THE COURT:  All right.  Let me hear the ones to which

8    you have an objection, Mr. Kelley.  We'll admit the ones to

9    which there is no objection, then we'll allow you to introduce

10   ones to which there is an objection during the course --

11         MR. KELLEY:  Sure.

12         THE COURT:  -- of the contested hearing.

13         MR. KELLEY:  Your Honor, fundamentally, I don't think

14   we're going to object to Exhibits A through -- I believe LL.

15   There appears to be a summary chart in MM, which we may or may

16   not object to, depending upon the testimony.  So for this point

17   in time, we'd like to assert an objection, pending --

18         THE COURT:  Right.  But through LL, you have no

19   objection.  A through LL.

20         MR. KELLEY:  Strike that.  We do have an objection as

21   to LL.  Sorry, Your Honor.

22         THE COURT:  Okay.  A through KK.

23         MR. KELLEY:  Yes.

24         THE COURT:  Okay.  A through KK are admitted by

25   agreement.

1       (Omega Exhibits A through KK received in evidence.)

2           THE COURT:  LL, MM, and NN can be offered during the

3       course of the proceeding, and we'll determine the objection at

4       that time.

5           MR. DELAUNAY:  Judge, we may be able to -- well, we've

6       added NN.  It was a payment received subsequent to the filing

7       of the motion, so we updated our exhibit list.  So it's

8       actually a credit of them, a $17,876.29 payment.  So I -- I

9       don't know that there will be an objection to that.

10          MR. KELLEY:  I'm not sure I understand the question.

11          THE COURT:  It's a -- it's a check.

12          MR. DELAUNAY:  It's a check --

13          THE COURT:  NN is a check.

14          MR. DELAUNAY:  -- showing payment.

15          MR. KELLEY:  There's a couple of checks.  There's

16      another one that should -- that came in for another one of

17      these invoices.

18          MR. DELAUNAY:  That's correct.  And I'm going to

19      correct that in a second.

20          THE COURT:  Do you object, though, to this check, NN,

21      coming in?

22          MR. KELLEY:  To the invoice NN?

23          THE COURT:  No, the check.

24          MR. DELAUNAY:  No, the check.

25          THE COURT:  It's a check from you.

1              MR. DELAUNAY:  For the $17,000 check.

2              MR. KELLEY:  I'm sorry, Your Honor.  I don't have it

3       in front of me.

4              THE COURT:  That's okay.  It's the very last --

5              MR. KELLEY:  Oh, there it is.  I don't -- I don't have

6       any objection to the ATP check coming in.

7              THE COURT:  Okay.  We'll admit NN, as well.

8          (Omega Exhibit NN received in evidence.)

9              MR. DELAUNAY:  And Judge, yesterday evening, ATP

10      produced a group of AFEs and requisitions, which we had

11      requested from them.  We did not get them until yesterday

12      evening.  And I'd like to add those as Exhibit OO, with the

13      Court's permission.

14             THE COURT:  All right.  Do you want to hand those up,

15      please?

16             MR. KELLEY:  We don't have any objection to those,

17      Judge.

18             MR. DELAUNAY:  And I have --

19             THE COURT:  Okay.  We'll admit OO.

20             MR. DELAUNAY:  -- two additional copies.

21             THE COURT:  Thank you.

22          (Omega Exhibit OO received in evidence.)

23             MR. KELLEY:  They were requested for a depo that was

24      noticed yesterday.

25             MR. DELAUNAY:  Right.

1          MR. KELLEY:  I just want to make sure there's no --
2     he's not talking about any delay.
3          MR. DELAUNAY:  No.  No suggestion of that.
4          THE COURT:  All right.
5          MR. DELAUNAY:  Okay.
6          THE COURT:  All right.  Mr. Pierson, would you come
7     forward, please, sir.  Step right up here, sir.  Would you
8     raise your hand, please.
9          MICHAEL PIERSON, WITNESS FOR OMEGA, SWORN.
10         THE COURT:  Thank you.  Would you have a seat right up
11    here, please.
12       (Participants confer.)
13            DIRECT EXAMINATION OF MICHAEL PIERSON
14    BY MR. DELAUNAY:
15    Q   Mr. Pierson, would you state your name for the Record,
16    please?
17    A   Jerry Michael Pierson.
18         THE COURT:  Sir, I need you to pull that close to you,
19    and speak up to where everybody in the court reporter is able
20    to hear you over here.
21    A   Jerry Michael Pierson.
22         THE COURT:  Thank you, sir.
23    BY MR. DELAUNAY:
24    Q   And Mr. Pierson, what's the highest educational degree that
25    you have attained?

1    A    I have a Bachelor's -- a Bachelor's Degree in Petroleum

2    Engineering.

3    Q    And where are you employed at this time?

4    A    ATP Oil & Gas.

5    Q    And what is your position there?

6    A    Chief Operations Engineer.

7    Q    And as Chief Operations Engineer, what are your

8    responsibilities and duties at ATP?

9    A    I'm responsible for overseeing the Gulf of Mexico

10   production operations.

11   Q    And that would include all of the wells and mineral

12   properties operated by ATP during the course of this bankruptcy

13   proceeding?

14   A    Yes.

15   Q    Do you know a company named Omega Natchiq, Inc.?

16   A    I do.

17   Q    Prior to the institution of bankruptcy, did ATP have a

18   business relationship with Omega?

19   A    Yes.

20   Q    And what was that relationship?

21   A    Omega provided construction crews to work offshore for us.

22   Q    And were you aware that, prior to the institution of the

23   bankruptcy, Omega had in place a Master Service Agreement?

24   A    Yes.

25   Q    Excuse me.

1          (Pause in proceedings.)

2     Q    Mr. Pierson, prior to the bankruptcy, what was the process

3     of -- by which -- let me back up.

4          The Master Service Agreement was a general contract with

5     terms and conditions, pursuant to which Omega would provide

6     services to ATP when requested.  Is that correct?

7     A    Yes.

8     Q    And when specific work was done, how was Omega asked to

9     perform work?  And I'm talking pre-bankruptcy.  Did you make a

10    call to Omega from time to time to ask them to do work, or

11    would you have someone do so?

12    A    Both.

13    Q    Both?  Did you have representatives, third-party

14    contractors, that were authorized to have Omega go out and do

15    certain work?

16    A    Yes.

17    Q    Okay.  And who would that include?

18    A    Farrow Management.

19    Q    They are an inspection company?

20    A    They're -- they're a consulting company.

21    Q    Okay.  And from time to time, would your field foreman also

22    be authorized to instruct Omega to do certain work on platforms

23    where they were located?

24    A    Yes.

25    Q    Okay.  Now subsequent to the institution of the bankruptcy,

1    did you, personally, call Omega and request that they continue

2    to provide services?

3    A    Yes.

4    Q    You spoke to whom?

5    A    Mr. Greg Sandoz.

6    Q    And did Omega agree to provide those services?

7    A    Yes, they did.

8    Q    And was the method pursuant to which Omega could be asked

9    to perform services any different subsequent to the filing of

10   bankruptcy?  That question wasn't very clear.

11       But subsequent to bankruptcy, did things work the same way?

12   That is, you might call them to perform work, mister -- that

13   Farrow Management might ask them to do work, or your field

14   foreman might ask them to do work?

15   A    Yes.

16   Q    Exhibit A in the exhibit book is an agreement.  I mean, a

17   work order.  We looked through that last night.  Do you

18   remember that?

19   A    (No verbal response.)

20   Q    Do you want to see it again?

21   A    I remember.

22   Q    What's that?

23   A    I remember.

24   Q    Okay.  And that was an amendment to your MSA that was

25   executed subsequent to the filing of the bankruptcy, correct?

1      MR. KELLEY:  Your Honor, just so we have a clear

2  Record, there's nothing in front of the witness.

3      MR. DELAUNAY:  Yeah, I will --

4      MR. KELLEY:  And I don't want to make an issue of

5  this, but I would like to keep it clear, as opposed to

6  pulling --

7      MR. DELAUNAY:  If I can approach --

8      MR. KELLEY:  -- things from memory.

9      MR. DELAUNAY:  If I can approach the witness, Judge?

10     THE COURT:  Thank you.  Yes, sir.

11     MR. KELLEY:  I can -- I don't mind putting my exhibits

12  in front of him, whatever is easier.

13     MR. DELAUNAY:  Why don't you do that.  That would be

14  -- that would be easier.

15     (Participants confer.)

16     MR. DELAUNAY:  It doesn't matter.  He can see your

17  notes.

18     (Participants confer.)

19  BY MR. DELAUNAY:

20  Q   Do you see Exhibit A?

21  A   I do.

22  Q   And that is the amendment to work order?

23  A   Yes.

24  Q   Now why was it important that Omega have a construction

25  contractor or -- such as -- I'm sorry.

40

1    Why was it important that ATP have a construction

2    contractor such as Omega available to perform work subsequent

3    to the filing of bankruptcy?

4    A    It -- the contract allowed us to just utilize Omega to

5    perform work as needed.

6    Q    Why was it important for ATP to have a contractor available

7    to perform work on its platforms?

8    A    Well, we had to perform maintenance and work, as needed.

9    Q    You're governed by MMS regulations, and the work was

10   following MMS regulations in the operation of the platforms?

11   A    To an extent, yes.

12   Q    Okay.  Are you required by regulation to perform certain

13   maintenance on the platforms on which you operate?

14   A    We are required by regulation to maintain them in a certain

15   -- or to meet minimum conditions.

16   Q    Okay.  You're required to perform work as necessary to

17   prevent any environmental hazards from occurring?

18   A    Yes.

19   Q    Okay.  And was that part of the work that Omega would do

20   for you?

21   A    If it was needed, yes.

22   Q    Mr. Pierson, your office is located where?

23   A    4600 Post Oak Place, Houston.

24   Q    Okay.  And is that the place, prior to bankruptcy, to which

25   Omega would mail invoices to ATP?

1    A    Yes.

2    Q    And subsequent to the filing of the bankruptcy, Omega

3    mailed its invoices to the same location?

4    A    I believe so.

5    Q    And the invoices which have been attached are addressed to

6    your attention.  If you would look, for instance, at Exhibit B?

7    A    (Witness reviews exhibits.)

8    Q    What -- could you explain to the Court, what is the

9    procedure that is employed by ATP once an invoice is received,

10   to make sure that the invoice is valid?

11   A    Well, the invoice would be received by our -- by our

12   receptionist.  They would log it, send it to accounting, and

13   would then log it into our system, and they would circulate it

14   to whomever had the authority to approve that particular

15   invoice.

16   Q    And part of the process included a review of the

17   attachments to the invoices?

18   A    Yes.  The recipient would review the attachments.

19   Q    And part of the review would also include comparing what

20   Omega claimed it did with the reports from your inspectors?

21   A    Yes.

22   Q    And that is Farrow Management?

23   A    On some work, yes.

24   Q    On some of the work?  Okay.

25        And if there was an objection to any of the charges by

1  Omega, what was your normal process?

2  A   Typically, we would mark the invoice short.  We would

3  contact Omega and advise them of the -- that it was short.

4  Q   Okay.

5  A   And we would try to negotiate what it should be.

6  Q   Since the filing of this motion in July, Mr. Pierson, has

7  ATP undertaken to review these invoices or review its records

8  to determine whether it had objected to or disputed any of the

9  charges from Omega?

10  A   I have no knowledge of that.

11  Q   Well, when invoices come in, they come to you first.  Is

12  that correct?

13  A   It -- for remarks, review, and approval, yes.

14  Q   And then they go through the -- is there -- the review

15  process?

16  A   Yes.

17  Q   And if there is an objection or -- to any of the invoices

18  or a dispute, are you made aware of that?

19  A   Yes.

20  Q   Okay.  Were you ever made aware of any disputes to any of

21  the invoices which are the subject of this hearing?

22  A   Not that I recall.

23  Q   Last night, when we were speaking, I asked if you might

24  take some time this morning and check your accounting system,

25  to determine whether or not there were any disputes.  Did you

1    do that?

2    A    I did not.

3    Q    Mr. Pierson, what portion of the -- which is reflected in

4    -- well, let me ask you this:  As you sit here today, do you

5    dispute, as the chief engineer in charge of operations in the

6    Gulf of Mexico for ATP, do you dispute that Omega performed the

7    work that is shown on its invoices?

8         MR. KELLEY:  Just so we're clear, he's asking this

9    question in his personal capacity, right?

10        MR. DELAUNAY:  Asking -- what is it?

11        MR. KELLEY:  He's not asking on behalf of the company,

12   so.

13        MR. DELAUNAY:  It's -- I'm asking him on behalf of the

14   company, as the chief engineer, in charge of operations for the

15   Gulf of Mexico.

16   BY MR. DELAUNAY:

17   Q    In that capacity, do you dispute whether Omega performed

18   the work that's shown on the invoices?

19        THE COURT:  Well, let me just -- I do think it's fair,

20   to get some clarification here.

21        MR. DELAUNAY:  Sure, Judge.

22        THE COURT:  He's testified that he is unaware of any

23   dispute.

24        MR. DELAUNAY:  Right.

25        THE COURT:  And so I need to know what's the

1    difference between that and the question you're asking now.

2             MR. DELAUNAY:  Good point, Judge.

3             THE COURT:  Okay.

4             MR. DELAUNAY:  Good point.

5    BY MR. DELAUNAY:

6    Q   Let's take it you, individually, Mr. Pierson.  Do you

7    dispute that Omega performed the work that's shown on its

8    invoices?

9    A   Not on the invoices I've approved.

10   Q   I'm sorry.  Say that again.

11   A   Not on the invoices -- not on the invoices I approve.

12   Q   Okay.  Well, did you approve these invoices?

13            MR. KELLEY:  Judge, can we just be clear, when he says

14   "these invoices."  Are you referring to all of the ones in the

15   book?

16            MR. DELAUNAY:  I'm sorry.  Yes.

17            MR. KELLEY:  What are you --

18   BY MR. DELAUNAY:

19   Q   All of the invoices that are in that book.

20   A   I don't know.

21   Q   Okay.  Is there someone within ATP who would know?

22   A   It would have to be someone in our accounting group who

23   would have the approved invoice.

24   Q   Okay.  And Mr. Pierson, let me ask you this.  If -- you

25   mentioned that the process called for Omega to be contacted if

1  there was a dispute as to any invoice?

2  A   Yes.

3  Q   If the evidence shows that no one ever contacted Omega to

4  dispute any of the invoices, what would that indicate to you?

5  A   That would indicate that there was no dispute.

6  Q   Thank you, sir.

7      You're aware that -- okay.  Let me get back to my question

8  concerning the Mississippi Canyon 711 properties.  Those were

9  operated from the Innovator.  Is that correct?

10 A   Correct.

11 Q   And am I also correct that ATP was the operator of the

12 Innovator?

13 A   Correct.

14 Q   Am I also correct that the wells produced until they were

15 shut in at the end of April 2013?

16 A   Yes, correct.

17 Q   You are aware that Omega had crews working on the Innovator

18 up through the end of April 2013?

19 A   Yes.

20 Q   And those crews were assisting in maintenance and repair

21 and construction activities on the Innovator?

22 A   Yes.

23 Q   And would you agree that those services benefitted ATP by

24 enhancing its ability to produce from the Innovator?

25 A   No.

1    Q    Okay.  What sort of work was Omega doing for you?

2    A    Omega was doing structural work in the halls.

3    Q    And was the Innovator in need of structural work?

4    A    Yes.

5    Q    And if that structural work did not occur, what were the

6    risks that ATP would take?

7         MR. KELLEY:  My objection is it's just vague as to

8    point in time, Judge.  Risks at what point in time?  The period

9    does matter for these types of questions.

10        MR. DELAUNAY:  Well, I'm talking --

11        THE COURT:  Overruled.  Overruled.

12        MR. DELAUNAY:  Okay.

13        THE COURT:  I'll let you fix that up.

14   BY MR. DELAUNAY:

15   Q    What were the risks if these repairs and maintenance was

16   not done?

17   A    Well, the -- the deterioration, the corrosion would have

18   continued over time.

19   Q    Okay.  Those could contribute to an environmental hazard?

20   A    I don't know that I would -- that I would say that, no.

21   Q    What would happen if corrosion allowed leaks into the --

22   into this platform, could it begin to list?

23   A    It could.

24   Q    And if -- and if the leaks became too bad, would it not

25   create an environmental hazard in the Gulf of Mexico

1    A    Depending on what all the circumstances were that led up to

2    it, it could, but --

3    Q    From a safety standpoint, am I correct that the Innovator

4    had columns or legs throughout its structure that had to be

5    repaired from time to time, to prevent leakage into those legs,

6    into the columns?

7    A    The columns?

8    Q    Part of the work that Omega was doing was to repair

9    corroded areas that might allow leakage into the facility.  Is

10   that correct?

11   A    Into the hull.

12   Q    Into the hull.

13   A    Correct.

14   Q    That's correct?  Is that correct?

15   A    Yes.

16        THE COURT:  I'm sorry.  What -- let me -- I just -- I

17   may have gotten --

18        MR. DELAUNAY:  Sure.

19        THE COURT:  -- my notes wrong on your question.  Was

20   it to stop leakage into the hull or to avoid leakage into the

21   hull?  And I'm just not sure what the question was.

22        MR. DELAUNAY:  Let me see if I can clarify that,

23   Judge.

24        THE COURT:  Thank you.

25   BY MR. DELAUNAY:

MICHAEL PIERSON - DIRECT BY MR. DELAUNAY

48

1   Q   Was there instances where leakage was, in fact, experienced

2   into the hull of the Innovator?

3   A   There -- we have had seepage into the hull of the

4   Innovator.

5   Q   Okay.  And how was that repaired?

6   A   When it was discovered, it was soft -- soft patches were

7   installed, temporary repairs.

8   Q   Okay.  And who would have done that?

9   A   That was done by Omega.

10  Q   Okay.  And on other occasions, to avoid future leakage, did

11  inspections attempt to identify corroded areas that might give

12  rise to future leakage?

13  A   Yes.

14  Q   All right.  And Omega was hired or instructed to assist in

15  the repair of those areas, also?

16  A   Yes.

17  Q   And as operator of the Innovator, it was the duty and

18  responsibility of ATP to perform ongoing maintenance and repair

19  to the Innovator, was it not?

20  A   Yes.

21  Q   And Omega was used to carry out that responsibility.  Is

22  that correct?

23  A   Yes.

24  Q   Were there safety reasons that maintenance was performed on

25  the Innovator?

1      A    Not the work that you are referring to.

2      Q    Okay.  Are there safety concerns related to leakage into

3      the hull?

4      A    Depending on the situation for that tank.

5      Q    Okay.  Am I correct, Mr. Pierson, that subsequent to filing

6      the bankruptcy, ATP could not have, as a practical matter,

7      operated its mineral properties without available services from

8      a contractor such as Omega?

9      A    Correct.

10     Q    And did ATP have any other contractors, such -- providing

11     services similar to Omega?

12     A    I'm sorry.  Would you repeat that, please?

13     Q    Sure.  Subsequent to the filing of bankruptcy, did ATP have

14     an agreement with any other contractors to provide services

15     similar to that of -- those provided by Omega?

16     A    Yes.

17     Q    Okay.  And do they still have -- are those still providing

18     services?

19     A    Yes.

20     Q    Once the -- explain to me, please, once the -- let me back

21     up.  You mentioned that there was an order to shut in

22     production at -- part of the Innovator, effective April 30th.

23     What caused that order to come down?

24     A    I don't know the details of the -- of that order.

25     Q    Okay.  Did they relate to -- well, strike that.

1        Once the order was in place, as an engineer, tells us,
2   could you just, at the end of the day, on April 30th, take
3   everybody on that platform, put them on a boat, and -- and just
4   leave it?
5   A    No.
6   Q    Okay.  From a regulatory matter, you had to do certain
7   things to the platform before you could essentially leave the
8   platform or abandon the platform, correct?
9   A    To an extent, yes.
10  Q    Some of the -- I mean, for instance, hulls and a couple of
11  the -- all the holes in the hull or between the different
12  levels of the hull had to be what, closed?
13  A    You would have had to close your watertight access hatches.
14  Q    Right.  And who was hired to do that?
15  A    The normal columns, anything routine, the marine crew on
16  board the facility would have handled that.
17  Q    Do you know whether or not Omega was asked by your
18  representatives on that platform to perform that type of work?
19  A    Omega would have done that for any tanks they were working
20  in.
21  Q    Okay.  And so, if an order came down on April 30th, you
22  would not expect to see Omega's time or efforts or billing stop
23  exactly on April 30th.
24  A    The -- no.
25  Q    Okay.

1          (Pause in proceedings.)

2     Q    Mr. Pierson, do you have any reason to believe that Omega

3     performed any of the work for which it has submitted invoices,

4     without authority from either you or your -- Farrow Management,

5     your consultant, or one of your field foremen?

6     A    No.

7          (Pause in proceedings.)

8               MR. DELAUNAY:  Excuse me.

9               THE COURT:  Certainly.

10         (Participants confer.)

11              MR. DELAUNAY:  Have we stipulated to OO?

12              MR. KELLEY:  There was no objection.

13              MR. DELAUNAY:  Thank you.  No, because we had agreed

14    last night on it.

15              MR. KELLEY:  Okay.

16         (Participants confer.)

17              MR. DELAUNAY:  May I approach the witness, Judge?

18              THE COURT:  Yes, sir.

19    BY MR. DELAUNAY:

20    Q    Mr. Pierson, I've handed you an exhibit entitled -- one

21    marked as Exhibit OO.  It consists of 25 pages.  You've seen

22    these documents before, have you not?

23    A    (Witness reviews exhibit.)

24         Yes.

25    Q    These are AFEs or "Authorizations for Expenditure" and

1    requisitions relating to the operation of ATP's properties in

2    the Gulf of Mexico.

3    A    Yes.

4    Q    Some of the AFEs, and for instance Page 1, show that it was

5    prepared and approved by, and your name is there.  When we see

6    that on an AFE, it's safe to conclude that -- or can I conclude

7    that you were adopting the preparation of the AFE?

8    A    Yes.

9    Q    Is it safe to conclude that the AFE represents

10   authorization for work that you felt to be necessary at ATP?

11   A    Yes.

12   Q    Looking at Page 1 of Exhibit OO, do you see the objective

13   portion of that AFE?

14   A    Yes.

15   Q    Looking at the description of the work that was being

16   authorized, that -- is that the type of work that Omega was

17   hired to do from time to time for ATP?

18   A    (Witness reviews exhibit.)

19       Yes.

20   Q    Looking at Page 2, which was another AFE bearing your name,

21   like the previous one, that's an AFE for work on the Innovator?

22   A    Yes.

23   Q    And once again, it's fair to say that this is work that you

24   determined was necessary for the operation of the ATP?

25   A    Yes.

1    Q    And is the work that's described there in the objective
2    section the type of work that Omega was hired to do?
3    A    (Witness reviews exhibit.)
4         Yes.
5    Q    We're not going to go through each one.  But for instance,
6    Page 5 of 25, if you look at that, is a -- that's what is known
7    as a "requisition."  Is that correct?
8    A    Yes.
9    Q    And that's a requisition made to Omega?
10   A    Yes.
11   Q    And why -- could you explain why that -- this work would be
12   requested by way of a requisition, rather than an AFE, through
13   an AFE?
14   A    The -- a requisition is typically done for lease operating
15   expenses of a small magnitude.
16   Q    Okay.
17   A    The AFEs are typically done on larger magnitude projects.
18   Q    Looking at Page 7, who -- could you tell us who Ben
19   Roseberry (phonetic) is?  His name is shown at the bottom of
20   that requisition.
21   A    He was a production foreman on the Innovator.
22   Q    Okay.  And it would not have been unusual for him, in that
23   position, to make a requisition for approval for certain work;
24   work such as this?
25   A    That's correct.

1    Q    Okay.  Go to Page 13, if you would, please.

2    A    (Witness reviews exhibit.)

3    Q    It bears the name Lawrence LeBeouff (phonetic).  Can you

4    tell the Court who that is, please?

5    A    He's our senior production foreman in the Gulf of Mexico.

6    Q    It would not have been unusual for him, from time to time,

7    to request -- make a request to Omega to perform -- for

8    performance of work?

9    A    That's correct.

10    Q    Page 14 is -- bears the name William Keith Kayes

11    (phonetic).  Do you know who that is?

12    A    I do.

13    Q    Who is that, please?

14    A    He was a production foreman on the Innovator.

15    Q    Okay.  Page 15 contains the -- an AFE -- it's an AFE which

16    shows it was prepared by Will Paulson (phonetic).  Who is Will

17    Paulson, please?

18    A    Will Paulson is ATP's abandonment manager.

19    Q    Is what?  I'm sorry.

20    A    ATP's plug and abandonment manager.

21    Q    Okay.  And would his job include preparing or determining

22    what sort of work might be necessary for ATP to meet its

23    plugging and abandoning obligations?

24    A    Yes.

25    Q    The last page of the exhibit is another requisition.  It

1   has Mr. LeBeouff's name.  I think you've already told us who

2   Mr. LeBeouff is.

3       Mr. Pierson, if we look at Omega's invoices -- for example

4   -- and as an example, if we look at Exhibit B in the book

5   before you.  Do you see that?

6   A   (Witness reviews exhibits.)

7       I do.

8   Q   All right.  Does it show, in the upper-right-hand corner,

9   there is a -- an AFE -- a number where -- a box where there's

10  either a PO or an AFE number to be inserted?

11  A   Yes.

12  Q   Is it customary for contractors, such as -- well, was it

13  customary for Omega during this time, working for ATP, when it

14  was asked to do work, to secure from you a number, an AFE

15  number or a requisition number, for inclusion on its invoice to

16  the company?

17  A   Typically, yes.

18  Q   Okay.  Do you have any reason to believe that the AFE

19  numbers shown on Omega's invoices are other than the AFE

20  numbers given to Omega at the time they were asked to perform

21  the work?

22  A   We have some occasions where they're miss --

23  Q   Okay.

24  A   -- the incorrect numbers are put down.

25  Q   And concerning the invoices that you have before you in the

1   exhibit book, do you have any reason to believe that the AFE

2   numbers or requisition numbers or PO numbers shown on Omega's

3   invoices are not the numbers given to them by ATP?

4           MR. KELLEY:  Lack of foundation.  If he wants to ask

5   the witness if he's looked at them previously, if he's going

6   through this exercise --

7           THE COURT:  Sustained.

8           MR. KELLEY:  -- but it's quite a big step.

9           THE COURT:  Sustained.

10  BY MR. DELAUNAY:

11  Q   Have you made any -- have you made an effort to determine,

12  as the chief engineer of operations, whether or not these AFE

13  numbers or PO numbers shown on Omega's invoices are something

14  other than numbers given by ATP?

15          MR. KELLEY:  And just so we're clear on the Record,

16  I'm assuming that what he's being asked about is the stack of

17  invoices in front of the witness --

18          MR. DELAUNAY:  That's correct.

19          MR. KELLEY:  -- and not all of the Omega invoices, in

20  general.

21          MR. DELAUNAY:  No, the invoices that are here.

22          MR. KELLEY:  Can we clear up the Record?

23          MR. DELAUNAY:  Sure.

24          THE COURT:  Go ahead.

25          THE WITNESS:  Would you please repeat the question?

1          MR. DELAUNAY:  Sure.

2     BY MR. DELAUNAY:

3     Q   Looking at the invoices before you, have you -- do you have

4     any reason to believe -- do you -- that these -- the AFE

5     numbers shown on there are not the numbers given to Omega?

6          MR. KELLEY:  This is the same question he asked

7     earlier --

8          MR. DELAUNAY:  And I'd say -- I asked the wrong

9     question, Judge.  I'll withdraw it.

10    BY MR. DELAUNAY:

11    Q   Did you make any effort, Mr. Pierson, to determine whether

12    the AFE numbers on these invoices come from anywhere other than

13    ATP?

14    A   Since this book was handed to me a few moments ago?

15    Q   No.  Since the invoices were received by ATP.

16         MR. KELLEY:  That's what my objection is.  We had a

17    series of invoices from Omega.  We are talking about a specific

18    subset here, and the questions need to be directed to these

19    invoices.  That's what's getting muddled in the Record.

20         THE COURT:  His question -- let me just try and reword

21    it.  He's only talking about the invoices in front of you in

22    the book.

23         THE WITNESS:  Right.

24         THE COURT:  And he wants to know whether you have,

25    previously to today, tried to determine whether the invoices

1    and the AFEs that are listed on the invoices match to the

2    actual AFEs that were authorized.

3            THE WITNESS:  Okay.  Sitting here, I can't tell you

4    that I've seen all of these before, but typically, when an

5    invoice from Omega comes in, I will review it, review all the

6    backup, and determine if that's -- if that information is

7    correct.  So I --

8            THE COURT:  So typically, you've done it, but you're

9    not sure if you've done it with respect to each of these

10   particular invoices.

11           THE WITNESS:  That's correct, Your Honor.

12           THE COURT:  Okay.  Go ahead.

13   BY MR. DELAUNAY:

14   Q   And Mr. Pierson, if you find that an AFE is incorrect, do

15   you communicate that to Omega?

16   A   Not necessarily.  If it's a small invoice, we'll typically

17   just scratch it up and make sure it gets allocated to the right

18   AFE.

19   Q   But what you do do is make sure that there is an

20   appropriate AFE or requisition for each invoice?

21   A   That's correct.

22   Q   And if there is not an AFE or a requisition for every

23   invoice that is appropriate, you would communicate that to

24   Omega, would you not?

25   A   Yes.

1    Q   And to the best of your recollection, with respect to any

2    of these invoices before you, was Omega at any time notified

3    that they -- there was not an appropriate or proper AFE or

4    requisition for the work shown in those invoices?

5           MR. KELLEY:  It may call for speculation.  I assume he

6    meant by this particular witness.

7           THE COURT:  That was the question?

8           MR. DELAUNAY:  Yes, that was the question.

9           THE WITNESS:  I have no recollection of that.

10          (Pause in proceedings.)

11   BY MR. DELAUNAY:

12   Q   Do you agree, Mr. Pierson, that the work performed by Omega

13   after the filing for bankruptcy enhanced the ability of ATP to

14   operate its mineral properties during the bankruptcy?

15          MR. KELLEY:  I'm going to object to the relevance

16   because the depth of the question may be seeking testimony

17   about invoices that aren't at issue here.  We're talking about

18   a specific subset of invoices that relate to an April and May

19   time frame, and that's what the question is, post-petition.  So

20   I don't think it's relevant about all the other work that isn't

21   subject to this motion.

22          THE COURT:  Overruled.  I'll let you fix that up on

23   Cross.

24          THE WITNESS:  Would you please repeat the question?

25          MR. DELAUNAY:  If I can.

1    BY MR. DELAUNAY:

2    Q   Do you agree, Mr. Pierson, that the services provided by

3    Omega to ATP since the filing of bankruptcy enhanced the

4    ability of ATP to operate its mineral properties during the

5    course of the bankruptcy?

6    A   I don't know that I would say it enhanced it.

7    Q   Well, okay.  Did it -- did it help in the operation of its

8    mineral properties?

9           MR. KELLEY:  Vague as to "help," Your Honor.  I don't

10   know if we're using the same definition for "help."  I don't

11   know what "help" means in this context.

12          THE COURT:  Overruled.

13          Go ahead and answer if you know the answer to that

14   question.

15          THE WITNESS:  Would you please repeat the question?

16   BY MR. DELAUNAY:

17   Q   Do you agree that it helped ATP in the operation of its

18   mineral properties?

19   A   I would -- I would agree that it allowed us to -- to

20   operate.

21   Q   Fair enough.

22       (Pause in proceedings.)

23          MR. DELAUNAY:  One second, Judge.

24       (Pause in proceedings.)

25   BY MR. DELAUNAY:

1    Q   Mr. Pierson, did you assist -- or do you assist in the
2    preparation of budgets for ATP?
3    A   I do.
4             MR. DELAUNAY:  Judge, may I approach the witness?
5             THE COURT:  Yes, sir.
6    BY MR. DELAUNAY:
7    Q   Mr. Pierson, I show you a budget which was attached to
8    Docket No. 1996 in this case, which was either the motion for
9    approval of a budget or the order approving the budget.  I
10   don't know where my copy went.  But we talked -- we talked
11   about this last night.  Do you recall?
12   A   I do.
13   Q   And it shows that a -- for Gomez properties, for June of
14   2013, budgeted expenses of $440,000.  Is that correct?  For
15   lease operating expenses?
16   A   Yes.
17   Q   What would -- what would be included in that?
18   A   I would anticipate that that would include normal operating
19   personnel.
20   Q   Okay.
21   A   I would --
22   Q   Just for Gomez properties?
23   A   Yes.
24   Q   Would that include repairs and maintenance?
25   A   It could, but I don't --

1    Q    Okay.

2    A    I can't tell by looking at this.

3    Q    Well, for June of 2013, if these properties were -- if the

4    Innovator was shut down, what operating expenses would you have

5    for those properties?

6              MR. KELLEY:  I'm not sure the foundation has been laid

7    from this witness, Your Honor.

8              MR. DELAUNAY:  Okay.

9              MR. KELLEY:  Objection.  Lack of foundation.

10             THE COURT:  Overruled.  If he knows, he knows.  If he

11   doesn't know --

12             MR. DELAUNAY:  If you know.

13             THE COURT:  -- he can say he doesn't know.

14             THE WITNESS:  In June of 2014?

15   BY MR. DELAUNAY:

16   Q    '13.

17   A    Sorry.  2013?

18   Q    Right.

19   A    The facility was still fully manned.  It was still

20   floating, so it still had to be manned and maintained.

21   Q    You said it still had to be manned and maintained?

22   A    The systems on it had to be maintained.

23   Q    Okay.

24        (Pause in proceedings.)

25   Q    Were you aware that, during the course of the bankruptcy

1   proceedings, the -- although there was no sale of the Gomez

2   properties, they were offered for sale?

3   A   Yes.

4   Q   And did you assist, in any manner, in preparing data, in

5   preparing information for potential bidders in connection with

6   that proposed sale -- or auction, rather?

7   A   Not that I recall.

8   Q   Okay.  Have you encountered -- during the operation -- I'm

9   sorry.

10      Since the filing of the bankruptcy, have you had or

11  encountered any issues with Government regulators relating to

12  the condition of the Innovator, either from an environmental

13  standpoint or a safety standpoint?

14  A   Which -- what -- are we talking about a specific group of

15  regulators?

16  Q   Any Government regulators.

17  A   I believe the vessel has been inspected by Coast Guard,

18  ABS, and BSEE.

19  Q   And were there notations about items that needed to be

20  corrected?

21  A   If they found deficiencies.

22  Q   Okay.  Would Omega have been involved in correction of

23  deficiencies?

24  A   They could have been.

25  Q   Well, did you know that there were -- do you know whether

1    or not there were any deficiencies noted with respect to the

2    Innovator during the period of time -- during -- since the

3    filing of bankruptcy?

4    A    I believe there may have been some BSEE deficiencies.

5    Q    Okay.  And do you recall what those included?

6    A    No.

7              THE COURT:  I'm sorry.  "Do you recall" what?

8              MR. DELAUNAY:  What those included.

9              THE COURT:  Thank you.

10   BY MR. DELAUNAY:

11   Q    As the operator of the Innovator, did ATP have an

12   obligation to address safety issues when they were discovered

13   immediately?

14   A    It was our -- certainly our policy to do that.

15   Q    Okay.  And if they involved construction needs, such as

16   hanger repairs or grading repairs or things of that sort, would

17   Omega -- I mean, would ATP rely on Omega's people on the

18   platform to perform that type of work?

19   A    They would have been one source, yes.

20   Q    Would you agree that, therefore, it was a benefit to ATP to

21   have Omega's personnel on the Innovator?

22             MR. KELLEY:  Again, Your Honor, objection.  Lack of

23   specific time frame.  I don't know how he can answer that

24   question.  Too vague.

25             THE COURT:  Overruled.

1          THE WITNESS:  Okay.  You're asking me it benefitted

2    ATP to have Omega on board?

3    BY MR. DELAUNAY:

4    Q    Right.

5    A    I don't believe that it was a benefit; I believe that it

6    was -- I believe it served a service to have them on board.

7    Q    Okay.  What service was that?

8    A    To provide maintenance and repairs.

9    Q    Okay.  Proper maintenance and repairs prevents having to

10   shut a facility down?

11   A    It could, but not necessarily.

12   Q    Well, one of the reasons you have a maintenance program or

13   a repair program is so that you don't get into a situation

14   where you have to shut a facility down to do repairs.  Is that

15   correct?

16   A    That's certainly one reason.

17        (Pause in proceedings.)

18          MR. DELAUNAY:  Judge, that's all the questions I have.

19   I tender the witness.

20          THE COURT:  Thank you.

21          Let me get a time announcement from a couple of folks.

22          MR. KELLEY:  Sure.

23          THE COURT:  And we're going to take a break in a

24   minute --

25          MR. DELAUNAY:  Yes.

1          THE COURT:  -- and we will come back and finish the

2     hearing.  Mr. Wood and Mr. Cohen, how long do you anticipate

3     needing for your hearing?

4          (Unrelated matters discussed.)

5          THE COURT:  We're going to be at least another hour

6     here, maybe longer than that.

7          We're going to take a 15-minute break, an afternoon

8     break.  We'll resume this hearing at 3:14; we'll take up TMT at

9     4:00.  Thank you.  You're welcome to stick around, Mr. Wood,

10    I'm just not going to get to you until 4:00.

11          MR. WOOD:  Thank you.

12          THE CLERK:  All rise.

13          (Recess taken from 2:59 p.m. to 3:15 p.m.)

14          (Witness resumes stand.)

15          THE COURT:  Go ahead, Mr. Kelley.

16          MR. KELLEY:  Thank you, Your Honor.

17              CROSS-EXAMINATION OF MICHAEL PIERSON

18    BY MR. KELLEY:

19    Q   Good afternoon, Mr. Pierson.  I apologize.  Could you

20    repeat for me again your title at ATP?

21    A   Chief Operations Engineer.

22    Q   About how long have you had a relationship with Omega?

23    A   I don't know exactly, but I've worked with Omega since the

24    early '90s.

25    Q   What kind of -- describe what sort of services they

MICHAEL PIERSON - CROSS BY MR. KELLEY                    67

1   provide, please.

2   A   Omega has a fabrication facility.  They build platforms,

3   they build production equipment, skids, instrumentation,

4   electrical.

5   Q   For the layman, is it predominantly working with metal, if

6   you will?

7   A   Metal and instrumentation, controls -- pneumatic controls,

8   electrical controls.

9   Q   And how long have -- you were asked by counsel for Omega

10  questions about work that Omega performed post-petition.

11      Do you recall, for the Record, when the petition date was?

12  A   Yes, it was August 17th of 2012.

13  Q   Two thousand -- can you pull the microphone a little closer

14  to your mouth.  You're very soft-spoken, but there are people

15  in the courtroom --

16  A   Sorry.  August 17th, 2012.

17  Q   Thank you.

18      And did Omega do work post-petition for ATP?

19  A   They did.

20  Q   Starting in that time frame, the August and September time

21  frame?

22  A   I don't believe that they started construction work for us

23  until a little later in the year.

24  Q   October/November?

25  A   Yes.

1    Q    And Omega -- was Omega working on a couple of different

2    properties, one specific property; what were they doing in that

3    time frame?

4    A    In October and November 2012, when we mobilized them -- re-

5    mobilized them on Gomez Mississippi Canyon 711.  I don't recall

6    if they were working anywhere else for us at that time.

7    Q    Do you recall how many invoices you got from Omega for work

8    they did in 2012?

9    A    No.

10   Q    And in that October/November -- and did they continue to

11   work in December of 2012?

12   A    I believe so.

13   Q    To your knowledge, have all those invoices been paid?

14   A    To my knowledge?

15   Q    Yes, sir.

16   A    Yes.

17   Q    Yes, they have been paid?

18   A    Yes.

19   Q    I'm sorry.  You -- it's drifting off to the side of the

20   microphone.  I just want to make sure --

21   A    Oh.

22   Q    -- that people can hear.

23        And did Omega do work in January and February; do you

24   recall?

25   A    I don't recall specifically.

MICHAEL PIERSON - CROSS BY MR. KELLEY                    69

1    Q    To the extent they did any work, are you aware of any

2    unpaid invoices for Omega in January or February of 2013?

3    A    I'm not aware of any.

4    Q    To the extent they did work, and to the extent they

5    invoiced them, do you believe they were paid for that work, if

6    they did it in that time frame?

7    A    I believe so.

8    Q    You're aware that they have done some work in March and

9    April and May 2013?

10   A    Yes.

11   Q    And there's a stack of invoices, and some of them you

12   testified you've looked at.  Have you looked at all of them?

13   A    It's possible that I have.

14   Q    As you sit here now, do you know, one way or the other?

15   A    No, I don't know.

16   Q    Omega has been paid for some of that work, in that

17   March/April/May time frame.

18   A    That's my understanding.

19   Q    Who would have issued those checks and -- and taken -- and

20   sent them from ATP; would that have been your department?

21   A    No.

22   Q    Which department would that have been?

23   A    It would have been our accounting group.

24   Q    So if I'm going to ask you which invoices remain paid and

25   which invoices aren't currently paid, are you going to be the

1    person who's going to have that answer?

2    A    No.

3    Q    So as you sit here now with that stack of invoices in front

4    of you in that notebook, do you know how many of those were

5    paid and how many remain unpaid?

6    A    No, I don't.

7    Q    You're aware some of them have been paid, though?

8    A    Yes.

9    Q    And with respect to the work -- strike that.

10         Was there -- are there a particular month or months for

11   work that we're really talking about today, for which Omega has

12   not yet been paid?

13   A    Yes.

14   Q    And what would those months be?

15   A    To my knowledge, it's April and May.

16   Q    And have they not been paid for any of their April and May,

17   or have they not been paid for certain of their April and May?

18   A    I believe it's certain.

19   Q    For example, has Omega done work on High Island -- is it

20   589?

21   A    Yes, High Island A-589.

22   Q    589?

23   A    They have.

24   Q    And has Omega been paid for the work it's done on High

25   Island 589?

1    A    It's my understanding they have.

2    Q    How about Ship Shoal 77?  Or did I say that wrong?  Was

3    there a Ship Shoal -- let me ask the right property.

4         (Participants confer.)

5    Q    Ship Shoal 358?

6    A    Yes.

7    Q    Has Omega done work on that?

8    A    Yes.

9    Q    To your knowledge, has Omega been paid for that work?

10   A    I believe they have.

11   Q    How about Mississippi Canyon 941; has Omega been paid for

12   that work?

13   A    Yes, I believe so.

14   Q    Now those three properties that I mentioned to you, do you

15   -- is there anything unique about those three properties?  Do

16   you know, for example, what the -- what's supposed to happen to

17   those properties in the bankruptcy Estate?

18   A    Those -- those three properties are being purchased by the

19   -- the key properties that are being purchased.

20   Q    So these are properties that the Estate has been able to

21   sell, to find a purchaser for?

22   A    Yes.

23   Q    What was the -- if we -- I understand you're not the

24   numbers person on this.  What is the vast amount of the work

25   that remains unpaid, what property was that on?

1    A   Mississippi Canyon 711.

2    Q   And just so that the Record is clear, when you describe it

3    as "Mississippi Canyon 711," are they out working in the water,

4    or are they working on a particular piece of property?

5    A   They're working on a facility.

6    Q   Which facility is that referring to, when we say

7    "Mississippi Canyon 711"?

8    A   It's the ATP Innovator.

9    Q   Now the Innovator, what -- can you describe that for the

10   Record, please.

11   A   The Innovator is a semi-submersible FOI.

12   Q   Who owns the Innovator?

13   A   The Innovator is owned by ATP IP.

14   Q   That is not the Debtor here.

15   A   No.

16   Q   And the vast amount of work that remains unpaid, Omega was

17   performing services on the Innovator.  Could you describe, to

18   the best of your ability, what type of services that Omega was

19   performing in that April/May time frame on the Innovator?

20   A   They were replacing -- they were performing maintenance and

21   repairs.  They were fabricating T stiffeners, ring girder

22   sections, doing bulkhead replacements as needed.

23   Q   Would you describe any of this as emergency work or routine

24   maintenance?

25   A   This would have been routine.

1    Q   How were these tasks identified that Omega was asked to do

2    these services?

3    A   We had -- our third-party inspector went out and went --

4    with a cleaning crew, they went through the entire facility,

5    through all the hull compartments, and identified work that

6    needed to be done for maintenance.

7    Q   Was any of this work that you had requested in this time

8    frame the result of any requirement by Coast Guard or some

9    other regulatory inspection or demand or mandate?

10          MR. DELAUNAY:  Well, let me just enter an objection.

11   Lack of foundation.  I'm not -- if I could just get on the

12   Record, I guess the witness can say that he personally

13   inspected -- or he personally asked for that work.  He wouldn't

14   know -- but to the extent he knows that, no objection.  But I

15   just think there's a lack of foundation as to his knowledge.

16          THE COURT:  Overruled.  You can deal with that on

17   Cross-examination.

18          MR. DELAUNAY:  Okay.

19   BY MR. KELLEY:

20   Q   Let me just make sure we've got this correct.  You

21   requested some of this work?

22   A   Yes.

23   Q   And other people may have requested some of this work?

24   A   Well, the way the scope of work was developed was we had

25   our third-party inspectors go through the facility, and I --

1    and then, from that, they recommended work to be done.  And

2    then I approved their recommendation.

3    Q   So you were involved in the process by which their

4    recommendations got converted into requests to do work.

5    A   Correct.

6    Q   With respect to the work for which you were involved in the

7    process, was any of that the result of an

8    order/mandate/requirement from any of the regulatory bodies?

9    A   No.

10   Q   At the time -- strike that.

11       Was any of the work in that April/May time frame that Omega

12   performed done to avoid any -- or to remedy any spill, leak, or

13   other urgent situation on the platform?

14   A   No.

15   Q   You testified earlier in response to some questions from

16   counsel for Omega about general post-petition and general types

17   of scope of work that Omega was asked to do.  Was -- were you

18   answering those questions in the broad sense, or were you

19   speaking specifically to this stack of unpaid invoices when you

20   gave that general testimony?

21   A   I was speaking to post-petition work.

22   Q   Just in general?

23   A   In general.

24   Q   Are you aware of any seeps or leaks or anything like that

25   that were being addressed in the April and May time frame by

MICHAEL PIERSON - CROSS BY MR. KELLEY                    75

1    Omega on the hull?

2    A    No, I'm not aware of any.

3    Q    Are you aware of any dire emergency, any -- any failed

4    stairwells, any safety issue that was -- required urgent repair

5    by Omega in that time frame?

6    A    No, I'm not aware of any.

7    Q    You were asked some questions about maintenance and what

8    could happen if things were not continued to be maintained, and

9    went through a series of examples; listing and potential

10   environmental issues.

11        Do you recall that line of questioning?

12   A    I do.

13   Q    The type of work that Omega was performing in the April or

14   May time frame, if that hadn't been performed at all, was there

15   any type of catastrophe that you foresee happening from that

16   over the next six to eight to ten months?

17   A    No.

18   Q    I want to make sure we're using the same terminology for

19   the Record.  You were asked questions about MMS-required

20   repairs.  You understand MMS was the predecessor name for the

21   regulatory body?

22   A    I do.

23   Q    And again, in the April and May time frame, none of these

24   were MMS or its successor entity's required repairs.  Is that

25   -- do I understand your testimony correctly?

1    A    That's correct.

2    Q    You were asked a general question about, did Omega provide

3    services that -- or did you agree that Omega's services allowed

4    ATP to operate.  Do you remember that question you were asked?

5    A    I do.

6    Q    I want to focus now on the unpaid invoices for April or

7    May.  Did any of the work that was performed in April or May by

8    Omega with respect to the Innovator, or any of the work that

9    remained unpaid, allow ATP to continue to operate?

10   A    I -- no, I don't believe so.

11   Q    Okay.  And in fact, the Innovator was shut down at some

12   point, or the production from that platform was shut down at

13   that point.

14   A    That's correct.

15             THE COURT:  At which point?

16   BY MR. KELLEY:

17   Q    In April 2013?  Do you -- well, let me ask it this way:  At

18   what point in time was the production on the -- shut down on

19   the Gomez hub and the Innovator platform?

20   Q    It was shut in, in late April of 2013.

21   Q    To your knowledge --

22             THE COURT:  I'm sorry.

23             MR. KELLEY:  -- has it ever --

24             THE COURT:  Did you give a date?

25             THE WITNESS:  I did not give a specific date, Your

1    Honor.

2    BY MR. KELLEY:

3    Q   To your knowledge, was it ever put back on production?

4    A   No.

5             THE COURT:  Do you know an exact date when it was shut

6    down?

7             THE WITNESS:  No, sir, I don't.

8    BY MR. KELLEY:

9    Q   You were asked some questions about participating in the

10   budget.  Do you remember that?

11   A   (No verbal response.)

12   Q   Which budget were you referring to when you answered that

13   question?

14   A   I put together a -- I maintain a lease operating work-over

15   budget, for all of the AFE projects that we do.

16   Q   Who do you present that to within the company or give it

17   to, so that they can incorporate it into the global budget?

18   A   I -- I present it to our -- to George Morris, who then

19   reviews it and prints it to -- presents it to Opportune.

20   Q   And then -- and are you involved in the decisions of what

21   items from that ultimately make it into the budgets that appear

22   before the Court?

23   A   No.

24   Q   That is something between ATP's senior management and

25   Opportune?

1      A    Yes.

2      Q    Okay.  Are there other contractors who provide the same

3      service that Omega has provided post-petition?

4      A    There are.

5      Q    And could you just give us the name of one or two of those

6      types of contractors, just by way of example?

7      A    Performance Energy Services.

8           (Pause in proceedings.)

9                THE COURT:  Mr. Kelley, he's a very literal man.  You

10     asked him for one or two.  He gave you one.

11               MR. KELLEY:  That's fair.  That's fair.

12     BY MR. KELLEY:

13     Q    Mr. Pierson, has Performance Energy Services provided work

14     for ATP?

15     A    Yes, they have.

16     Q    They've provided some post-petition?

17     A    Yes, they have.

18     Q    With respect to the invoices that remain unpaid, which is,

19     I believe you testified, a subset of those that appear in this

20     notebook.  Do you know whether you've reviewed and approved all

21     of those?

22     A    I do not.

23     Q    Did you -- do you know whether you or any -- to your

24     knowledge, anyone at ATP has reviewed -- or whether some of

25     these expenses are actually expenses that should be incurred

MICHAEL PIERSON - CROSS BY MR. KELLEY

79

1    from a bankruptcy context or benefit the Estate?

2    A    I -- no, I don't.

3    Q    You did not perform that type of review.

4    A    No.

5            MR. KELLEY:  No further questions, Your Honor.

6            THE COURT:  Thank you.

7            Any other party have any further questions for Mr.

8    Pierson?

9            MR. DELAUNAY:  Yes, Judge.

10           THE COURT:  Mr. deLaunay.

11       (Participants confer.)

12           MR. DELAUNAY:  Judge, if I just might make a statement

13   for the Court regarding what invoices are paid and unpaid?

14           With respect to Exhibit MM, Your Honor, and the check

15   that is marked as Exhibit NN, the check on Exhibit NN

16   represents payments or we would acknowledge receipt of payments

17   for the invoices that are shown at the bottom of page --

18       (Participants confer.)

19           MR. DELAUNAY:  Of the exhibit page bearing ATP Bates

20   No. 462, which is the first page of Exhibit MM, of --

21           THE COURT:  Wait, M --

22           MR. DELAUNAY:  -- $7,631 --

23           THE COURT:  Of MM?

24           MR. DELAUNAY:  MM, yes, Judge.

25           THE COURT:  MM was not admitted.

1          MR. DELAUNAY:  No, it's -- okay.  I'd offer -- maybe I

2     can clear it up, so that we can offer it.  What I'm trying to

3     show is which ones are paid, and this one has been paid.

4          (Participants confer.)

5          MR. DELAUNAY:  Well, I just wanted to enter -- and we

6     can stipulate if you want, that some of the -- which invoices

7     have been paid, which if --

8          MR. KELLEY:  I'm happy to try to reach a stipulation,

9     Your Honor, if you'll give me a few minutes to speak with the

10    client, and maybe that --

11         (Participants confer.)

12         MR. DELAUNAY:  Okay.  Good.

13              REDIRECT EXAMINATION OF MICHAEL PIERSON

14    BY MR. DELAUNAY:

15    Q   Mr. Pierson, you were asked about invoices that may have

16    been paid.  You were specifically asked about invoices relating

17    to High Island A-589 and Ship Shoal 258.  Do you recall those

18    questions?

19    A   Ship Shoal 358?  Yes, sir.

20    Q   And your answer was that it was your understanding that

21    those invoices had been paid?

22    A   Yes, sir.

23    Q   And what was the basis of that understanding?

24    A   I was advised of that by our CFO earlier this afternoon.

25    Q   Okay.  Did you talk about what other invoices had been paid

1 or what invoices remained unpaid?

2 A No.  We only talked about which invoices had been paid.

3 Q Now are you familiar with South Timber 77, Number 6?

4 A Yes.

5 Q What is that, for the Court?

6 A It is a small well protector platform.

7 Q And is that platform owned by ATP?

8 A Yes.

9 Q Okay.  Excuse me.

10 (Pause in proceedings.)

11 Q Look at exhibits -- if you would look at your exhibit book

12 to Exhibit T, please; T and U.

13 A (Witness reviews exhibits.)

14 Q Do you see Exhibit T?  Let's look at that one first.

15 A Okay.

16 Q In the description of work on the first page of the

17 invoice, let's see, it talks about heliport skirting repairs.

18 A Yes.

19 Q Are you aware that that was done?

20 A Yes.

21 Q Okay.  And Exhibit U would also relate to heliport skirting

22 repairs to the same platform?

23 A Yes, assuming that the information is correct.

24 Q Okay.  Why were those repairs done?

25 A This heliport had been placed out of service, and so the

1    repairs were done to return the heliport to service.

2    Q   Okay.  And was that an obligation of ATP?

3    A   No.

4    Q   Okay.  Why was it done, or why did ATP choose to expend

5    those funds?

6    A   Well, ATP -- ATP just elected to return the heliport to

7    service because, without it, we would have -- we would have

8    been limited to transfer to and from the locations by boat

9    only.

10   Q   So you felt that this would further the ability of ATP to

11   operate its mineral properties in the -- in the vicinity?

12   A   It would have made it more convenient to operate this

13   facility.

14   Q   Okay.  This was something that you, in good faith, as an

15   engineer, felt was in the best interest of ATP at the time that

16   you authorized this work?

17   A   Yes.

18   Q   Do you know if that invoice has been paid?

19   A   I don't -- I don't know.

20   Q   Okay.  Generally speaking -- or are you familiar with ATP's

21   regulatory obligations for maintenance of its facilities?

22   A   Generally speaking.

23   Q   Okay.  And in a general sense, what is your understanding?

24   A   Well, basically, we maintain our platforms in a manner to

25   eliminate noncompliance with the regulations.

1    Q    Okay.  And what is your understanding of the regulations?

2    A    There are literally thousands of regulations.

3    Q    In a general sense, I mean, do these regulations include

4    requirements that you maintain the facility in a safe manner?

5    A    Yes.

6    Q    That you maintain your facility in a manner to avoid risks

7    or hazards -- risk of injury or hazards to person and to

8    property and the environment?

9    A    Yes.

10   Q    And in furtherance of those obligations, one of the things

11   you do, am I correct, is you adopt and implement maintenance

12   procedures for your facilities?

13   A    We have maintenance facilities, yes.

14   Q    And one of the reasons you have that is to comply with your

15   obligations to maintain your facilities in a safe manner, to

16   avoid risk of injury to person or property.

17   A    That's -- that's one of the results.

18   Q    And in fact, that's one of the reasons you had the

19   maintenance program aboard the Innovator.

20   A    Is for --

21   Q    Maintaining your facilities, to avoid the risk of injury or

22   hazard to person or property.

23   A    That is one of the -- the goals of this system, yes.

24   Q    Okay.  And work of Omega was in furtherance of those goals,

25   correct?

1    A    Are you asking me if the Omega work was -- that the purpose

2    of that was to -- was safety?

3    Q    No.  It was in furtherance of your goals of maintenance --

4    of meeting your maintenance program, of satisfying your

5    maintenance program, correct?

6    A    Yes.

7    Q    And your maintenance program was in furtherance of your

8    goal of satisfying regulations, to prevent injuries or hazards

9    to person and property.

10   A    That was one of the goals, yes.

11   Q    Okay.  And when you authorized Omega to perform this --

12   these maintenance and repair tasks in April and May, which are

13   described in the various invoices, you believed, in good faith,

14   that this was necessary for ATP?

15   A    I did.

16   Q    Necessary for what?

17   A    To maintain the facility.

18   Q    Okay.  To avoid the -- strike that.

19        (Pause in proceedings.)

20   Q    Maintenance of your facility, and in particular, the

21   Innovator, is part of the function of operating the Innovator.

22   Is that correct?

23   A    Yes.

24   Q    You were obligated to operate the Innovator up until the

25   time it was abandoned?

MICHAEL PIERSON - REDIRECT BY MR. DELAUNAY                    85

1    A    Up until the time it will be abandoned.

2    Q    Okay.

3              THE COURT:  Let me talk about what you mean.

4    "Abandoned" bankruptcy, or "abandoned" --

5              MR. DELAUNAY:  Okay.  And that's probably a very bad

6    question, Judge.

7              THE COURT:  That would be best.


9              THE COURT:  Yeah.

10   BY MR. DELAUNAY:

11   Q    Okay.  Up until the time that the wells were shut in, you

12   were operating this facility, correct?

13   A    Yes.

14   Q    And you were producing hydrocarbons from the facility?

15   A    Yes.

16   Q    And part of that operation was contributed to by Omega by

17   the services it provided.

18   A    The maintenance, yes.

19   Q    Now are you aware of the work that Omega did subsequent to

20   the time that the wells were shut in?

21   A    Generally, yes.

22   Q    Are you aware of the -- are you aware of the repairs and

23   maintenance that was going on at the time that the wells were

24   shut in?

25   A    Yes.

1   Q    What sort of repairs were going on?

2   A    They were in the late phases of working in the tank that

3   they were in, which was they were working on bulkhead repairs.

4   Q    Okay.

5   A    They were working on ring girders, longitudinal members.

6   Q    And what did these bulkhead repairs consist of?

7   A    The bulkhead repairs is basically replacing steel plate.

8   Q    Okay.  And at the time of the -- after the wells were shut

9   in, were there open holes that needed to be closed before they

10  could leave the Innovator?

11  A    Yes.  They -- Omega cut holes as they went down into the

12  hull, so before they could leave, those would have to be

13  closed.

14  Q    And why is that?

15  A    To restore the integrity of the hull and the compartments,

16  if you will.

17  Q    Why was that important to ATP?

18  A    To maintain the stability of the facility.

19  Q    Okay.  If these holes had not been closed, what are the

20  risks?

21  A    If they pulled out and left the holes open, then it would

22  limit you on your ability to stabilize the rig.

23  Q    Okay.  And what is the risk of that?

24  A    That depends on what -- what situation it's put into.

25  Q    It could cause a catastrophe, right?

1    A    That's one of the potential outcomes.

2    Q    And are you aware that, after the wells were shut in, Omega

3    was requested to stay around in order to -- the term I think

4    they use is "safe-operate," to close the holes and get things

5    in an orderly condition before leaving the rig?

6    A    Yes, that was the final action.

7    Q    They were asked to stay around, so that the rig would be

8    left in a safe -- a more safe condition than what it was at the

9    time that the wells were shut down.

10   A    Yes.

11           MR. DELAUNAY:  Okay.  Thank you, Mr. Pierson.

12           THE COURT:  Anything further?

13           MR. KELLEY:  Yes, please.

14             RECROSS-EXAMINATION OF MICHAEL PIERSON

15   BY MR. KELLEY:

16   Q    You were asked a question about South Timbalier 77?

17   A    Yes.

18   Q    Is that one of the rejected properties?

19   A    Yes, it is.

20   Q    So that's one that ATP no longer owns?

21   A    Correct.

22   Q    And that platform is one that ATP has abandoned?

23   A    That we've abandoned?  I don't believe that that's been

24   abandoned, but --

25   Q    Do you know?

1    A    I do not know.

2         THE COURT:  Are you using -- again, are you using

3    "abandoned" in the sense of plugging and abandonment under

4    BSEE, or are you using "abandoned" in terms of bankruptcy

5    abandonment?

6         MR. KELLEY:  I'm using it in terms of bankruptcy

7    abandonment, leaving behind --

8         THE COURT:  I don't think the --

9         MR. KELLEY:  -- walking away from.

10        THE COURT:  I don't believe the witness is, so let's

11   ask the question in a way that I know what we're talking about.

12   BY MR. KELLEY:

13   Q    Are you aware, in this bankruptcy case, whether -- and with

14   the discussions that have gone on with BOEM, whether ATP has

15   walked away from South Timbalier 77 and that platform?

16   A    Yes, we have.

17   Q    Okay.  So when I was using the word "abandon," I mean to

18   walk away from.  That's one of the properties that's been left

19   behind.

20   A    Yes.

21   Q    With the Government?

22   A    Yes.

23   Q    Okay.  Now you were talking about -- at the very end of the

24   last couple of questions, you were asked by counsel for Omega

25   -- you were talking about replacing some cut out holes.  What

1    does that mean?

2    A    When the -- when the crews entered -- to get into the

3    pontoons to perform the work, they would enter through a manway

4    up on the main deck and go down into the columns.  As they go

5    into the columns, there's a watertight manway at each level.

6    It's a series of compartments in the columns.  So each column

7    at each level would be opened up to allow them to access down

8    to the -- to the pontoons.  Then, once they got to the pontoon,

9    they would open a series of holes to allow them to get into the

10   desired tank.

11        THE COURT:  By "opening the holes," do you mean they

12   would take torches and cut holes, or do you mean they would

13   open hatches --

14        THE WITNESS:  Both.

15        THE COURT:  -- or something else?

16        THE WITNESS:  Both.

17        THE COURT:  So there was some just opening and closing

18   of hatches.

19        THE WITNESS:  Yes, sir.

20        THE COURT:  And that's -- is that just removing a

21   series of bolts?

22        THE WITNESS:  Yes, sir.

23        THE COURT:  And then there were other instances where

24   they actually cut steel to get -- to make a hole?

25        THE WITNESS:  Yes, sir.

1              THE COURT:  Okay.

2     BY MR. KELLEY:

3     Q    And do you know, with respect to the pontoon that they were

4     working on in that April/May time frame, which they had to do,

5     whether they had to unbolt hatches or unscrew hatches, or

6     whether they had to cut hatches; do you know?

7     A    I believe it was a series of both.

8     Q    And as part of their leaving the vessel, they had to

9     replace those pieces of metal; either re-bolt them or weld back

10    in the plate?

11    A    Yes, they had to either reinstall the plate that had been

12    cut out and weld it up, or they would reinstall the manway,

13    bolt it out.

14    Q    And that was the safety item you were talking about that

15    needed to be done to avoid some problem?

16    A    Yes.

17    Q    Okay.  Were those the specific acts you were referring to

18    when you were testifying about the safety issue, just replacing

19    those pieces of metal?

20    A    Yes.

21    Q    Have you looked at the invoices and tried to figure out how

22    much of the work that's billed on those invoices were those

23    specific tasks?

24    A    No, I haven't.

25    Q    Have you identified -- strike that.

1          You were asked some general questions about maintenance and
2     the maintenance program associated with the platform.  Who was
3     responsible for overseeing maintenance on the Innovator
4     platform?
5     A    I am.
6     Q    How about more specifically on the platform, who's
7     responsible?
8     A    On the marine side, it would be the offshore installation
9     manager.  On --
10    Q    And -- I'm sorry.
11    A    On the production side, it would be the production foreman.
12    Q    And how many people manned the platform at that time?
13    A    The typical manning level is between twenty-five and thirty
14    men.
15    Q    Did any of those twenty-five or thirty have maintenance
16    responsibility?
17    A    Yes.
18    Q    What were those responsibilities?  I don't want to get into
19    all the details.  Is it safe to say those responsibilities were
20    fairly broad?
21    A    Yes.
22    Q    Equipment, maintaining equipment?
23    A    Yes.
24    Q    Maintaining integrity of the vessel?
25    A    Yes.

1      Q    And these are GreyStar and ATP employees?

2      A    Yes.  For the most part, yes.

3      Q    Were there other consultants, contractors and others, out

4      there out on the platform who were part of the maintenance of

5      that platform?

6      A    Yes, they would come in as they were needed.

7      Q    I just want to make sure the Record is clear.  And Omega

8      was just providing certain discrete tasks in this time frame?

9      A    Yes.

10     Q    And these were the ones that we've already talked about?

11     A    Yes.

12          MR. KELLEY:  Okay.  No further questions, Your Honor.

13          THE COURT:  Anything else?

14          MR. DELAUNAY:  No, that's all.

15               EXAMINATION OF MICHAEL PIERSON

16          BY THE COURT:  You described that the platform was

17     owned by ATP IP, I think.

18          THE WITNESS:  Yes, sir.

19          THE COURT:  Was, from an internal point of view, ATP

20     IP, or was ATP corporate the one that was doing the work on the

21     Innovator platform?

22          THE WITNESS:  ATP Corp.

23          THE COURT:  Corp.  So the maintenance work was ATP

24     Corp.

25          THE WITNESS:  Yes, sir.

1          THE COURT:  Okay.  Thank you.  If you want to step

2     down --

3          MR. KELLEY:  Can I just ask a follow-up?

4          THE COURT:  You may.

5          MR. KELLEY:  Because of your question.

6          FURTHER RECROSS-EXAMINATION OF MICHAEL PIERSON

7     BY MR. KELLEY:

8     Q    Are you familiar with the Platform Use Agreement, the

9     contract that relates to that platform?

10    A    No, I'm not.

11    Q    Did you -- not familiar with it, meaning you didn't know it

12    existed, or not familiar with it, you don't know what it says?

13    A    I don't know the details of it.  I know it exists.

14    Q    Did you work -- did you have any understanding at all as to

15    whether that had any sort of requirements about maintenance for

16    the platform?

17    A    Yes.

18    Q    What was your understanding?

19    A    My understanding is that ATP Corp., as operator, would

20    maintain the facility.

21    Q    And so your understanding was that was a contractual

22    relationship?

23    A    Yes.

24         MR. KELLEY:  Thank you.

25         THE COURT:  Thank you.  All right.  You can step down.

1       (Witness excused.)

2           THE COURT:  Mr. deLaunay.

3           MR. DELAUNAY:  Your Honor, we're going to call

4    Mr. Greg Sandoz.

5           THE COURT:  All right.  Mr. Sandoz.

6           MR. DELAUNAY:  And Judge, if I could alert the Court

7    that Mr. Sandoz has some hearing issues.

8           THE COURT:  All right.

9           MR. DELAUNAY:  And so, essentially, we try to have him

10   see our face when he speaks to us, because he does a lot of

11   lip-reading.

12          THE COURT:  Mr. Sandoz, do earphones help or not help?

13          MR. SANDOZ:  No.

14          THE COURT:  Okay.  Thank you.  Let us know if you're

15   not understanding us.

16          MR. SANDOZ:  Okay.

17          THE COURT:  Thank you.  Would you -- would you raise

18   your right hand, please, sir?

19           GREGORY SANDOZ, WITNESS FOR OMEGA, SWORN.

20          THE COURT:  Thank you.

21           DIRECT EXAMINATION OF GREGORY SANDOZ

22   BY MR. DELAUNAY:

23   Q   State your name for the Record, please.

24   A   Gregory Sandoz.

25   Q   And Mr. Sandoz, by whom are you employed?

1    A    Omega Natchiq.

2    Q    And what is your position with Omega?

3    A    I'm the Offshore On-site Operation Manager.

4    Q    Do you know Mr. Michael Pierson?

5    A    Yes, sir, I do.

6    Q    Did you have occasion to deal with Mr. Pierson from time to

7    time during -- over the years, while Omega had a relationship

8    with ATP?

9    A    Yes, sir, I do.

10   Q    Mr. Sandoz, subsequent to the filing of bankruptcy by ATP,

11   did you have occasion to speak to Mr. Pierson?

12   A    Yes, sir, I did.

13   Q    And what was that about?

14   A    Just a lot of stuff, work and the stuff we've done in the

15   past and work that was coming up.

16   Q    And did -- was there any discussion with Mr. Pierson about

17   Omega continuing to do work post-petition, after the filing of

18   the bankruptcy?

19   A    Yes, sir.

20   Q    Are you familiar with the work that was being done, in

21   general, the work that was being done on the Innovator?

22   A    Yes, sir.

23   Q    Did you speak to -- did you have occasion to discuss with

24   any representatives, anyone representing ATP, the requests or

25   the orders for that work?

1    A    Yes, sir.  Me and Mike talked occasionally about the work

2    being done out there.

3    Q    Okay.  Did mister -- what did Mr. Pierson tell you,

4    concerning the need for Omega on that platform?

5    A    Prior or post?

6    Q    Post.

7    A    Post.  Well, I mean, basically, they needed us out there,

8    it was necessary for us to be in there and repair the hull.

9    Q    Okay.

10   A    Not just the hull; the column, the pontoon, basically, and

11   the hull.

12   Q    And were you -- are you aware, not necessarily of the

13   particular date, but at some point, the production at that

14   facility on the Innovator was shut in?

15   A    No, sir, I wasn't.

16   Q    Okay.  But are you aware now that that -- do you recall

17   that there came a time when they told you shut -- production

18   was being shut in, and you would have to go in?

19   A    Yes, sir.

20   Q    Okay.  At the time -- up until --

21            THE COURT:  Well, wait.  I don't know what you mean.

22   I don't know what you would mean "and you would have to go in."

23            THE WITNESS:  Okay.

24            THE COURT:  So I just need clarification, so I'm

25   understanding.

1          MR. DELAUNAY:  Yeah, let me do that.

2     BY MR. DELAUNAY:

3     Q   Did there come a time when Omega was advised that

4     production on the Innovator would be shut in, and Omega's crews

5     on the Innovator would no longer be needed?

6     A   Yes, sir.

7     Q   Okay.  And after that time, when the production was shut

8     in, was Omega asked to stay and perform some additional work on

9     the Innovator, before it took its tools and equipment and

10    people and went in?

11    A   I don't recall exactly a time frame of when, but we were

12    asked to finish up before we came in.

13    Q   Okay.  What does -- the term "safe-out."  What does that

14    mean to you?

15    A   Basically, to get the facility back safe, working

16    operation --

17    Q   Okay.

18    A   -- so that when we pull off of there, they won't have any

19    kind of issues, someone could get hurt or cause the platform to

20    tip or anything that we were working on.

21    Q   Okay.  And in the -- in the period of April and May 2013,

22    do you recall that Omega was doing some column repairs?

23    A   Yes, sir.

24    Q   And did that involve cutting holes in the -- between the

25    different levels of the Innovator and going into the columns?

A    Yes, sir.

Q    And did that also involve cutting holes in the pontoons on
the bottom, and going into different compartments in the
pontoons?

A    Yes, sir.

Q    And subsequent to the shut-in, was the work Omega did after
the shut-in requested to make sure that all of these holes were
closed?

A    Yes, sir.

        THE COURT:  Let me be sure I understand.  So after you
learned of the shut-in, were you asked to leave safely, or were
you asked to finish the ongoing work and then to leave safely?

        THE WITNESS:  We were asked to finish safely, after
putting everything back safe, as far as the way it would be in
operation.

        THE COURT:  If you were in the middle of a repair, did
you cease the repair and simply safe-out, or did you finish the
repair and then safe-out?

        THE WITNESS:  That would have to be simultaneously --
that would have to be done to be safe, then you back your way
out of it, and you work your way up through the -- through the
-- through the column.

        THE COURT:  Right.  But let's assume that you had
entered a column for the purpose of re-plating a girder.

        THE WITNESS:  Okay.

1          THE COURT:  And then they said, okay, leave.  Did you

2     re-plate the girder, or did you just leave safe-out and close

3     the holes?

4          THE WITNESS:  I can't really tell you one way or the

5     other if it was a girder or what.  But backing up, you

6     basically have to close out each piece and put it back to where

7     it's back -- the integrity of the facility.

8          THE COURT:  And is that all you did after you were

9     told it was going to be shut in, or did you finish the repair

10     work?

11          THE WITNESS:  I'd have to look at each invoice and

12     then go by day-by-day.

13          THE COURT:  And can you tell from the invoices what

14     happened?

15          THE WITNESS:  Pardon?

16          THE COURT:  Let me ask you to turn to -- can we give

17     him a book?

18       (Participants confer.)

19          THE COURT:  Go to EE.

20       (Witness reviews exhibits.)

21          THE COURT:  Where was the EE work performed, on what

22     facility?

23          THE WITNESS:  What invoice are you looking at?

24          THE COURT:  The one EE.

25          THE WITNESS:  Well, that's just the front page, but

1    each -- behind it -- okay.  You've got a ticket behind it, a

2    DSR.

3             THE COURT:  What facility was that at; was that at

4    Innovator?

5             THE WITNESS:  That's for -- if I'm looking at the

6    right one, EE -- is that Invoice No. 82093T-5?

7             MR. DELAUNAY:  Yes.

8             THE WITNESS:  That work was being done on West Cameron

9    432.

10             THE COURT:  All right.  Would you find one that was

11    done on the Innovator?

12             MR. KELLEY:  Your Honor, if I may suggest W might be

13    an example.

14             THE COURT:  All right.

15             MR. KELLEY:  W.

16             THE WITNESS:  Okay.

17             MR. KELLEY:  I believe it's MC71.

18             THE COURT:  All right.

19             MR. DELAUNAY:  All right.

20         (Witness reviews exhibits.)

21             THE WITNESS:  Okay.  Invoice W?

22             THE COURT:  I -- yes.

23             THE WITNESS:  Okay.  What DSR do you want me to look

24    at?

25             THE COURT:  Well, just look generally through that and

1    tell me whether that is totally safe-out work, or whether it is

2    both safe-out and continued repair work.

3         (Witness reviews exhibit.)

4              THE WITNESS:  Basically, we are, basically, working on

5    the ninety-three-foot level, removing scaffolding, so basically

6    we're safing-out, we're moving out.

7         (Pause in proceedings.)

8              THE COURT:  So all of the invoices are safe-out

9    invoices?

10             THE WITNESS:  From -- from what I'm seeing.  I mean, I

11   backed up to another invoice, another DSR, which is the "Daily

12   Service Report."  And we put it on forty-foot level cut out and

13   started welding -- welding it, grinding the ninety-three-foot

14   level cut, cut out and safe-out area, picked up -- we were

15   basically working our way out of the hole.

16             THE COURT:  All right.  Thank you, sir.

17   BY MR. DELAUNAY:

18   Q   Mr. Sandoz --

19             MR. KELLEY:  Just for the Record, he just said he

20   looked at something, but didn't make it clear which document he

21   was looking at.  Can you --

22             THE WITNESS:  That's Invoice Number 052013HR.

23             MR. KELLEY:  Is that W, still?

24             THE WITNESS:  Yes, sir.

25             MR. KELLEY:  Okay.

1            THE COURT:  I think it's ATP-00282.

2    BY MR. DELAUNAY:

3    Q   All right.  Mr. Sandoz, once Omega was told that the

4    Innovator was being shut in, but that they were asked to stay

5    around for what you call the "safe-out work," under whose

6    instructions were they working -- were you working?

7    A   We were under instruction of the inspection company who was

8    working for ATP.

9    Q   Okay.  And were you told by the inspection company the

10   reason you needed to stay around was to place the Innovator in

11   a condition, so that it was safe to leave?

12   A   Yes, sir.

13   Q   And did you only do things that the inspection company,

14   ATP's representative, told you were necessary to put the

15   Innovator in a safe condition, so you could leave?

16   A   Yes, sir.  My understanding.

17   Q   I'd like to call your attention to Exhibits T and U.

18   A   I'm sorry.  Say that again, sir.

19   Q   Exhibit T and U.

20   A   (Witness reviews exhibits.)

21       I'm on T.

22   Q   Okay.  There's been a suggestion those are the invoices

23   relating to the heliport skirting repairs, ST 77, Number 6,

24   that Mr. Pierson testified to earlier.

25   A   Yes, sir.

1   Q   Do you recall that project?

2   A   Yes, sir.

3   Q   And did you have discussions with anyone with ATP regarding

4   that project before it was done?

5   A   Yes, sir.  I remember my project manager talking to the man

6   offshore about needing to get the --

7           MR. KELLEY:  Your Honor, I'm going to --

8           MR. DELAUNAY:  Your discussions.

9           MR. KELLEY:  I'm going to object.  He started talking

10   about a conversation someone else was having with someone at

11   ATP, that would be hearsay.

12           THE COURT:  Sustained.

13   BY MR. DELAUNAY:

14   Q   Were you present for a conversation?

15   A   Yes, sir.

16   Q   Okay.  During a conversation when you were present, okay,

17   did you --

18           MR. KELLEY:  Same objection.

19   BY MR. DELAUNAY:

20   Q   What did -- the ATP representative -- who was the ATP

21   representative?

22   A   I don't --

23   Q   Do you remember?

24   A   I'm not sure.

25   Q   Okay.  Was he identified as -- by position as a ATP guy?

GREGORY SANDOZ - DIRECT BY MR. DELAUNAY

A    One of the production foremen of -- on the facility.

Q    Okay.  And did he say why this was the --

MR. KELLEY:  Your Honor, again, we're getting into hearsay.  We don't know the identity of the witness and -- other than he was from the facility, which could be a GreyStar employee, since there's only one ATP person on the facility.  We're getting into hearsay.

MR. DELAUNAY:  And if he's a representative, I think that --

THE COURT:  I think that's right.

MR. DELAUNAY:  -- there's an exception.

THE COURT:  I just want to go read the rule.

MR. DELAUNAY:  Sure, Judge.  I'm sorry.

(Pause in proceedings.)

THE COURT:  I'm going to overrule the hearsay objection.  The individual was identified as an ATP production foreman.  It doesn't matter whether the production foreman is a direct employee or was an agent acting within the scope of his duty.  If he was the production foreman, he can give these kinds of instructions.  And under 801(d)(2)(D), I find it's not hearsay.

MR. KELLEY:  I may have heard different testimony, and I may ask you to play it back, because he said a production foreman or someone on the facility.

THE COURT:  First of all, I don't mind just getting

1   that clarified.

2           MR. DELAUNAY:  Well, I can do that.

3           THE COURT:  Let's see what he said.

4           MR. DELAUNAY:  Sure.

5           THE COURT:  If you want, I'll play it back --

6           MR. KELLEY:  No, that --

7           THE COURT:  -- but it may be easier just to clarify.

8   BY MR. DELAUNAY:

9   Q   Do you recall who the person was that was speaking?

10  A   No, I do not.

11  Q   Do you recall the position of the person?

12  A   Yes, sir, I do.

13  Q   What was -- what was his position?

14  A   He said he was the production foreman.

15  Q   Okay.  And when the person who represented himself to be

16  the production foreman asked for this work, did they say why

17  they wanted this work?

18  A   The reason for the work to be performed was for safety

19  issues that were being -- the heliport was shut in, and they

20  needed to put a deck back on to get it back working.

21  Q   Is that --

22          MR. KELLEY:  Your Honor, I'm going to object to the

23  lack of responsiveness, yes, what the person said --

24          MR. DELAUNAY:  And I'll clear that up.

25          THE COURT:  I sustain that objection.

1    BY MR. DELAUNAY:

2    Q   Was that -- is that your understanding of the reason, or is

3    that what you were told by the ATP representative?

4    A   That's what the ATP rep said.

5    Q   Okay.  Mr. Sandoz, there are a series of invoices near the

6    end dealing with West Cameron.  If you would look at the sheet

7    that's been marked -- well, let me see.  Let me get my --

8        If you'd look at Exhibit CC, please?

9    A   Double T?

10   Q   C.

11   A   C.

12   Q   I'm sorry.  Double C.

13   A   (Witness reviews exhibits.)

14   Q   It's for $192.  Do you see that?

15   A   Yes, sir.

16   Q   Okay.  And there are a series of exhibits starting there

17   which the next -- the four exhibits -- three exhibits in a row

18   for $192.  That seems like -- well, I don't know if you

19   answered yet.  Do you recall what that work was for on those

20   platforms?

21   A   The gentlemen that went offshore and looked at all the

22   different facilities at each --

23   Q   Okay.  Were you told --

24   A   And --

25   Q   Okay.  The request from ATP was to do what?

1    A   Well, we were called to go out and look at a series of

2    different write-ups or issues they have on the platform to be

3    fixed, necessarily needed to be fixed.  We went out and we

4    looked at it.  He came in, drew them up, and we charged time

5    for each one, accordingly, in the -- per platform.

6    Q   There exists -- exactly -- Exhibit CC refers to "Handrail

7    and grading repairs at West Cam 4729."

8    A   Yes, sir.

9    Q   Are you telling us that he was being asked to provide a --

10   sort of a survey of the work that was necessary to prepare

11   handrails or grading?

12   A   Yes, sir.

13   Q   And would that be similar to what occurred with respect to

14   all of these -- I call them "three-digit invoices" -- CC

15   through GG; the first three for $192, and the next two for

16   $312?

17   A   Yes, sir.  Yes, sir.

18   Q   Okay.  Mr. Sandoz, that's all the questions I have.

19           MR. DELAUNAY:  I tender the witness.

20           THE COURT:  Thank you.  Mr. Kelley.

21           MR. KELLEY:  Your Honor, let me.

22               CROSS-EXAMINATION OF GREGORY SANDOZ

23   BY MR. KELLEY:

24   Q   I apologize.  I did not write your last name down

25   correctly.

1    A    Sandoz.

2    Q    Sandoz.

3    A    Yeah.  S-A-N-D-O-Z.

4    Q    O-Z.  Thank you.  Thank you, Mr. Sandoz.

5         Mr. Sandoz, you were talking about a conversation you had

6    associated with the South Timbalier 77 property, that you were

7    present during?

8    A    Yes, sir.

9    Q    Where did that conversation occur?

10   A    In my project manager's office.

11   Q    And where is that?

12   A    In the Port of Liberia.

13   Q    And you were present during that conversation?

14   A    Yes, sir.

15   Q    When was that?

16   A    Time-wise, I couldn't tell you the date when he called in,

17   but I specifically was in there when he -- when he did call

18   Q    So he wasn't present.  This was over a phone call?

19   A    That is correct.

20   Q    Did you -- did you recognize the voice, was it someone you

21   had spoken with in the past?

22   A    No, sir.

23   Q    Were you aware that South Timbalier is an unmanned

24   facility?

25   A    No, sir.

1    Q    Did you know which -- whether this person you were speaking

2    with was a contractor, a contract employee, or whom it was,

3    related to ATP?

4    A    Other than the fact that he told us he worked for ATP and

5    he was the field foreman out there.

6    Q    The field foreman?

7    A    Yeah, production foreman.

8    Q    Well, let's -- what do you mean -- what does "production

9    foreman" mean to you?

10   A    He is in charge of that facility and that field.

11   Q    So this was not someone onsite, that you're aware of?

12   A    I couldn't tell one way or the other.

13   Q    I'd like to go back and talk to you briefly about -- sorry.

14        I'd like to go back and talk to you briefly about Exhibit W

15   again.

16   A    (Witness reviews exhibits.)

17        Okay.

18   Q    How many days worth of work does, say, Exhibit W cover?

19   A    (Witness reviews exhibit.)

20        Are you specifically speaking offshore, on-shore?  What are

21   you specifically asking?

22   Q    I don't -- Exhibit W is an Omega document, correct?

23   A    Correct.

24        (Witness reviews exhibit.)

25            THE COURT:  Mr. Kelley, I want you to clarify the

1    question, as to whether you mean elapsed days or days onsite.

2         MR. KELLEY:  Understood.

3    BY MR. KELLEY:

4    Q   Exhibit W is a document prepared by Omega, correct?

5    A   It's an invoice, if that's what you're asking, yes.

6    Q   And it's prepared by Omega?

7    A   Yes, sir.

8    Q   The invoice bills for work performed during what periods of

9    time?

10   A   I'll have to look back on the contact.  We -- we were

11   expecting to end our -- it's as quickly as possible, to get

12   invoices out, to get paid in.  And none of them have a specific

13   date, how many days we have on it.

14   Q   As I read the first page of Exhibit W, it identified --

15   A   Hold up.

16       (Witness reviews exhibit.)

17       Okay.

18   Q   As I read the first page of Exhibit W, it identifies work

19   from May 17th through June 4th.  June 4th.

20   A   Okay.

21   Q   Is that correct?

22   A   (Witness reviews exhibit.)

23       That is correct.

24   Q   About seventeen days worth of work?

25   A   Yes, sir.

1    Q   You were -- you were looking at the fifth page -- the fifth

2    page at the -- at the bottom, it says "ATP-0282"?

3    A   (Witness reviews exhibit.)

4        Yes, sir.

5    Q   What day is that for?

6    A   May 20th.

7    Q   It identifies a portion of the work involves welding a

8    plate back in, correct?

9    A   That is correct.

10   Q   It involves the grinding and the welding of that work?

11   A   Yes, sir.

12   Q   What other work does it include?

13   A   Basically, to cut and fit a forty level plate that was cut

14   out and started welding on it.  We grind it on a ninety-three-

15   foot level, cut out, and safe for that area.  They picked up

16   loose material from the twenty-foot level and cleaned out all

17   the work area at the end of the day.

18   Q   What does a "ringer" do?

19   A   He does grind -- he does grinding, cuts right up to that

20   plate, watch simultaneously, a lot of different tasks.

21   Q   What does "continue welding on forty-foot level" mean?

22       (Pause in proceedings.)

23   A   Basically, it said they prepped and fitted the forty-foot

24   level cut out, which is where we cut -- cut out to get material

25   to go down and do the work below that, at the ninety-three-foot

1   level and so on and so on, on down.

2   Q   If you were doing work on that forty-foot level, how would

3   you describe it, other than replacing the cutout?

4   A   I'm not -- I'm not understanding what you're trying to say.

5   Q   You're cutting out through shells in the hull to get to the

6   next levels, correct?

7   A   We're coming out of the hull.

8   Q   But to get into the hull, you cut holes to go into those

9   levels.

10  A   Yes, sir.

11  Q   And when you're working in those levels, how do you

12  describe the work in those levels?

13  A   I still don't -- I still don't follow exactly what you're

14  asking.

15  Q   I'm trying to understand how Omega invoices work.  If you

16  sent a crew into the forty-foot level to do just the repairs

17  they were asked to do, how would that work be described?

18  A   This was -- this was being done offshore by the supervisor

19  that's working -- who is assigned by the inspector, who is

20  observing all the work being done.

21  Q   And --

22  A   Which is not something we do in-house, in our office.

23  Q   So --

24  A   These tickets are signed offshore by the company rep for

25  ATP.

1    Q    My question is not very clear.  I apologize.

2    A    Okay.

3    Q    The hull on which work was being performed is broken into

4    sections, correct?

5    A    To my understanding, correct.

6    Q    Did you go into the hull?

7    A    No, sir, I haven't.

8    Q    So if a crew had to go into a specific area of the hull to

9    do work, it would describe the section on which they did their

10   work, correct?

11   A    From what it says here, they were working on the forty-foot

12   level and working on the ninety-three-foot level.

13   Q    That's --

14        THE COURT:  Let me try and help with your question.

15   Exhibit H was work done before they were doing the safe-out.

16   And so it does have the invoices that you're trying to find

17   out, sort of hypothetically, what they would look like.

18        MR. KELLEY:  I think W does, too, Your Honor.

19        THE COURT:  Well, we don't know if W does.  H

20   obviously does.

21        MR. KELLEY:  Yes.

22        THE COURT:  Since you're having confusing about your

23   question --

24        MR. KELLEY:  I see what you're saying.

25        THE COURT:  -- it may help to look at one that -- I

1    understand where you're going, but I think your question was

2    more general, how would you generally describe it.  And here,

3    you have an example in H.  Take a look at 00088, for example,

4    under H, or 90.

5         (Pause in proceedings.)

6              MR. KELLEY:  Let me approach it this way.

7    BY MR. KELLEY:

8    Q   Do you recall the point in time when Omega began -- let me

9    use the right term.  Do you recall when Omega stopped doing the

10   general repair work?

11   A   No, sir, I do not.

12   Q   Do you know when Omega began backing out of the work?

13   A   I don't recall, no, sir.

14   Q   So we don't know a specific point in time where the safe-

15   out work starts?

16   A   The ticket should show everything on it.

17   Q   Okay.  Have you, before you got here today, gone through

18   the invoices to summarize which ones were safe-out and which

19   ones were not?

20   A   No, sir.

21   Q   And when you went through safe-out, or going through that

22   process, have you gone through the tickets to figure out which

23   ones were actual work, working on safe-out, versus which is

24   just billing for downtime because they had to stop work?

25   A   I just answered.  Just -- you asked the same question

1    again.

2    Q    It's slightly different.

3    A    Okay.

4    Q    But is the answer --

5    A    It's the same --

6    Q    -- still no?

7    A    Same answer.

8    Q    Who is the person at Omega who is responsible for tracking

9    which work has been paid for and which work has not been paid

10   for?

11   A    We have a -- an accounting department.  There's a series of

12   girls that work in the department.

13   Q    That's not your responsibility?

14   A    No, sir.

15            MR. KELLEY:  No more questions, Your Honor.

16            THE COURT:  Thank you.  Anything further?

17            MR. DELAUNAY:  Short, briefly.

18                REDIRECT EXAMINATION OF GREGORY SANDOZ

19   BY MR. DELAUNAY:

20   Q    Mr. Sandoz, you told us earlier that up until the shut-in -

21   - or rather, at the time that you were advised, Omega was

22   advised, that the Innovator would be shut in, you were asked

23   for Omega to keep their crew up there to do what we'll call the

24   "safe-out work."  Is that correct?

25   A    Yes, sir.

1    Q    Did Omega decide what was the particular tasks necessary

2    for safe-out?

3    A    No, sir.

4    Q    Did ATP have a person there directing Omega as to what was

5    necessary for the safe-out?

6           MR. KELLEY:  Your Honor, lack of foundation.  The

7    witness hasn't been out to the job site, so we need to --

8           MR. DELAUNAY:  Well --

9           MR. KELLEY:  -- lay that foundation.

10          MR. DELAUNAY:  Okay.

11          THE COURT:  Sustained.

12   BY MR. DELAUNAY:

13   Q    Subsequent to the shut-in, when your people were asked to

14   stay there, who directed Omega's work?

15   A    The consultant group that's out there.

16          MR. DELAUNAY:  Okay.  Thank you.  That's all I have.

17               RECROSS-EXAMINATION OF GREGORY SANDOZ

18   BY MR. KELLEY:

19   Q    Counsel for Omega just asked you a question about when you

20   were asked to begin safe-out.  Do you know who asked Omega to

21   begin the safe-out exercise?

22   A    No, sir.

23   Q    Do you know when that conversation might have taken place?

24   A    Not really.  I don't -- do not recall.

25   Q    So if the Government told ATP at some point in time to shut

1    in the project, you don't know when ATP talked to Omega, do

2    you?

3    A    I do not.

4    Q    So it was just sometime after that, as far as you knew.

5    A    Yes, sir.

6            MR. KELLEY:  No more questions.

7            THE COURT:  Anything further, Mr. deLaunay?

8            MR. DELAUNAY:  Nothing further, Judge.

9            THE COURT:  Thank you, sir.  You can step down.

10            THE WITNESS:  Thank you.

11        (Witness excused.)

12            THE COURT:  All right.  What we're going to do is, I

13    want to take a recess in this Omega hearing for a few minutes,

14    and ask the parties to have the meeting they had discussed.

15            Mr. Kelley, I'm hoping you have someone who can do

16    that, as your designee, to figure out which invoices have been

17    paid and which ones haven't been paid, which I think you all

18    said you all could probably together --

19            MR. DELAUNAY:  I think we can do that, Your Honor.

20            THE COURT:  -- and resolve that.  And then, during

21    that recess, I'm going to call my other case, and then we'll

22    come back and we'll finish Omega.

23        (Recess taken from 4:31 p.m. to 5:14 p.m.)

24            THE COURT:  Were the parties able to reach an

25    agreement as to the invoices?

1          MR. KELLEY:  We were, Judge, largely due to the work

2     of my colleagues.  I'm just kidding.  Seriously, he was

3     involved with looking at the --

4          MR. DELAUNAY:  The -- just for the -- the amount,

5     Judge, is $649,026.47.

6          THE COURT:  Six four nine?

7        (Participants confer.)

8          THE COURT:  I'm sorry.  Six four nine?

9        (Participants confer.)

10         MR. DELAUNAY:  It would be oh two six point four

11    seven, Your Honor.  And for the Court's -- just by way of

12    explanation, if the Court looks at what we have marked as

13    Exhibit MM --

14         THE COURT:  For demonstrative purposes --

15         MR. DELAUNAY:  All the way on the right-hand column,

16    on Page 0462, which is the first page of Exhibit M, the last

17    two entries, the 7631.29 and the 10,245 have been paid.  And on

18    the second page of Exhibit M, the second-to-last entry for

19    85,925.33 has been paid.

20         THE COURT:  And do you mind me using Exhibit M for the

21    purpose of identifying of identifying which invoices are paid

22    and which ones are not paid?

23         MR. KELLEY:  We know that that's the correct amount,

24    Your Honor.  I believe -- if that's the correct invoices, it

25    is.  I just don't know that we -- we have anyone here who can

1     tell us that, we don't have anyone from our accounting group.
2     We know what checks have been issued --
3             THE COURT:  And they exactly match those amounts?
4             MR. KELLEY:  Yes.
5             THE COURT:  Okay.
6             MR. KELLEY:  I mean, I think the answer is yes,
7     but I --
8             THE COURT:  Fair enough.  All right.  And did you have
9     any more witnesses?
10            MR. DELAUNAY:  Judge, I have one more, I think we can
11    do it shortly.  Mr. Gary Buchanan.
12            THE COURT:  Mr. Buchanan.  Mr. Buchanan, sorry to keep
13    you waiting.  Would you raise your hand, please, sir?
14            GARY BUCHANAN, WITNESS FOR OMEGA, SWORN.
15            THE COURT:  Thank you.  Have a seat, please.
16        (Pause in proceedings.)
17            DIRECT EXAMINATION OF GARY BUCHANAN
18    BY MR. DELAUNAY:
19    Q   Mr. Buchanan, would you state your full name for the
20    Record, please.
21    A   Gary Buchanan.
22    Q   And what is your current employment?
23    A   I'm the President of Omega Natchiq.
24    Q   And how long have you served in that position?
25    A   It's eight years.

GARY BUCHANAN - DIRECT BY MR. DELAUNAY

120

1    Q   Okay.  You're familiar with the invoices which -- for which

2    payment is being claimed?

3    A   Yes, sir.

4    Q   And the invoices in the exhibit book, other than those that

5    we have stipulated are paid, do they remain unpaid at this

6    time?

7    A   Yes, sir.

8    Q   Would you -- I just want to briefly establish how these

9    invoices come to be.

10   A   Okay.

11   Q   First of all, there is a -- on each of the invoices, you

12   have a purchase order or an AFE number?

13   A   Yes, sir.

14   Q   Where does that number come from?

15   A   It comes from ATP.

16   Q   Okay.  So when you're called for work, you request an AFE

17   or a purchase order number?

18   A   Yes.  They -- actually, they gave us one.

19   Q   Okay.  And now in terms of invoices, there is something

20   called -- what's you -- if we could look at Exhibit W again,

21   we've used that as an example --

22   A   Yes, sir.

23   Q   -- in the past, and we'll use that once again.

24       The second page of Exhibit W appears to be a service report

25   or something to that effect.  Would you tell us what that is?

1   A    Yes.  That looks like -- it looks like we got some supplies

2   in from one of our vendors, and then we had that loaded out and

3   sent to ATP.

4   Q    Okay.  And so if we look at that sheet, and then -- it does

5   not match the form of the Daily Service Reports that have names

6   of people and the number of hours by each person.  Do you

7   recall that?

8   A    No, sir, that --

9   Q    Do you see that?

10  A    The one you're looking at, on Page 2, that's an on-shore --

11  that's done at an on-shore facility in New Iberia, and the

12  DSRs, or the Daily Service Reports, are done offshore.

13  Q    So just so that we can be clear, and so that the Court

14  understands, some of the work that was done was prepared in

15  part at your -- at your offices in New Iberia, then it was

16  shipped out to the Innovator?

17  A    Yes, sir.

18  Q    Okay.  And the same would be true for materials that were

19  needed on the Innovator; they might have been loaded out -- or

20  acquired and loaded out at your offices and then sent out to

21  the Innovator?

22  A    Yes, sir.

23  Q    And if we go further down to -- I guess look at the Daily

24  Service Report for May 20, 2013, or refer to -- that's the

25  first typed Daily Service Report.  Do you see that?

1    A    Yes, sir.

2    Q    Okay.  First of all, where are these Daily Service Reports,

3    which show the number of hours, describe the work done, and

4    name the parties that were working; where are they prepared?

5    A    They're prepared offshore.  The offshore superintendent

6    that works for Omega prepares the Daily Service Report.  He has

7    that report signed by the offshore representative for the oil

8    company that we're working for -- and then that is sent in to

9    our office in New Iberia.

10   Q    So for instance, on the one you're looking at, where it

11   says "customer representative," that would be the signature of

12   ATP's representative on the Innovator?

13   A    Yes, sir.

14   Q    Okay.  Now the on-shore work, the previous one, if we go

15   back, it also has a customer representative signature on it?

16   A    Yes, sir.

17   Q    And is there a customer representative at your yard, where

18   is he at?

19   A    Probably not.  We fax that out or send that out to the

20   Innovator or to whoever we're working for, and then that is

21   signed by them and sent back in to us.

22   Q    Okay.  And once these DSRs come in, what else goes in to --

23   how do you go about preparing an invoice?

24   A    All of the DSRs, or Daily Service Reports, are sent in to

25   our payroll department, that's put into the payroll.  Payroll

GARY BUCHANAN - DIRECT BY MR. DELAUNAY

1    then takes those DSRs, those are sent up to accounting, and

2    accounting processes the invoices.

3    Q    Okay.  And what about third-party charges; are those

4    included on your invoices?

5    A    Yes, sir.

6    Q    Okay.  And then those invoices -- the invoices that are at

7    issue today are -- they have a billing address, so Mr. Michael

8    Pierson, ATP Oil & Gas, 4600 Post Oak Place, do you see that,

9    in Houston?

10   A    Yes, sir.

11   Q    Okay.  And is that the same place you sent your invoices

12   prior to the bankruptcy?

13   A    I believe so.

14   Q    Okay.  Now after these invoices were sent, did you ever

15   receive any notice from ATP; a phone call or email, a letter, a

16   note, advising that they disputed any portion of the invoices?

17   A    No, sir.

18   Q    Did you ever receive any notice from ATP that any of the

19   work on the -- shown on the invoices and in -- and the

20   attachments is not properly authorized, did not have a proper

21   AFE or purchase order?

22   A    No, sir.

23   Q    Okay.  After these invoices became over 30 days old, did

24   you make inquiries with ATP?

25   A    Our accounting department --

1    Q   Okay.

2    A   -- inquires to ATP, as to what's going on, you know, are

3    they in process, or what's happening.  I'm notified that they

4    have -- that we have a late payment, that ATP is behind.  I

5    notified Greg.  I have asked him on numerous occasions to, you

6    know, get with ATP and find out, you know, what's going on

7    there and --

8    Q   Did Omega receive any emails from ATP saying what was

9    happening with the invoices?

10   A   I believe that Greg had some emails that were sent to him,

11   saying that certain invoices were --

12            MR. KELLEY:  Object, Your Honor.

13            MR. DELAUNAY  If you know?

14            MR. KELLEY:  Objection; hearsay, Your Honor.

15            MR. DELAUNAY:  Sure.

16            THE COURT:  Sustained.

17            MR. DELAUNAY:  I'll withdraw it, Judge.

18            THE WITNESS:  Okay.

19   BY MR. DELAUNAY:

20   Q   Okay.  But you received no objections, no complaints, no

21   disputes with respect to any of the invoices.  Is that correct?

22   A   No, sir.

23            MR. DELAUNAY:  That's all I have, Judge.

24            THE COURT:  Thank you.

25            CROSS-EXAMINATION OF GARY BUCHANAN

BY MR. KELLEY:

Q    Good evening, Mr. Buchanan.

A    Good evening, sir.

Q    How are you?

A    Fine.

Q    I believe, if I heard correctly, your counsel was asking
you some questions about -- we've been using it by way of
example -- Exhibit -- Invoice W?

A    Yes, sir.

Q    And I believe you identified what you called "on-shore
work."

A    Yes, sir.

Q    That's the first couple of invoices?

A    Yes, sir.

Q    The first couple of pages behind the first page?

A    Yes, sir.

Q    Omega does fabrication work, doesn't it?

A    Yes, sir.

Q    And that fabrication work is done in its shop?

A    Yes, sir.

Q    And that's what these types of pages represent, the
first -- one, two, three, four -- five pages?

A    Not necessarily.  The first one is we had received some
supplies from some vendors, placed it in a game box, and then
loaded the game box for delivery, and that was picked up by a

1    truck.

2    Q    What kind of supplies do you know were being delivered in

3    that time frame?

4    A    I wouldn't -- I don't know.

5    Q    You were here in the courtroom when -- you heard the

6    testimony from Mr. Sandoz about that, at some point, there was

7    a process that the Omega team was doing called "safe-out" --

8    A    Yes, sir.

9    Q    -- or basically backing out of their work --

10   A    Yes, sir.

11   Q    -- and closing up the hull behind them?

12   A    Yes, sir.

13   Q    What supplies were you sending out for that exercise?

14   A    I don't know.

15   Q    It's my understanding that, essentially, they're grinding,

16   replacing the plate, and welding it back in place, and bolting

17   back certain connections.  You heard that testimony?

18   A    Yes, sir.

19   Q    Do you disagree with that?

20   A    No, sir.

21   Q    So are you aware of any supplies they need from shore that

22   would have accounted for these five pages and all this work,

23   that would have dealt with safe-out?

24   A    If they're grinding, they might have needed some grinding

25   disks.  I wouldn't know; I wasn't out there.

1    Q    For all these hours of shipping out grinding disks?

2    A    Could have -- well, I don't know.  I wasn't there.

3    Q    And you --

4    A    I don't --

5    Q    I think you understand why I'm asking --

6    A    Oh, yes, sir.

7    Q    -- that question.

8    A    Yes, sir.

9    Q    It appears to me that this invoice, if it includes safe-out

10   work, also includes some other work.

11   A    It possibly could.

12   Q    Have you had -- asked anyone at Omega to go through the

13   invoices and break out which portion may be just safe-out work?

14   A    No, sir.

15   Q    As you sit here now and look at the invoices, are you able

16   to do that?

17   A    No, sir.

18   Q    If you -- have you looked at these invoices and tried to

19   identify which would we did which would be beneficial to a

20   Bankruptcy Estate?  And I understand that that's a concept,

21   associated with bankruptcy.  But have you -- have you looked at

22   it and said, this benefits this Estate, or asked someone from

23   your team to go through the invoices and try to group those

24   types of expenses?

25   A    No, sir.

1    Q    Could you take a look at Tab I, please?

2    A    (Witness reviews exhibits.)

3         Okay.

4    Q    Could you look at the third page of Tab I?  Strike that.

5         The fifth page, I guess.  Let me count these out.

6    A    Would that be --

7    Q    It's numbered at the very bottom in the center as

8    ATP-00108.

9    A    (Witness reviews exhibit.)

10        Okay.

11   Q    Could you explain what the job description is for this --

12   for this page, and what it reflects?

13   A    They drove from New Iberia or our shop in New Iberia to

14   Port Fourchon, waited for weather to clear, drove back to shop.

15   Q    How does ATP benefit from those types of hours or services?

16   A    We were asked to bring people there, and we did.  They

17   didn't go out with the weather.  I can't control the weather.

18   Q    So for these specific hours, ATP doesn't benefit, does it?

19        MR. DELAUNAY:  I'm going to object, to the extent it

20   calls for a legal conclusion, Your Honor.

21        THE COURT:  Sustained.

22   BY MR. KELLEY:

23   Q    Can -- are you aware of any benefit that ATP enjoys from

24   having these folks just do that work, that drive out there and

25   back?

1    A    I don't guess I understand your question.

2    Q    Are you aware of any safety or work that is completed, or

3    any actual improvement to the -- to the assets of the Estate;

4    to the Innovator, to any operation that is created by having

5    these individuals do this type of exercise, drive out there --

6    A    That was not an exercise.

7    Q    Fair enough.  By -- they spent some time doing this.  Is it

8    eighteen hours?  Am I reading that correctly?

9    A    That's what it says.

10   Q    So each -- these two individuals each had eighteen hours

11   driving, making that drive, waiting, and then driving back

12   home?

13   A    That's what the -- that's what the DSR says.

14   Q    They didn't do any work on the ATP platform?

15   A    I don't know.

16   Q    Is there any indication on here that they did any work on

17   the -- on or for the platform --

18   A    No, sir.

19   Q    -- during those eighteen hours?

20   A    No, sir.

21   Q    What I'm getting at is:  Has anyone gone through and pulled

22   out from the invoices these types of hours that didn't actually

23   result in any physical work being done on the platform?

24   A    No, sir.

25   Q    Has anyone gone through and pulled out for downtime or work

1     that didn't actually change or improve or do anything to the

2     asset?

3     A    No, sir.

4     Q    So all of that is still embedded in all of these invoices?

5     A    Yes, sir.

6     Q    Would you take a look, please, at Invoice R?

7     A    (Witness reviews exhibits.)

8          Yes, sir.

9     Q    Again, this is just by way of example.  But could you take

10    a -- I think it's the 11th page of Invoice R, it's ATP-00200.

11    A    (Witness reviews exhibit.)

12         Okay.

13    Q    Have you -- do you have -- do you see that this is an

14    invoice that covers for just downtime, where they're not doing

15    any work?

16    A    It says "Downtime due to weather, but job on intake is

17    complete."

18    Q    So they're billing for their time, where it says

19    "downtime," because of the situation with the weather.

20    A    Yes.  They're offshore.  It appears that they're offshore.

21    Q    And I take it, because of the weather, they weren't doing

22    any work on the platform at that point in time?

23    A    I wouldn't have any idea.

24    Q    I can go through a number of these examples, but it --

25    you're aware that it appears in each of these invoices.  If

1  there's downtime, someone's time is recorded; if they're

2  driving or not actually working on the project, that time is

3  included in these invoices, correct?

4  A    It -- yes, sir, it should be.

5  Q    And it's in -- it's throughout these invoices.

6  A    Okay.  Yes.

7  Q    I mean, is that --

8  A    Yes.

9  Q    -- your understanding?

10  A    Yes.

11  Q    And --

12  A    I mean, they're -- they're offshore, and they -- they get

13  paid twelve -- at least twelve hours a day, the time that

14  they're offshore.

15  Q    Because that's your agreement with your employees, to pay

16  them those twelve hours?

17  A    No, sir.  That's the agreement that ATP and Omega has.

18  Q    So you can charge ATP for those twelve hours?

19  A    Yes, sir.

20  Q    So basically, when these employees are offshore, no matter

21  what they're doing, they're billing ATP for twelve hours of

22  their time every day.

23  A    Yes, sir.

24  Q    I apologize.  I may have asked you this question.

25  A    That's okay.

1   Q   I don't intend to ask you it twice.  Did I ask you, have

2   you done any allocation between the work that was just safe-

3   out, versus the rest of the work that was being done on the

4   platform?

5   A   No, sir, I have not.

6   Q   Has Omega done that at all?

7   A   No, sir.

8   Q   What is your title at Omega?

9   A   I'm the President.

10  Q   So if someone would have done that, they would have done

11  that at your direction?

12  A   Yes, sir.

13  Q   And as of today's date, you haven't asked anyone to do

14  that.

15  A   No, sir.

16  Q   How would we go about determining -- if it's concluded that

17  just platform and the situation with the platform on extracting

18  the crew and returning those pieces of metal, which was

19  necessary for safety, is an expense that ATP should pay, how

20  would we go about computing that expense from these invoices?

21  A   To be honest with you, I -- I don't know.  I really don't

22  know.

23  Q   There's not really enough information in these invoices to

24  compute that, is there?

25  A   Not that I've seen.

1    Q    I haven't either.  I'm not trying to argue.

2         (Pause in proceedings.)

3    Q    Were you directly involved in communicating with ATP

4    associated with this -- with any of these tasks or jobs?

5    A    No, sir.

6    Q    Do you know when ATP communicated to Omega that they needed

7    to leave the platform or that the work had to stop?

8    A    No, sir.

9    Q    So you don't know, specifically, when the safe-out work

10   would have commenced, either?

11   A    No, sir.

12   Q    No, sir, you do not know?

13   A    I do not know.

14   Q    I'm sorry.  I -- my problem with the question.

15        (Laughter.)

16        MR. KELLEY:  No further questions, Your Honor.

17        THE COURT:  Thank you.  Anything further?

18        MR. DELAUNAY:  Yeah, just a couple.

19             REDIRECT EXAMINATION OF GARY BUCHANAN

20   BY MR. DELAUNAY:

21   Q    Mr. Buchanan.

22   A    Yes, sir.

23   Q    You were here during Mr. Sandoz's testimony?

24   A    Yes, sir.

25   Q    Do you recall his testimony that, after the well was shut

1    in, Omega was asked to leave its crew on there to do the work

2    on the -- the safe-out work?

3    A   Yes, sir.

4    Q   Okay.  And that they worked under the instructions of the

5    ATP representative?

6    A   Yes, sir.

7    Q   Okay.  If someone wanted -- if there was someone that could

8    tell us or contended that there was work that was done that was

9    not safe-out, would ATP's representatives be the one to do it?

10         MR. KELLEY:  That calls for speculation from this

11    witness, Your Honor.  I don't know --

12         THE COURT:  Sustained.

13   BY MR. DELAUNAY:

14   Q   Okay.  Was Omega doing the work that ATP's representative

15   told them was necessary to the safe-out?

16         MR. KELLEY:  Again, speculation.  This witness doesn't

17   have personal information whatsoever, Judge.

18         THE COURT:  Sustained.

19   BY MR. DELAUNAY:

20   Q   At any time since the issuance of invoices, or at any time

21   since the filing of this, has ATP ever said, "Well, we don't

22   want to pay for a portion of the invoice because it did not

23   give us any benefit"?

24   A   No, sir.

25         MR. DELAUNAY:  Okay.  That's all I have.  Thank you,

1    Judge.

2            THE COURT:  Thank you.  Anything further?

3        (No verbal response.)

4            THE COURT:  Thank you, sir.  You can step down.

5            THE WITNESS:  Thank you.

6        (Witness excused.)

7            THE COURT:  Any further evidence by Omega?

8            MR. DELAUNAY:  Judge, I had submitted an affidavit

9    with the exhibits.  The contract calls for payment of

10   attorneys' fees in the event it's necessary to employ the

11   services of an attorney to collect post-petition -- this is the

12   post-petition contract to collect any invoices.  I had done an

13   affidavit, which is included as -- I think it's L -- LL.  I

14   would ask the Court for permission to update the affidavit.

15   There's been two depositions since I did that affidavit, and I

16   could -- I could update it for the Court.

17           THE COURT:  LL hasn't been admitted.  Let's start with

18   that.

19           MR. DELAUNAY:  Right.

20           THE COURT:  And I'm about to ask for some briefing.

21           MR. DELAUNAY:  Okay.

22           THE COURT:  So I want to figure out how we're going to

23   figure out your attorneys' fees without bringing you back.

24           MR. DELAUNAY:  Thank you, Judge.

25           THE COURT:  How do you all think that can happen?

1          MR. KELLEY:  I'm sorry?

2          THE COURT:  Let's assume for a moment that they

3     prevail, because I am going to require some briefing, and I'm

4     not certain of the full answer yet.

5          If they prevail, and if they are entitled to

6     attorneys' fees, how do you propose that we figure out how much

7     those are, given that there's still going to be briefing, and I

8     don't want to spend the money to come back over from -- is it

9     Lafayette or -- that you're coming from?

10         MR. KELLEY:  I would like to think we could discuss

11    that and reach an agreement on something like that, if the

12    Court provided us some sort of ruling or mandate, where we

13    would not incur additional time --

14         MR. DELAUNAY:  Can we just --

15         MR. KELLEY:  -- or have to come over here.

16         THE COURT:  If we can't -- I'm going to go ahead and

17    swear you in now, we're going to continue the hearing, and

18    allow you to testify on the phone.

19         MR. DELAUNAY:  Okay.

20         MR. KELLEY:  We can -- I'm learning from our other

21    bankruptcy case that declarations work fine on these issues.

22    It's --

23         THE COURT:  Well, what if you challenge it?  If you

24    were to challenge the declaration, I don't want him to come

25    back over here to defend --

1         MR. KELLEY:  Then I'll have no problem doing his

2    testimony over the telephone at that point in time.

3         THE COURT:  Right.

4         MR. KELLEY:  And I would --

5         THE COURT:  So you can submit a revised affidavit, he

6    can challenge it.  If he does --

7         MR. DELAUNAY:  Wonderful.

8         THE COURT:  -- you can testify on the phone.  Raise

9    your right hand.

10                  GERALD DELAUNAY, ESQ., SWORN.

11         THE COURT:  The hearing is continued, in the event

12    that we have that issue --

13         MR. DELAUNAY:  We had a question.

14         THE COURT:  -- and you'll be able to testify on the

15    phone.

16         MR. DELAUNAY:  Can you do an oath over the phone?

17         THE COURT:  I don't need to.  It's going to be the

18    same hearing --

19         MR. DELAUNAY:  I know.  It --

20         THE COURT:  -- and you're going to remain under oath.

21         MR. DELAUNAY:  It is, but --

22         THE COURT:  Oh, I don't know.

23         MR. DELAUNAY:  We had a deposition, we did an oath

24    over the phone.

25         THE COURT:  You know, I --

1          MR. DELAUNAY:  I kept saying, I've never done that in

2     forty years, but --

3          THE COURT:  I can waive an oath, if I have to.  I got

4     you -- I got you under oath, don't lie to me.  How's that?

5          MR. DELAUNAY:  Okay.

6          THE COURT:  I think we'll be okay.

7       (Laughter.)

8          MR. DELAUNAY:  I haven't done it in forty years.

9          MR. KELLEY:  Are they closing the --

10          THE COURT:  They're resting, yeah.

11          MR. DELAUNAY:  Yeah, that's it.

12          THE COURT:  Do you have any evidence?

13          MR. KELLEY:  Well, I do.  I have two witnesses that

14     I'm prepared to put on, Your Honor.  But I was going to start

15     with basically the equivalent of a directed verdict on this, in

16     the sense that it is their burden to demonstrate how the Estate

17     benefits from this.  Our objection on this, which we filed,

18     Your Honor, lays out the law pretty clearly, if I may?

19       (Pause in proceedings.)

20          MR. KELLEY:  As the Fifth Circuit has stated *In the*

21     *Matter of Trans American Natural Gas Corp.*, Your Honor, it's a

22     two-prong test.  Not only must the claims arise from the

23     transaction with the Debtor-in-Possession, but the goods or

24     services supplied must enhance the ability of the Debtor-in-

25     Possession's business to function as a going concern.

1          And the Court must construe the words as we've said --

2     laid out in our brief, and I'm not going to read it for Your

3     Honor.  But the issue here is that it actually benefitted the

4     Estate and its creditors.  The point is, just because it's

5     post-petition, automatically, as Your Honor knows, doesn't give

6     rise to an administrative expense.  It has to, in fact, have

7     benefitted the Estate.

8          Of the amount of work that was performed,

9     approximately $649,000, I think, was the stipulation.  Six

10    hundred thousand of it relates to the Innovator.  And of

11    that -- the work on the Innovator, one, production had stopped

12    in May.  The witnesses that I'm going to call will testify as

13    to when the Debtors lost an economic interest in that, and the

14    Estate benefitting from that, starting in February.  We'll

15    bring that up, if that's necessary for this.

16         But the point is that, with the Gomez hub and with the

17    Estate's interest in it, the Estate no longer benefitted from

18    this work and these services provided on the Innovator.  And in

19    fact, none of this was related to emergency or necessary work.

20    None of it was driven by any mandate from the BOEM, none of it

21    was driven by any order or requirement from any of the

22    regulatory authorities.

23         THE COURT:  So you never want anybody to do work for

24    your client again when you ask them to?

25         MR. KELLEY:  Your Honor, that is not the -- I, of

140

1course, don't want that situation, and I understand the

2rhetorical nature of that question.  Unfortunately, Your Honor,

3is well aware of the playing field, in which I'm limited in the

4way I have to argue on this.  We have certain assets that are

5not within our budget, that we don't have monies to spend on

6those types of issues, and it's not included within there.  But

7I am left with the position of arguing that these

8administrative expenses don't benefit the Estate, and it is an

9unfortunate --

10THE COURT:  I'm just saying, I don't think that the

11way that you are describing benefit matches the Fifth Circuit's

12description of benefit, and the law cannot be that people

13should no longer ever do work for a Chapter 11 Estate because,

14even if it is, you know, work to go and renovate a platform or

15maintain a platform, which has sort of facial benefit to an

16Estate, that somebody can later come back and say to

17Ms. Guffy's client, "Well, yeah, I know you did the work, I

18know we promised you we would pay for the work, I know you did

19exactly what we asked, and I know that you accomplished laying

20the pipeline.  Well, guess what, we lost money on it, so it

21didn't benefit us, we're not going to pay you."  That's not the

22law, nor will it be.

23MR. KELLEY:  I understand the Court's -- but there's

24big distinctions between the way the Clipper Pipeline Project

25is dealing with the opportunity to try to -- to try to generate

1        production.

2                    THE COURT:  Gomez --

3                    MR. KELLEY:  And the benefit --

4                    THE COURT:  Gomez tried to produce; Gomez failed.

5                    MR. KELLEY:  Since February of 2013, Your Honor, we've

6        been trying to reject that property.  We allowed those parties

7        to try to come up with a plan, by which they could extract

8        value.  Even the Government got tired of it, and they entered

9        their shut-in order.  Their shut-in order was intended to say,

10       you're not dealing with employment, you're done, you don't have

11       the ability or the wherewithal.  The Estate gets no value from

12       that, Your Honor.

13                   THE COURT:  Well, it's --

14                   MR. KELLEY:  The way the benefit --

15                   THE COURT:  The safe-out work is obviously a benefit

16       to the Estate because of *Midlantic*.  I don't think there's an

17       issue about the safe-out work.

18                   MR. KELLEY:  Well, the point -- the burden of

19       allocation, though, and the burden on this case remains on

20       them.  The safe-out work, they have the duty to allocate that

21       and come up with what the safe-out work amounts are.

22                   THE COURT:  I can look -- I can look at the invoices.

23                   MR. KELLEY:  But the issue that -- I think that --

24       well, I don't even know that there's sufficient enough

25       testimony and, as we heard from the President of the company,

1    he doesn't think there's sufficient information to be able to

2    break it out on the invoices.

3         THE COURT:  No, that's not what he said.

4         MR. KELLEY:  I asked him if he were -- if there was

5    the ability to extract that information there, and he said he

6    didn't think there was sufficient information on the invoices.

7         THE COURT:  You asked Mr. Sandoz, and he said you can

8    look at the description and tell what work was done.  If you

9    look at the descriptions, for example, on May 6th and May 7th,

10   that description shows that they continued to do remediation

11   work.  At some point, the descriptions change, and the

12   descriptions changed to "We were sealing up holes."

13        MR. KELLEY:  But the entire invoices are not related

14   to that and --

15        THE COURT:  But you can look at those.  There's

16   individual daily work that's done, and you can read the

17   individual daily work.  And yeah, I don't need to -- this isn't

18   a criminal case.  I have to look at them and make a best

19   judgment on what those invoices are --

20        MR. KELLEY:  Yes, you do, Your Honor.

21        THE COURT:  -- and I can.

22        MR. KELLEY:  Well, the invoices include fifteen --

23   seventeen days of work, some of which, and on the individual

24   days where such backup exists, you may be able to look and

25   identify what work is done on those days.

1          THE COURT:  Well, there's backup on every day.  Show
2     me a day for which there isn't backup.
3          MR. KELLEY:  Well, maybe I misread the invoices that
4     we were using, but Your Honor --
5          THE COURT:  I thought there was back -- I have not
6     seen a day without backup.  But I mean, maybe that is true in
7     the evidence, but I don't think so.
8          MR. KELLEY:  Well, I'll tell you what, if the Court is
9     asking for briefing, I would like to do that in a little bit
10     more detail, and we'll address it there when -- those days.
11     It's either there or it's not.
12          But the point is the work that was done certainly
13     yielded a benefit to the Innovator.  ATP was undertaking that
14     by virtue of its contract.  And the value of the -- and the way
15     they get paid may, in fact, be their liens or claims against
16     the Innovator, whether that vessel is sold --
17          THE COURT:  Well, that's going to be part of the
18     briefing I want done.
19          MR. KELLEY:  -- and whether that vessel is sold or
20     whether it's scrapped, but they have a claim against that, and
21     we're not disputing that.  The issue that we have is that ATP
22     performed work pursuant to its Platform Use Agreements,
23     contractual obligations, and it did that work as part of the
24     maintenance program.
25          Did the Estate benefit from that?  I'm hearing Your

1    Honor's concerns, and yet, one of the things that, as the

2    Debtors' counsel, we have to point out is I can't -- I can't

3    sit here and say, and the evidence doesn't support it, and we

4    won't -- and ATP doesn't see it that we can tell the general

5    creditor body that you have benefitted from this work, given

6    that, unfortunately, the way that process worked on the

7    Innovator, where we were unable to reject at the time we wanted

8    to, and with the delay in getting that stuff put to bed, that

9    the contractor is finding itself exposed on this.  That is --

10   that's not a great situation, we don't draw any pleasure from

11   that, and it's not a comfortable argument.  But it is an

12   argument the Estate has to make, that --

13            THE COURT:  No, I don't -- well, since you're making

14   the argument, I just think the argument is wrong, so I'm going

15   to -- if that's the extent of your motion, I'll deny it, and

16   I'm going to have you put your witnesses on.

17            MR. KELLEY:  Okay.

18            MR. DELAUNAY:  Your Honor, with respect to witnesses,

19   I -- this is the first I hear of witnesses.  They did not file

20   a witness list, other than saying that they were going to --

21   any witness called by any other party, and that's it.  But had

22   I known there were witnesses, I would have deposed those

23   witnesses.

24            THE COURT:  Counsel --

25            MR. DELAUNAY:  I've never seen a witness list.

1          THE COURT:  Counsel --

2          MR. KELLEY:  I believe we did designate and file our

3   witness list with the Court, Your Honor, that identified

4   Mr. Latimer and --

5          MR. DELAUNAY:  Well --

6          THE COURT:  Let's take a look.

7          MR. DELAUNAY:  Let's look and see, because.

8       (Pause in proceedings.)

9          THE COURT:  Do you know when?

10      (Participants confer.)

11         THE COURT:  This is going to be on 2311 --

12         MR. KELLEY:  I have a September 4th document, Your

13   Honor.

14         THE COURT:  There's a witness list related to 2311

15   filed on September 4th.

16         MR. KELLEY:  The document I have --

17         THE COURT:  Do you have one before September 4th?

18         MR. KELLEY:  What I've got in my notebook here is

19   dated September 4th.  I don't know that there was one before --

20         THE COURT:  So you filed a witness list yesterday?

21         MR. KELLEY:  I know we filed an amended one yesterday.

22   If there was not an earlier one --

23         THE COURT:  I see.  There was a witness list filed on

24   August 20th with respect to 2311.

25         Right here, it's on the screen.

1           MR. DELAUNAY:  Okay.

2           THE COURT:  I'm going to sustain the objection.  You

3      haven't identified any witnesses.

4           MR. KELLEY:  Even for purposes of rebuttal, Your

5      Honor?

6         (Participants confer.)

7           MR. KELLEY:  2498.  We may have filed something --

8           THE COURT:  You can have rebuttal witnesses, but don't

9      forget what the Fifth Circuit said about rebuttal witnesses, is

10     they're not for the purpose of surprise; they're true rebuttals

11     for things that weren't known.  I mean, if you knew that you

12     were going to put on some testimony, you just put it up.

13           What are they going to rebut?

14           MR. KELLEY:  Well, I think, Your Honor, given the

15     Court's rulings, the witness list --

16           THE COURT:  This is the September 4th list.

17           MR. KELLEY:  What was the other?

18         (Participants confer.)

19           THE COURT:  The other one just said anybody called by

20     the other party.

21           MR. KELLEY:  No, he gave me a number for another

22     document, that's what I was --

23           THE COURT:  Okay.

24         (Participants confer.)

25           THE COURT:  2498 is what up.  And you identified

1    Mr. Latimer and Mr. Reese, but that was yesterday, which was

2    obviously far too late.  Do you have any true rebuttal, or is

3    it really your case that you want to put on?

4         MR. KELLEY:  Well, I'm trying to think if there's

5    anything more we need in the Record on this issue because I

6    believe the witnesses have already testified about the shut-in.

7    You know, I believe the Record here -- I think the Court can

8    take judicial notice of the fact of when we rejected the

9    Innovator.

10        THE COURT:  I'll take judicial notice of when you

11   rejected both -- I don't remember if the Innovator platform has

12   been rejected.

13        MR. KELLEY:  The platform use agreement was

14   rejected --

15        THE COURT:  That was --

16        MR. KELLEY:  -- at the same time with the Gomez

17   leases.

18        THE COURT:  The Gomez was rejected.  Yeah, I'll take

19   judicial notice of when all that was rejected.  That's part of

20   my own docket sheet.

21        MR. KELLEY:  And I mean, the Debtors' case for that

22   was the economic rationale that's --

23        THE COURT:  All right.  Here's -- I need a couple of

24   things briefed.  The first one is that the relief sought

25   includes, not just an allowance of the administrative expense,

1    but a motion to compel payment of the expense.  I'm not

2    inclined to do a motion to compel payment because I know in

3    advance that performance is impossible, which I know; in some

4    sense, know.

5          On the other hand, if they have an administrative

6    expense that they're not paying, and you were to then file

7    whatever relief was appropriate in the form of conversion or

8    dismissal or whatever, that would seem something that we would

9    then have to take up at a future hearing.  But I want to know

10   whether the law requires me to issue an order to compel payment

11   when, from the case, it appears they don't have the money to

12   pay.  That's separate from the allowance question and how you

13   would then ultimately get paid.  But I just want to know what

14   the law requires me to do there.  And if the law does require

15   me to compel payment, even when it appears that that's -- there

16   is no reasonable possibility of performance, then I'll do that.

17   But I need briefing on whether I'm supposed to do that.

18         The second question I have is:  From the day that the

19   rejection occurred until the day that the safe-out work

20   occurred, there was a substantial amount of work, from my

21   review of the invoices, for continued repair and maintenance on

22   the Innovator facility.  Just looking at the invoices and

23   trusting Mr. Sandoz's testimony -- which I do; I credit it

24   fully -- I think there was that kind of work done.  That work,

25   from the evidence, was done at the direction of ATP.

1          And I want to know what the law says is supposed to

2     happen when you have, for lack of a better description, a

3     transition period from the time that an event of rejection

4     occurs and the time that people realize an event of rejection

5     occurred.  Do we just stick the vendor?  It doesn't seem fair

6     to me, but that may very well be the law.  And that is a

7     different situation than, I think, the prior time period, when

8     you all were doing regular R&M work on the case.  So I want to

9     know if there's any law that tells me what to do about that

10    transition period because it's a fairly substantial amount of

11    money --

12         MR. DELAUNAY:  And just --

13         THE COURT:  -- with the transition.

14         MR. DELAUNAY:  We're talking about the Order the Court

15    authorizing the rejection --

16         THE COURT:  I think the --

17         MR. DELAUNAY:  -- on June 21?

18         THE COURT:  No, I think that Order -- didn't -- it was

19    ordered shut in, I think, on the 30th of April.

20         MR. DELAUNAY:  Correct.

21         THE COURT:  And so that order of BSEE caused the shut-

22    in, and a notice of the shut-in got filed.  You all may not

23    have known about that shut-in for five or six days, when you

24    then started the safe-out.  I don't have any evidence of when

25    you -- of the date you learned of the shut-in order.  But I

1    know when the shut-in order occurred, and the testimony, I

2    think, was when the shut-in -- I think the testimony was at the

3    end of April, and my best recollection was April 30.  And I can

4    look at my own docket and tell that.

5            MR. KELLEY:  I believe the April 30th date is correct,

6    Your Honor.

7            THE COURT:  Yeah.  But in any event, I don't know what

8    the law requires during that transition period.  And I've not

9    tied down the exact date from looking at the invoices.  But I

10   think there were six or seven days worth of fairly substantial

11   work that were done during what I'm going to refer to as a

12   "transition period," and that is --

13           MR. DELAUNAY:  And from our -- just so I understand

14   what the Court is looking for, the transition period is --

15           THE COURT:  The date of shut-in --

16           MR. DELAUNAY:  Okay.

17           THE COURT:  -- until the date you were told to do a

18   safe-out.

19           MR. DELAUNAY:  Oh, okay.  Okay.

20           THE COURT:  And I can -- I can tell when you were told

21   to do the safe-out by looking at the invoices, and it was

22   around the 9th or 10th or 11th, and I don't remember exactly.

23   I started looking at the invoices, and I didn't want to look at

24   invoices and not listen to testimony, but it's -- there was --

25           MR. DELAUNAY:  Okay.

1          THE COURT:  There were quite a -- there were several

2     days where work continued, and you all -- since I have no

3     evidence and my -- the testimony is that you all did what you

4     were told.

5          MR. DELAUNAY:  Right.

6          THE COURT:  So I'm going to just accept that you

7     started doing the safe-out at the same time you were told to do

8     the safe-out.  I want to know what to do during that interim

9     period.

10          MR. DELAUNAY:  Right.  I see.  Right, Judge.

11          THE COURT:  And I just need to know what the law tells

12     me to do on that.

13          The third question has to do with the fact that the

14     ATP Innovator was owned by a separate corporation, and that the

15     Debtor was operating pursuant to its operating agreement on the

16     Innovator platform, and that was a matter of record, who owned

17     that platform.  So if work benefitted the platform, and

18     benefitted -- the platform being owned by an affiliate of the

19     Debtor, and it simultaneously benefitted the Debtor because it

20     allowed the Debtor to perform under its, at that point,

21     unrejected agreement, does that constitute a benefit to the

22     Estate, or is that just a lien against the platform?

23          It's basically the argument that Mr. Kelley made to me

24     at the end.  The Debtor, of course, got the benefit of a

25     reduced liability because it was honoring its obligation.  But

1   that reduced liability is to an unsecured claim, for which

2   there will be very little benefit.

3          And all of that is in the context of you were being

4   asked to do this facially productive work.  But I want to know

5   whether I allocate that -- whether I tell you to go file your

6   lien against the platform, or whether you get a claim here.

7          MR. DELAUNAY:  Yes, sir.

8          THE COURT:  And I need to know when we have different

9   ownership versus operations.

10         As to the safe-out work, I have a very narrow question

11  about that, and that is I think the Debtor did have a *Midlantic*

12  obligation to do the safe-out work.  But I believe that the

13  owner of the ATP Innovator Platform also had a *Midlantic* duty

14  -- well, also had a duty to do the safe-out work.  It wouldn't

15  have been a *Midlantic* duty because they weren't in bankruptcy.

16         So if the Debtor is meeting its *Midlantic* duties,

17  which are administrative claims against the Estate, to make

18  everything safe and compliant with regulations, and those were

19  also the duties of the Debtors' affiliate, was the meeting of

20  that administrative obligation itself a benefit to the Estate,

21  or is it not considered a benefit because there was a benefit

22  also to an affiliate from the work?  I think I know the answer

23  to that, I think it was a benefit to the Estate, but I want it

24  briefed, to be sure that I get it right.

25         And because there's not money right now to pay your

1    client with, which is just the reality, I'm going to let you

2    tell me how long you want to get the briefing done.  You'll do

3    the initial briefing, you can do a follow-on brief.  And if you

4    want to do it next week, that's fine; if you want to take three

5    weeks to do it, that's fine.  I'm not going to rush you because

6    I know you all want to get paid, but the one thing that

7    probably isn't going to happen as a result of this motion is

8    quick payment to your client.  I mean, that's unfortunately

9    just if there isn't money, there isn't money.  But you're going

10   to get an order that entitles you to payment of at least some

11   of this.  It's pretty clear to me you're entitled to at least

12   some of this.  So you tell me what you want to do on a briefing

13   schedule.

14          MR. DELAUNAY:  Well --

15          THE COURT:  And you may get an order that compels

16   payment, but I need that briefed, to see if that's what I'm

17   supposed to do.

18          MR. DELAUNAY:  Right.  Judge, I can -- if I can have

19   ten minutes?

20       (Participants confer.)

21          MR. DELAUNAY:  Today is the --

22          THE COURT:  Here's a calendar for you.

23          MR. DELAUNAY:  Today is the 5th, so --

24          THE COURT:  Here's a calendar right here.  Do you want

25   to come in on the -- do you want to do it on the 26th, and then

1    I'll give him until the 10th?

2         MR. DELAUNAY:  Yes, that would be great, Judge.  Yeah.

3         THE COURT:  Can you -- can you do that, if they do

4    their briefing by the 26th, and you'll respond by the 10th?

5       (No verbal response.)

6         THE COURT:  Okay.  And then I'll take a yellow sheet

7    on that, Mr. Rios, on the 11th of October.

8         MR. KELLEY:  You raised a question when I was arguing

9    that -- about the Fifth Circuit law, and if I can't read the

10   law -- it makes me want to look more carefully at that.  If I

11   find something, I assume you won't be opposed to including

12   something in the --

13        THE COURT:  Yeah.  No, go right ahead.  That's fine.

14   Yeah, I mean, if I've got the law wrong, I'd rather not mess it

15   up.  But you know, I'm pretty familiar with those Fifth Circuit

16   cases, and in general, I think that the law is not precisely as

17   you described it, but we'll see.  We'll see, so.

18        MR. KELLEY:  We'll take a look at it, Your Honor.

19        THE COURT:  Mr. Rios, did you have a question?

20        THE CLERK:  I have no questions, Judge.

21        THE COURT:  All right.  Anybody else need us to do

22   anything?

23      (No verbal response.)

24        THE COURT:  All right.  We're adjourned.  Thank you.

25        MR. DELAUNAY:  Thank you, Judge.

1       THE CLERK:  All rise.

2       (Proceedings adjourned at 5:59 p.m.)

3                    *  *  *  *  *

4       *I certify that the foregoing is a correct transcript*

5  *to the best of my ability from the electronic sound recording*

6  *of the proceedings in the above-entitled matter.*

7  */S./  MARY D. HENRY*

8  *AAERT CET**D-337*

9  *JUDICIAL TRANSCRIBERS OF TEXAS, INC.*

10 *JTT INVOICE #51531*

11 *DATE:  SEPTEMBER 11, 2013*

12

13

14

15

16

17

18

19

20

21

22

23

24

25