## IN THE UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| ATP Oil & Gas Corporation, | § | Case No.: 12-36187 |
| | § | |
| Debtor. | § | Hon. Marvin Isgur |

---

**DEBTOR'S MOTION PURSUANT TO 11 U.S.C. §§ 105(A) AND 363 AND BANKRUPTCY RULES 2002 AND 6004 FOR AN ORDER (I) AUTHORIZING THE SALE OF SHARES OF DEBTOR'S WHOLLY OWNED NON-DEBTOR AFFILIATE ATP OIL & GAS (UK) LIMITED ON THE TERMS OF THE SHARE PURCHASE AGREEMENT; (II) APPROVING AND AUTHORIZING THE DEBTOR TO ENTER INTO THE SHARE PURCHASE AGREEMENT AND RELATED ANCILLARY DOCUMENTS; (III) APPROVING THE RELEASE OF THE CHARGES OVER THE SHARES HELD BY CREDIT SUISSE A.G. AS ADMINISTRATIVE AGENT AND AS COLLATERAL AGENT FOR THE LENDERS UNDER THE DIP CREDIT AGREEMENT AND THE 2010 FACILITY AGREEMENT; (IV) AUTHORIZING THE DEBTOR TO VOTE IN FAVOR OF, AGREE TO BE BOUND BY AND TO OTHERWISE SUPPORT, THE COMPANY VOLUNTARY ARRANGEMENT AND ENTER INTO RELATED ANCILLARY DOCUMENTS; AND (V) GRANTING RELATED RELIEF**

A HEARING WILL BE CONDUCTED ON THIS MATTER ON <u>DECEMBER 19, 2013</u>, AT 1:30 P.M. AT THE U.S. BANKRUPTCY COURT, 515 RUSK AVENUE, HOUSTON, TEXAS 77002.

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OBJECT TO THE RELIEF REQUESTED, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST RESPOND IN WRITING AND SEND A COPY TO THE MOVING PARTY. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS MOTION WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEYS.

TO THE HONORABLE MARVIN ISGUR, UNITED STATES BANKRUPTCY JUDGE:

ATP Oil & Gas Corporation (the "**Debtor**") files this Motion Pursuant To 11 U.S.C. §§ 105(A) and 363 and Bankruptcy Rules 2002 and 6004 for an Order (I) Authorizing The Sale of Shares of Debtor's Wholly Owned Non-Debtor Affiliate ATP Oil & Gas (UK) Limited on the Terms of the Share Purchase Agreement; (II) Approving and Authorizing the Debtor to Enter Into the Share Purchase Agreement and Related Ancillary Documents; (III) Approving the Release of the Charges Over The Shares Held By Credit Suisse A.G. as Administrative Agent and as Collateral Agent for the Lenders Under The DIP Credit Agreement (as defined below) and the 2010 Facility Agreement (as defined below); (IV) Authorizing the Debtor to Vote in Favor of, Agree to Be Bound By, and to Otherwise Support, the Company Voluntary Arrangement and Enter Into Related Ancillary Documents; and (V) Granting Related Relief (the "**Motion**").  In support of the Motion, the Debtor respectfully submits the following:

## JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought hereby are Sections 105(a) and 363(b), (f), and (m) of the Bankruptcy Code and Rules 2002 and 6004 of the Bankruptcy Rules.

## BACKGROUND

**THE DEBTOR**

2.      On August 17, 2012 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (this "**Bankruptcy Court**").  Since the

Petition Date, the Debtor has continued to operate and manage its business as a debtor-in-possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.  On August 24, 2012, the U.S. Trustee appointed a committee of unsecured creditors (the "**Creditors' Committee**") and on November 6, 2012, the U.S. Trustee appointed a committee of equity holders (the "**Equity Committee**" and, together with the Creditors' Committee, the "**Committees**") in this case.

3.     The events leading up to the Petition Date and the facts and circumstances supporting the bankruptcy filing are set forth in the Declaration of Albert L. Reese, Jr. in Support of First Day Pleadings [Dkt. No. 28] (the "**Reese Declaration**") filed on the Petition Date.

**ATP OIL & GAS (UK) LIMITED**

4.     The Debtor is the parent company of ATP Oil & Gas (UK) Limited ("**ATP-UK**"). ATP-UK operates an oil and gas business in the UK North Sea.  ATP-UK has interests in both producing and development North Sea oil and gas licenses.  These licenses have been granted from the UK regulatory body, the Department of Energy & Climate Change ("**DECC**").  DECC is similar to the United States Department of Interior Bureau of Ocean Energy Management and Bureau of Safety and Environmental Enforcement ("**BOEM/BSEE**") the regulatory body governing oil and gas development in the US.  The DECC licensing process, like the BOEM/BSEE process, is a highly regulated and monitored process for oil & gas development in the UK.  ATP-UK currently holds licenses (the "**Licenses**") granted by DECC in three (3) producing UK North Sea fields known as (i) Helvellyn, (ii) Tors, and (iii) Wenlock and three (3) development fields known as, (iv) Blythe, (v) Skipper and (vi) Cheviot (collectively, the "**Fields**").  ATP-UK shares the interest in the Licenses (with the exception of the Cheviot license) with a variety of other parties and has interests ranging between 17% to 50% in the Fields that have reached production.  ATP-UK has operated these Fields on behalf of itself and

its partners as a "Regulated Operator" approved by DECC to conduct operations in the UK North Sea.

5.  The Wenlock and Tors Fields in which ATP-UK has a 20% interest and 17% interest, respectively, are both currently producing gas.  The Helvellyn Field in which ATP-UK has a 50% interest, had been producing gas, but is currently shut in.  The Blythe, Skipper and Cheviot Fields in which ATP-UK has a 50%, 50% and 100% interest, respectively, are currently in development ("**Development Licenses**").  The Development Licenses have been extended by DECC and are currently due to expire on December 31, 2013.  The development and potential production from the Cheviot Field had previously included the partial construction of a floating production storage and offloading unit (the "**FPSO**").

6.  Prepetition, ATP-UK was heavily dependent upon funding from the Debtor.  On account of the Debtor's bankruptcy, funding by the Debtor to ATP-UK eventually ceased and the development of the Fields, particularly Cheviot and the construction of the FPSO, stopped.

7.  Prepetition, the Debtor provided certain loans to ATP-UK pursuant to promissory notes or intracompany debt in the total amount of approximately $700 million.  The Debtor has assigned its rights in the notes and that debt to Bennu Oil & Gas, LLC ("**Bennu**") in accordance with the Final Order (A) Approving the Sale of Certain of the Debtor's Assets Free and Clear of Claims and Liens and (B) Approving the Assumption and Assignment of Contracts and Leases [Docket No. 2706] (the "**DIP Sale Order**") and pursuant to (i) that certain Bill of Sale, effective as of November 1, 2013 and (ii) that certain Note Power by the Debtor for the benefit of Bennu, dated November 1, 2013.  Such amount represents the largest asserted creditor claim against ATP-UK.

8.      In addition to being its sole shareholder, the Debtor recently acquired and now holds an intercompany claim against ATP-UK pursuant to the Settlement and Assignment Agreement between the Debtor, ATP-UK and ATP Oil & Gas (Netherlands) B.V. dated as of October 23, 2013 in the amount of $14,691,332.17 (the "**Netherlands Note**").

9.      Reference is made to that certain Credit Agreement among the Debtor, Credit Suisse A.G., as administrative agent and collateral agent, and certain lenders, dated as of June 18, 2010 (as amended or otherwise modified, the "**2010 Facility Agreement**"), and that certain Senior Secured Super Priority Debtor In Possession Credit Agreement among the Debtor, Credit Suisse A.G. as administrative agent and collateral agent, and the DIP Lenders, dated August 29, 2012 (as amended or otherwise modified, the "**DIP Credit Agreement**", and together with the 2010 Facility Agreement, the "**Credit Agreements**").  In connection with the execution of the Credit Agreements, the Debtor among other things, provided two charges (formally recorded liens) in approximately 65% of the issued shares of ATP-UK pursuant to (i) that certain Charge over Shares dated as of June 18, 2010, by Debtor, as chargor for the benefit of Credit Suisse AG, as agent (the "**2010 Share Charge**"), and (ii) that certain Charge over Shares dated as of November 16, 2012, by Debtor, as chargor for the benefit of Credit Suisse AG, as agent (the "**DIP Share Charge**", and together with the 2010 Share Charge, the "**Share Charges**").[1]

**THE MARKETING PROCESS OF ATP-UK'S ASSETS**

10.      The Debtor, through its investment banker, Jefferies & Company, Inc. ("**Jefferies**"), conducted an extensive marketing process[2] over many months that targeted

---

[1]      The DIP Lenders contend that they have liens on 100% of the Shares pursuant to the DIP Sale Order.

[2]      The Debtor's Emergency Motion Pursuant to 11 U.S.C. §§ 105(a), 363 and 365 and Bankruptcy Rules 2002, 6004 and 6006 for Orders (I)(A) Approving (i) Bidding Procedures; (ii) Bid Protections; (iii) Auction Procedures; and (iv) Assumption and Assignment Procedures; (B) Approving Notice Procedures for (i) the Solicitation of Bids; and (ii) an Auction; (C) Scheduling Hearings on Approval of a Sale or Sales of Substantially All of Debtor's Deepwater Property Assets; and (D) Granting Related Relief; and (II)(A) Approving the Sale or Sales of Substantially All of the Debtor's Deepwater Property Assets Free and Clear

5

numerous potential buyers for the Debtor's domestic US assets based on a variety of factors, including (i) contacting those suggested by the Committees in this case, (ii) considering a potential buyer's perceived interest in the Debtor's assets, (iii) considering a potential buyer's familiarity with the Debtor's business operations and the asset class, as well as whether they had the financial and operational resources necessary to consummate a transaction.  Toward that end, the Debtor, with the assistance of its attorneys, Jefferies, and other representatives, assembled data and documents and prepared business presentations to facilitate the diligence process for potential buyers regarding the Gulf of Mexico assets.  Although not explicitly part of the marketing efforts, the Debtor's interest in ATP-UK was certainly disclosed to, and information about the interest made available to any potentially interested purchaser who contacted or were contacted by Jefferies.

11.     In the aggregate, the Jefferies' marketing process (in two (2) phases) spanned from November 30, 2012 to May 2, 2013 (one hundred fifty-three (153) days).  Jefferies contacted approximately one hundred (100) parties and provided each of them with introductory materials regarding the opportunity to purchase some or all of, in particular, the Deepwater and/or Shelf Assets, among others.

12.     In addition to the potential buyers' ability to conduct due diligence by virtue of their access to confidential information through the virtual data room, parties were invited to meet with the Debtor's management team, and Jefferies maintained an active dialogue with potential buyers in order to facilitate potential bidders' evaluation of the Debtor's assets.

13.     Jefferies' rigorous marketing process ultimately led to the receipt of seven (7) separate indications of interest and five (5) Qualified Bids, including the credit bid by Credit

---

of Claims and Liens and (B) Approving the Assumption and Assignment of Contracts and Leases [Dkt. No. 1252] sets forth in detail the marketing process for the Shelf and Deepwater Assets (as defined therein), and is incorporated herein by reference.

Suisse as Agent for the DIP Lenders.  None of the bids received included within its scope a bid on or for the shares or assets of ATP-UK.

14.     Going back as far as prepetition and even well before the Debtor's bankruptcy filing, the Debtor and ATP-UK sought to find a purchaser for the FPSO and explored options for funding the construction and continued development of the Cheviot Field, including joint venture partners, purchasers or others interested in investing in the development of the North Sea assets. Neither entity was able to obtain funding or to find a purchaser for the FPSO.

15.     In January, 2013, ATP-UK engaged the services of Deloitte LLP ("**Deloitte**") to assist in the review of disposal options and to prepare for a potential sale by assisting in the preparation of relevant information and conducting discussions with potential buyers to assess their preliminary interest.  This involved an intensive and comprehensive marketing process of the ATP-UK assets.  The engagement also covered assisting in the preparation of marketing documentation on the assets and also a management presentation summarizing the opportunity to potential purchasers.  The key objective of Deloitte's marketing process was to ascertain how ATP-UK could maximize value of its assets or its operation for the benefit of its creditors (including the Debtor).

16.     Deloitte initiated a comprehensive marketing process over a seven (7) month period which involved approaching over eighty-five (85) parties who might be interested in submitting an offer for the shares or assets of ATP-UK.  Potential bidders were offered the option of acquiring any or all of the assets of ATP-UK (including a transaction consummated through the acquisition of Debtor's shares in ATP-UK).  These parties were provided with a high-level overview of the opportunity and, upon execution of Nondisclosure Agreements, (i) provided management presentations from ATP-UK; (ii) given access to various data

(operational, commercial, technical, and physical workstation data); (iii) provided with options on the transaction structure; and (iv) given access to ATP-UK management and its advisors.

17.     ATP-UK's marketing process yielded eleven (11) offers to purchase part or all of the assets of ATP-UK in various combinations with both proposals of share and asset structures being received.  ATP-UK, with the input and advice of its counsel and Deloitte, carefully evaluated the eleven (11) offers in order to determine which available offers were capable of consummation and which would yield the most value to ATP-UK's creditors.

**Highest and Best Offer**

18.     Based on the marketing process of Deloitte (and the market exposure through Jefferies' earlier process), and ATP-UK's evaluation (with advice from its counsel and Deloitte) of actual offers received regarding ATP-UK's assets, it became apparent that a share sale (combined with a Company Voluntary Arrangement of ATP-UK ("**CVA**") through the administration process in the UK) would generate the highest return to creditors from a sale of ATP-UK's assets in whole or via a break up with assets sold to separate parties.  A CVA is a formal procedure under English legislation (the Insolvency Act 1986) which enables a company (with the consent of the statutory requisite majority of its creditors voting at a meeting of creditors) to agree with its creditors on a reduction of its debt or a scheme of arrangement of its affairs which determines how its debt should be paid and in what proportions.  For purposes of the approval requested herein, Debtor shall file a summary of the terms of the CVA prior to the hearing of the Motion.

19.     The proposal for purchase of the shares of ATP-UK from the Debtor, (the "**Share Sale**") initially submitted by an affiliate of the now-proposed buyer, known as Alpha Petroleum (UK) Holdings Limited (the "**Buyer**"), emerged as the preferred bid because, as

determined by ATP-UK, in consultation with Deloitte, its counsel and the Debtor, such proposal constituted the highest and best offer based on value, structure and timing of the consideration offered, financial capability, deliverability and likely acceptability to DECC.[3]

20.      Based on the exhaustive marketing processes undertaken, the Debtor has concluded that (i) the Share Sale to the Buyer represents the highest and best offer that has been received and can be expected; (ii) any continuation of the marketing exercise or delay in progressing with the Share Sale will not improve the return to ATP-UK's creditors, and in turn to the estate of the Debtor; and (iii) delay is likely to lead to a potentially significant reduction in value given the expiration of the Development Licenses (currently set to expire on December 31, 2013).

21.      The Debtor believes that the Share Sale, in conjunction with the contemplated CVA, will provide ATP-UK with the greatest amount of funding available for distribution to its creditors, which includes the Debtor.  As a creditor of ATP-UK, maximizing the amount for distribution by ATP-UK to its creditors through a CVA is important to the Debtor recouping the highest amount in respect of the Netherlands Note.  In addition to a distribution under the CVA pursuant to the terms of the SPA (defined below), the Debtor will receive $1,000 in consideration for the sale of its shares.  In addition, given the nominal consideration to be received by the estate, the Debtor will ensure the estate is not negatively impacted by the process of participating in the sale and seeking the relief herein by also obtaining reimbursement by ATP-UK for expenses and fees not otherwise covered in connection with this transaction.

22.      DECC has expressed a preference for a share sale transaction, which would enable ATP-UK's business to continue without significant interruption or further loss of value.

---

[3]      A purchaser's financial robustness is key in securing DECC's consent to the renewal/continuation of the Development Licenses and to not exercise its right to revoke the Licenses upon a change of control, as explained below.

DECC has indicated that, in principle, it is supportive of the transaction with the Buyer.  As in the US with BOEM/BSEE's oversight, DECC's approval is a requirement for any transaction involving ATP-UK and its offshore rights, as DECC has a right to revoke ATP-UK's Licenses on a change in control.  In addition, the ATP-UK Development Licenses are currently due to expire on December 31, 2013.  DECC has indicated that, subject to successful progress towards, and completion of, this proposed transaction, they would in principle be willing to grant a further extension of the Development Licenses beyond that date.  Should the Development Licenses expire, all potential future value to be realized from the Development Fields may be lost.

**TERMS OF THE SHARE SALE**

23.     The Share Sale will be implemented through (and the final terms of the Share Sale shall be set out in) (i) a Sale and Purchase Agreement ("**SPA**") (a substantially agreed form copy of which will be filed prior to the hearing on the Motion), (ii) a CVA (the terms of which will be set forth in summary prior to the hearing on the Motion) and (iii) related ancillary documents.

24.     The parties initially negotiated the structure of the transaction, as reflected in a Heads of Terms agreement (as further described and defined below) in August 2013.  The Heads of Terms contemplates that ATP-UK will proceed with a sale of the business and assets of ATP-UK to the Buyer as a fall back option in the event that the Share Sale is not capable of completion.  Such an asset sale is less desirable due to the lower financial returns (it has been agreed in the Heads of Terms that the Buyer would pay less in the event of an asset sale) and would therefore give ATP-UK's creditors, and in turn the estate of the Debtor, a smaller return on their indebtedness.  An asset sale by its nature is more complex and a range of approvals from DECC and ATP-UK's contract parties may be required, therefore, making an asset sale have

inherent risks of non-delivery.  Additionally, an asset sale would take longer to implement than the Share Sale; any delay of the transaction would likely lead to a potentially significant reduction in value given the expiration of the Development Licenses and DECC's preference for a share sale of ATP-UK.  In addition, as the shares of ATP-UK would not be sold in the context of an asset sale, the Debtor would receive no consideration for the sale of its shares in ATP-UK and a lower amount (if any) would likely be received by the Debtor in respect of the Netherlands Note than under a Share Sale.

25.     The Share Heads of Terms, dated August 9, 2013, the related Deed of Adherence and Amendment to the Share Heads of Terms, dated as of October 10, 2013, and the related Exclusivity Extension Letter dated November 18, 2013, all among the Debtor, ATP-UK, and the Buyer (collectively, the "**Parties**"),[4] set forth the salient terms of the Share Sale (some of which are non-binding) (collectively the "**Heads of Terms**").  The main terms of the Heads of Terms are set forth in the summary below (the "**Term Sheet Summary**"). however, certain terms agreed in the Heads of Terms are no longer reflective of those agreed with the Buyer as at the date of this Motion.  Footnotes are included in the summary below to reflect the key changes agreed with the Buyer, which will be reflected in the SPA.  Although not attached hereto, Debtor intends to supplement this Motion prior to the hearing with the SPA itself when the parties confirm agreement with its form.

26.     In addition, pursuant to the terms of that certain Memorandum for Lenders – ATP Oil & Gas (UK) Limited Transactions dated as of September 9, 2013 (the "**Posting Memo**"), the Debtor's Required Lenders (as defined in the DIP Credit Agreement) under the DIP Credit Agreement, have approved the Share Sale, and agree to support the decision of the

---

[4]     To the extent there are any conflicts or inconsistencies between this summary and the SPA, the terms of the SPA shall govern in all respects.

Debtor to vote in favor of, agree to be bound by and otherwise support the CVA, and have agreed not to enter into discussion regarding any alternative transactions pending the earlier of the termination of the preferred bidder period under the Heads of Terms or March 1, 2014. DECC has also provided its in-principle support to the Share Sale.  In addition, the Debtor's Required Lenders consented to the release of the Share Charges both formally recorded and under the DIP Sale Order.

| 1. Buyer | Alpha Petroleum (UK) Holdings Limited |
|---|---|
| 2. Seller | The Debtor |
| 3. Structure | Subject to the Buyer's due diligence, the Proposed Share Transaction is by way of a sale by the Debtor of 100% of the shares of ATP-UK, on a cash free basis. The parties shall agree with the Debtor an SPA, and the CVA documentation. Subject to and following approval of the Proposed Share Transaction by the US Bankruptcy Court and satisfaction of the other conditions set out in section 9 of this summary, the parties and the Debtor shall execute the SPA and commence the formal CVA process. Subject to and following approval of the CVA and satisfaction of the other conditions set out in section 11 of this summary, the Proposed Share Transaction shall be completed.<br><br>In the event that the Proposed Share Transaction is not capable of being completed for any reason, ATP-UK, acting through its administrators, and the Buyer will proceed with the acquisition of ATP-UK's business and assets by the Buyer in accordance with Section 8(B)(viii) of this summary (the "**Proposed Business Transaction**"). |
| 3A. Buyer Protections | **(A) Liquidated Damages**<br><br>In the event that, following approval of the SPA and the Proposed Share Transaction by the US Bankruptcy Court and execution of the SPA, the Proposed Share Transaction does not close for any reason (other than for a material breach by the Buyer or a failure to obtain the approvals and confirmations required from DECC to enable the Proposed Share Transaction or the Proposed Business Transaction to complete) and the Shares or all or substantially all of the assets of ATP-UK are sold or agreed to be sold to a bidder other than Buyer (an "**Alternate Sale Transaction**") prior to March 31, 2014, then the parties agree that liquidated damages of $2,660,000 shall be payable to the Buyer by the Debtor from the proceeds of the Alternate Sale Transaction, without any withholding, reduction or offset at the time of closing of such transaction (the "**Liquidated** |

|  | **Damages**").  The Debtor agrees to pay the Liquidated Damages, to the extent that proceeds of an Alternate Sale Transaction are actually received by Debtor (or its designees).<br><br>**(B) Creditor and Shareholder Non-Solicitation Agreement**<br><br>The Debtor confirms that it has received consent of the DIP Lenders to the Proposed Share Transaction and the terms by which the Debtor and Company have agreed not to solicit, consider, support or accept any transaction other than the Proposed Share Transaction (or, if the Proposed Share Transaction is not capable of being completed, the Proposed Business Transaction), until the earlier of (a) the execution, delivery and approval by the US Bankruptcy Court of the SPA, and (b) termination of the Preferred Bidder Period by ATP-UK or the Buyer in accordance with the terms this summary.<br><br>The Debtor agrees not to solicit bids for ATP-UK, or market the business, shares or assets of ATP-UK, until the earlier of (a) the date of approval of the Proposed Share Transaction by the US Bankruptcy Court and, following such approval, the execution and delivery of the SPA and (b) termination of the Preferred Bidder Period by ATP-UK or the Buyer in accordance with the terms of this summary.  Prior to approval of such a transaction by the US Bankruptcy Court, the Debtor will retain the right to consider unsolicited Alternate Sale Transactions to the extent necessary to honor its fiduciary duties. |
|---|---|
| **4. Consideration for Proposed Share Transaction** | The amount payable in connection with the Proposed Share Transaction will be $35,000,000 payable in cash on Completion (the "**Initial Payment**").[5]<br><br>Additional contributions will be payable in cash as follows:<br><br>**Cheviot Field**<br><br>$20 million payable at FDP approval and $55 million at First Oil, totaling $75 million;<br><br>**Skipper Field**<br><br>$3 million payable at FDP approval and $15 million at First Oil, totaling $18 million; and<br><br>**Blythe Field** |

---

[5]   It has been agreed that the Debtor shall receive $1,000 in consideration for the sale of the Shares.  It is also agreed that the Buyer will make an initial payment, (after the reimbursement/payment to the Debtor for expenses, disbursements and fees incurred and not otherwise reimbursed) for distribution to ATP-UK's creditors bound by the CVA of $34,999,000 of which $32,999,000 will be payable in cash on Completion and $2,000,000 will be retained in escrow until the net cash of ATP-UK at Completion is agreed or determined.

13

| | |
|---|---|
| | $5 million payable at First Gas.<br><br>"**FDP approval**" means the receipt of final approval from the Secretary of State for the DECC of the relevant Field Development Plan.<br><br>"**First Gas**" means the first commercial gas production following development.<br><br>"**First Oil**" means the first commercial oil production following development.<br><br>The net cash of ATP-UK at Completion will be retained by ATP-UK and added to the Initial Payment. [6] |
| **5. Rig Contract** | During the Preferred Bidder Period (as defined below) the parties shall discuss in good faith how to deal with the contract for the provision of mobile offshore drilling unit "GSF Arctic III" between ATP-UK and Transocean Drilling U.K. Ltd ("**Rig Contract**") and all related agreements, it being acknowledged that ATP-UK[7] intends to retain net revenues. |
| **6. Assumed Liabilities** | Subject to the terms of the SPA as agreed between the Buyer and the Debtor, as the transaction proposed pursuant to this summary is a purchase of the shares of ATP-UK, the Buyer will assume all the obligations and liabilities of ATP-UK not compromised in the CVA (the "**Assumed Liabilities**") including, but not limited, to:<br><br>(a) field decommissioning regulations;<br><br>(b) health & safety regulations; and<br><br>(c) environmental regulations.[8] |
| **7. Financing** | The Buyer confirms that it has entered into discussions with the investment committee and investors of the Buyer ("**Investors**") with regard to funding the Proposed Share Transaction as outlined in this summary.<br><br>The Buyer confirms that it intends to finance the Initial Payment by way of equity funding from the Investors, with no requirement to secure any additional funding from any party other than the Investors. |

---

[6]   It has been agreed that the net cash of ATP-UK at Completion will (if positive) be retained by ATP-UK and will be payable to the supervisor of the CVA for distribution to ATP-UK's creditors bound by the CVA. If negative, the net cash will be deducted from the amount payable to the supervisor for distribution to ATP-UK'S creditors.

[7]   The Heads of Terms referred to the Debtor and this is acknowledged as a mistake in the Heads of Terms, it should instead refer to ATP-UK. The commercial terms are still being negotiated.

[8]   The parties have also agreed that this list should include production critical creditors and contracts.

14

| | |
|---|---|
| **8. Timing and Process** | **(A) Preferred Bidder Period**<br><br>Preferred Bidder status will be granted to the Buyer from August 9, 2013 until March 31, 2014[9] (the "**Preferred Bidder Period**") for both the Proposed Share Transaction and, failing that, the Proposed Business Transaction.<br><br>During the Preferred Bidder Period, ATP-UK agrees that:<br><br>(a) ATP-UK and advisors will cease discussions with all other bidders/interested parties in respect of the shares or business and assets of ATP-UK;<br><br>(b) ATP-UK will act in good faith and not market and, so far as it is able, decline to support the marketing of, the shares or business and assets of ATP-UK to any other party;<br><br>(c) ATP-UK shall not, without the prior consent of the Buyer, sell, pledge, charge, encumber or otherwise dispose of all or any part of any of its assets (with the exception of the Rig Contract); or<br><br>(d) ATP-UK shall not consider or accept any offer in respect of nor enter into any transaction in relation to the shares or the assets or business of ATP-UK.<br><br>The obligations of ATP-UK in this section 8(A) of this summary shall cease (and ATP-UK shall have no liability in respect of a breach of section 8(A) of this summary) in the event that, prior to execution of the SPA:<br><br>    1.  the Buyer reduces the consideration offered by it on the Proposed Share Transaction below the level set out in section 4 of this summary; or<br><br>    2.  DECC indicates that it is not prepared to accept the Buyer as a new owner of the shares or assets of ATP-UK.<br><br>Notwithstanding any other provision, ATP-UK shall continue to carry on its activities and business in the ordinary and usual course of business (in the context of a company in the financial circumstances of ATP-UK) and in accordance with good and prudent oil and gas field and industry practice, so as to protect and maintain such interests.<br><br>In addition ATP-UK shall keep the Buyer informed of all material developments in relation to ATP-UK's business and shall not enter into, terminate, extend or amend any material contract, acquire or dispose of any material asset or incur any significant liability without first informing the |

---

[9]    The Heads of Terms originally referred to January 31, 2014 as the end of the Preferred Bidder Period, but an amendment to the Heads of Terms changed that end-date to March 31, 2014.

Buyer.

**(B) Work streams**

The Buyer and ATP-UK will work together in good faith to make progress and complete the relevant work streams and processes within the required timings during the Preferred Bidder Period, including:

*(i) Due Diligence*

During the Preferred Bidder Period the Buyer will be provided by ATP-UK with full cooperation and access to ATP-UK officers, personnel, advisors and records, contracts and all other information requested by the Buyer to complete the specified due diligence and to obtain committed, unconditional financing.  ATP-UK undertakes to respond, as far as it is able, to the due diligence questionnaire of the Buyer and reply to any clarifications or further queries of the Buyer or its advisors which arise from such responses.

The Buyer confirms that it has performed an evaluation of the technical and commercial aspects of ATP-UK and has received all information and access to Management requested to date. The Buyer confirms that it requires to carry out further due diligence to confirm its evaluation of ATP-UK.  In addition, the Buyer's evaluation of ATP-UK requires to be independently assessed by its professional advisors.

The Buyer is to instruct its professional advisors to conduct a legal due diligence report, a commercial due diligence report, a tax due diligence report on the Proposed Share Transaction and the Proposed Business Transaction and a technical facilities audit of the producing assets of ATP-UK.[10]

*(ii) Stakeholder discussions*

Simultaneously, ATP-UK will during the Preferred Bidder Period progress discussions with its stakeholders (DECC, the Debtor and the DIP Lenders and, as appropriate in the context of the envisaged CVA, with the other relevant creditors of ATP-UK) to determine (if not already clear) whether there is in principle support for the Proposed Share Transaction with the Buyer and to progress the consents, approvals and confirmations required to execute the Proposed Share Transaction (including the approval of US Bankruptcy Court of the Debtor's agreement to sell the Shares).

---

[10]      The due diligence process is largely complete.

In particular, ATP-UK confirms that it will:

(a) in relation to DECC:

    i.    arrange and attend meeting(s) with DECC with a view to both parties consulting with DECC to expedite the process of obtaining the approvals necessary from DECC to enable the Proposed Share Transaction or the Proposed Business Transaction to complete;

    ii.    consult with the Buyer around the exact extent of the extensions to be sought from DECC in respect of the licenses; and

(b) keep the Buyer fully informed during the Preferred Bidder Period with all information in respect of the CVA process and the position of the creditors of ATP-UK in respect of the Proposed Share Transaction (and the Proposed Business Transaction, if applicable).[11]

***(iii) Documentation***

First drafts of the SPA, and CVA documentation will be produced by ATP-UK's advisors.

The parties will seek to agree an SPA and, as required, the CVA documentation during the Preferred Bidder Period.  The CVA documentation shall be in agreed form between the Buyer and ATP-UK.

***(iv) Exchange of SPA***

Both parties shall use their commercially reasonable efforts to progress the Proposed Share Transaction and cause the exchange of a binding sale and purchase agreement between the Debtor and the Buyer in respect of the Shares (**"SPA"**) to occur as soon as reasonably possible.  The Conditions to exchange of an SPA are summarized below.  The parties intend that, subject to the Buyer's due diligence, exchange of an SPA will occur in late December 2013.[12]

***(v) Exclusivity***

In consideration of the Buyer undertaking, and incurring fees and expenses and other costs in connection with, the due diligence investigations in relation to ATP-UK, the SPA will contain provisions under which the Buyer will be granted exclusivity by the Debtor and ATP-UK until a date to be agreed at that time which reflects the expected timing required to complete the Proposed Share Transaction and, failing that, the Proposed Business Transaction (the

---

[11]    Progress has been made in principle in securing support for these transactions.

[12]    The Heads of Terms originally referred to Exchange of the SPA as taking place in early September 2013, however, the parties currently expect that the SPA will be signed in late December 2013 due to the pending approval by this Court of this Motion.

| | |
|---|---|
| | "**Exclusivity Period**").<br><br>*(vi) Commence CVA process*<br><br>Following Exchange of the SPA and in accordance with the process agreed between ATP-UK and the Buyer ATP-UK will commence the formal CVA process to enable the Conditions to Completion of the SPA to be satisfied.<br><br>*(vii) Completion of SPA*<br><br>The Conditions to Completion of an SPA are summarized below.<br><br>The parties intend that Completion (as defined below) will occur as soon as is possible and the Buyer and ATP-UK will work together in good faith to define and agree the relevant process and required timings to Completion.<br><br>It is anticipated that subject to fulfillment or waiver of all of the conditions precedent set out in the SPA, Completion will occur in the middle of February 2014, before the expiration of the Preferred Bidder Period.[13]<br><br>*(viii) Failure of the Proposed Share Transaction*<br><br>In the event that Completion under the SPA does not occur because the Proposed Share Transaction is not approved or deliverable for any reason it is the current intention of the board of ATP-UK, prior to the Proposed Business Transaction, to place ATP-UK into administration appointing Deloitte (subject to the approval of its internal compliance and conflicts committees) or such other administrators as is reasonably acceptable to ATP-UK and the Buyer.   Prior to Exchange of the SPA, the proposed administrators, will provide confirmation to the Buyer that they are willing and able to cause ATP (in administration) to execute a sale to the Buyer in substantially the form set out in the Business SPA.   An agreed form draft of the Business SPA was originally contemplated to be attached as a schedule to the SPA.[14] |
| **9. Conditions to Exchange of SPA** | It is intended that Exchange of the SPA will not occur until at least the following conditions are satisfied or waived:<br><br>(a)  ATP-UK obtaining the following:<br><br>    i.    the approval of the Debtor and the US Bankruptcy Court to the sale of the Shares and release of the Shares Charge (as defined below)  and  approval  of  creditor/equity  constituencies  (if |

---

[13]  The Heads of terms referred to Completion expected in October 2013, however, the parties currently expect that Completion will occur in mid-February 2014.

[14]  It is acknowledged by the parties that this confirmation will not be obtained and a draft of the Business SPA will be not attached to the SPA.  The parties have since instead agreed that ATP-UK shall use its reasonable endeavors to procure that such administrator (on behalf of ATP-UK) shall, as soon as reasonably practicable, enter into a business sale agreement, reflecting the key terms of the heads of agreement entered into between the Company and the Purchaser dated August 9, 2013 (as amended from time to time) if Completion does not occur as described in this section.

applicable);

    ii.    the consent of the DIP lenders of the Debtor to:

        i.  the sale of the Shares by the Debtor to the Buyer;

        ii.  the release of the Shares Charge;

        iii.  the amendment or waiver of the mandatory prepayment provisions in the DIP Credit Agreement requiring mandatory prepayment by the Debtor of the loans provided to the Debtor under the DIP Credit Agreement upon a disposition of assets (to the extent required);

    iii.    the proposed administrators providing reasonable comfort to the Buyer that they are willing and able to cause ATP-UK (in administration) to execute a sale to the Buyer in substantially the form set out in the Business SPA[15]; and

    iv.    the "in-principle" agreement of DECC to the Proposed Share Transaction in relation to their willingness to provide the consents and approvals required from DECC as a condition precedent to Completion; and

(b) the Buyer:[16]

    i.    obtaining committed, unconditional financing for the Proposed Share Transaction and arranging for sufficient funds to be placed in an escrow account at or within three business days after Exchange of the SPA and in any event before the CVA is convened, not to exceed the amount of the Initial Funding.  In the event that the Proposed Share Transaction does not complete for any reason whatsoever, then the Buyer shall be entitled to repayment of the full amount of the funds placed by it into escrow and all interest accrued thereon;

    ii.    obtaining final approval from its investment committee;

    iii.    being satisfied with the terms of agreement with the management team of ATP-UK detailing the key terms and conditions of their overall compensation packages to apply post-Completion;

    iv.    being satisfied as to the taxation implications of the Proposed Share Transaction and Proposed Business Transaction; and

---

[15]    It is acknowledged by the parties that this is no longer required.
[16]    These will be amended and updated in the SPA.

| | |
|---|---|
| | v.   being satisfied with the results of the legal, tax and technical due diligence reports in respect of ATP-UK. |
| **10. Period prior to Completion** | The SPA shall include provisions relating to the conduct of the business of ATP-UK from the date of exchange of the SPA until the date of Completion.<br><br>The obligations on the Debtor shall include (without limitation) the general undertaking to continue to carry on its activities in relation to the interests of ATP-UK, and in all other respects, in the ordinary and usual course of business (in the context of a company in the financial circumstances of ATP-UK) and in accordance with good and prudent oil and gas field and industry practice, so as to protect and maintain such interests in addition to further more specific undertakings related to the conduct of ATP-UK's business in the period prior to Completion. |
| **11. Conditions to Completion of SPA** | It is intended that completion of the sale and purchase of the Shares pursuant to the SPA ("**Completion**") will be conditional on:<br><br>(a) the CVA being approved by:<br>   i.   a majority of 75% or more (in value) of the Company's creditors present and voting in person or by proxy at the creditors' meeting called to consider the proposal for a CVA in relation to the Company including 50% (in value) of the creditors that are unconnected with the Company; and<br>   ii.   more than 50% in value of the members present in person or by proxy at the meeting of the Company called to consider the proposal for a CVA in relation to the Company;<br>and that there has been no challenge to the CVA within the 28 day period specified in Section 6(3) of the Insolvency Act 1986;<br>(b) DECC providing confirmation that: (i) it will not exercise its power to revoke any of the Company's licenses as a result of the intended sale of the Shares to the Buyer and (ii) it will be willing to grant extensions to September 30, 2014 in respect of Cheviot Field, Blythe Field and Skipper Field; and<br>(c) any other conditions agreed.<br>The CVA will compromise specified and unspecified creditors with claims against ATP-UK arising in connection with intra-group lending, Cheviot (save for certain claims such as those arising from health & safety and environmental regulations) and the FPSO.  It is not proposed to compromise the claims of the trading creditors or counterparties of ATP-UK, whose |

| | |
|---|---|
| | debts continue to be paid as and when they fall due, nor the Assumed Liabilities (as earlier defined).<br><br>In the event that the CVA is not approved or a successful challenge is made to the CVA within the 28 day period specified in Section 6(3) of the Insolvency Act 1986, pursuant to the terms of the SPA, ATP-UK and the Buyer will enter into the Proposed Business Transaction for the sale and purchase of the business and assets of ATP-UK. |
| **12. Warranties** | The Debtor shall give the following warranties:<br><br>(a) that it has the necessary power and capacity to enter into the SPA (and the documents referred to in it to which it is a party) and that they constitute valid, legal and binding obligations on the Debtor;<br><br>(b) that the Shares constitute the entire allotted and issued share capital of ATP-UK and are fully paid, or credited as fully paid;<br><br>(c) that, save for the Shares Charge, the Debtor is the sole legal and beneficial owner of the Shares and is entitled to transfer the legal and beneficial title to the Shares to the Buyer free from all encumbrances of any nature whatsoever;<br><br>(d) that, save for the Shares Charge, no encumbrance has been granted to any person or otherwise exists affecting the Shares or any unissued shares, debentures or other unissued securities of ATP-UK, and no commitment to create any such encumbrance has been given, nor has any person claimed any such rights;<br><br>(e) that no person has any right to require at any time, the transfer, creation, issue or allotment of any share, loan capital, or other securities (or any rights or interest in them) of ATP-UK, and the Debtor has not agreed to confer any such rights, and no person has claimed any such right; and<br><br>(f) any other warranties agreed between the parties. |
| **13. Buyer approval process** | The Buyer confirms that the only approvals required by it prior to Exchange of the SPA are:<br><br>a) the final approval of its board of directors and/or investment committee; and<br><br>b) approvals related to the provision of committed, unconditional financing for the Proposed Share Transaction. |
| **14. Expenses** | Each party will bear their own legal, accounting, banking, financing |

| | |
|---|---|
| | and advisory fees and other expenses with respect to the Proposed Share Transaction, and the Proposed Business Transaction (if applicable), in each case whether or not completed. |
| **15. Governing law** | The Proposed Share Transaction and, if relevant, the Proposed Business Transaction, and all related transaction documentation and any dispute or claim arising out of or in connection with them or their subject matter or formation (including non-contractual disputes or claims) shall be governed and construed in accordance with English Law and each party irrevocably agrees that the English Courts shall have exclusive jurisdiction to settle any dispute or claim arising out of or in connection with this summary or its subject matter or formation (including non-contractual disputes or claims). |

27.     In order to implement the Share Sale and the CVA, the Debtor will be required to execute (in addition to the SPA), various ancillary documents including (i) stock transfer form (an instrument required under English law to transfer the shares of ATP-UK); (ii) disclosure letter (a letter to be provided by the Debtor and ATP-UK to the Buyer upon execution of the SPA making general and specific disclosures against the warranties contained in the SPA); (iii) completion disclosure letter (if required, a letter to be provided by the Debtor and ATP-UK to the Buyer upon completion of the SPA making general and specific disclosures regarding the warranties contained in the SPA); (iv) an irrevocable power of attorney (provided to enable the Buyer to control the rights attaching to the shares of ATP-UK after completion of the SPA and pending registration of the transfer of those shares); (v) a letter appointing agent for service of process (the Debtor appoints a process agent so that court papers can be served on the Debtor within the UK); (vi) a shares charge release in respect of the 2010 Shares Charge; (vii) a shares charge release in respect of the DIP Shares Charge (collectively the "**SPA Ancillary Documents**"); (viii) an undertaking to vote in favor of and be bound by the CVA as both a shareholder and creditor of ATP-UK; (ix) a proxy form to record the Debtor's vote in respect of the shareholders meeting to be held in connection with the CVA; and (x) a proxy form to record

the Debtor's vote in respect of the creditors meeting to be held in connection with the CVA (collectively the "**CVA Ancillary Documents**").

**RELIEF REQUESTED**

28.     By this Motion, the Debtor requests entry of an order (I) authorizing the sale of shares of the Debtor's wholly owned non-debtor affiliate ATP-UK on the terms of the SPA; (II) approving and authorizing the Debtor to enter into the SPA and SPA Ancillary Documents; (III) approving the release of the Share Charges; (IV) authorizing the Debtor to vote in favor of, agree to be bound by, and to otherwise support, the CVA and enter into the CVA Ancillary Documents; and (V) granting related relief.

**BASIS FOR RELIEF**

A.     **The Debtor's Sale Of ATP-UK Shares Is A Product Of The Debtor's Reasonable Business Judgment**

29.     Section 363(b)(1) of the Bankruptcy Code provides: "[t]he Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Section 105(a) of the Bankruptcy Code provides in relevant part: "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

30.     Virtually all courts have held that approval of a proposed sale of assets of a debtor under Section 363 of the Bankruptcy Code outside the ordinary course of business and prior to the confirmation of a plan of reorganization is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the trustee or debtor-in-possession.  *See In re Abbotts Dairies of Pa.,* 788 F.2d 143 (3d Cir. 1986); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (holding that the following non-exclusive list of factors may be considered by a court in determining whether there is a sound business purpose

23

for an asset sale: "the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the effect of the proposed disposition of [sic] the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value."); *In re Stroud Ford, Inc.,* 164 B.R. 730, 732 (Bankr. M.D. Pa 1993); *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Industrial Valley Refrigeration & Air Conditioning Supplies Inc.,* 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987); *In re Lionel Corp.,* 722 F.2d 1063 (2d Cir. 1983); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 391 (6th Cir. 1986); *In re Ionosphere Clubs, Inc.,* 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); *In re Phoenix Steel Corp.,* 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a Section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").

31.     The "sound business reason" test requires a trustee or debtor-in-possession to establish four elements: (1) that a sound business purpose justifies the sale of assets outside the ordinary course of business; (2) that accurate and reasonable notice has been provided to interested persons; (3) that the trustee has obtained a fair and reasonable price; and (4) good faith.  *In re Titusville Country Club*, 128 B.R. at 399; *In re Sovereign Estates, Ltd.,* 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); *Phoenix Steel Corp.,* 82 B.R. at 335-36; *see also Stephens Indus.*, 789 F.2d at 390; *In re Lionel Corp.,* 722 F.2d at 1071.

32.     Additionally, courts have held that private sales of estate property are entitled to similar deference.  *Matter of Embrace Systems Corp.*, 178 B.R. 112, 123 (Bankr. W.D. Mich. 1995) ("A large measure of discretion is available to a bankruptcy court in determining whether

24

a private sale should be approved."); *see also In re Ancor Exploration Co.*, 30 B.R. 802, 808 (N.D. Okla. 1983) ("the bankruptcy court should have wide latitude in approving even a private sale of all or substantially all of the estate assets not in the ordinary course of business under § 363").

33.      The Share Sale meets the "sound business reason" test.  First, sound business purposes justify the sale.  The proposed sale will generate $1,000 to the Debtor in consideration for the sale of its shares, in addition to reimbursement by ATP-UK for expenses and fees not otherwise covered in connection with this transaction to even-out the Debtor.  In addition, the proposed sale will generate the highest amount of cash payable to ATP-UK for distribution, through the CVA process, to creditors.  As the Debtor is a creditor of ATP-UK, a higher amount received at this point will yield a higher recovery for the Debtor as a creditor.  The marketing process, as described detailed above, justifies designating the Share Sale to the Buyer as the highest and best.

34.      Second, the Share Sale satisfies the other factors of the "sound business reason" test.  The Debtor will provide notice to all of its creditors and other parties-in-interest as noted below, substantially agreed form copies of the SPA, SPA Ancillary Documents and CVA Ancillary Documents, and the summary of the CVA, notice of the sale hearing, and notice of the related objection deadline.  Under the circumstances of this case, the Debtor submits that the notice period proposed satisfies the requirements of the Bankruptcy Rules, including Bankruptcy Rule 2002, and provides sufficient time for parties in interest to submit objections, if any exist, to the proposed sale.

35.     Finally, the Debtor submits that the Share Sale represents the product of good faith, arm's length negotiations with respect to the price and other terms of the sale of its shares in ATP-UK.

36.     As set forth above, the Debtor has determined, in the exercise of its sound business judgment, that the Share Sale is appropriate and in the best interests of the Debtor's estate and creditors.  The Share Sale will yield the highest recovery from the ATP-UK estate on the Netherlands Note, which will in turn afford the Debtor's estate an opportunity to maximize the recoveries to its own creditors.  Accordingly, the Debtor requests that the Court approve the sale of shares of ATP-UK on the terms of the SPA.

**B.      The Buyer, as Purchaser of the Shares, Should be Granted the Protection of Bankruptcy Code Section 363(m)**

37.     As will be set forth in further detail at the sale hearing, the Debtor also maintains that the Buyer is and will be entitled to the protections afforded by Bankruptcy Code Section 363(m).

38.     Specifically, Bankruptcy Code Section 363(m) provides that:

[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

39.     While the Bankruptcy Code does not define "good faith," "[t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Abbotts Dairies of*

26

*Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (citations omitted); *see generally Marin v. Coated Sales, Inc., (In re Coated Sales, Inc.)*, Case No. 89-3704 (KMW), 1990 WL 212899 (S.D.N.Y. Dec. 13, 1990) (holding that party, to show lack of good faith, must demonstrate "fraud, collusion, or an attempt to take grossly unfair advantage of other bidders"); *see also In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (quoting *In re Bel Air Assocs., Ltd.*, 706 F.2d 301, 305 (10th Cir. 1983)); *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining facts of each case, concentrating on "integrity of [an actor's] conduct during the sale proceedings" (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

40.     The Debtor and ATP-UK have spent a considerable amount of time and resources marketing the assets of ATP-UK and negotiating the SPA at arm's length, with give and take on both sides.  The Buyer has engaged in lengthy negotiations with the Debtor and ATP-UK over a period of months.  Under these circumstances, this Court should find in the order approving the Share Sale, the Buyer is entitled to all of the protections of Bankruptcy Code Section 363(m).

### C.     The Share Sale is Not the Subject of Collusive Bidding Under Bankruptcy Code Section 363(n)

41.     As the Debtor will demonstrate at the sale hearing, the SPA has been negotiated and proposed by the Debtor, ATP-UK and the Buyer without collusion, in good faith, and from arm's-length bargaining positions.  Neither the Debtor, ATP-UK nor the Buyer has engaged in any conduct that would cause or permit the SPA to be avoided under Bankruptcy Code Section 363(n).

### D.     Sale of the ATP-UK Shares Does Not Require the Appointment of a Consumer Privacy Ombudsman

42.     Under Section 363(b)(1) of the Bankruptcy Code, if the sale of a consumer customer list containing personal information relating to individual persons is inconsistent with

the Debtor's consumer privacy policy, Section 332 governs the appointment of a consumer privacy ombudsman. 11 U.S.C. § 363(b)(1). Here, none of the Debtor's customers that are subject to the sale of the ATP-UK assets are individuals, and the Debtor does not have a consumer privacy policy, so Section 363(b)(1) does not apply, and a consumer privacy ombudsman is not required.

### E.   Sale of the ATP-UK Shares Should Be Free and Clear Of Claims and Interests

43.      Subject to the release of the Share Charges and pursuant to Section 363(f) of the Bankruptcy Code, the Debtor seeks authority to sell and transfer the shares of ATP-UK free and clear of all Liens, Claims and Interests, with such Liens, Claims and Interests to attach to the proceeds of the Share Sale, subject to any rights and defenses of the Debtor and other parties in interest with respect thereto.  Section 363(f) of the Bankruptcy Code provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
> (1)      applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)      such entity consents;
>
> (3)      such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)      such interest is in bona fide dispute; or
>
> (5)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). *See also In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that Section 363(f) written in disjunctive; court may approve sale "free and clear" provided at least one of the requirements is met).

44.      A sale free and clear of all Liens, Claims and Interests is necessary to maximize the value of the shares of ATP-UK.  The lenders have agreed to release the Share Charges as part of the sale, and so the sale free and clear of the Share Charges is permitted by consent pursuant to Section 363(f)(2).  In any event, a sale free and clear of Liens is particularly appropriate under the circumstances because any Lien in, to or against the shares of ATP-UK that exists immediately prior to the closing of any sale will attach to the sale proceeds with the same validity, priority, force and effect as it had at such time, subject to the rights and defenses of the Debtor or any party in interest.  The Debtor submits that holders of Liens will be adequately protected by the availability of the proceeds of the Sale to satisfy their Liens.  Claims and Interests may also be asserted against the sale proceeds with the same validity, priority, force and effect as they had against the Debtor's shares in ATP-UK at such time, subject to the rights and defenses of the Debtor or any party in interest.  Thus, the proposed sales satisfy Sections 363(f) of the Bankruptcy Code. Moreover, any holder of a Lien, Claim or Interest that receives notice of the sale and which fails to object to the sale of the shares of ATP-UK free and clear of Claims and Interests should be deemed to consent to the sale, thereby complying with Section 363(f)(2) of the Bankruptcy Code.

## F.      Waiver of Automatic Fourteen-Day Stay Under Bankruptcy Rules 6004(h)

45.      Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to Section 363 of the Bankruptcy Code are automatically stayed for fourteen (14) days after entry of the order.  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).

46.     Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, commentators agree that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure. *See generally* 10 *Collier on Bankruptcy* ¶ 6004.09 (15th ed. 1999). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal. *Id.*

47.     The transaction requires, among other things, the CVA process to be commenced and finalized (which takes a minimum of 6 weeks) and DECC approval regarding the Licenses. Therefore, the Debtor must close this sale promptly after all closing conditions have been met or waived in order to increase certainty that the requisite number of creditors of ATP-UK will approve the CVA. Thus, waiver of any applicable stays is appropriate in this circumstance.

<u>**NOTICE**</u>

48.     Notice of this Motion has been given to (i) all entities contacted by Deloitte and/or known by Deloitte, ATP-UK or the Debtor to have expressed interest in consummating a transaction with respect to the ATP-UK assets during the past nine (9) months; (ii) all state and local taxing authorities or recording offices which have a reasonably known interest in the relief requested; (iii) all insurers; (iv) DECC; and (v) all parties set forth in the Debtor's Master Service List maintained in accordance with this Court's Order Establishing Notice Procedures [Dkt. No. 132].

49.     WHEREFORE, the Debtor respectfully requests that this Court (I) Authorize The Sale Of Shares Of Debtor's Wholly Owned Non-Debtor Affiliate ATP Oil & Gas (UK)

Limited On The Terms of the SPA; (II) Approve And Authorize The Debtor To Enter Into The Share Purchase Agreement and the SPA Ancillary Documents; (III) Approve The Release of the Share Charges; (IV) Authorize The Debtor To Vote In Favor Of, Agree to Be Bound by, and To Otherwise Support, The Company Voluntary Arrangement and Enter Into the CVA Ancillary Documents; And (V) Grant Related Relief.

Dated:  Houston, Texas
            November 25, 2013                            Respectfully submitted,

                                                         **MAYER BROWN LLP**

                                                         By:  /s/ Charles S. Kelley
                                                         Charles S. Kelley
                                                         Attorney-in-Charge
                                                         State Bar No. 11199580
                                                         Southern District of Texas Bar No. 15344
                                                         700 Louisiana Street, Suite 3400
                                                         Houston, Texas 77002-2730
                                                         Telephone: 713 238-3000
                                                         Facsimile: 713 238-4888

                                                         *Attorneys for the Debtor and Debtor-in-Possession*