**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
03/18/2014

| | | |
|---|---|---|
| IN RE: | § | |
| ATP OIL & GAS CORPORATION | § | CASE NO: 12-36187 |
| Debtor(s) | § | |
| | § | CHAPTER 11 |

<u>**MEMORANDUM OPINION**</u>

Omega is awarded an administrative expense for $649,026.47. Omega's motion to compel immediate payment of its administrative expense is denied.

**Background**

On July 26, 2013, Omega filed a motion to recognize and compel payment of administrative expenses of outstanding invoices for $798,172.35 of postpetition work. (ECF No. 2311). The Debtor subsequently paid certain of Omega's invoices totaling approximately $150,000. (ECF No. 2668 at 3). Omega now seeks an order recognizing and compelling immediate payment of an administrative expense for the remaining $649,026.47 owed to Omega.

**Facts**

At the September 5, 2013 hearing, the Court heard testimony from Jerry Pierson, Chief Operations Engineer for ATP, Gregory Sandoz, Offshore On-site Operations Manager for Omega, and Gary Buchanan, President for Omega. Each of the witnesses was credible. Based on the testimony and documentary evidence presented, the Court makes the following findings of fact.

Subsequent to ATP's bankruptcy filing, Omega and ATP entered into an "Amendment to Work Order," pursuant to which Omega agreed to perform postpetition repair and maintenance work for ATP.

The amount owed to Omega for its postpetition work is $649,026.47.[1]  The vast majority of the amount owed relates to invoices for work performed in April and May of 2013 on the ATP Innovator, which served as a production platform for Mississippi Canyon Block 711 (also known as the "Gomez Properties").  The ATP Innovator is owned by ATP IP, an affiliate of the Debtor. ATP holds a 50% interest in ATP IP.  ATP, as operator of the Innovator, maintained the facility and performed work pursuant to its Platform Use Agreement with ATP IP.

On April 24, 2013, the Bureau of Safety and Environmental Enforcement (an agency of the United States) issued an order directing the Debtor to shut-in operations on its Gomez Properties by April 30, 2013.  The Debtor timely completed its shut-in of the Gomez Properties by April 30, 2013.  Up until the shut-in, ATP made efforts to sell the Gomez Properties to interested third parties.

Two months prior to the Bureau's Shut-In Order, ATP filed an emergency motion to shut-in the Gomez Properties due to difficulties in maintaining economic production. On May 22, 2013, ATP filed its Motion for Entry of an Order Authorizing Rejection of Certain Unexpired Leases and Executory Contracts Related to the Gomez Properties and Abandonment of Any Interests Relating Thereto. (ECF No. 1902).  The Court granted the motion on June 13, 2013 and authorized rejection of certain unexpired leases and executory contracts related to the Gomez Properties, including the Platform Use Agreement between ATP and ATP IP.

Omega submitted a breakdown of its invoices that details the charges for work performed by Omega on the MC Block 711 properties (the Innovator) prior to the shut-in and after the shut-in. (ECF No. 2599-1).   Omega's pre-shut-in expenses total $317,625.33 and its post-shut-in expenses total $291,590.73.   The pre-shut-in work was primarily repair and maintenance

---

[1] Omega has been paid for all of its services performed relating to Ship Shoal 77, Ship Shoal 358, Mississippi Canyon 941. (ECF No. 2537 at 71-72).

services.  The post-shut-in work appears to be a combination of routine maintenance and repair services and "safe out" work.  Safe out work is work related to making the platform safe for abandonment.

Omega's breakdown does not identify which post-shut in expenses are for "safe out" work and which are for maintenance and repair work.  Neither Mr. Sandoz, Mr. Pierson, nor Mr. Buchanan could recall the precise date on which ATP communicated to Omega to commence the safe out work.

Mr. Sandoz testified that all of the invoices for Exhibit W, which identifies work from May 17th through June 4th, appeared to be for safe-out work.  (ECF No. 2537 at 101).  He made this determination by reading the description on DSR #052013-HR (ATP 00282), which represent the services performed on May 20, 2013.  He identified Omega's work as "safe out work" by explaining that the description indicates that they were working their way out of the hole by welding it.  *Id*. at 101.

Based on the best evidence available, it appears that Omega commenced "safe out" work on the Innovator on May 7, 2013.  This is consistent with the Daily Service Reports (DSRs) in Exhibits S, which start showing notes about "starting welding out" on May 7, 2013.  (Exhibit S, DSR # 50713-HR, ATP 00223). In Exhibit R, notes about "welding out" begin to appear on May 8, 2013. (Exhibit R, DSR # 50813-Al, ATP 00197).

There is no dispute that the "safe out work" was necessary to make the platform safe. There is also no dispute that the "safe out work" commenced, and other work ceased, when ATP informed Omega that ATP was shutting in the platform.

Accordingly, Omega provided six days of non-safe out services after the Gomez Properties were shut in (April 30, 2013), but before Omega was informed of the shut-in decision.

After reviewing Attachment 1 and Exhibits L-S, it appears that there was a total of $69,172.54 in post-shut in non-safe out work performed by Omega from May 1-May 6, 2013.

**Post Shut In Non Safe Out Work**

| Exhibit | Page # | Date | Amount |
|---------|--------|------|--------|
| M | ATP 00160 | 5/2/2013 | $780.00 |
| M | ATP 00161 | 5/2/2013 | $1,248.00 |
| M | ATP 00162 | 5/3/2013 | $928.00 |
| M | ATP 00163 | 5/4/2013 | $928.00 |
| M | ATP 00164 | 5/5/2013 | $990.00 |
| N | ATP 00171 | 5/4/2013 | $90.00 |
| N | ATP 00172 | 5/4/2013 | $112.50 |
| P | ATP 00184 | 5/1/2013 | $770.00 |
| P | ATP 00183 | 5/2/2013 | $990.00 |
| P | ATP 00182 | 5/3/2013 | $770.00 |
| Q | ATP 00186 | 5/4/2013 | $8,198.00 |
| Q | ATP 00187 | 5/6/2013 | $828.00 |
| R | ATP 00195 | 5/6/2013 | $762.00 |
| S | ATP 00217 | 5/1/2013 | $8,984.00 |
| S | ATP 00218 | 5/2/2013 | $8,684.00 |
| S | ATP 00219 | 5/3/2013 | $8,984.00 |
| S | ATP 00220 | 5/5/2013 | $9,002.00 |
| S | ATP 00222 | 5/6/2013 | $10,580.00 |
| S | ATP 00238 | 5/1/2013 | $2,133.70 |
| S | ATP 00239 | 5/2/2013 | $3,410.34 |
| **Total** | | | **$69,172.54** |

All of Omega's work completed on and after May 7, 2013 was deemed by ATP or a representative of ATP to be essential to making the platform safe for abandonment. Gregory Sandoz, Offshore On-site Operations Manager for Omega, testified that Omega performed the safe out work at the direction of an Inspection Company, who was acting as ATP's representative. (ECF No. 2537 at 102). He further testified that Omega only did what they were

told was necessary to put the Innovator in a safe condition. (*Id.*).  This testimony was not disputed by ATP.

## Analysis

Pursuant to Section 507 of the Code, administrative expenses allowed under Section 503(b) of the Code are entitled to priority. *See* 11 U.S.C. § 507. Section 503(b) includes, in relevant part, "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after commencement of the case." *Id.* at § 503(b)(1)(A). Whether a particular expense is an "actual and necessary cost" is a question of fact to be determined "after notice and a hearing." *Id.* at § 503(b).

The policy behind allowing administrative expense priority is to provide an incentive for creditors and vendors to continue doing business with the debtor in possession. *See In re Summit Metals, Inc*., 379 B.R. 40, 56-57 (Bankr. D. Del. 2007) ("One of the main policies underlying section 503(b)(1)(A) is to provide an incentive for creditors and others to continue or commence doing business with an insolvent entity"); *See also In re Mammoth Mart, Inc.,* 536 F.2d 950, 954 (1st Cir. 1976) ("[I]f a business is to be reorganized, third parties must be willing to provide the necessary goods and services. Since they clearly will not do so unless their claims for payment will be paid ahead of the pre-petition debts and liabilities of the debtor, [the Code] provides a priority for expenses incurred by the debtor-in-possession in order to maintain, preserve, or rehabilitate the bankrupt estate."). Absent this incentive, third parties would be far more inclined to refrain from dealing with a debtor in bankruptcy, thereby harming other creditors.

Omega must prove that its claim was for actual, necessary costs and expenses of preserving the estate.  *See In re TransAmerican Natural Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992).  A prima facie case under § 503(b)(1) may be established by evidence that the claim

"(1) arise[s] from a transaction with the debtor-in-possession and (2) is beneficial to the debtor-in-possession in the operation of the business." *In re Jartran, Inc.*, 732 F.2d 584, 587 (7th Cir. 1984).

The Supreme Court in *Reading v. Brown* provided an expansive interpretation of what is an "actual, necessary cost" entitled to priority, and stated that "actual and necessary costs should include costs ordinarily incident to operation of a business, and not be limited to costs without which rehabilitation would be impossible." *See* 391 U.S. 471 at 483 (1968).  "While the trustee has an implicit duty to preserve the estate, preservation may also include and be a means to other ends in the administration of an estate, such as the continuation of the business or an orderly liquidation." *See* Lawrence P. King, ed., 4 Collier on Bankruptcy ¶ 503.06 [1] (16th rev. ed. 2010) (citing *Reading Co. v. Brown*, 391 U.S. 471 at 475 (1968)).

The Fifth Circuit has stated that "[t]he "benefit" requirement has no independent basis in the Code, however, but is merely a way of testing whether a particular expense was truly "necessary" to the estate: If it was of no "benefit," it cannot have been "necessary." *See In re H.L.S. Energy Co., Inc.*, 151 F.3d 434, 437 (5th Cir. 1998).

Accordingly, in interpreting whether Omega's services aided in "preserving the estate," the services do not have to relate solely to the continuation of the business as a going concern, but can also aid the debtor in achieving an orderly liquidation or abandonment.

The first prong for establishing an administrative expense under § 503(b)(1) is satisfied because Omega and ATP's postpetition "Amendment to Work Order" establishes that Omega's claim arises from a transaction with the debtor-in-possession. The issue in this case is the second prong, which is whether Omega's services were "beneficial to the debtor-in-possession in the operation of the business." *In re Jartran, Inc.*, 732 F.2d 584, 587 (7th Cir. 1984).

ATP cites to *In re TransAmerican Natural Gas Corp.* to support its claim that the Fifth Circuit requires that "the goods or services supplied enhanced the ability of the debtor-in-possession's business to function as a going concern" in order to qualify as an administrative expense. *In re TransAmerican Natural Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992). ATP's recitation of this Fifth Circuit case misstates the rule by replacing the word "must" with "may": "A prima facie case under § 503(b)(1) ***may*** be established by evidence that (1) the claim arises from a transaction with the debtor-in-possession; and (2) the goods or services supplied enhanced the ability of the debtor-in-possession's business to function as a going concern." *Id*. at 1406.

ATP does not dispute the amount owed to Omega or the quality of its work. Mr. Pierson, Chief Operations Engineer for ATP, testified that he has no reason to believe that there was any unauthorized work done by Omega and that all of Omega's services were performed at the direction of an authorized agent of ATP. (ECF No. 2537 at 52).

For Omega's pre-shut-in services, ATP used its business judgment to determine what work was necessary to operate the platform, and Omega performed that work as directed. From May 1- May 6, 2013, Omega continued to provide repair and maintenance services at ATP, even though the Gomez Properties were shut-in on April 30, 2013. As for Omega's post-shut-in services beginning on May 7, 2013, ATP determined what work was necessary to make the platform safe for abandonment, and Omega performed that work as directed.

ATP now argues that the work should be reviewed with the benefit of hindsight. It makes this argument because ATP directed that Omega provide services that were necessary to either (i) operate the platform or (ii) make the platform safe for abandonment. In hindsight, ATP

now argues that some of the work that it directed Omega to perform did not actually benefit the estate.

ATP has not provided the Court with any cases where a court denied administrative expense priority to a third party that provided postpetition goods or services pursuant to a postpetition agreement, where all of the goods or services were authorized by and done at the direction of the debtor in possession.  Nor has the Court found any such case.   Although the Court could imagine scenarios involving malfeasance or other nefarious conduct that might justify a disallowance, Omega and ATP each acted in good faith, with diligence, and without ill purpose.

ATP complains that Omega has not adequately described how its services have actually benefitted the estate.[2]  ATP argues that Omega is not entitled to an administrative expense for the entire amount owed because Omega has not provided a breakdown identifying which post-shut-in expenses are for "safe out" work and which are for repair and maintenance work.  The Court finds that there is sufficient evidence and testimony to determine which post-shut-in expenses are for "safe out" work and which are for repair and maintenance work.

Omega has provided the Court with a complete list of invoices backed by DSRs (Daily Service Reports), which account for the entirety of the amount owed to Omega. Each DSR provides a detailed description of the type of work completed.   Additionally, Omega has compiled a breakdown that identifies which invoices relate to pre-shut-in expenses and which relate to post-shut-in expenses.  (ECF No. 2599-1).

As set forth above, Omega's services on the *Innovator* are divided into three categories of work: (i) repair and maintenance work performed prior to the shut-in; (ii) repair and maintenance

---

[2] (ECF No. 2409 at 2) ("As a threshold matter, many of the Vendor Motions contain inadequate detail as to the specific natures of the goods or services provided to the Debtor, or any factual evidence to support the respective Vendor's contention that such goods or services actually benefitted the Debtor's estate.").

work performed after the shut-in but before Omega's operational personnel learned of the shut-in; and (iii) work performed after Omega's operational personnel learned of the shut-in, in order to make the *Innovator* safe for abandonment ("safe out" work).

The Court will examine whether each of these three categories of expenses were beneficial to ATP in the operation of its business under Section 503(b)(1)(A).

**Pre-Shut-In Expenses:**

All of the $317,625.33 of Omega's pre-shut-in services are entitled to an administrative expense.[3]  Even under ATP's strict "benefit" standard, which requires Omega's goods and services to relate to ***the continuation of the business as a going concern***,[4] Omega's pre-shut-in work is entitled to an administrative expense.

Jerry Pierson's (Chief Operations Engineer for ATP) testified as to the invoices that relate to Omega's pre-shut-in work.  Mr. Pierson testified that Omega's repair and maintenance work did not "enhance its ability to produce." (ECF No. 2537 at 45).  However, the benefit does not have to "enhance ATP's ability to produce" in order to qualify as an administrative expense.

Indeed, ATP was actively trying to sell the Gomez Properties to third parties up until the shut-in order.[5]  Omega's repair and maintenance work was necessary for keeping the Gomez

---

[3] Omega's Attachment 1 states that its pre shut in expenses total $317,625.33. (ECF No. 2599-1).

[4] "A prima facie case under § 503(b)(1) *may* be established by evidence that (1) the claim arises from a transaction with the debtor-in-possession; and (2) the goods or services supplied enhanced the ability of the debtor-in-possession's business to function as a going concern." *In re TransAmerican Natural Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992).

[5] In Debtor's Objection to Motion of Gomez Hub Pipeline Partners to Compel Payment of an Administrative Expense, ATP stated that "[b]eginning in November 2012, the Debtor also engaged in a robust sale process to market substantially all of its assets, including the Gomez Properties. This process culminated in the Debtor's receipt of multiple bids for certain of its assets in March and April 2013. Although the final bid deadline for the Debtor's deepwater assets was extended to May 2, 2013, no potential bidders who sought an extension of the bid deadline expressed any interest in acquiring the Gomez Properties, and the Debtor did not anticipate—nor did it receive—any bids following the BSEE Shut-In Order that sought to acquire the Gomez Properties." (ECF No. 2408 at 3-4).

Properties saleable. For example, Mr. Pierson testified that "Omega was doing structural work in the hulls" and that without such work, the Innovator was at greater risk of deterioration and corrosion. (ECF No. 2537 at 46).

The fact that ATP did not ultimately sell the Gomez Properties[6] and realize a profit is not dispositive. The estate does not need to actually profit from Omega's services in order to qualify as a "benefit" under Section 503(b)(1)(A). *See In re Continental Airlines, Inc.,* 146 B.R. 520, 527 (Bankr.D.Del.1992) (the creditor must show that the debtor in possession used his property in the ordinary course of his business, and not that he put the property to its highest and best use). A trade vendor who provides inventory to a debtor in possession that cannot be sold is entitled to an administrative expense. A debtor in possession must pay for the use of a nondebtor's property, even where the use turns out to be unprofitable. *See In re Klein Sleep Prods., Inc.,* 78 F.3d 18, 26 (2d Cir.1996) (a lessor under an assumed lease does not lose its priority the moment the deal turns sour and the assumed lease becomes unprofitable). Likewise, Omega is entitled to an administrative expense for it postpetition services, even where the services turn out to be unprofitable for the estate. Omega's pre-shut-in services were deemed necessary by ATP to maintain the platform so that it could be sold to a third party for the benefit of the estate.

Accordingly, Omega's pre-shut-in services are entitled to an administrative expense under Section 503(b)(1)(A).

**Post-Shut-In Expenses:**

---

[6] On May 7, 2013, ATP conducted an auction for substantially all of its shelf and deepwater assets (namely, its hydrocarbon leases and the various production facilities located thereon), which was the culmination of a robust sales process commenced in November 2012. At the auction, the DIP Lenders presented the highest and best offer for the Debtor's producing assets (the "**Acquired Leases**"), but neither the DIP Lenders nor any other potential purchaser, sought to purchase either ATP's Gomez Properties or any of its other nonproducing properties. (ECF No. 2409 at 4).

All $291,590.73 of Omega's post-shut-in services are entitled to an administrative expense. Based on the table set forth above, $222,418.19 of the $291,590.73 in post-shut-in expenses relates to safe out work, and $69,172.54 relates to non-safe out work.

At the conclusion of the September 5, 2013 hearing, the Court raised several questions relating to the post-shut-in work. Specifically, the Court asked the parties to brief three issues (one relating to the non-safe out work and two relating to safe out work):

> (i)    Is Omega entitled to administrative expense priority for Omega's post-shut-in repair work (i.e. the $69,472.54 in post-shut-in non-safe out work)?

> (ii)    Is Omega entitled to an administrative expense claim against the debtor or just a lien against the Innovator where Omega's work benefited ATP IP, the non-debtor owner of the property, while simultaneously reducing ATP's obligation to operate and maintain that property?

> (iii)    Since the owner of the platform, ATP IP, also had an obligation to perform the work necessary to make the platform safe before it was abandoned, was there a benefit to the estate?

## A. Non-Safe Out Work

Omega is entitled to an administrative expense for its post-shut-in repair work.

ATP exercised its business judgment to determine that Omega's repair and maintenance services were necessary on May 1- May 6, 2013. A representative of ATP directed Omega to perform such work on those days and Omega followed those directions. It appears that some, if not all, of Omega's work on those six days were unnecessary because ATP should have promptly directed Omega to commence safe out work on May 1, 2013. ATP argues that Omega should bear this $69,472.54 loss.[7]

ATP warns that if the Court grants an administrative expense for these services, "the Court would encourage similarly situated vendors of troubled debtors to hide their heads in the

---

[7] "Here, Omega should not be afforded preferential treatment for its post-shut-in repair work on the *Innovator* simply because its operations team was unaware of the shut-in." (ECF No. 2668 at 10-11).

sand to the detriment of the debtors' estates." (ECF No. 2668 at 9). ATP suggests that Omega should have known about the shut-in order, realized that their repair and maintenance services were not beneficial to the bankruptcy estate, and refused to perform those services. The Court disagrees. The debtor in possession is much better situated than third party service providers to be making business judgments on what services are beneficial to the estate.

Denying an administrative expense like this would require vendors to determine whether and which of its services would provide a "benefit to the estate" and require them to constantly second guess the debtor's business judgment. This requirement would chill the vendor's willingness to provide goods and services, and ultimately, frustrate the goal of rehabilitation. *See, e.g., In re Patient Educ. Media, Inc.*, 221 B.R. 97, 103 (Bankr. S.D.N.Y. 1998).

Moreover, there is no evidence that Omega was purposefully ignorant of the shut-in order. Had evidence of willfulness by Omega been presented, the Court would more seriously consider ATP's position. The evidence supports the conclusion that ATP ignored the need to terminate the work being performed by Omega, and that Omega did not ignore any cautionary statements by ATP.

### B. Safe Out Work

ATP, as operator of the *Innovator*, had a *Midlantic* duty to make the Innovator Platform safe for abandonment under state law.[8] Accordingly, Omega is entitled to an administrative expense for all of its services related to the safe out work performed on the Innovator.

In the context of environmental claims, the meaning of "preserving the estate" under Section 503 of the Code has been expanded to encompass protection of the environment and

---

[8] Because the Court finds that ATP had a *Midlantic* duty to make the Innovator Platform safe for abandonment, it need not decide whether aiding ATP in fulfilling its contractual obligations to ATP-IP, thereby reducing its liability for damages, provided a "benefit" to ATP under section 503(b)(1)(A).

public health. The Supreme Court in *Midlantic National Bank v. New Jersey Department of Environmental Protection,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986), enunciated the obligations of a bankruptcy trustee or a debtor-in-possession in ensuring that the environment and public health are not unduly degraded:

> [A]nyone in possession of the site ... must comply with the environmental laws.... Plainly, that person or firm may not maintain a nuisance, pollute the waters of the State, or refuse to remove the source of such conditions.

In keeping with the obligations declared in *Midlantic,* the Fifth Circuit has held that post-petition plugging and abandonment obligations are generally entitled to administrative priority. *Matter of H.L.S. Energy Co., Inc*., 151 F.3d 434, 436 (5th Cir. 1998).  The Fifth Circuit reasoned that debtors must operate a bankruptcy estate in accordance with state law and held that expenses incurred to bring a debtor in compliance with state law are actual and necessary costs. *Id.*

The fact that ATP IP also had a legal obligation to make the platform safe for abandonment does not affect ATP's obligations.  In *In re Am. Coastal Energy Inc*., this Court held that "expenditures for remedying violations of environmental and safety laws are necessary to preserve the estate, regardless of whether liability for the state law violation first occurred before or after the filing of a bankruptcy petition." The Court reasoned that:

> A debtor's obligation to expend funds to bring the estate into compliance with a state health and safety law is not contingent upon whether the obligation arose before or after the bankruptcy filing. State law imposes a continuing duty to plug the wells at issue. That continuing state-law-health-and-safety duty makes the plugging obligation a post-petition obligation that has pre-petition antecedents.

*In re Am. Coastal Energy Inc*., 399 B.R. 805, 811 (Bankr. S.D. Tex. 2009).

Likewise, a debtor's obligation to expend funds to bring the estate into compliance with a state health and safety law does not change just because another entity has the same obligation. State law imposes a continuing duty to plug the wells at issue.

ATP contends that "[w]here a debtor and non-debtor entities are co-liable for environmental responsibilities relating to a particular property, the ability to be satisfied from the non-debtor's liability should preclude giving rise to an administrative expense claim against the debtor's estate." (ECF No. 2668 at 12).   To support its argument, ATP cites a New Jersey Bankruptcy Court decision, which held in dicta,[9] that a creditor's contribution claim against the Debtor's estate for an environmental obligation does not sufficiently benefit the Debtor's estate under section 503(b).  *In re G-I Holdings, Inc.*, 308 B.R. 196, 210 (Bankr. D.N.J. 2004).

This case is distinguishable.  The Court in *In re G-I Holdings* relied on the fact that the environmental compliance costs arose from pre-petition conduct:  "To hold otherwise would judicially craft a more expansive exception to the general rule that environmental compliance costs which arise from *pre-petition conduct* are treated as general unsecured claims, and this Court declines to do so now." *In re G-I Holdings, Inc.*, 308 B.R. 196, 204 (Bankr. D.N.J. 2004) As discussed above, this Court has already ruled that "a debtor's obligation to expend funds to bring the estate into compliance with a state health and safety law is not contingent upon whether the obligation arose before or after the bankruptcy filing."  *In re Am. Coastal Energy Inc.*, 399 B.R. 805, 811 (Bankr. S.D. Tex. 2009).

Finally, "Debtor submits that Omega should be required in the first instance to seek satisfaction of its claims for work on the *Innovator* through a lien on the platform and should only then be entitled to allowance." (ECF No. 2668 at 2).  In support of this argument, ATP appears to rely on the fact that the "Court has broad discretion in determining whether to award administrative expense priority."  ATP has no basis in law or equity to require Omega to seek

---

[9] "Since the Novak Group cannot satisfy the first prong of the § 503(b) analysis, **it is not necessary to address whether the second prong has been satisfied**. Nevertheless, the Court concludes the Novak Group also cannot demonstrate sufficient benefit to the Debtor's estate. *In re G-I Holdings, Inc.*, 308 B.R. 196, 210 (Bankr. D.N.J. 2004).

satisfaction of its claims through a lien on the platform before it is entitled to an administrative expense.

Accordingly, Omega is entitled to an administrative expense for all of its services related to its safe out work on the Innovator.

In so ruling, the Court reaches no conclusion as to whether ATP has rights against ATP IP for reimbursement of amounts paid by ATP to Omega.

## Charges for Downtime

Finally, ATP requests that the Court deny administrative expense priority to $8,300.00 worth of "downtime charges." (ECF No. 2668 at 10)("Omega's invoices also include charges for 198 man-hours of various delays and down time. ATP submits that downtime due to weather and other delays do not provide the sort of benefit to the estate that would entitle those charges to administrative expense priority; which Omega's witness essentially conceded."). The Court rejects ATP's argument that these "downtime charges" do not benefit the estate.

The table below summarizes the downtime charges:

### Charges for Downtime

| Trial Exhibit # (at page #) | Date | Amount |
|---|---|---|
| Exhibit B (at 00018) | 4/10/2013 | $334.00 |
| Exhibit I (at 00107) | 4/15/2013 | $1,884.00 |
| Exhibit I (at 00108) | 4/16/2013 | $1,884.00 |
| Exhibit R (at 00199) | 5/10/2013 | $864.00 |
| Exhibit R (at 00200) | 5/10/2013 | $864.00 |
| Exhibit S (at 00215) | 4/29/2013 | $1,216.00 |
| Exhibit S (at 00216) | 4/30/2013 | $1,254.00 |
| **Total Charges for Downtime** | | **$8,300.00** |
| Pre shut-in Total | | **$6,572.00** |

Post shut-in Total                          **$1,728.00**

ATP's interpretation of the "benefit requirement" runs contrary to one of the main purposes of section 503(b), which is to induce third parties to provide goods and services to the debtor in possession. *See In re Jartran, Inc.*, 732 F.2d 584, 586 (7th Cir. 1984) ("[w]hen third parties are *induced* to supply goods or services to the debtor-in-possession ... the purposes of [§ 503] plainly require that their claims be afforded priority."). The "benefit" requirement does not allow the Debtor to argue ex post that certain costs incidental to providing beneficial services don't relate to a direct benefit to the estate.

This would be akin to arguing that the bankruptcy estate does not benefit from the payment of insurance premiums in the event that the estate does not incur an insurable loss and receive settlement proceeds during the bankruptcy case. Insurance premiums constitute a typical postpetition obligation that benefits the estate, and are accorded administrative status. *See. e.g., In re Mel-Hart Products, Inc.*, 136 B.R. 197 (Bankr. E.D. Ark. 1991).

The charges for labor during downtime are an agreed upon cost of providing services to ATP. The parties' agreement allocates the risk of bad weather to ATP by requiring ATP to pay Omega for labor during downtime. The debtor may not argue that a specific line item expense that goes into providing a service did not directly benefit the estate. Accordingly, Omega is entitled to an administrative expense priority for the $8,300.00 worth of "downtime charges."

***Reading Exception***

Even if any subset of Omega's services does not satisfy the usual "benefit" requirement for administrative expenses, Omega is entitled to an administrative expense under the "Reading Exception."

An exception to the requirement that there be an *actual benefit* to the estate before a claim can be accorded administrative priority has developed in the context of torts committed by the trustee or debtor-in-possession during the course of a chapter 11 proceeding. *See In re Puerto Rican Food Corp.,* 41 B.R. 565, 572–73 (Bankr.E.D.N.Y.1984) (citing *Reading Co. v. Brown,* 391 U.S. 471, 482, 88 S.Ct. 1759, 1765, 20 L.Ed.2d 751 (1968)) (other citations omitted). *In re Old Carco LLC*, 424 B.R. 633, 643 (Bankr. S.D.N.Y. 2010).   In *Reading Co. v. Brown,* the Supreme Court addressed the allowability of an administrative claim that did not "benefit" the estate in the typical sense. *See* 391 U.S. 471 (1968). The Court provided an expansive interpretation of what is an "actual, necessary cost" entitled to priority, and stated that "actual and necessary costs *should include costs ordinarily incident to operation of a business*, and not be limited to costs without which rehabilitation would be impossible." *Id.* at 483. In reaching its conclusion, the Supreme Court held that considerations of fundamental fairness and logic required the allowance of a claim for administrative priority. *See id.* at 477.

The doctrine established in *Reading* has been applied to a "variety of other post-petition claims." Lawrence P. King, ed., 4 Collier on Bankruptcy ¶ 503.06 [3][c] (16th rev. ed. 2010). Moreover, application of the *Reading* doctrine has not been limited to intentional or egregious misconduct. For example, the Fifth Circuit has allowed administrative priority for statutory interest which accrued post-petition on state sales tax receipts the debtor held in trust for the state. *See In re Al Copeland Enters.*, 991 F.2d 233, 239 (5th Cir.1993).  *In re Al Copeland*, the court reasoned, "the post-petition decision on the part of Copeland resulted in monetary harm to the State resulting from the State being deprived of the use of its $1,817,15138." *Id.* at 240.  The interest that accrued as a result of his post-petition decision not to pay was an administrative

expense: an "actual and necessary cost" comparable to the damages resulting from the negligence of the receiver in *Reading*. *See Id*. at 238–240.

To the extent that any of Omega's services may not have actually benefitted the bankruptcy estate, an administrative expense should be recognized under the Reading Exception.

### Motion to Compel Immediate Payment of Administrative Expenses Denied

The timing of payment of administrative expenses is within the Court's discretion. *E.g., In re HQ Global Holdings, Inc.*, 282 B.R. 169, 173 (Bankr. D. Del. 2002).

The parties cite a three-factor test for use in determining the appropriate timing of payment of administrative expense claims: "(1) the prejudice to the debtor[], (2) the hardship to the claimant, and (3) potential detriment to other creditors." *In re UTEX Commc'ns Corp.*, 457 B.R. 549, 569 (Bankr. W.D. Tex. 2001). "In most situations the courts prefer to postpone payment of the administrative claim until after confirmation of a plan or the distribution in a liquidation. However, once a claimant has requested payment, the court may exercise its discretion whether circumstances warrant immediate response." 2 NORTON BANKR. L. & PRAC. 2d § 42:14.

In support of Omega's motion to compel immediate payment, Omega simply points out that it agreed to provide goods and services to ATP in good faith and that the hardship on Omega is "self-evident." (ECF No. 2599 at 4). Omega has not shown sufficient hardship to persuade the Court to compel immediate payment of its administrative claim.

The third factor weighs against compelling immediate payment. ATP is effectively administratively insolvent on a cash basis and has extremely limited cash resources (and many of those which it possesses are subject to super-priority senior secured liens). (ECF No. 2668 at 6). Compelling immediate payment of Omega's claim only encourages a race to the courthouse, and

threatens any pro rata sharing among administrative claimants as ATP seeks to manage an orderly wind down of its estate. (ECF No. 2668 at 6).

### Conclusion

The Court will enter an Order consistent with this Opinion.

SIGNED **March 18, 2014.**

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE